# IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

*Plaintiff - Appellee,*

v.

SYDNI FRAZIER,

*Defendant - Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT BALTIMORE

**JOINT APPENDIX - VOLUME I OF III**
**(Pages 1 - 408)**

Christopher M. Davis
Mary E. Davis
DAVIS & DAVIS
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
202-234-7300
cmdavisdc@gmail.com
dcmedavis@gmail.com

*Counsel for Appellant*

Christina A. Hoffman
Brandon K. Moore
OFFICE OF THE UNITED
STATES ATTORNEY
36 South Charles Street
4th Floor
Baltimore, MD 21201
410-209-4800
christina.hoffman@usdoj.gov
brandon.moore@usdoj.gov

*Counsel for Appellee*

# TABLE OF CONTENTS

## VOLUME I OF III

JA Page

District Court Docket Sheet [1:16-cr-00267-LKG-25] ............................................. 1

Second Superseding Indictment
  Filed June 1, 2017 [ECF515]............................................................................. 41

Order (Declaring Mistrial)
  Entered April 15, 2019 [ECF1130] .................................................................. 118

Third Superseding Indictment
  Filed July 30, 2019 [ECF1255] ....................................................................... 119

Motion to Suppress Tangible Evidence with Exhibit
  Filed August 14, 2019 [ECF1266]................................................................... 126

  Ex. 1:    Application for Search and Seizure Warrant [ECF1266-1]........ 132

Defendant's Reply in Support of Motion to Suppress
Evidence Seized from 961 Bennett Place with Exhibit
  Filed February 13, 2020 [ECF1415]................................................................ 137

  Ex. A:    Correspondence from Bess and Faruq [ECF1415-1].................. 146

Transcript of Motion Hearing and Arraignment
Before the Honorable Catherine C. Blake
  On February 18, 2020 [ECF1797].................................................................... 149

  LISA BESS
    Direct Examination by Mr. Davis ....................................................... 152
    Cross Examination by Ms. Hoffman.................................................... 164
    Redirect Examination by Mr. Davis..................................................... 184
    Recross Examination by Ms. Hoffman ................................................ 187

Defendant's Exhibit List and Exhibits to Motion Hearing and Arraignment on
2/8/2020 *(Exhibits 6-8: Located in Joint Appendix Vol. III - Digital Media Volume)*
    Filed February 19, 2020 [ECF1422]..................................................................233

    Ex. 1:    Niedermier's Testimony 4-9-19 ...................................................234

    Ex. 2:    New Windows - Bars-Boarded ...................................................236

    Ex. 3:    No Trespass Sign........................................................................237

    Ex. 4:    Forcible Entry............................................................................238

    Ex. 5:    MECU Card 05-17 .....................................................................239

    Ex. 9:    Redemption Letter.....................................................................241

Government's Opposition to the Defendant's Motion
to Suppress Evidence Seized from 961 Bennett Place
    Filed February 21, 2020 [ECF1425]................................................................. 243

Order (Denying Motion to Dismiss and Motion to Suppress)
    Entered February 21, 2020 [ECF1427] ........................................................... 265

Excerpts of Transcript of Proceedings
Before the Honorable Catherine C. Blake
    On February 25, 2020 [ECF1788] ................................................................... 266

    DET. GARY NIEDERMEIER
        Direct Examination by Mr. Rigali........................................................ 267
        Cross Examination by Mr. Harris......................................................... 304
        Redirect Examination by Mr. Rigali .................................................... 318
        Recross Examination by Mr. Harris ..................................................... 319

    MALCOLM LASHLEY
        Direct Examination by Ms. Perry......................................................... 321
        Cross Examination by Mr. Davis .......................................................... 347
        Redirect Examination by Ms. Perry ..................................................... 401

# TABLE OF CONTENTS

## VOLUME II OF III

JA Page

Excerpt of Transcript of Proceedings
Before the Honorable Catherine C. Blake
    On March 2, 2020 [ECF1792] ........................................................................ 409

        Jury Instructions ..........................................................................................410

        Closing Arguments ................................................................................... 421

Excerpt of Transcript of Proceedings
Before the Honorable Catherine C. Blake
    On March 3, 2020 [ECF1791] ........................................................................ 513

Verdict Form
    Filed March 6, 2020 [ECF1453] ..................................................................... 529

Correspondence from Defense re: Ivo Louvado
dated March 18, 2020 with Attachments
    Filed March 18, 2020 [ECF1458] ................................................................... 531

        Att. 1:    Baltimore Sun Media Article dated March 12, 2020
                 [ECF1458-1] .................................................................... 533

        Att. 2:    Search and Seizure Warrant [ECF1458-2] ................................. 535

Correspondence from Government re: Ivo Louvado dated April 3, 2020
    Filed April 3, 2020 [ECF1470] ...................................................................... 557

Correspondence from Defense re: Ivo Louvado dated April 8, 2020
    Filed April 28, 2020 [ECF1472] .................................................................... 560

Defendant's Motion to Reopen Suppression
Hearing and Motion for a New Trial
    Filed June 2, 2020 [ECF1502] ....................................................................... 562

Consent Motion to Partially Unseal and for a Protective Order with Exhibit
Filed November 3, 2020 [ECF1573] ............................................................... 580

    Ex. 1:    Government's Consolidated Response to Defendants'
                Motions for New Trial (ECF 1502, 1505, & 1514)
                [ECF1573-1]...............................................................................587

Order (Partially Unseal Documents)
Entered November 4, 2020 [ECF1574]...........................................................665

Defendant Sydni Frazier's Reply to the Government's
Consolidated Response to Defendants' Motions for New Trial
Filed January 24, 2021 [ECF1622].................................................................. 667

Memorandum
Entered April 21, 2022 [ECF1743] ................................................................ 676

Order
Entered April 21, 2022 [ECF1744] ................................................................ 700

Correspondence re Request for Minor Factual
Correction to Order Denying Motions for New Trial
Filed May 2, 2022 [ECF1753]........................................................................ 701

Amended Memorandum
Entered May 9, 2022 [ECF1756].................................................................... 703

Judgment in a Criminal Case
Entered June 1, 2022 [ECF1764].................................................................... 727

Notice of Appeal
Filed June 1, 2022 [ECF1766]........................................................................ 733

# TABLE OF CONTENTS

## VOLUME III OF III - DIGITAL MEDIA*

Defendant's Digital Exhibits to Motion Hearing and Arraignment on 2/8/2020
   Filed February 19, 2020 [ECF1422]:

   Ex. 6:     Video 5 .57 to 1.11 X81124465 under construction

   Ex. 7:     Video 5 4.29 to 4.43 x8112446 Couch-construct-surprised

   Ex. 8:     Video Electrical Work

*This Digital Media is compatible with Windows Media Player and contains
3 MP4 files, 2 AVI files.  This media has been confirmed to be virus-free through
Vipre Virus Protection, EndpointSecurity, version 11.0.7633 virus scan.*

**Query**　　**Reports**　　**Utilities**　　**Help**　　**Log Out**

APPEAL,CLOSED,MAG-SAG

# U.S. District Court
## District of Maryland (Baltimore)
## CRIMINAL DOCKET FOR CASE #: 1:16-cr-00267-LKG-25

Case title: USA v. Bailey et al

Date Filed: 05/26/2016

Date Terminated: 06/01/2022

---

Assigned to: Judge Lydia Kay Griggsby

Appeals court case number: 22-4368
Fourth Circuit Court of Appeals

### Defendant (25)

| | |
|---|---|
| **Sydni Frazier**<br>*TERMINATED: 06/01/2022*<br>*also known as*<br>Sid<br>*TERMINATED: 06/01/2022*<br>*also known as*<br>Perry<br>*TERMINATED: 06/01/2022* | represented by **Adam Daniel Harris**<br>Law Office of Adam D. Harris, L.L.C.<br>600 Jefferson Plz.<br>Ste. 201<br>Rockville, MD 20852<br>301-960-5005<br>Fax: 301-251-4111<br>Email: adam@adamharrislawfirm.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>Designation: CJA Appointment<br><br>**Christopher Michael Davis**<br>Davis and Davis<br>1350 Connecticut Ave NW Ste 202<br>Washington, DC 20036<br>12022347300<br>Fax: 12028300056<br>Email: cmdavisdc@gmail.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED*<br>Designation: CJA Appointment<br><br>**Mary Elizabeth Davis**<br>Davis & Davis<br>1350 Connecticut Ave., NW<br>Ste Site 202<br>Washington, DC 20036<br>202-234-7300<br>Email: dcmedavis@gmail.com |

**JA1**

ATTORNEY TO BE NOTICED
*Designation: Pro Bono*

| **Pending Counts** | **Disposition** |
|---|---|
| 21:846 CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES<br>(1s) | IMPRISONMENT for a term of 60 months as to Count 1s; 60 months as to Count 3s, to run concurrent to Count 1s; 60 months as to Count 4s, to run concurrent to Counts 1s and 3s; Life as to Count 2s, to run consecutive to Counts 1s, 3s, and 4s; for a total term of Life plus 60 months with credit for time served in Federal custody since 1/25/17; SUPERVISED RELEASE for a term of 4 years as to Counts 1s, 2s, and 4s; 3 years as to Count 3s, all terms to run concurrent, for a total term of 4 years; ASSESSMENT $400 |
| 18:924(j) POSSESSION OF A FIREARM IN FURTHERANCE OF A DRUG TRAFFICKING CRIME RESULTING IN DEATH<br>(2s) | IMPRISONMENT for a term of 60 months as to Count 1s; 60 months as to Count 3s, to run concurrent to Count 1s; 60 months as to Count 4s, to run concurrent to Counts 1s and 3s; Life as to Count 2s, to run consecutive to Counts 1s, 3s, and 4s; for a total term of Life plus 60 months with credit for time served in Federal custody since 1/25/17; SUPERVISED RELEASE for a term of 4 years as to Counts 1s, 2s, and 4s; 3 years as to Count 3s, all terms to run concurrent, for a total term of 4 years; ASSESSMENT $400 |
| 18:922(g) POSSESSION OF FIREARMS BY A FELON<br>(3s) | IMPRISONMENT for a term of 60 months as to Count 1s; 60 months as to Count 3s, to run concurrent to Count 1s; 60 months as to Count 4s, to run concurrent to Counts 1s and 3s; Life as to Count 2s, to run consecutive to Counts 1s, 3s, and 4s; for a total term of Life plus 60 months with credit for time served in Federal custody since 1/25/17; SUPERVISED RELEASE for a term of 4 years as to Counts 1s, 2s, and 4s; 3 years as to Count 3s, all terms to run concurrent, for a total term of 4 years; ASSESSMENT $400 |
| 21:841 POSSESSION WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES<br>(4s) | IMPRISONMENT for a term of 60 months as to Count 1s; 60 months as to Count 3s, to run concurrent to Count 1s; 60 months as to Count 4s, to run concurrent to Counts 1s and 3s; Life as to Count 2s, to run consecutive to Counts 1s, 3s, and 4s; for a |

**JA2**

total term of Life plus 60 months with credit for time served in Federal custody since 1/25/17; SUPERVISED RELEASE for a term of 4 years as to Counts 1s, 2s, and 4s; 3 years as to Count 3s, all terms to run concurrent, for a total term of 4 years; ASSESSMENT $400

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| 18:1962(d) RACKETEERING CONSPIRACY<br>(1) | DISMISSED |
| 21:846 CONSPIRACY TO DISTRIBUTE CONTROLLED SUBSTANCES<br>(2) | DISMISSED |
| 18:922(g) POSSESSION OF A FIREARM AND AMMUNITION BY A FELON<br>(22) | DISMISSED |
| 21:841 DISTRIBUTION AND POSSESSION WITH INTENT TO DISTRIBUTE CONTROLLED SUBSTANCES<br>(29) | DISMISSED |

**Highest Offense Level (Terminated)**

Felony

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

**Plaintiff**

| **USA** | represented by | **Christina A Hoffman**<br>US Attorney's Office<br>District of Maryland<br>36 S. Charles Street, Suite 400<br>Baltimore, MD 21201<br>4102094871<br>Fax: 4109623124<br>Email: christina.hoffman@usdoj.gov<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |
| --- | --- | --- |

*Designation: Assistant US Attorney*

**Jason Daniel Medinger**
Office of the United States Attorney
36 S Charles St Fourth Fl
Baltimore, MD 21201
14102094800
Fax: 14109620122
Email: jason.medinger@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Liane Dublinski Kozik**
U.S. Attorney's Office, District of
Maryland
Violent & Organized Crime
36 S. Charles St.
Ste 4th Floor
Baltimore, MD 21202
410-209-4878
Email: liane.kozik@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Christopher M Rigali**
US Attorneys Office
36 S. Charles St. 4th Floor
Baltimore, MD 21201
4102094831
Fax: 4109623124
Email: christopher.rigali2@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Daniel Charles Gardner**
United States Attorney's Office
District of Maryland
6406 Ivy Lane
Ste 800
Greenbelt, MD 20770
3013444433
Fax: 3013444516
Email: daniel.gardner@usdoj.gov
*TERMINATED: 01/11/2017*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Lauren E Perry**
United States Attorney's Office

**JA4**

District of Maryland
36 South Charles Street
Baltimore, MD 21201
4102094839
Fax: 4109620716
Email: lauren.perry@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Peter J Martinez**
Office of the United States Attorney
36 S Charles St
Baltimore, MD 21230
14102094800
Fax: 14109620717
Email: peter.martinez@usdoj.gov
*TERMINATED: 07/25/2019*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/01/2017 | 515 | SEALED Second Superseding INDICTMENT as to Dante D. Bailey (1) count(s) 1ss, 2ss, 3ss, 4ss, 17ss, 18ss, Dontray Johnson (2) count(s) 1s, 2s, 5s, 6s, 8s, 9s, Adrian Jamal Spence (3) count(s) 1s, 7s, Randy Banks (5) count(s) 1s, 2s, Ayinde Deleon (6) count(s) 1s, 2s, 25s, Jamal Lockley (8) count(s) 1s, 2s, 10s, Jacob Bowling (10) count(s) 1s, 2s, 19s-21s, 23s, Corloyd Anderson (11) count(s) 1s, 2s, 24s, Devon Dent (13) count(s) 1s, 2s, Tiffany Bailey (17) count(s) 1s, 2s, 18s, Takuma Tate (18) count(s) 1s, 2s, Maurice Pollock (19) count(s) 1s, 2s, 11s-13s, Shakeen Davis (20) count(s) 1s, 2s, 16s, 30s, 31s, 32s, Delante Lee (23) count(s) 1s, 2s, 14s-15s, 28s, Sydni Frazier (25) count(s) 1, 2, 22, 29 (krs, Deputy Clerk) (Entered: 06/02/2017) |
| 06/01/2017 | | ** (krs, Deputy Clerk) (Entered: 06/02/2017) |
| 06/01/2017 | 516 | Redacted Second Superseding INDICTMENT as to Dante D. Bailey (1) count(s) 1ss, 2ss, 3ss, 4ss, 17ss, 18ss, Dontray Johnson (2) count(s) 1s, 2s, 5s, 6s, 8s, 9s, Adrian Jamal Spence (3) count(s) 1s, 7s, Randy Banks (5) count(s) 1s, 2s, Ayinde Deleon (6) count(s) 1s, 2s, 25s, Jamal Lockley (8) count(s) 1s, 2s, 10s, Jacob Bowling (10) count(s) 1s, 2s, 19s-21s, 23s, Corloyd Anderson (11) count(s) 1s, 2s, 24s, Devon Dent (13) count(s) 1s, 2s, Tiffany Bailey (17) count(s) 1s, 2s, 18s, Takuma Tate (18) count(s) 1s, 2s, Maurice Pollock (19) count(s) 1s, 2s, 11s-13s, Shakeen Davis (20) count(s) 1s, 2s, 16s, 30s, 31s, 32s, Delante Lee (23) count(s) 1s, 2s, 14s-15s, 28s, Sydni Frazier (25) count(s) 1, 2, 22, 29 (krs, Deputy Clerk) (Entered: 06/02/2017) |

**JA5**

| | | |
|---|---|---|
| 06/01/2017 | 517 | Redlined Second Superseding Indictment filed by USA on 6/1/2017 as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (krs, Deputy Clerk) Modified on 6/12/2017 per 537 Order (krs, Deputy Clerk). (Entered: 06/02/2017) |
| 06/01/2017 | 519 | MOTION to Partially Seal (krs, Deputy Clerk) Modified on 6/12/2017 per 537 Order (krs, Deputy Clerk). (Entered: 06/02/2017) |
| 06/01/2017 | 520 | ORDER granting 519 Motion to Partially Seal. Signed by Magistrate Judge J. Mark Coulson on 6/1/2017 (krs, Deputy Clerk) Modified on 6/12/2017 per 537 Order (krs, Deputy Clerk). (Entered: 06/02/2017) |
| 06/06/2017 | 528 | FILED IN ERROR, WILL RE-FILE - PAPERLESS Correspondence to government counsel: Please provide a status report by June 23, 2017, after consultation with defense counsel. (Blake, Catherine) Modified on 6/7/2017 (cags, Deputy Clerk). (Entered: 06/06/2017) |
| 06/07/2017 | 530 | PAPERLESS Correspondence to government counsel: Please provide a status report by June 23, 2017, after consultation with defense counsel. (Blake, Catherine) (Entered: 06/07/2017) |
| 06/07/2017 | 531 | CJA 20 as to Sydni Frazier: Appointment of Attorney Christopher Michael Davis for Sydni Frazier. Signed by Chief Judge Catherine C. Blake on 6/2/2017. (bmhs, Deputy Clerk) (Entered: 06/07/2017) |
| 06/08/2017 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Sydni Frazier. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 6/8/2017. An interpreter will not be needed. Arraignment set for 6/16/2017 10:30 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Beth P. Gesner. Initial Appearance set for 6/16/2017 10:30 AM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Beth P. Gesner.(Hoffman, Christina) (Entered: 06/08/2017) |
| 06/09/2017 | 536 | MOTION to Unseal Second Superseding Indictment by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, Randy Banks, Ayinde Deleon, Jamal Lockley, Jacob Bowling, Corloyd Anderson, Devon Dent, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Delante Lee, Sydni Frazie. (krs, Deputy Clerk) (Entered: 06/12/2017) |
| 06/09/2017 | 537 | Order to Unseal Second Superseding Indictment as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jacob Bowling, Corloyd Anderson, Devon Dent, Jarmal Harrid, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Delante Lee, Sydni Frazier, Malcolm Lashley.. Signed by Magistrate Judge J. Mark Coulson on 6/9/2017. (krs, Deputy Clerk) (Entered: 06/12/2017) |
| 06/10/2017 | 534 | NOTICE OF ATTORNEY APPEARANCE: Christopher Michael Davis as CJA Appointment appearing for Sydni Frazier(Davis, Christopher) (Entered: 06/10/2017) |

**JA6**

| 06/16/2017 | 551 | Initial Appearance as to Sydni Frazier (Defendant informed of Rights.) held on 6/16/2017 before Magistrate Judge J. Mark Coulson.(FTR Klein -7B.) (jks, Deputy Clerk) (Entered: 06/19/2017) |
|---|---|---|
| 06/16/2017 | 552 | Arraignment as to Sydni Frazier (25) Counts 1,2,22,29 held on 6/16/2017, Plea entered by Sydni Frazier of Not Guilty as to counts 1,2,22,29. before Magistrate Judge J. Mark Coulson.(FTR Klein -7B.) (jks, Deputy Clerk) (Entered: 06/19/2017) |
| 06/23/2017 | 554 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Attachments: # 1 Exhibit A)(Perry, Lauren) (Entered: 06/23/2017) |
| 06/28/2017 | 556 | PAPERLESS Correspondence to counsel: Thank you for your Status Report. An updated Status Report is requested by August 1, 2017. (Blake, Catherine) (Entered: 06/28/2017) |
| 08/01/2017 | 574 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Hoffman, Christina) (Entered: 08/01/2017) |
| 08/08/2017 | 578 | PAPERLESS Correspondence: An updated Status Report is requested in this case by September 1, 2017. A scheduling conference call will held thereafter in September. (Blake, Catherine) (Entered: 08/08/2017) |
| 08/09/2017 | 579 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 08/09/2017) |
| 08/09/2017 | 580 | SEALED DOCUMENT (Whalen, Teresa) Modified on 8/23/2017 (krs, Deputy Clerk). (Entered: 08/09/2017) |
| 08/22/2017 | 587 | -SEALED-ORDER granting 579 Motion to Seal as to 580 Proposed Sealed Document. Signed by Chief Judge Catherine C. Blake on 8/21/2017. (krs, Deputy Clerk) (Entered: 08/23/2017) |
| 08/24/2017 | 590 | MOTION to Suppress *Tangible Evidence* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |
| 08/24/2017 | 591 | MOTION to Suppress *Cell Phone Evidence* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |
| 08/24/2017 | 592 | MOTION to Suppress *DNA Evidence* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |

**JA7**

| | | |
|---|---|---|
| 08/24/2017 | 593 | MOTION to Suppress *Statements* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |
| 08/24/2017 | 594 | MOTION to Suppress *Social Media* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |
| 08/24/2017 | 595 | MOTION to Sever Defendant by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |
| 08/24/2017 | 596 | Corrected MOTION to Sever Defendant by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/24/2017) |
| 09/01/2017 | 606 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Hoffman, Christina) (Entered: 09/01/2017) |
| 09/06/2017 | 607 | Miscellaneous Correspondence to counsel requesting a status update. (Blake, Catherine) (Entered: 09/06/2017) |
| 09/27/2017 | 635 | NOTICE by USA *of Intention to Seek Enhanced Mandatory Minimum Sentence* (Hoffman, Christina) (Entered: 09/27/2017) |
| 09/27/2017 | 636 | NOTICE by USA *of Intention to Seek Enhanced Mandatory Minimum Sentence* (Hoffman, Christina) (Entered: 09/27/2017) |
| 10/09/2017 | 650 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 10/09/2017) |
| 10/09/2017 | 651 | SEALED DOCUMENT (Whalen, Teresa) Modified on 10/11/2017 (krs, Deputy Clerk). (Entered: 10/09/2017) |
| 10/10/2017 | 653 | -SEALED-ORDER granting 650 Motion to Seal as to 651 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 10/10/2017. (krs, Deputy Clerk) (Entered: 10/11/2017) |
| 11/09/2017 | 672 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 11/09/2017) |
| 11/09/2017 | 673 | SEALED DOCUMENT (Whalen, Teresa) Modified on 11/13/2017 (bas, Deputy Clerk). (Entered: 11/09/2017) |

**JA8**

| | | |
|---|---|---|
| 11/09/2017 | 674 | -SEALED- ORDER Granting 672 Motion to Seal as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 11/9/2017. (bas, Deputy Clerk) (Entered: 11/13/2017) |
| 12/04/2017 | 682 | PAPERLESS Correspondence to counsel: A Status Report in this matter is requested by DECEMBER 11, 2017. (Blake, Catherine) (Entered: 12/04/2017) |
| 12/05/2017 | 683 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 12/05/2017) |
| 12/05/2017 | 684 | SEALED DOCUMENT (Whalen, Teresa) Modified on 12/5/2017 (krs, Deputy Clerk). (Entered: 12/05/2017) |
| 12/05/2017 | 685 | -SEALED- ORDER granting 683 Motion to Seal as to 684 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 12/5/2017. (krs, Deputy Clerk) (Entered: 12/05/2017) |
| 12/08/2017 | | Telephone Conference as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Jamal Lockley, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Jay Greer, Sydni Frazier, Malcolm Lashley held on 12/8/2017 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 12/11/2017) |
| 12/11/2017 | 688 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Perry, Lauren) (Entered: 12/11/2017) |
| 01/02/2018 | | Telephone Conference as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley held on 1/2/2018 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 01/09/2018) |
| 01/03/2018 | 696 | ORDER confirming the results of the telephone conference held on 1/2/18. Signed by Judge Catherine C. Blake on 1/3/2018. (krs, Deputy Clerk) (Entered: 01/03/2018) |

**JA9**

| 01/08/2018 | 697 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 01/08/2018) |
|---|---|---|
| 01/08/2018 | 698 | SEALED DOCUMENT (Whalen, Teresa) Modified on 1/10/2018 (krs, Deputy Clerk). (Entered: 01/08/2018) |
| 01/09/2018 | 699 | -SEALED-ORDER granting 697 Motion to Seal as to 698 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 1/9/2018. (krs, Deputy Clerk) (Entered: 01/10/2018) |
| 02/05/2018 | 708 | Consent MOTION for Speedy Trial *Exclusion* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 02/05/2018) |
| 02/06/2018 | 709 | ORDER granting 708 Motion to Exclude Time under the Speedy Trial Act as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 2/6/2018. (krs, Deputy Clerk) (Entered: 02/07/2018) |
| 02/12/2018 | 714 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 02/12/2018) |
| 02/12/2018 | 715 | SEALED DOCUMENT (Whalen, Teresa) Modified on 2/13/2018 (bas, Deputy Clerk). (Entered: 02/12/2018) |

**JA10**

| | | |
|---|---|---|
| 02/13/2018 | 719 | -SEALED- ORDER Granting 714 Motion to Seal as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 2/13/2018. (bas, Deputy Clerk) (Entered: 02/13/2018) |
| 03/06/2018 | 731 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 03/06/2018) |
| 03/06/2018 | 732 | SEALED DOCUMENT (Whalen, Teresa) Modified on 3/7/2018 (krs, Deputy Clerk). (Entered: 03/06/2018) |
| 03/06/2018 | 733 | -SEALED-ORDER granting 731 Motion to Seal as to 732 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 3/6/2018. (krs, Deputy Clerk) (Entered: 03/07/2018) |
| 04/02/2018 | 739 | NOTICE by USA *of Intent Not to Seek Death Penalty* (Hoffman, Christina) (Entered: 04/02/2018) |
| 04/03/2018 | 740 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 04/03/2018) |
| 04/03/2018 | 741 | SEALED DOCUMENT (Whalen, Teresa) Modified on 4/26/2018 (krs, Deputy Clerk). (Entered: 04/03/2018) |
| 04/03/2018 | 742 | -SEALED-ORDER granting 740 Motion to Seal as to 741 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 4/3/2018. (krs, Deputy Clerk) (Entered: 04/04/2018) |
| 04/11/2018 | 746 | MOTION to Adopt Motion of Other Defendant*s* by Shakeen Davis as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (McKnett, Harry) (Entered: 04/11/2018) |
| 04/13/2018 | 753 | MOTION to Sever Defendant *Dante Bailey* by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, |

**JA11**

| | | |
|---|---|---|
| | | Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Enzinna, Paul) (Entered: 04/13/2018) |
| 04/13/2018 | 755 | MOTION to Suppress *Evidence Derived From Searches of Social Media and ICloud* by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B, # 3 Text of Proposed Order)(Enzinna, Paul) (Entered: 04/13/2018) |
| 04/13/2018 | 756 | MOTION to Adopt Motion of Other Defendant by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Enzinna, Paul) (Entered: 04/13/2018) |
| 04/17/2018 | 760 | ORDER as to Dante D. Bailey, et al Confirming results of telephone conference held today re: dates for jury trial, motions hearing and status report. Signed by Judge Catherine C. Blake on 4/17/2018. (cags, Deputy Clerk) (Entered: 04/17/2018) |
| 04/17/2018 | | Telephone Conference re: Scheduling as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Jamal Lockley, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, Tiffany Bailey, Takuma Tate, Shakeen Davis, Jay Greer, Sydni Frazier, Malcolm Lashley held on 4/17/2018 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 04/18/2018) |
| 04/26/2018 | 763 | QC NOTICE: 762 Proposed Sealed Document filed by Melvin Lashley was filed incorrectly. \*\**Motion to Seal must be filed in conjunction when filing a Proposed Sealed Document.* (krs, Deputy Clerk) (Entered: 04/26/2018) |
| 05/03/2018 | 768 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 05/03/2018) |
| 05/03/2018 | 769 | SEALED DOCUMENT (Hoffman, Christina) Modified on 5/4/2018 (krs, Deputy Clerk). (Entered: 05/03/2018) |
| 05/08/2018 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Dante D. Bailey, Dontray Johnson, Randy Banks, Ayinde Deleon, Jamal Lockley, Jacob Bowling, Corloyd Anderson, Shakeen Davis, Sydni Frazier, Malcolm Lashley. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 5/8/2018. An interpreter will not be needed. Pretrial Hearing on |

**JA12**

| | | |
|---|---|---|
| | | Motions set for 6/1/2018 09:00 AM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 05/08/2018) |
| 05/09/2018 | | Corrected PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Dante D. Bailey, Dontray Johnson, Randy Banks, Ayinde Deleon, Jamal Lockley, Jacob Bowling, Corloyd Anderson, Shakeen Davis, Sydni Frazier, Malcolm Lashley. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 5/8/2018. An interpreter will not be needed. Pretrial Hearing on Motions set for 6/1/2018 09:00 AM in Courtroom 1A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 05/09/2018) |
| 05/15/2018 | 779 | RESPONSE in Opposition by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley re 594 MOTION to Suppress *Social Media*, 756 MOTION to Adopt Motion of Other Defendant, 755 MOTION to Suppress *Evidence Derived From Searches of Social Media and ICloud*, 424 MOTION to Suppress *Evidence Obtained by Electronic Surveillance and Interception by Wire*, 753 MOTION to Sever Defendant *Dante Bailey*, 593 MOTION to Suppress *Statements*, 592 MOTION to Suppress *DNA Evidence*, 590 MOTION to Suppress *Tangible Evidence*, 591 MOTION to Suppress *Cell Phone Evidence*, 746 MOTION to Adopt Motion of Other Defendant*s*, 758 MOTION to Adopt Motion of Other Defendant, 419 MOTION for Disclosure Pursuant to Fed. Ev. 404(b) and 609 , 420 MOTION for Severance , 757 MOTION to Suppress *Statements*, 596 Corrected MOTION to Sever Defendant (Attachments: # 1 Appendix Index of Exhibits, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36)(Hoffman, Christina) (Entered: 05/15/2018) |
| 05/23/2018 | 787 | MEMORANDUM to Government Counsel re: Motions as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Jamal Lockley, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, Tiffany Bailey, Takuma Tate, Shakeen Davis, Jay Greer, Sydni Frazier, Malcolm Lashley. Signed by Judge Catherine C. Blake on 5/23/2018. (hmls, Deputy Clerk) (Entered: 05/23/2018) |
| 05/24/2018 | 788 | Correspondence re: Motions Requiring the Taking of Evidence (Hoffman, Christina) (Entered: 05/24/2018) |
| 05/29/2018 | 792 | Memorandum to Counsel re: motions requiring evidence to be heard on 6/1/18. Signed by Judge Catherine C. Blake on 5/29/2018 (krs, Deputy Clerk) (Entered: 05/30/2018) |

**JA13**

| 05/30/2018 | 793 | Memorandum to Counsel re: correction to 792 Memorandum re motions hearing on 6/1/18. Signed by Judge Catherine C. Blake on 5/30/2018 (krs, Deputy Clerk) (Entered: 05/30/2018) |
|---|---|---|
| 05/30/2018 | 794 | Correspondence re: Malcolm Lashley's Motion to Suppress Statements (ECF 757) (Hoffman, Christina) (Entered: 05/30/2018) |
| 06/01/2018 | 798 | SECONDARY SCREENING ORDER. Signed by Judge Catherine C. Blake on 5/31/2018. (krs, Deputy Clerk) (Entered: 06/01/2018) |
| 06/01/2018 | 800 | Motion Hearing as to Dante D. Bailey, Dontray Johnson, Randy Banks, Jacob Bowling, Corloyd Anderson, Devon Dent, Sydni Frazier held on 6/1/2018 re 751 MOTION to Suppress *Tangible and Derivative Evidence* filed by Randy Banks, 397 MOTION to Suppress *Statement* filed by Corloyd Anderson, 512 MOTION to Suppress *Warrantless Searches* filed by Dante D. Bailey, 593 MOTION to Suppress *Statements* filed by Sydni Frazier, 754 MOTION to Suppress *Statements* filed by Devon Dent, 489 MOTION to Suppress *Statements from July 31 and October 3, 2015* filed by Dontray Johnson, 28 MOTION to Suppress *Statements* filed by Dante D. Bailey, 421 MOTION to Suppress *Statements* filed by Jacob Bowling, 412 MOTION to Suppress *Residences, Person, Vehicle* filed by Dante D. Bailey before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 06/04/2018) |
| 06/04/2018 | 802 | EXHIBIT LIST by USA as to Dante D. Bailey, Dontray Johnson, Randy Banks, Jacob Bowling, Corloyd Anderson, Devon Dent, Sydni Frazier (cags, Deputy Clerk) (Entered: 06/04/2018) |
| 06/05/2018 | 806 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 06/05/2018) |
| 06/05/2018 | 807 | **SEALED DOCUMENT** (Whalen, Teresa) Modified on 6/6/2018 (hmls, Deputy Clerk). (Entered: 06/05/2018) |
| 06/19/2018 | 820 | ORDER denying 397 Corloyd Anderson's Motion to Suppress Statements; denying 421 Jacob Bowlings' Motions to Suppress Statements; denying 412 Dante Bailey's Motion to Suppress as to the Search of the Princely Way Residence and a Mercury Marauder on 7/3/15; denying 512 Dante Bailey's Motion to Suppress Evidence and Statements as to the stop and search of a Lexus on 4/23/15; denying as to the search of a Lexus and the arrest on 6/18/15; denying as moot as to the search on 4/28/15; denying 751 Randy Banks' Motion to Suppress as to an arrest and search on 5/12/16; denying as moot as to the Evidence Obtained from the arrest of Banks on 3/14/15; withdrawing 754 Devon Dent's Motion to Suppress as to statements made on 5/20/12; denying as to statements made on 10/26/16; denying 593 Sydni Frazier's Motion to Suppress Statements; denying 28 Dante Bailey's Motion to Suppress Statements made on 5/17/18; denying 489 Dontray Johnson's Motion to Suppress Statements made on 7/31/15. Signed by Judge Catherine C. Blake on 6/19/18. (krs, Deputy Clerk) (Entered: 06/20/2018) |

**JA14**

| 06/25/2018 | 827 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Dante D. Bailey, Dontray Johnson, Randy Banks, Jacob Bowling, Corloyd Anderson, Devon Dent, Sydni Frazier held on 6/1/18 (Excerpts: Testimony of Det. Young & TFO Louvado), before Judge Blake. Court Reporter/Transcriber Douglas J. Zweizig, Telephone number 410-962-4474. Total number of pages filed: 59. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 7/16/2018. Redacted Transcript Deadline set for 7/26/2018. Release of Transcript Restriction set for 9/24/2018. (dz, Court Reporter) (Entered: 06/25/2018) |
|---|---|---|
| 06/27/2018 | 831 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 06/27/2018) |
| 06/28/2018 | 833 | MOTION to Suppress *CSLI Evidence* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 06/28/2018) |
| 07/02/2018 | 834 | Consent MOTION for Extension of Time to File Response/Reply as to 819 Miscellaneous Correspondence by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 07/02/2018) |
| 07/02/2018 | 835 | ORDER GRANTING 834 Motion for Extension of Time to File Response/Reply re: 819 and 823 as to Dante D. Bailey (1), Devon Dent (13). Signed by Judge Catherine C. Blake on 7/2/2018. (hmls, Deputy Clerk) (Entered: 07/02/2018) |
| 07/08/2018 | 838 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 07/08/2018) |
| 07/08/2018 | 839 | SEALED DOCUMENT (Whalen, Teresa) Modified on 7/10/2018 (krs, Deputy Clerk). (Entered: 07/08/2018) |
| 07/09/2018 | 840 | -SEALED-ORDER granting 838 Motion to Seal as to 839 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 7/9/18. (krs, Deputy Clerk) (Entered: 07/10/2018) |
| 07/12/2018 | 843 | MOTION for Speedy Trial *Exclusion* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, |

**JA15**

| | | |
|---|---|---|
| | | Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 07/12/2018) |
| 07/13/2018 | 845 | ORDER granting 843 Motion for Speedy Trial Exclusion. Signed by Judge Catherine C. Blake on 7/13/18. (krs, Deputy Clerk) (Entered: 07/13/2018) |
| 07/26/2018 | 847 | RESPONSE in Opposition by USA as to Sydni Frazier re 833 MOTION to Suppress *CSLI Evidence* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Hoffman, Christina) (Entered: 07/26/2018) |
| 08/01/2018 | 848 | MEMORANDUM to Counsel re: Scheduling of Oral Argument Hearing as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. Signed by Judge Catherine C. Blake on 8/1/2018. (hmls, Deputy Clerk) (Entered: 08/01/2018) |
| 08/03/2018 | 849 | ORDER re: Motions Hearing Schedule as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. Signed by Judge Catherine C. Blake on 8/3/2018. (hmls, Deputy Clerk) (Entered: 08/03/2018) |
| 08/17/2018 | 852 | Memorandum to Counsel re trial of case. Signed by Judge Catherine C. Blake on 8/17/2018. (krs, Deputy Clerk) (Entered: 08/17/2018) |
| 08/20/2018 | 856 | NOTICE *Trial Conflicts* (Davis, Christopher) (Entered: 08/20/2018) |
| 08/20/2018 | 857 | ORDER regarding 853 Third Updated Status Report; denying the request for the presence of the defendant as the motions hearing on 8/24/18. Signed by Judge Catherine C. Blake on 8/20/18. (krs, Deputy Clerk) (Entered: 08/21/2018) |
| 08/22/2018 | 860 | NOTICE by Dante D. Bailey *of Trial Date Conflicts* (Enzinna, Paul) (Entered: 08/22/2018) |
| 08/23/2018 | 868 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Hoffman, Christina) (Entered: 08/23/2018) |
| 08/31/2018 | 874 | PAPERLESS Correspondence to counsel requesting a Status Report from the government by SEPTEMBER 21, 2018. (Blake, Catherine) (Entered: 08/31/2018) |
| 08/31/2018 | 875 | ORDER granting 395 , 407 , 417 , 434 , 490 , 500 , 746 , 747 , 748 , 752 , 756 , 758 , 759 Motions to Adopt; denying 506 , 753 , 596 , 497 Motions for Severance; denying 399 , 545 , 492 , 431 Motions to Suppress Wiretap Evidence; denying as moot 400 , 402 , 414 , 498 Motions for Notice of 404(b) Evidence; denying 512 , 819 Motions to |

| | | |
|---|---|---|
| | | Suppress as to Search of Lexus on 4/23/2015; denying 398 , 29 , 412 , 544 , 592 , 493 , 433 Motions to Suppress Evidence Obtained From Search Warrants; denying 833 , 525 , 826 Motions to Suppress Cell Site Location Information; denying 404 , 408 , 432 Motions to Suppress GPS Tracking Warrants; denying 409 , 591 , 495 Motions to Suppress as to Search Warrants for Electronic Devices; denying 410 , 411 , 594 , 494 Motions to Suppress Social Media Warrants. Signed by Judge Catherine C. Blake on 8/31/2018. (krs, Deputy Clerk) (Entered: 09/04/2018) |
| 09/21/2018 | 888 | STATUS REPORT by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Hoffman, Christina) (Entered: 09/21/2018) |
| 10/01/2018 | 905 | MARGINAL ORDER approving 888 Status Report. Signed by Judge Catherine C. Blake on 10/1/18. (krs, Deputy Clerk) (Entered: 10/02/2018) |
| 10/01/2018 | | Telephone Conference as to Sydni Frazier held on 10/1/2018 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 10/04/2018) |
| 10/08/2018 | 912 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 10/08/2018) |
| 10/08/2018 | 913 | **PROPOSED SEALED DOCUMENT** (Whalen, Teresa) (Entered: 10/08/2018) |
| 10/09/2018 | 914 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings as to Dante D. Bailey, Dontray Johnson, Randy Banks, Jacob Bowling, Corloyd Anderson, Devon Dent, Sydni Frazier held on 6/1/18, before Judge Blake. Court Reporter/Transcriber Douglas J. Zweizig, Telephone number 410-962-4474. Total number of pages filed: 305. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 10/30/2018. Redacted Transcript Deadline set for 11/9/2018. Release of Transcript Restriction set for 1/7/2019. (dz, Court Reporter) (Entered: 10/09/2018) |
| 10/11/2018 | | Telephone Conference as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley held on 10/11/2018 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 10/30/2018) |
| 11/06/2018 | 940 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd |

| | | |
|---|---|---|
| | | Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 11/06/2018) |
| 11/06/2018 | 941 | SEALED DOCUMENT (Whalen, Teresa) Modified on 11/6/2018 (krs, Deputy Clerk). (Entered: 11/06/2018) |
| 11/06/2018 | 942 | -SEALED-ORDER granting 940 Motion to Seal as to 941 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 11/6/2018. (krs, Deputy Clerk) (Entered: 11/06/2018) |
| 11/20/2018 | 947 | MOTION *for Miscellaneous Relief* by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Memorandum in Support, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Enzinna, Paul) (Entered: 11/20/2018) |
| 12/04/2018 | 955 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 12/04/2018) |
| 12/04/2018 | 956 | SEALED DOCUMENT (Whalen, Teresa) Modified on 12/6/2018 (krs, Deputy Clerk). (Entered: 12/04/2018) |
| 12/04/2018 | 958 | -SEALED-ORDER granting 955 Motion to Seal as to 956 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 12/4/18. (krs, Deputy Clerk) (Entered: 12/06/2018) |
| 12/11/2018 | 961 | MOTION for Hearing *Attorney Inquiry* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 12/11/2018) |
| 12/12/2018 | 963 | ORDER granting 961 Motion to Set the Case in for an Attorney Inquiry Hearing as to Sydni Frazier (25). Signed by Judge Catherine C. Blake on 12/12/18. (krs, Deputy Clerk) (Entered: 12/12/2018) |
| 12/12/2018 | 964 | ORDER referring case to Magistrate Judge Stephanie A. Gallagher for Attorney Inquiry Hearing as to Sydni Frazier. Signed by Judge Catherine C. Blake on 12/12/2018. (jnls, Deputy Clerk) (Entered: 12/12/2018) |
| 12/13/2018 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Sydni Frazier. *Attorney Inquiry Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 12/13/2018. An interpreter will not be needed. Hearing set for 12/17/2018 02:00 PM in Courtroom 7B, 101 West Lombard Street, Baltimore, Maryland 21201, before Magistrate Judge Stephanie A Gallagher. (Hoffman, Christina) (Entered: 12/13/2018) |

**JA18**

| | | |
|---|---|---|
| 12/17/2018 | 966 | Attorney Inquiry Hearing as to Sydni Frazier held on 12/17/2018 before Magistrate Judge Stephanie A Gallagher.(FTR KLEIN -7B.) (jks, Deputy Clerk) (Entered: 12/17/2018) |
| 01/07/2019 | 973 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 01/07/2019) |
| 01/07/2019 | 974 | SEALED DOCUMENT (Whalen, Teresa) Modified on 1/8/2019 (krs, Deputy Clerk). (Entered: 01/07/2019) |
| 01/07/2019 | 975 | -SEALED-ORDER granting 973 Motion to Seal as to 974 Proposed Sealed Document as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 1/7/19. (krs, Deputy Clerk) (Entered: 01/08/2019) |
| 01/24/2019 | 983 | NOTICE by USA re 636 Notice (Other) *Withdrawal of Notice of Intention to Seek Enhanced Mandatory Minimum Sentence Against Sydni Frazier* (Hoffman, Christina) (Entered: 01/24/2019) |
| 02/06/2019 | | Telephone Conference as to Sydni Frazier held on 2/6/2019 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 02/26/2019) |
| 02/07/2019 | 992 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 02/07/2019) |
| 02/07/2019 | 993 | **SEALED DOCUMENT** (Whalen, Teresa) Modified on 2/8/2019 (hmls, Deputy Clerk). (Entered: 02/07/2019) |
| 02/08/2019 | 995 | -SEALED- ORDER GRANTING 992 Motion to Seal as to 993 Proposed Sealed Document as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 2/8/2019. (hmls, Deputy Clerk) (Entered: 02/08/2019) |

**JA19**

| 02/08/2019 | 997 | ORDER confirming the results of recent conference calls as to Dante D. Bailey, William Banks, Randy Banks, Jamal Lockley, Corloyd Anderson, Devon Dent, Tiffany Bailey, Shakeen Davis, Sydni Frazier, Malcolm Lashley. Signed by Judge Catherine C. Blake on 2/8/2019. (hmls, Deputy Clerk) (Entered: 02/08/2019) |
|---|---|---|
| 02/19/2019 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 2/19/2019. An interpreter will not be needed. Jury Trial set for 3/18/2019 09:00 AM in Courtroom 1A, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 02/19/2019) |
| 02/22/2019 | 1003 | MOTION in Limine *Re Cellphone Expert* by Dante D. Bailey. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5)(Whalen, Teresa) (Entered: 02/22/2019) |
| 02/25/2019 | 1004 | SEALED DOCUMENT (Hoffman, Christina) Modified on 3/5/2019 (cags, Deputy Clerk). (Entered: 02/25/2019) |
| 02/25/2019 | 1005 | MOTION in Limine *to Admit Business Records Pursuant to Rules 803(6) and 902(11)* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoffman, Christina) (Entered: 02/25/2019) |
| 02/25/2019 | 1006 | MOTION in Limine *to Admit 911 Calls Pursuant to Rules 803(1) and 803(2)* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 02/25/2019) |
| 02/25/2019 | 1007 | MOTION in Limine *To Preclude or Limit Expert Testimony* by Dante D. Bailey. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Errata C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L)(Whalen, Teresa) (Entered: 02/25/2019) |
| 02/25/2019 | 1008 | MOTION in Limine *to Exclude Evidence Pursuant to Rules 803(6) and 403* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Hoffman, Christina) (Entered: 02/25/2019) |

**JA20**

| 02/25/2019 | 1009 | MOTION in Limine *to Admit Dante Bailey's 2006 Jail Letters* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoffman, Christina) (Entered: 02/25/2019) |
|---|---|---|
| 02/26/2019 | 1016 | MOTION to Strike *Appearance* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Medinger, Jason) (Entered: 02/26/2019) |
| 02/27/2019 | 1021 | Second MOTION to Sever Defendant *(renewed based on ECF 1004)* by Sydni Frazier. (Davis, Christopher) (Entered: 02/27/2019) |
| 02/27/2019 | 1022 | MOTION to Adopt Motion of Other Defendant by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 02/27/2019) |
| 03/05/2019 | 1034 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 03/05/2019) |
| 03/05/2019 | | Pretrial Conference as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/5/2019 before Judge Catherine C. Blake. (kam, Deputy Clerk) (Entered: 03/21/2019) |
| 03/06/2019 | 1037 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 03/06/2019) |
| 03/06/2019 | 1038 | SEALED DOCUMENT (Whalen, Teresa) Modified on 3/18/2019 (jnls, Deputy Clerk). (Entered: 03/06/2019) |
| 03/06/2019 | 1039 | MOTION to Dismiss *Count Four* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 03/06/2019) |

**JA21**

| 03/08/2019 | 1041 | Proposed Voir Dire by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Perry, Lauren) (Entered: 03/08/2019) |
|---|---|---|
| 03/08/2019 | 1042 | Proposed Jury Instructions by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley (Hoffman, Christina) (Entered: 03/08/2019) |
| 03/11/2019 | 1045 | RESPONSE in Opposition by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley re 1007 MOTION in Limine *To Preclude or Limit Expert Testimony Regarding Firearms and Toolmark Identification* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19)(Hoffman, Christina) (Entered: 03/11/2019) |
| 03/11/2019 | 1046 | RESPONSE in Opposition by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley re 1003 MOTION in Limine *Re Cellphone Expert* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoffman, Christina) (Entered: 03/11/2019) |
| 03/12/2019 | 1048 | RESPONSE in Opposition by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley re 1010 MOTION to Adopt Motion of Other Defendant *(Updated Motion) and other Defense Motions in Limine* (Hoffman, Christina) (Entered: 03/12/2019) |
| 03/14/2019 | 1057 | NOTICE OF ATTORNEY APPEARANCE Peter J Martinez appearing for USA.(Martinez, Peter) (Entered: 03/14/2019) |
| 03/14/2019 | 1058 | RESPONSE re 1050 MOTION to Enforce Plea Agreement filed by USA. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit)(Martinez, Peter) (Entered: 03/14/2019) |

**JA22**

| 03/14/2019 | 1059 | ORDER re: Secondary Screening as to Dante D. Bailey, et al. Signed by Judge Catherine C. Blake on 3/14/2019. (hmls, Deputy Clerk) (Entered: 03/15/2019) |
| 03/18/2019 | 1076 | Arraignment as to Sydni Frazier (25) Count 1,2,22,29 of the 2nd Superseding Indictment held on 3/18/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 03/19/2019) |
| 03/18/2019 | 1097 | Jury Trial (Day 1) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/18/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/19/2019 | 1069 | NOTICE OF ATTORNEY APPEARANCE Jason Daniel Medinger appearing for USA.(Medinger, Jason) (Entered: 03/19/2019) |
| 03/19/2019 | 1098 | Jury Trial (Day 2) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/19/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/20/2019 | 1099 | Jury Trial (Day 3) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/20/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/21/2019 | 1100 | Jury Trial (Day 4) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/21/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/25/2019 | 1101 | Jury Trial (Day 5) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/25/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/26/2019 | 1102 | Jury Trial (Day 6) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/26/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/27/2019 | 1103 | Jury Trial (Day 7) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/27/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/04/2019) |
| 03/28/2019 | 1104 | Jury Trial (Day 8) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 3/28/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/05/2019) |
| 04/01/2019 | 1105 | Jury Trial (Day 9) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/1/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/05/2019) |

**JA23**

| 04/02/2019 | 1106 | Jury Trial (Day 10) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/2/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/05/2019) |
|---|---|---|
| 04/03/2019 | 1107 | Jury Trial (Day 11) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/3/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/05/2019) |
| 04/04/2019 | 1108 | Jury Trial (Day 12) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/4/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/05/2019) |
| 04/08/2019 | 1109 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 04/08/2019) |
| 04/08/2019 | 1110 | SEALED DOCUMENT (Whalen, Teresa) Modified on 4/8/2019 (krs, Deputy Clerk). (Entered: 04/08/2019) |
| 04/08/2019 | 1111 | -SEALED-ORDER granting 1109 Motion to Seal as to 1110 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 4/8/2019. (krs, Deputy Clerk) (Entered: 04/08/2019) |
| 04/08/2019 | 1112 | Jury Trial (Day 13) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/8/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/09/2019) |
| 04/09/2019 | 1118 | Jury Trial (Day 14) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/9/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/11/2019) |
| 04/10/2019 | 1113 | MOTION in Limine *to Exclude Certain Testimony* by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit 1)(Enzinna, Paul) (Entered: 04/10/2019) |
| 04/10/2019 | 1114 | MOTION in Limine *to Recall Daniel Lamont* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. |

**JA24**

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoffman, Christina) (Entered: 04/10/2019) |
| 04/10/2019 | 1116 | RESPONSE in Opposition by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley re 1113 MOTION in Limine *to Exclude Certain Testimony* (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 04/10/2019) |
| 04/10/2019 | 1117 | RESPONSE in Opposition by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley re 1114 MOTION in Limine *to Recall Daniel Lamont* (Enzinna, Paul) (Entered: 04/10/2019) |
| 04/11/2019 | 1119 | Jury Trial (Day 15) as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, and Sydni Frazier held on 4/11/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 04/15/2019) |
| 04/15/2019 | 1120 | ORDER granting 1008 Motion in Limine to exclude certain records from Advantage Sentencing Alternative Programs, Inc., as to Dante D. Bailey (1), et al. Signed by Judge Catherine C. Blake on 4/15/2019. (cags, Deputy Clerk) (Entered: 04/15/2019) |
| 04/15/2019 | 1121 | SEALED DOCUMENT (Davis, Christopher) Modified on 4/17/2019 (krs, Deputy Clerk). (Entered: 04/15/2019) |
| 04/15/2019 | 1124 | Jury Trial (Day 16) as to Sydni Frazier held on 4/15/2019 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kam, Deputy Clerk) (Entered: 04/16/2019) |
| 04/15/2019 | 1130 | ORDER declaring a mistrial for manifest necessity as to Sydni Frazier; severing the charges against Frazier and scheduling a retrial at a later date. Signed by Judge Catherine C. Blake on 4/15/2019. (krs, Deputy Clerk) (Entered: 04/17/2019) |
| 04/16/2019 | 1122 | QC NOTICE: 1121 Proposed Sealed Document filed by Sydni Frazier was filed incorrectly. <br> **Motion to Seal was not filed in conjunction with the proposed sealed document. Please file corresponding motion.* (krs, Deputy Clerk) (Entered: 04/16/2019) |
| 04/16/2019 | 1128 | -SEALED- MOTION to Seal by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 04/16/2019) |
| 04/17/2019 | 1131 | -SEALED-ORDER granting 1128 Motion to Seal as to 1121 Proposed Sealed Document as to Sydni Frazier (25). Signed by Judge Catherine C. Blake on 4/17/2019. (krs, Deputy Clerk) (Entered: 04/17/2019) |
| 04/18/2019 | 1137 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, |

**JA25**

| | | |
|---|---|---|
| | | Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 04/18/2019) |
| 04/18/2019 | 1138 | **SEALED DOCUMENT** (Hoffman, Christina) Modified on 4/23/2019 (hmls, Deputy Clerk). (Entered: 04/18/2019) |
| 04/18/2019 | 1139 | MOTION to Exclude *Alibi Defense* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Hoffman, Christina) (Entered: 04/18/2019) |
| 04/19/2019 | 1141 | Correspondence from Teresa Whalen re: Request for the U.S. Marshal Service to pay travel expenses for witness (krs, Deputy Clerk) (Entered: 04/19/2019) |
| 04/19/2019 | 1142 | ORDER for United States Marshal Service to pay travel expenses. Signed by Judge Ellen L. Hollander on 4/19/2019. (c/c 4/19/19) (krs, Deputy Clerk) (Entered: 04/19/2019) |
| 04/19/2019 | 1144 | Correspondence re: Correction to Motion to Preclude Alibi (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 04/19/2019) |
| 04/21/2019 | 1146 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Hoffman, Christina) (Entered: 04/21/2019) |
| 04/21/2019 | 1147 | **SEALED DOCUMENT** (Hoffman, Christina) Modified on 4/23/2019 (hmls, Deputy Clerk). (Entered: 04/21/2019) |
| 04/23/2019 | 1150 | -SEALED- ORDER GRANTING 1137 Motion to Seal 1138 Proposed Sealed Document as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 4/22/2019. (hmls, Deputy Clerk) (Entered: 04/23/2019) |

**JA26**

| | | |
|---|---|---|
| 04/23/2019 | 1151 | -SEALED- ORDER GRANTING 1146 Motion to Seal 1147 Proposed Sealed Document as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 4/22/2019. (hmls, Deputy Clerk) (Entered: 04/23/2019) |
| 05/02/2019 | 1162 | GOVERNMENT'S TRIAL EXHIBIT LIST(krs, Deputy Clerk) (Entered: 05/02/2019) |
| 05/02/2019 | 1166 | COURT TRIAL EXHIBITS (krs, Deputy Clerk) (Entered: 05/02/2019) |
| 05/02/2019 | 1167 | Stipulation re: Certification of Exhibits Submitted to the Jury (krs, Deputy Clerk) (Entered: 05/02/2019) |
| 05/09/2019 | 1187 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 05/09/2019) |
| 05/09/2019 | 1188 | SEALED DOCUMENT (Whalen, Teresa) Modified on 5/9/2019 (krs, Deputy Clerk). (Entered: 05/09/2019) |
| 05/09/2019 | 1189 | -SEALED-ORDER granting 1187 Motion to Seal as to 1188 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 5/9/2019. (krs, Deputy Clerk) (Entered: 05/09/2019) |
| 06/03/2019 | 1209 | MOTION to Adopt Motion of Other Defendant by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Enzinna, Paul) (Entered: 06/03/2019) |
| 06/03/2019 | 1210 | CJA 20 as to Sydni Frazier: Appointment of Attorney Adam Daniel Harris for Sydni Frazier. Signed by Judge Catherine C. Blake on 5/31/2019. (jnls, Deputy Clerk) (Entered: 06/03/2019) |
| 06/06/2019 | 1215 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 06/06/2019) |
| 06/06/2019 | 1216 | SEALED DOCUMENT (Whalen, Teresa) Modified on 6/6/2019 (jnls, Deputy Clerk). (Entered: 06/06/2019) |

**JA27**

| 06/06/2019 | 1217 | -SEALED- ORDER granting 1215 Motion to Seal as to 1216 Proposed Sealed Document as to Dante D. Bailey et al. Signed by Judge Catherine C. Blake on 6/6/2019. (c/m 6/6/19 jnls, Deputy Clerk) (Entered: 06/06/2019) |
| --- | --- | --- |
| 06/07/2019 | | Telephone Conference as to Sydni Frazier held on 6/7/2019 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 06/24/2019) |
| 06/11/2019 | 1225 | ORDER confirming the results of the telephone conference call held on 6/7/2019 as to Sydni Frazier. Signed by Judge Catherine C. Blake on 6/11/2019. (krs, Deputy Clerk) (Entered: 06/11/2019) |
| 07/02/2019 | 1239 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 07/02/2019) |
| 07/02/2019 | 1240 | SEALED DOCUMENT (Whalen, Teresa) Modified on 7/3/2019 (krs, Deputy Clerk). (Entered: 07/02/2019) |
| 07/03/2019 | 1243 | -SEALED-ORDER granting 1239 Motion to Seal as to 1240 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 7/3/2019. (krs, Deputy Clerk) (Entered: 07/03/2019) |
| 07/10/2019 | 1244 | MOTION to Withdraw *Appearance* by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Martinez, Peter) (Entered: 07/10/2019) |
| 07/11/2019 | 1245 | STATUS REPORT by USA as to Sydni Frazier (Hoffman, Christina) (Entered: 07/11/2019) |
| 07/25/2019 | 1252 | MARGINAL ORDER approving 1244 Motion to Withdraw Appearance. Signed by Judge Catherine C. Blake on 7/25/2019. (krs, Deputy Clerk) (Entered: 07/26/2019) |
| 07/25/2019 | | Attorney update in case. Attorney Peter J Martinez terminated. (krs, Deputy Clerk) (Entered: 07/26/2019) |
| 07/29/2019 | 1254 | NOTICE OF ATTORNEY APPEARANCE: Adam Daniel Harris as CJA Appointment appearing for Sydni Frazier(Harris, Adam) (Entered: 07/29/2019) |
| 07/30/2019 | 1255 | Third Superseding INDICTMENT as to Sydni Frazier (25) count(s) 1s, 2s, 3s, 4s. (krs, Deputy Clerk) (Entered: 07/31/2019) |
| 07/30/2019 | 1257 | Redlined Third Superseding Indictment filed by USA on 7/30/2019as to Sydni Frazier. (krs, Deputy Clerk) (Entered: 07/31/2019) |
| 08/06/2019 | 1260 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, |

**JA28**

|  |  |  |
|---|---|---|
|  |  | Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 08/06/2019) |
| 08/06/2019 | 1261 | SEALED DOCUMENT (Whalen, Teresa) Modified on 8/20/2019 (krs, Deputy Clerk). (Entered: 08/06/2019) |
| 08/14/2019 | 1265 | MOTION to Dismiss on Speedy Trial - *Count Two of Third Superseding Indictment* by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 08/14/2019) |
| 08/14/2019 | 1266 | MOTION to Suppress *Tangible Evidence* by Sydni Frazier. (Attachments: # 1 Exhibit, # 2 Text of Proposed Order)(Davis, Christopher) (Entered: 08/14/2019) |
| 08/19/2019 | 1270 | -SEALED-ORDER granting 1260 Motion to Seal as to 1261 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 8/19/2019. (krs, Deputy Clerk) (Entered: 08/20/2019) |
| 09/10/2019 | 1285 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 09/10/2019) |
| 09/10/2019 | 1286 | **SEALED DOCUMENT** (Whalen, Teresa) Modified on 2/21/2020 (hmls, Deputy Clerk). (Entered: 09/10/2019) |
| 10/07/2019 | 1296 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 10/07/2019) |
| 10/07/2019 | 1297 | SEALED DOCUMENT (Whalen, Teresa) Modified on 10/7/2019 (bmhs, Deputy Clerk). (Entered: 10/07/2019) |
| 10/07/2019 | 1298 | -SEALED- ORDER granting 1296 Motion to Seal. Signed by Judge Catherine C. Blake on 10/7/2019. (bmhs, Deputy Clerk) (Entered: 10/07/2019) |
| 11/04/2019 | 1331 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 11/04/2019) |
| 11/04/2019 | 1332 | SEALED DOCUMENT (Whalen, Teresa) Modified on 11/5/2019 (krs, Deputy Clerk). (Entered: 11/04/2019) |
| 11/05/2019 | 1335 | -SEALED-ORDER granting 1331 Motion to Seal as to 1332 Proposed Sealed Document. Signed by Judge Catherine C. Blake on 11/5/2019. (krs, Deputy Clerk) |

**JA29**

| | | |
|---|---|---|
| | | (Entered: 11/05/2019) |
| 11/19/2019 | 1352 | RESPONSE in Opposition by USA as to Sydni Frazier re 1265 MOTION to Dismiss on Speedy Trial - *Count Two of Third Superseding Indictment* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Hoffman, Christina) (Entered: 11/19/2019) |
| 11/20/2019 | 1354 | MOTION for Protective Order by USA as to Sydni Frazier. (Hoffman, Christina) (Entered: 11/20/2019) |
| 11/20/2019 | | Telephone Conference re: Scheduling as to Sydni Frazier held on 11/20/2019 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 12/04/2019) |
| 11/21/2019 | 1355 | ORDER granting 1354 Motion for Protective Order as to Sydni Frazier (25). Signed by Judge Catherine C. Blake on 11/21/2019. (krs, Deputy Clerk) (Entered: 11/21/2019) |
| 11/21/2019 | 1380 | ORDER confirming the results of the telephone conference re: schedule as to Sydni Frazier. Signed by Judge Catherine C. Blake on 11/21/2019. (hmls, Deputy Clerk) (Entered: 11/22/2019) |
| 12/03/2019 | 1383 | -SEALED- MOTION to Seal by Dante D. Bailey as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Whalen, Teresa) (Entered: 12/03/2019) |
| 12/03/2019 | 1384 | SEALED DOCUMENT (Whalen, Teresa) Modified on 12/4/2019 (krs, Deputy Clerk). (Entered: 12/03/2019) |
| 12/03/2019 | 1385 | -SEALED-ORDER granting 1383 Motion to Seal as to 1384 Proposed Sealed Document as to Dante D. Bailey (1), Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Jamal Lockley (8), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Tiffany Bailey (17), Takuma Tate (18), Maurice Pollock (19), Shakeen Davis (20), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 12/3/2019. (krs, Deputy Clerk) (Entered: 12/04/2019) |
| 12/04/2019 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Sydni Frazier. *Motions Hearing* PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 12/4/2019. An interpreter will not be needed. Hearing set for 2/18/2020 10:00 AM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 12/04/2019) |
| 12/04/2019 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Sydni Frazier. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 12/4/2019. An interpreter will not be needed. Jury Trial set for 2/24/2020 09:00 AM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 12/04/2019) |

| 02/04/2020 | 1405 | -SEALED- MOTION to Seal by USA as to Sydni Frazier. (Hoffman, Christina) (Entered: 02/04/2020) |
|---|---|---|
| 02/04/2020 | 1406 | SEALED DOCUMENT (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Hoffman, Christina) Modified on 2/24/2020 (krs, Deputy Clerk). (Entered: 02/04/2020) |
| 02/05/2020 | 1407 | NOTICE OF ATTORNEY APPEARANCE Christopher M Rigali appearing for USA.(Rigali, Christopher) (Entered: 02/05/2020) |
| 02/11/2020 | 1411 | Consent MOTION in Limine *to Admit Testimony of DNA Expert* by USA as to Sydni Frazier. (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 02/11/2020) |
| 02/12/2020 | 1412 | Proposed Jury Instructions by USA as to Sydni Frazier (Rigali, Christopher) (Entered: 02/12/2020) |
| 02/12/2020 | 1413 | Proposed Voir Dire by USA as to Sydni Frazier (Rigali, Christopher) (Entered: 02/12/2020) |
| 02/12/2020 | 1414 | Sealed Document - CJA Funding (c/s 2/13/2020) (krs, Deputy Clerk) (Entered: 02/13/2020) |
| 02/13/2020 | 1415 | REPLY TO RESPONSE to Motion by Sydni Frazier re 1266 MOTION to Suppress *Tangible Evidence Seized From 961 Bennett Place* (Attachments: # 1 Exhibit Correspondence from Bess and Faruq)(Harris, Adam) (Entered: 02/13/2020) |
| 02/14/2020 | 1416 | Proposed Jury Instructions by USA as to Sydni Frazier (Rigali, Christopher) (Entered: 02/14/2020) |
| 02/18/2020 | 1418 | Arraignment as to Sydni Frazier (25) as to Counts 1s,2s,3s, and 4s held on 2/18/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 02/18/2020) |
| 02/18/2020 | 1420 | Motion Hearing as to Sydni Frazier held on 2/18/2020 re 1265 MOTION to Dismiss on Speedy Trial - *Count Two of Third Superseding Indictment* filed by Sydni Frazier, 1266 MOTION to Suppress *Tangible Evidence* filed by Sydni Frazier before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 02/18/2020) |
| 02/18/2020 | | Pretrial Conference as to Sydni Frazier held on 2/18/2020 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 02/18/2020) |
| 02/19/2020 | 1421 | Government's EXHIBIT LIST as to Sydni Frazier (krs, Deputy Clerk) (Entered: 02/19/2020) |
| 02/19/2020 | 1422 | Defendant's EXHIBIT LIST by Sydni Frazier (krs, Deputy Clerk) (Entered: 02/19/2020) |
| 02/19/2020 | 1423 | Stipulation re: Return of Exhibits to Counsel (krs, Deputy Clerk) (Entered: 02/19/2020) |
| 02/21/2020 | 1425 | RESPONSE in Opposition by USA as to Sydni Frazier re 1266 MOTION to Suppress *Tangible Evidence* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # |

**JA31**

| | | |
|---|---|---|
| | | 15 Exhibit 15, # 16 Exhibit 16)(Hoffman, Christina) (Entered: 02/21/2020) |
| 02/21/2020 | 1426 | -SEALED- ORDER GRANTING 1285 Motion to Seal as to Dontray Johnson (2), Adrian Jamal Spence (3), William Banks (4), Randy Banks (5), Ayinde Deleon (6), Dominick Wedlock (7), Dwight Jenkins (9), Jacob Bowling (10), Corloyd Anderson (11), Melvin Lashley (12), Devon Dent (13), William Jones (14), Jarmal Harrid (15), Jamal Smith (16), Takuma Tate (18), Maurice Pollock (19), Charles Blackwell (21), Kenneth Torry (22), Delante Lee (23), Jay Greer (24), Sydni Frazier (25), Malcolm Lashley (26). Signed by Judge Catherine C. Blake on 2/21/2020. (hmls, Deputy Clerk) (Entered: 02/21/2020) |
| 02/21/2020 | 1427 | ORDER denying 1265 Motion to Dismiss Count Two; denying 1266 Motion to Suppress Tangible Evidence; granting 1405 Motion to Seal as to 1406 Proposed Sealed Document; granting 1411 Consent Motion to Admit Testimony as to Sydni Frazier (25). Signed by Judge Catherine C. Blake on 2/21/2020. (krs, Deputy Clerk) (Entered: 02/24/2020) |
| 02/24/2020 | 1432 | Jury Trial (Day 1) as to Sydni Frazier held on 2/24/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 02/26/2020) |
| 02/25/2020 | 1433 | Jury Trial (Day 2) as to Sydni Frazier held on 2/25/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 02/26/2020) |
| 02/26/2020 | 1435 | Jury Trial (Day 3) as to Sydni Frazier held on 2/26/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 02/27/2020) |
| 02/27/2020 | 1436 | Jury Trial (Day 4) as to Sydni Frazier held on 2/27/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 02/28/2020) |
| 03/02/2020 | 1438 | Jury Trial (Day 5) as to Sydni Frazier held on 3/2/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 03/03/2020) |
| 03/03/2020 | 1444 | Jury Trial (Day 6) as to Sydni Frazier held on 3/3/2020 before Judge Catherine C. Blake.(Court Reporter: Douglas Zweizig) (kams, Deputy Clerk) (Entered: 03/04/2020) |
| 03/06/2020 | 1450 | GOVERNMENT'S EXHIBIT LIST by USA as to Sydni Frazier (krs, Deputy Clerk) (Entered: 03/06/2020) |
| 03/06/2020 | 1451 | DEFENDANT'S EXHIBIT LIST by Sydni Frazier (krs, Deputy Clerk) (Entered: 03/06/2020) |
| 03/06/2020 | 1452 | COURT'S EXHIBIT LIST by Sydni Frazier (krs, Deputy Clerk) (Entered: 03/06/2020) |
| 03/06/2020 | 1453 | JURY VERDICT as to Sydni Frazier (25) Guilty on Count 1s,2s,3s,4s. (krs, Deputy Clerk) (Entered: 03/06/2020) |
| 03/06/2020 | 1454 | -SEALED- JURY VERDICT Signed (krs, Deputy Clerk) (Entered: 03/06/2020) |
| 03/06/2020 | 1455 | Sentencing Order as to Sydni Frazier. Signed by Judge Catherine C. Blake on 3/3/2020. (krs, Deputy Clerk) (Entered: 03/06/2020) |

**JA32**

| 03/06/2020 | 1456 | Stipulation re: Return of Exhibits to Counsel (krs, Deputy Clerk) (Entered: 03/06/2020) |
| 03/13/2020 | | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Sydni Frazier. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 3/13/2020. An interpreter will not be needed. Sentencing set for 5/29/2020 09:30 AM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 03/13/2020) |
| 03/18/2020 | 1458 | Correspondence re: Ivo Louvado (Attachments: # 1 Exhibit, # 2 Exhibit)(Davis, Christopher) (Entered: 03/18/2020) |
| 04/03/2020 | 1470 | RESPONSE filed by USA. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Hoffman, Christina) (Entered: 04/03/2020) |
| 04/08/2020 | 1472 | Second Correspondence re: Ivo Louvado (Davis, Christopher) (Entered: 04/08/2020) |
| 04/28/2020 | 1489 | Memorandum to Counsel re request for the government for file its motion to partially unseal its sentencing memorandum. Signed by Catherine C. Blake on 4/28/2020. (krs, Deputy Clerk) (Entered: 04/28/2020) |
| 06/02/2020 | 1502 | MOTION *to Reopen Suppression Hearing*, MOTION for New Trial by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Mary) (Entered: 06/02/2020) |
| 06/04/2020 | 1507 | Consent MOTION for Extension of Time to File Response/Reply as to 1502 MOTION *to Reopen Suppression Hearing* MOTION for New Trial , 1505 MOTION for New Trial by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Hoffman, Christina) (Entered: 06/04/2020) |
| 06/04/2020 | 1508 | MARGINAL ORDER approving 1507 Motion for Extension of Time to File Response/Reply as to Dante D. Bailey (1), Randy Banks (5), Jamal Lockley (8), Corloyd Anderson (11), Shakeen Davis (20), Sydni Frazier (25). Signed by Judge Catherine C. Blake on 6/4/2020. (krs, Deputy Clerk) (Entered: 06/04/2020) |
| 07/07/2020 | 1531 | Consent MOTION for Extension of Time to File Response/Reply as to 1505 MOTION for New Trial by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Hoffman, Christina) (Entered: 07/07/2020) |
| 07/08/2020 | 1532 | MARGINAL ORDER approving 1531 Consent Motion to Further Extend the Deadline for Responding to the Defendants' Motions for New Trial as to Dante D. Bailey (1), Randy Banks (5), Jamal Lockley (8), Corloyd Anderson (11), Shakeen Davis (20), Sydni Frazier (25). Signed by Judge Catherine C. Blake on 7/8/2020. (krs, Deputy Clerk) (Entered: 07/08/2020) |
| 09/07/2020 | 1551 | Consent MOTION for Extension of Time to File Response/Reply *to Defendants' Motions for New Trial* by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Hoffman, Christina) (Entered: 09/07/2020) |

**JA33**

| | | |
|---|---|---|
| 09/08/2020 | 1552 | MARGINAL ORDER approving 1551 Consent Motion to Further Extend the Deadline for Responding to the Defendants' Motions for New Trial as to Dante D. Bailey (1), Randy Banks (5), Jamal Lockley (8), Corloyd Anderson (11), Shakeen Davis (20), Sydni Frazier (25). Signed by Judge Catherine C. Blake on 9/8/2020. (krs, Deputy Clerk) (Entered: 09/08/2020) |
| 09/14/2020 | 1553 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Hoffman, Christina) (Entered: 09/14/2020) |
| 09/14/2020 | 1554 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16)(Hoffman, Christina) (Entered: 09/14/2020) |
| 10/01/2020 | 1560 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Hoffman, Christina) (Entered: 10/01/2020) |
| 10/01/2020 | 1561 | **PROPOSED SEALED DOCUMENT** (Hoffman, Christina) (Entered: 10/01/2020) |
| 10/02/2020 | 1562 | NOTICE OF ATTORNEY APPEARANCE: Mary Elizabeth Davis as Pro bono Appointment appearing for Sydni Frazier(Davis, Mary) (Entered: 10/02/2020) |
| 10/20/2020 | 1565 | Consent MOTION for Extension of Time to File Response/Reply as to 1505 MOTION for New Trial by Shakeen Davis as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Berman, Stuart) (Entered: 10/20/2020) |
| 10/22/2020 | 1568 | ORDER confirming the results of the conference call held on 10/22/2020 regarding pending motions to seal and a proposed protective Order. Signed by Judge Catherine C. Blake on 10/22/2020. (krs, Deputy Clerk) (Entered: 10/22/2020) |
| 11/03/2020 | 1573 | Consent MOTION to Unseal Document *Partially, and for a Protective Order* by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 11/03/2020) |
| 11/04/2020 | 1574 | ORDER granting 1573 Motion to Partially Unseal the Government's Consolidated Opposition to the Defendants' Motion for New Trial as to Dante D. Bailey (1), Randy Banks (5), Jamal Lockley (8), Corloyd Anderson (11), Shakeen Davis (20), Sydni Frazier (25). Signed by Judge Catherine C. Blake on 11/4/2020. (krs, Deputy Clerk) (Entered: 11/04/2020) |
| 12/16/2020 | 1599 | Consent MOTION for Extension of Time to File Response/Reply as to 1502 MOTION *to Reopen Suppression Hearing* MOTION for New Trial by Sydni Frazier. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 12/16/2020) |

**JA34**

| | | |
|---|---|---|
| 12/16/2020 | 1600 | ORDER granting 1599 Motion for Extension of Time as to Sydni Frazier (25). Signed by Judge Catherine C. Blake on 12/16/2020. (krs, Deputy Clerk) (Entered: 12/16/2020) |
| 01/06/2021 | 1613 | NOTICE by USA *WITHDRAWAL OF APPEARANCE* (Gardner, Daniel) (Entered: 01/06/2021) |
| 01/23/2021 | 1620 | [FILED IN ERROR per counsel] REPLY TO RESPONSE to Motion by Sydni Frazier re 1502 MOTION *to Reopen Suppression Hearing* MOTION for New Trial (Davis, Christopher) Modified on 1/25/2021 (krs, Deputy Clerk). (Entered: 01/23/2021) |
| 01/24/2021 | 1621 | [FILED IN ERROR per counsel] REPLY TO RESPONSE to Motion by Sydni Frazier re 1502 MOTION *to Reopen Suppression Hearing* MOTION for New Trial *Corrected Dkt. 1620* (Davis, Christopher) Modified on 1/25/2021 (krs, Deputy Clerk). (Entered: 01/24/2021) |
| 01/24/2021 | 1622 | REPLY TO RESPONSE to Motion by Sydni Frazier re 1502 MOTION *to Reopen Suppression Hearing* MOTION for New Trial *Corrected Dkt. 1620 & 1621* (Davis, Christopher) (Entered: 01/24/2021) |
| 04/03/2021 | 1636 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Hoffman, Christina) (Entered: 04/03/2021) |
| 04/03/2021 | 1637 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1)(Hoffman, Christina) (Entered: 04/03/2021) |
| 04/06/2021 | 1638 | Sealed Document (krs, Deputy Clerk) (Entered: 04/07/2021) |
| 04/22/2021 | 1639 | MOTION to Unseal Document by Dwight Jenkins as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Barron, Erek) (Entered: 04/22/2021) |
| 09/21/2021 | 1667 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Hoffman, Christina) (Entered: 09/21/2021) |
| 09/21/2021 | 1668 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoffman, Christina) (Entered: 09/21/2021) |
| 10/08/2021 | 1674 | ORDER on Motion for a Protective Order as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick |

**JA35**

| | | |
|---|---|---|
| | | Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. Signed by Judge Catherine C. Blake on 10/8/2021. (bmhs, Deputy Clerk) (Entered: 10/08/2021) |
| 10/29/2021 | 1684 | -SEALED- MOTION to Seal by USA as to Dante D. Bailey, Randy Banks, Jamal Lockley, Corloyd Anderson, Shakeen Davis, Sydni Frazier. (Hoffman, Christina) (Entered: 10/29/2021) |
| 10/29/2021 | 1685 | **PROPOSED SEALED DOCUMENT** (Hoffman, Christina) (Entered: 10/29/2021) |
| 11/04/2021 | 1690 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Memorandum in Support)(Davis, Christopher) (Entered: 11/04/2021) |
| 11/08/2021 | 1691 | -SEALED- MOTION to Seal by Sydni Frazier as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 11/08/2021) |
| 11/08/2021 | 1692 | **PROPOSED SEALED DOCUMENT** (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Supplement)(Davis, Christopher) (Entered: 11/08/2021) |
| 11/08/2021 | 1693 | -SEALED- MOTION to Seal by Sydni Frazier as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley. (Attachments: # 1 Text of Proposed Order)(Davis, Christopher) (Entered: 11/08/2021) |
| 11/08/2021 | 1694 | **PROPOSED SEALED DOCUMENT** (Davis, Christopher) (Entered: 11/08/2021) |
| 03/02/2022 | 1727 | Request for Scheduling (Davis, Christopher) (Entered: 03/02/2022) |
| 03/09/2022 | 1732 | ORDER confirming the results of the conference call; scheduling the sentencing for 5/31/2022 at 2:00 p.m. in Courtroom 7D as to Sydni Frazier. Signed by Judge Catherine C. Blake on 3/9/2022. (kk5s, Deputy Clerk) (Entered: 03/09/2022) |
| 03/09/2022 | | Telephone Conference re: Scheduling as to Sydni Frazier held on 3/9/2022 before Judge Catherine C. Blake. (kams, Deputy Clerk) (Entered: 03/21/2022) |
| 04/21/2022 | 1743 | MEMORANDUM. Signed by Judge Catherine C. Blake on 4/21/2022. (kk5s, Deputy Clerk) (Entered: 04/21/2022) |
| 04/21/2022 | 1744 | ORDER denying 1502 Sydni Frazier's motions to reopen his suppression hearing and for a new trial; denying 1505 Dante Bailey's, Randy Banks's, Jamal Lockley's, Corloyd Anderson's, and Shakeen Davis's motion for a new trial; granting 1553 Government's motion to seal its consolidated response to the defendants' motion for a new trial; granting 1558 Defendants' motion to seal its opposition to the government's motion to seal; granting 1560 Government's motion to seal the consent motion; |

|  |  | granting 1611 Defendants' consent motion to seal exhibits to its reply motion; granting 1667 Government's motion to seal ECF 1668 ; granting 1685 Government's motion to seal ECF 1685 ; granting 1691 Defendants' motion to seal their supplemental memorandum; granting 1693 Defendants' motion to seal their November 8, 2021 letter (ECF 1694 ). Signed by Judge Catherine C. Blake on 4/21/2022. (kk5s, Deputy Clerk) (Entered: 04/21/2022) |
|---|---|---|
| 05/02/2022 | 1753 | Correspondence re: Request for Minor Factual Correction to Order Denying Motions for New Trial (Hoffman, Christina) (Entered: 05/02/2022) |
| 05/09/2022 | 1755 | MARGINAL ORDER approving 1753 Correspondence re: Request for Minor Factual Correction to Order Denying Motions for New Trial. Signed by Judge Catherine C. Blake on 5/9/2022. (kk5s, Deputy Clerk) (Entered: 05/09/2022) |
| 05/09/2022 | 1756 | AMENDED MEMORANDUM. Signed by Judge Catherine C. Blake on 5/9/2022. (kk5s, Deputy Clerk) (Entered: 05/09/2022) |
| 05/12/2022 |  | PAPERLESS NOTICE OF HEARING by U.S. Attorney's Office as to Sydni Frazier. PLEASE NOTE: Defendant is in custody. A writ has not been requested. A come up was requested on 5/12/2022. An interpreter will not be needed. Sentencing set for 5/31/2022 02:00 PM in Courtroom 7D, 101 West Lombard Street, Baltimore, Maryland 21201, before Judge Catherine C. Blake.(Hoffman, Christina) (Entered: 05/12/2022) |
| 05/16/2022 | 1757 | SENTENCING MEMORANDUM by Sydni Frazier (Attachments: # 1 Exhibit) (Davis, Christopher) (Entered: 05/16/2022) |
| 05/18/2022 | 1759 | SENTENCING MEMORANDUM by USA as to Sydni Frazier (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3)(Hoffman, Christina) (Entered: 05/18/2022) |
| 05/31/2022 | 1763 | Sentencing as to Sydni Frazier held on 5/31/2022 before Judge Catherine C. Blake. (R. Carrick - Courtroom 7D)(Court Reporter: Christine Asif) (rc2s, Deputy Clerk) (Entered: 05/31/2022) |
| 06/01/2022 | 1764 | JUDGMENT as to Sydni Frazier (25), Count(s) 1, 2, 22, 29, DISMISSED; Count(s) 1s, 2s, 3s, 4s, IMPRISONMENT for a term of 60 months as to Count 1s; 60 months as to Count 3s, to run concurrent to Count 1s; 60 months as to Count 4s, to run concurrent to Counts 1s and 3s; Life as to Count 2s, to run consecutive to Counts 1s, 3s, and 4s; for a total term of Life plus 60 months with credit for time served in Federal custody since 1/25/17; SUPERVISED RELEASE for a term of 4 years as to Counts 1s, 2s, and 4s; 3 years as to Count 3s, all terms to run concurrent, for a total term of 4 years; ASSESSMENT $400. Signed by Judge Catherine C. Blake on 6/1/2022. (kk5s, Deputy Clerk) (Entered: 06/01/2022) |
| 06/01/2022 | 1766 | NOTICE OF APPEAL by Sydni Frazier Fee Status: CJA. (Davis, Mary) (Entered: 06/01/2022) |
| 06/29/2022 | 1770 | Transmission of Notice of Appeal and Docket Sheet as to Sydni Frazier to US Court of Appeals re 1766 Notice of Appeal - Final Judgment (slss, Deputy Clerk) (Entered: 06/29/2022) |
| 06/30/2022 | 1771 | USCA Case Number 22-4368 as to Sydni Frazier for 1766 Notice of Appeal - Final Judgment filed by Sydni Frazier - Case Manager - Anisha Walker. (slss, Deputy Clerk) (Entered: 06/30/2022) |

| | | |
|---|---|---|
| 06/30/2022 | 1772 | ORDER of USCA (certified copy) "Appointing" Christopher Michael Davis as counsel as to Sydni Frazier re 1766 Notice of Appeal - Final Judgment. (slss, Deputy Clerk) (Entered: 06/30/2022) |
| 07/14/2022 | 1776 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Sydni Frazier for proceedings held on Trial - 02/24/2020-03/03/2020 before Judge Blake, re 1766 Notice of Appeal - Final Judgment - Transcript due by 8/22/2022. (Court Reporter: Douglas Zweizig) (slss, Deputy Clerk) (Entered: 07/14/2022) |
| 07/14/2022 | 1777 | TRANSCRIPT ORDER ACKNOWLEDGMENT by Sydni Frazier for proceedings held on Sentencing - 05/31/2022 before Judge Blake, re 1766 Notice of Appeal - Final Judgment - Transcript due by 8/22/2022. (Court Reporter: Christine Asif)(slss, Deputy Clerk) (Entered: 07/14/2022) |
| 08/26/2022 | 1785 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 5/31/2022 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Christine T. Asif, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 9/16/2022. Redacted Transcript Deadline set for 9/26/2022. Release of Transcript Restriction set for 11/25/2022. (cas2, Court Reporter) (Entered: 08/26/2022) |
| 09/06/2022 | 1786 | Transcript of Voir Dire Proceedings as to Sydni Frazier held on 2/24/2020, before Judge Catherine C. Blake. Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Redaction Request due 9/26/2022. Redacted Transcript Deadline set for 10/4/2022. Release of Transcript Restriction set for 12/2/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |
| 09/06/2022 | 1787 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 2/24/2020 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |
| 09/06/2022 | 1788 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 2/25/2020 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |

**JA38**

| 09/06/2022 | 1789 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 2/26/2020 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |
| --- | --- | --- |
| 09/06/2022 | 1790 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 2/27/2020 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - N. Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |
| 09/06/2022 | 1791 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 3/3/2022 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |
| 09/06/2022 | 1792 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 3/2/2020 before Judge Catherine C. Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter Douglas J. Zwiezig, Telephone number 410-962-4492. Transcript may be viewed at the court public terminal or purchased through the Court Reporter before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 9/27/2022. Redacted Transcript Deadline set for 10/7/2022. Release of Transcript Restriction set for 12/5/2022. (cas2, Court Reporter) (Entered: 09/06/2022) |
| 09/28/2022 | 1797 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Sydni Frazier for dates of 2/18/2020 before Judge Blake, re 1766 Notice of Appeal - Final Judgment Court Reporter/Transcriber Douglas J. Zweizig. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained from the Court Reporter or through PACER. Does this satisfy all appellate orders for this reporter? - Y. Redaction Request due 10/19/2022. Redacted Transcript Deadline set for 10/31/2022. Release of Transcript Restriction set for 12/27/2022. Redaction Request due 10/19/2022. Redacted Transcript Deadline set for 10/31/2022. Release of Transcript Restriction set for 12/27/2022. (Zweizig, Douglas) (Entered: 09/28/2022) |

**JA39**

| | | |
|---|---|---|
| 10/19/2022 | | Case as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley Reassigned to Judge Lydia Kay Griggsby. Judge Catherine C. Blake no longer assigned to the case. (kns, Deputy Clerk) (Entered: 10/19/2022) |
| 10/19/2022 | | Case as to Dante D. Bailey, Dontray Johnson, Adrian Jamal Spence, William Banks, Randy Banks, Ayinde Deleon, Dominick Wedlock, Jamal Lockley, Dwight Jenkins, Jacob Bowling, Corloyd Anderson, Melvin Lashley, Devon Dent, William Jones, Jarmal Harrid, Jamal Smith, Tiffany Bailey, Takuma Tate, Maurice Pollock, Shakeen Davis, Charles Blackwell, Kenneth Torry, Delante Lee, Jay Greer, Sydni Frazier, Malcolm Lashley Reassigned to Judge Lydia Kay Griggsby. Judge Catherine C. Blake no longer assigned to the case. (kns, Deputy Clerk) (Entered: 10/19/2022) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 04/21/2023 09:26:19 | | |
| **PACER Login:** | Lantagne92 | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 1:16-cr-00267-LKG |
| **Billable Pages:** | 30 | **Cost:** | 3.00 |

**JA40**

CAH/LEP/JDM USAO#2016R00363



RRH
5/31/17

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2017 JUN -1  PM 4: 43

CLERK'S OFFICE
AT BALTIMORE

BY_____DEPUTY

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| | : |
| | : **Criminal No. CCB-16-0267** |
| **v.** | : |
| | : |
| | : **(Racketeering Conspiracy, 18 U.S.C.** |
| **DANTE BAILEY,** | : **§ 1962(d); Conspiracy to Distribute** |
| a/k/a "Gutta," | **Controlled Substances, 21 U.S.C.** |
| a/k/a "Almighty," | : **§ 846; Murder in Aid of Racketeering,** |
| a/k/a "Wolf," | : **18 U.S.C. § 1959(a)(1); Use, Carry,** |
| **DONTRAY JOHNSON,** | **Brandish, and Discharge a Firearm** |
| a/k/a "Gambino," | **During and in Relation to a Crime of** |
| a/k/a "Bino," | **Violence, 18 U.S.C. § 924(c); Possess,** |
| a/k/a "Tray," | **Brandish, and Discharge a Firearm in** |
| **ADRIAN JAMAL SPENCE,** | **Furtherance of a Drug Trafficking** |
| a/k/a "Spittle," | **Crime, 18 U.S.C. § 924(c);  Use of a** |
| a/k/a "SP," | **Firearm Resulting in Death, 18 U.S.C.** |
| a/k/a "AJ," | **§ 924(j); Distribution and Possession** |
| **RANDY BANKS,** | **with Intent to Distribute Controlled** |
| a/k/a "Dirt," | **Substances, 21 U.S.C. § 841;** |
| **AYINDE DELEON,** | **Possession of a Firearm and** |
| a/k/a "Murda," | **Ammunition by a Felon, 18 U.S.C.** |
| a/k/a "Yin," | **§ 922(g); Accessory After the Fact, 18** |
| **JAMAL LOCKLEY,** | **U.S.C. § 3; Aiding and Abetting, 18** |
| a/k/a "T-Roy," | **U.S.C. § 2; Forfeiture, 18 U.S.C. §§** |
| a/k/a "Droid," | **924, 1963; 21 U.S.C. § 853; 28 U.S.C.** |
| **JACOB BOWLING,** | **§ 2461)** |
| a/k/a "Jakey," | |
| a/k/a "Ghost," | |
| a/k/a "Fred," | |
| **CORLOYD ANDERSON,** | |
| a/k/a "Bo," | |
| **DEVON DENT,** | |
| a/k/a "Tech," | |
| **TIFFANY BAILEY,** | |
| a/k/a "Tiff," | |
| **TAKUMA TATE,** | |

1

a/k/a "Oop,"
a/k/a "Ook,"
MAURICE POLLOCK,
a/k/a "Reese,"
SHAKEEN DAVIS,
a/k/a "Creams,"
DELANTE LEE,
a/k/a "Tay Tay,"
SYDNI FRAZIER,
a/k/a "Sid,"
a/k/a "Perry," and
MALCOLM LASHLEY,
a/k/a "Spook."
Defendants.

## SECOND SUPERSEDING INDICTMENT

## COUNT ONE

### (Racketeering Conspiracy)

### Introduction

1.      Murdaland Mafia Piru ("MMP"), also known as the "Mob" or "Mobsters," is a violent subset of the Bloods gang that operates on the streets and in correctional facilities in Maryland and elsewhere.  For many years, MMP has controlled the drug trade in large swaths of Northwest Baltimore City and neighboring Baltimore County, including Forest Park, Windsor Mill, Gwynn Oak, Howard Park, Woodlawn, and Walbrook Junction.  MMP also has offshoots in East Baltimore City and in other cities such as Washington, DC.

2.      MMP is descended from the Tree Top Piru (TTP) subset of the Bloods gang.  TTP was formed in Compton, California in the 1970s and derives its name from a group of streets in Compton named after trees.  Eventually, TTP spread throughout other states across the country, and it became prevalent in Maryland beginning in the late 1990s.

2

3.     In February 2008, the United States Attorney's Office for the District of Maryland indicted twenty-eight leaders of TTP on racketeering charges, effectively ending TTP's control in Maryland.  According to MMP gang paperwork, the 2008 indictment "destroyed" TTP because it led to accusations of "snitching" and "creat[ed] separation between brothers."  MMP was formed in response to the federal indictment, and replaced TTP in Baltimore.  Although MMP adopted some of the same practices as TTP, it developed its own unique ideology—in particular, an association with the terminology and symbols of the Italian Mafia, and a preoccupation with money and murder.

4.     At all times relevant to this Second Superseding Indictment, the acting leader of MMP has been Dante BAILEY, who is referred to as the "Don" or "Godfather" of the gang.  BAILEY was responsible for writing and disseminating many of MMP's charter documents beginning in 2009 while he was incarcerated.  After his release from prison in 2011, BAILEY flew to California to meet with west coast leaders of TTP and gain their official approval for the MMP set in Maryland.

5.     At all times relevant to this Second Superseding Indictment, MMP has been organized hierarchically, with Dante BAILEY at the top and various subordinates underneath.  According to MMP gang paperwork, some of these subordinates have specialized functions, such as the "Five-Star General," whose job is "training soldiers to defend our family," and the "Boss of All Bosses," whose job is overseeing the gang's finances and "orchestrat[ing] a dues system."  There are also MMP units corresponding to different geographic regions or prisons, each consisting of a "Boss," an "Underboss," and various "Capos," "Lts," and "soldiers."

6.     At all times relevant to this Second Superseding Indictment, MMP members were required to follow certain rules of conduct.  Members who violated these rules or who disobeyed

3

an order from a superior were subjected to disciplinary measures called "sanctions," which ranged from fines or work assignments for minor violations, to physical beatings or stabbings for more serious violations, to murder for the most serious violations.  Violations that are punishable by death include "[a]ny acts or attempted acts of treason" and "[a]ny co-operation with authorities that lead[s] to incriminating others."  Other MMP rules include: "[w]hen at war fight like you are ready to die," and "[w]henever we are forced to strike, our only option is to kill." MMP members enhanced their status within the gang by carrying out acts of violence against rivals; for instance, members could earn a "lightning bolt" tattoo for "killing for the Mob." Several MMP members, including BAILEY, have lightning bolt tattoos on their faces or bodies.

7.     At all times relevant to this Second Superseding Indictment, prospective members of MMP were required to successfully complete an initiation process and recite an oath of loyalty called the "Omerta Code."  MMP members were required to pay dues to the gang consisting of a portion of the proceeds of their criminal activities, and they were subject to reprisal—and sometimes murder—for failing to do so.

8.     At all times relevant to this Second Superseding Indictment, MMP operated street-level drug distribution "shops" in various locations in Baltimore City.  These drug shops were operated by MMP members and associates and distributed heroin, cocaine, cocaine base (commonly known as "crack"), fentanyl, and marijuana, among other controlled substances. Non-members who wished to sell drugs in MMP's territories were forced to pay a "tax" or were targeted for violence by MMP members.  MMP's primary drug shops were located in the 5200 block of Windsor Mill Road (which MMP considered to be its headquarters), and at the intersection of Gwynn Oak Avenue and Liberty Heights Avenue.  The drug shop in the 5200 block of Windsor Mill Road was particularly lucrative due to its close proximity to Interstate 70,

4

which made it easily accessible to drug customers driving from western Maryland and neighboring states. It was not unusual for MMP members and associates to sell over a kilogram of drugs per week at this location, which could translate to over $100,000 in drug revenue per week.

9.      At all times relevant to this Second Superseding Indictment, MMP members and associates attempted to assume control over the legitimate businesses that operated in MMP's drug territories, including the BP gas station in the 5200 block of Windsor Mill Road. MMP members and associates frequently stashed drugs and firearms on the premises of this gas station and made drug sales at the gas pumps or within the store itself.

10.      At all times relevant to this Second Superseding Indictment, MMP used social media websites such as Instagram, Facebook, and YouTube to assert its claim to particular drug territories, intimidate rival gangs and drug traffickers, enhance MMP's status, and enhance individual members' status within the gang. MMP members and associates posted photographs and rap videos to these social media websites in which they flaunted firearms and threatened to kill those who stood in the way of the gang.

11.      In or about 2015, Dante BAILEY formed the so-called "Black Blood Brotherhood," an alliance between MMP and other gangs in Baltimore City, primarily the Black Guerilla Family ("BGF"). In essence, the Black Blood Brotherhood functioned as an efficient market for contract killings. For instance, if a BGF leader wanted someone killed, he might pay BAILEY to sub-contract the murder to a subordinate in MMP, or vice versa. By contracting out murders to members of other gangs, BAILEY and other gang leaders made it more difficult for law enforcement to solve the murders and apprehend those responsible.

5

12.     At all times relevant to this Second Superseding Indictment, MMP members engaged in criminal activities in furtherance of the gang, including, but not limited to, narcotics trafficking, conspiracy to commit narcotics trafficking, murder, attempted murder, conspiracy to commit murder, assault, extortion, obstruction of justice, witness intimidation and retaliation, and money laundering.  By participating in criminal activities in furtherance of the gang, particularly violent acts directed by the MMP leadership, MMP members earned respect from fellow members and maintained or advanced their position within the gang.

13.     At all times relevant to this Second Superseding Indictment, the following individuals among others were members and associates of MMP:

    a.  **DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**

    b.  **DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**

    c.  **ADRIAN JAMAL SPENCE, a/k/a "Spittle," a/k/a "SP, a/k/a "AJ,"**

    d.  **WILLIAM BANKS, a/k/a "Trouble,"**

    e.  **RANDY  BANKS, a/k/a "Dirt,"**

    f.  **AYINDE DELEON, a/k/a "Murda," a/k/a "Yin,"**

    g.  **DOMINICK WEDLOCK, a/k/a "Rage," a/k/a "Nick,"**

    h.  **JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid,"**

    i.  **DWIGHT JENKINS, a/k/a "Huggie," a/k/a "Unc,"**

    j.  **JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"**

    k.  **CORLOYD ANDERSON, a/k/a "Bo,"**

    l.  **MELVIN LASHLEY, a/k/a "Menace,"**

    m.  **DEVON DENT, a/k/a "Tech,"**

    n.  **WILLIAM JONES, a/k/a "Bill," a/k/a "Smalls,"**

6

o.  **JARMAL HARRID, a/k/a "J-Rock," a/k/a "PJ,"**

p.  **JAMAL SMITH, a/k/a "Mal," a/k/a "Lil Mal,"**

q.  **TIFFANY BAILEY, a/k/a "Tiff,"**

r.  **TAKUMA TATE, a/k/a "Oop," a/k/a "Ook,"**

s.  **MAURICE POLLOCK, a/k/a "Reese,"**

t.  **SHAKEEN DAVIS, a/k/a "Creams,"**

u.  **CHARLES BLACKWELL, a/k/a "Ci-Bo," a/k/a "Lil Charlie,"**

v.  **KENNETH TORRY, a/k/a "Kenny,"**

w.  **DELANTE LEE, a/k/a "Tay Tay,"**

x.  **JAY GREER, a/k/a "Champagne," a/k/a "Montana Gold," a/k/a "Slick,"**

y.  **SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry," and**

z.  **MALCOLM LASHLEY, a/k/a "Spook."**

### The Racketeering Enterprise

14.     At all times relevant to this Second Superseding Indictment, MMP, including its leadership, members, and associates, constituted an "enterprise" as defined in Section 1961(4) of Title 18, United States Code, that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constitutes an ongoing organization whose members and associates function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

### Purposes of the Enterprise

15.     Among the purposes of the enterprise were the following:

a.      Enriching the leaders, members, and associates of the enterprise through the distribution of controlled substances and other criminal activities, and through the use of

7

threats, intimidation, and violence, including, but not limited to, acts of murder and retaliation against witnesses;

b.      Promoting and enhancing the enterprise and its members' and associates' activities;

c.      Preserving and protecting the power, territory, operations, and proceeds of the enterprise through the distribution of controlled substances, and use of threats, intimidation, and violence, including acts of murder, witness retaliation, and assaults;

d.      Preserving and protecting the enterprise and its leaders by keeping its members and associates from cooperating with law enforcement through intimidation, violence, and threats of violence;

e.      Providing financial support and information to members, including those who were incarcerated for narcotics trafficking, acts of violence, or other offenses;

f.      Providing assistance to other gang members who committed crimes for and on behalf of the gang in order to hinder, obstruct, and prevent law enforcement officers from identifying, apprehending, and punishing the offender; and

g.      Keeping victims and witnesses in fear of the enterprise and in fear of its leaders, members, and associates through acts of violence and threats of violence.

## The Racketeering Conspiracy

16.     Beginning on a date unknown to the Grand Jury, but at least prior to 2011, and continuing until on or about the date of this Second Superseding Indictment, in the District of Maryland, and elsewhere, the defendants, **DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf," DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray," ADRIAN JAMAL SPENCE, a/k/a "Spittle," a/k/a "SP," a/k/a "AJ," RANDY BANKS,**

a/k/a "Dirt," AYINDE DELEON, a/k/a "Murda," a/k/a "Yin," JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid," JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred," CORLOYD ANDERSON, a/k/a "Bo," DEVON DENT, a/k/a "Tech," TIFFANY BAILEY, a/k/a "Tiff," TAKUMA TATE, a/k/a "Oop," a/k/a "Ook," MAURICE POLLOCK, a/k/a "Reese," SHAKEEN DAVIS, a/k/a "Creams," DELANTE LEE, a/k/a "Tay Tay," SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry," MALCOLM LASHLEY, a/k/a "Spook"; each being a person employed by and associated with MMP, an enterprise, which engaged in, and the activities of which affected, interstate and foreign commerce, together with each other and with other persons known and unknown to the Grand Jury, did knowingly, intentionally, and unlawfully combine, conspire, confederate, and agree to violate Section 1962(c) of Title 18, United States Code, that is, to conduct and participate, directly and indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity, as defined in Sections 1961(1) and (5) of Title 18, United State Code, which pattern of racketeering activity consisted of:

    a.   multiple acts involving:

        i.   Murder, chargeable under Md. Code Ann., Crim. Law §§ 2-201, 2-204, 2-205, 2-206, and the Common Law of Maryland punishable pursuant to Md. Code Ann., Crim. Law §§ 1-201, 1-202;

        ii.   Extortion, chargeable under Md. Code Ann., Crim. Law §§ 3-701, 3-705, and the Common Law of Maryland punishable pursuant to Md. Code Ann. Crim. Law §§ 1-201 and 1-202; and

        iii.   Robbery, chargeable under Md. Code Ann., Crim Law § 3-402, and the Common Law of Maryland punishable pursuant to Md. Code Ann. Crim. Law §§ 1-201 and 1-202;

9

b.   multiple offenses involving dealing in controlled substances, in violation of:

i.   21 U.S.C. § 846 (Conspiracy to Distribute and Possess with Intent to Distribute a Controlled Substance)

ii.   21 U.S.C. § 841 (Distribution and Possession with Intent to Distribute a Controlled Substance); and

c.   multiple acts indictable under:

i.   18 U.S.C. § 1956 (Money Laundering);

ii.   18 U.S.C. § 1512 (Witness Tampering); and

iii.   18 U.S.C. § 1513 (Witness Retaliation).

**Methods and Means of the Racketeering Conspiracy**

17.     Among the methods and means by which the defendants and their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

18.     MMP members and associates employed and used gang-related terminology, symbols, and tattoos.  They frequently identified with the letter "M," which is the first letter of "Murdaland," "Mafia," and "Mob"; with the color red, which is the color of the Bloods gang; and with the number "5200," which is a reference to the 5200 block of Windsor Mill Road. MMP members could "earn" gang tattoos, including an "M" for taking the MMP oath, a lightning bolt for committing murder in furtherance of the gang, and a pink rose for the wife of an MMP member.

19.     MMP members and associates attended meetings with other MMP gang members to discuss, among other things, past criminal acts; rival gangs and drug traffickers; the arrest or incarceration of MMP members; the sanctioning of MMP members; the collection of dues; the identities of individuals suspected of cooperating with law enforcement and the proposed actions

10

**JA50**

to be taken against them; plans and agreements regarding the commission of future crimes, including murder, the distribution of controlled substances, illegal possession of firearms, witness tampering, as well as ways to conceal these crimes from law enforcement.

20.    Incarcerated MMP members and associates used jail telephones to disseminate information about arrests and releases of members and associates, to warn of investigations and undercover officers, to publicize the identities of persons believed to be cooperating with law enforcement, to order assaults and murders of such persons, as well as enemies of the enterprise, to request money from MMP members and associates who were not incarcerated, and to impose sanctions on members and associates perceived to be in violation of the rules of the enterprise. Because they knew that jail telephone calls were recorded, MMP members and associates often made calls using other inmates' account numbers in an attempt to conceal their identities.

21.    MMP members and associates agreed to purchase, maintain, and circulate weapons and firearms for use in criminal activity by MMP members.  They frequently obtained firearms from drug customers in exchange for drugs.

22.    MMP members and associates used, carried, possessed, brandished, and discharged firearms in connection with the enterprise's illegal activities, including, but not limited to, murder, attempted murder, and extortion.

23.    MMP members and associates used violence, threats of violence, and intimidation to prevent victims and witnesses from cooperating with law enforcement against members of MMP about criminal acts committed by MMP.

24.    MMP members and associates obstructed justice and harmed, threatened, and intimidated witnesses and victims who cooperated with law enforcement, including other members of MMP and their associates.

11

25.     MMP members and associates distributed and conspired to distribute controlled substances, including, but not limited to heroin, cocaine, cocaine base, fentanyl, and marijuana in and around Baltimore City, and elsewhere.

26.     MMP members and associates controlled drug territories and generally permitted only MMP members to sell drugs in these territories. Non-MMP members who wished to distribute drugs in these territories were forced to pay a tax or were targeted for violence by MMP members.

27.     MMP members and associates paid dues to MMP leaders and were subject to reprisal—and sometimes murder—for failure to do so.  These dues were used for gang purposes including paying for bails and for lawyers of incarcerated members, acquiring firearms for use by the gang, and enriching high-ranking members of MMP.

28.     MMP members and associates earned money for their enterprise and financed their activities, including the payment of dues, through the distribution of controlled substances, robbery, and extortion.

29.     MMP members and associates concealed the illegal source of funds by purchasing automobiles and other valuable property through nominees.  MMP members and associates also gambled drug proceeds at casinos in and around Maryland, or simply funneled drug proceeds through casinos to launder the money by making it appear as though they had won the money gambling.

30.     MMP members and associates used cellular telephones to communicate with one another concerning and during the commission of the enterprise's illegal activities.

31.     MMP members and associates attempted to conceal the purposes of the acts done in furtherance of the enterprise, and used coded language and other means to avoid detection and

12

apprehension by law enforcement and otherwise to provide security to members and associates of the enterprise.

32.     MMP members and associates agreed that acts of violence, including murder, would be committed in order to protect and further the interests of MMP and impose discipline within the gang.

### Overt Acts

33.     In furtherance of the conspiracy and to achieve the objective thereof, the defendants and others performed and caused to be performed the following overt acts, among others, in the District of Maryland and elsewhere:

(1)     On or about January 3, 2011, Adrian Jamal SPENCE threatened to kill a drug customer who owed him a drug debt.  SPENCE sent the customer a text message saying, "Yo I want my money or my dope or im goin kill u today."  The customer replied, "im sorry dude. im sick!!!! ill get you your $. that's the last thing i wanted to do to you. please believe me."  SPENCE replied, "I don't give a fu** how sick u were I want my fu**n money . And im not goin wait either or people goin die."  A few minutes later, SPENCE sent a text message to a second individual that said, "Yo ill give you some money or some girl I jus need his address and his parents adress.ima make an example out of This motherfu**er."

(2)     On or about March 6, 2011, Adrian Jamal SPENCE agreed to purchase a .380 caliber firearm and 50 rounds of ammunition from a drug customer in exchange for 3.5 grams of heroin.

(3)     On or about September 12, 2012, in the 1900 block of Forest Park Avenue, Shakeen DAVIS possessed a stolen Smith & Wesson .45 caliber firearm (serial number TAK3106).

13

(4)     In or about October 2012, Dante BAILEY, Adrian Jamal SPENCE, and William BANKS conspired to murder S.H., as retaliation for stealing drug customers from MMP in the vicinity of Windsor Mill Road and Forest Park Avenue, and because he was believed to be cooperating with law enforcement.  SPENCE agreed to supply money for the hit.  On or about October 15, 2012, William BANKS attempted to murder S.H., shooting him multiple times in the head and torso with a .45 caliber firearm outside the Club Mirage nightclub in downtown Baltimore.  A bystander was also struck in the leg while attempting to flee.  Dante BAILEY, Dontray JOHNSON, Randy BANKS, and Devon DENT were present at the scene.  JOHNSON, who wore a red shirt with the words "MOBB SQUAD" on the back, filmed the victim with a tablet device.

(5)     On or about October 18, 2012, Dante BAILEY, William BANKS, and Corloyd ANDERSON met outside the Unit Block of Custom House Avenue.  BANKS wore a sweatshirt that said "Murdaland Mafia."

(6)     On or about November 4, 2012, in the Unit Block of Custom House Avenue, Devon DENT and an unindicted co-conspirator possessed with intent to distribute heroin, cocaine base, and marijuana.  At the time of their arrest, DENT and the unindicted co-conspirator also possessed MMP paperwork setting forth the history and structure of the gang, as well as certain rules of conduct, including that "retaliation is a must," and that "co-operation with authorities that lead[s] to incriminating others" is punishable by death.

(7)     On or about November 22, 2012, in the 2000 block of North Forest Park Avenue, Dontray JOHNSON murdered MMP member Antoine Ellis, a/k/a "Poopy," at Dante BAILEY's direction.  Earlier that day, JOHNSON had posted a comment to his Facebook account saying "198 n risen"—a reference to that year's murder tally in Baltimore City.

(8)     On or about January 14, 2013, William BANKS and Adrian Jamal SPENCE attempted to murder T.G.  BANKS and SPENCE fired multiple shots through T.G.'s car window while T.G.'s two-year-old daughter sat in the backseat.  BANKS used a .40 caliber firearm stolen in a residential burglary in Baltimore County on January 6, 2013.  BANKS got caught in SPENCE's crossfire and was shot in the wrist during the attack.

(9)     On or about July 10, 2013, in the 5500 block of Force Road, Maurice POLLOCK possessed a loaded Astra .40 caliber firearm (serial number 8250E).

(10)    On or about November 1, 2013, MMP members posted a rap video entitled "Boy You Lying" to the social media website YouTube, for the purpose of enhancing the gang's status, intimidating rivals, and discouraging anyone from selling drugs in the gang's territories without paying its members.  The video stars Dante BAILEY, William BANKS, and Dontray JOHNSON, who take turns brandishing a firearm while rapping about killing people who do not "stay in line."  The video includes a skit in which a young drug dealer dressed in red takes a call from "Gutta" (*i.e.*, BAILEY) and promises him drug money, telling him he "just sold 100 packs today."  When BAILEY and several older males dressed in red arrive to collect the money, the young drug dealer claims he "ain't got that money."  BAILEY and the older males accuse him of lying and begin beating him.

(11)    On or about November 1, 2013, MMP members posted a rap video entitled "Str8 Mobbin" to YouTube for the purpose of enhancing the gang's status and asserting MMP's dominance over its drug territories.  The video features Dante BAILEY, William BANKS, Dontray JOHNSON, Randy BANKS, Adrian Jamal SPENCE, Takuma TATE, and other MMP members, as well as footage of MMP's drug territories at the intersections of Windsor Mill Road and Forest Park Avenue, Gwynn Oak Avenue and Liberty Heights Avenue,

15

Lauretta Avenue and Warwick Avenue, 27th Street and Boone Street, and Edmonson Avenue and Loudon Avenue. In the opening scene, BAILEY takes a telephone call from William BANKS, who tells him that "nig\*\*s talkin' about they run the city; it's time to turn up on these nig\*\*s, man." BAILEY replies, "Say no more; just get the Mob together, and we gonna show these nig\*\*s what it is." The rap lyrics include references to killing people who stand in the way of the gang, and JOHNSON and another MMP member brandish firearms in the video.

(12)    On or about February 15, 2014, Corloyd ANDERSON attempted to send approximately $88,000 in drug proceeds to a drug supplier in another state using a courier. When the courier was intercepted by the Transportation Security Administration at the Baltimore/Washington International Airport, ANDERSON told law enforcement the money was his and claimed he had won it gambling at Maryland Live! Casino.

(13)    On or about August 14, 2014, Dante BAILEY and deceased MMP member James Edwards, a/k/a "Bangout," used Corloyd ANDERSON's identification card to rent hotel rooms together in East Point, Georgia, while both had open arrest warrants in Maryland. Edwards was in possession of a loaded Smith & Wesson .40 caliber firearm (serial number AG17918).

(14)    On or about February 8, 2015, Dante BAILEY, William BANKS, Dominick WEDLOCK, and William JONES were at the BP gas station in the 5200 block of Windsor Mill Road. WEDLOCK confronted a group of three men who were pumping gas, and then asked BAILEY for a gun. BAILEY fired multiple shots at the three men with a .40 caliber firearm, causing them to flee. JONES slashed a tire on the victims' car before leaving the scene with WEDLOCK.

16

(15)    On or about February 11, 2015, Dante BAILEY and Tiffany BAILEY filmed a video with Tiffany BAILEY's juvenile son.  The three held hands while the juvenile son said, "Dear Lord, please kill all these snitches."  Dante BAILEY and Tiffany BAILEY then said, "Amen."

(16)    On or about February 12, 2015, in the 300 block of Collins Avenue, Dante BAILEY murdered MMP member James Edwards, a/k/a "Bangout," using the same .40 caliber firearm he had discharged at the BP gas station on February 8, 2015.

(17)    On or about February 13, 2015, Dominick WEDLOCK called Dante BAILEY from a recorded telephone at the Baltimore County Detention Center.  During the call, BAILEY asked WEDLOCK for his "money" phone, *i.e.*, the phone WEDLOCK had been using to make drug sales.  WEDLOCK told BAILEY he had given the phone to William JONES.  BAILEY said he wanted the phone.

(18)    On or about April 15, 2015, in the 3500 block of Gwynn Oak Avenue, Devon DENT distributed cocaine base to an undercover officer.

(19)    On or about April 16, 2015, Jarmal HARRID, Maurice POLLOCK, and an unindicted co-conspirator possessed with intent to distribute heroin and cocaine base and led police on a high-speed car chase, during which they threw a Smith & Wesson 9mm firearm (serial number PAC7887) from the vehicle.

(20)    On or about April 22, 2015, in the 4700 block of Gwynn Oak Avenue, Devon DENT distributed cocaine base to an undercover officer.

(21)    On or about April 23, 2015, near the intersection of Windsor Mill Road and Beverly Avenue, Dante BAILEY and an unindicted co-conspirator possessed with intent to distribute approximately 21 grams of heroin.

17

(22)    On or about April 25, 2015, in a recorded telephone call, Dante BAILEY and his wife Tiffany BAILEY used coded language to discuss their heroin inventory. Tiffany BAILEY was using the "money" phone that Dante BAILEY had obtained from Dominick WEDLOCK and William JONES.

(23)    On or about April 28, 2015, Dante BAILEY and Randy BANKS burglarized Hopkins Beauty Supply at 1713 Pennsylvania Avenue during the riots in Baltimore City.

(24)    On or about May 25, 2015, Dante BAILEY took a photograph of himself holding a Sturm, Ruger & Co. 9mm caliber firearm with an extended magazine.

(25)    On or about May 30, 2015, Shakeen DAVIS attempted to murder D.J. and D.G.   DAVIS fired at least nine rounds at D.J. and D.G. with a 5.56x45mm caliber rifle as they sat in their car in the 2100 block of North Forest Park Avenue.   D.J. suffered two graze wounds to his back, and both victims suffered cuts to their arms and hands from broken glass.

(26)    On or about June 9, 2015, Adrian Jamal SPENCE distributed 22 grams of heroin.

(27)    On or about June 10, 2015, Adrian Jamal SPENCE distributed 17 grams of heroin.

(28)    On or about June 12, 2015, Shakeen DAVIS agreed to help Kenneth TORRY sell 100 grams of heroin.

(29)    On or about June 12, 2015, Kenneth TORRY sent a text message to Dante BAILEY asking when BAILEY would be ready with the payment for 100 grams of heroin that had been provided to him on consignment.   In a reply text message, BAILEY indicated that he would not be able to sell off the heroin until the police presence in the area died

18

down.  Bailey stated: "It's scorching. He can get this hundon back until it cool down. When I'm done I will take u to c the president."

(30)   On or about June 17, 2015, Adrian Jamal SPENCE supplied 50 grams of heroin to Jamal SMITH for distribution.

(31)   On or about June 18, 2015, in the 1900 block of Forest Park Avenue, Dante BAILEY possessed with intent to distribute approximately 33 grams of marijuana.  As he was being arrested, BAILEY instructed an unindicted co-conspirator that he needed to take the marijuana charge for him.  The co-conspirator then advised police that the marijuana in BAILEY's vehicle belonged to him.

(32)   On or about June 19, 2015, Adrian Jamal SPENCE purchased 150 grams of heroin from an unindicted co-conspirator.

(33)   On or about June 20, 2015, in a recorded telephone call, Adrian Jamal SPENCE informed Jarmal HARRID that he had just purchased a new supply of heroin from an unindicted co-conspirator, and that a drug customer of SPENCE's thought the quality of the heroin was "good . . . like an eight-and-a-half, nine."  HARRID told SPENCE he was working on getting a supply of heroin from the unindicted co-conspirator.

(34)   On or about June 23, 2015, in a recorded telephone call, Adrian Jamal SPENCE agreed to supply 10 grams of heroin to Jamal LOCKLEY.

(35)   On or about June 29, 2015, in a recorded telephone call, Jamal LOCKLEY informed Adrian Jamal SPENCE that there was a drug customer at the BP gas station in the 5200 block of Windsor Mill Road looking to buy a gram of heroin.

(36)   On or about June 30, 2015, Adrian Jamal SPENCE supplied William JONES with 12 grams of heroin for distribution.

19

(37)     On or about July 1, 2015, Adrian Jamal SPENCE called the "money" phone previously in use by Dominick WEDLOCK, Dante BAILEY, and Tiffany BAILEY, and instructed an unknown co-conspirator to distribute two grams of heroin to a customer on Oakmont Street. When the unknown co-conspirator asked where Oakmont Street was, SPENCE told him to ask Dante BAILEY.

(38)     On or about July 3, 2015, Tiffany BAILEY possessed with intent to distribute approximately 26 grams of heroin and 21 grams of cocaine base. Shortly after her arrest, in a recorded telephone call, Dante BAILEY informed Adrian Jamal SPENCE that Tiffany BAILEY had been locked up and the drugs had been seized.

(39)     On or about July 3, 2015, Dante BAILEY possessed drug packaging material, a money counter, a loaded Smith & Wesson .357 caliber firearm (serial number CNW4373), and a loaded Beretta 9mm caliber firearm (serial number BER421485Z).

(40)     On or about July 4, 2015, Dante BAILEY made a series of calls to Jay GREER from the Baltimore County Detention Center. BAILEY instructed GREER to continue mixing drugs together while he was locked up and "get everybody together and make 'em push everything." GREER told BAILEY that Adrian Jamal SPENCE had "front[ed]" drugs to him the day before and that he was going to "try to help get some of that cheese together" to "pay[] for the bills." GREER also informed BAILEY that the search warrant paperwork left at BAILEY's residence said "something about a CI [confidential informant]."

(41)     On or about July 4, 2015, in a recorded telephone call, Dante BAILEY advised Kenneth TORRY that "everything is still the same," and that he would continue to work through Adrian Jamal SPENCE and his wife (Tiffany BAILEY) from jail.

20

BAILEY instructed TORRY to collect $700 from the members of the organization and give it to Tiffany BAILEY so that she could pay for his bail.

(42)     On or about July 4, 2015, in a recorded telephone call, Dante BAILEY instructed Kenneth TORRY to supply Jay GREER with 200 grams of heroin on consignment.  When TORRY expressed reluctance, BAILEY said, "How you going to dictate what I do with my business?"  TORRY agreed to supply 100 grams of heroin to GREER and another 100 grams of heroin to BAILEY when he was released from jail.

(43)     On or about July 4, 2015, in a recorded telephone call, Dante BAILEY informed Jay GREER that Kenneth TORRY was getting ready to give GREER 100 grams of heroin, which would amount to at least "ten bands" (*i.e.*, $10,000).  BAILEY said "ain't no excuse" and asked, "You understand what we in?"  GREER said he understood.

(44)     On or about July 6, 2015, Kenneth TORRY sent Shakeen DAVIS a text message offering to supply him with 10 grams of heroin for distribution.  Later in the day, DAVIS sent TORRY a text message indicating that customers were saying they did not like the quality of the heroin.

(45)     On or about July 9, 2015, Kenneth TORRY sent a text message to Shakeen DAVIS indicating that he had a supply of high-quality heroin for sale.  TORRY stated: "Got all 9s on this.....still a little soft but good they gonna like it."  In a reply text message, DAVIS asked TORRY to "[c]ome holla at me."

(46)     On or about July 6, 2015, in a recorded telephone call, Adrian Jamal SPENCE agreed to supply Jamal LOCKLEY with 40 grams of heroin for distribution.

(47)     On or about July 6, 2015, in a recorded telephone call, Adrian Jamal SPENCE agreed to supply William JONES with 20 grams of heroin for distribution.

21

**JA61**

(48)    On or about July 6, 2015, in a recorded telephone call, Tiffany BAILEY told Adrian Jamal SPENCE that Dante BAILEY had been given a $100,000 bail and that she needed "like a thousand dollars." SPENCE agreed to bring the money to her.

(49)    From in or about July 6, 2015 until in or about July 16, 2015, in a series of recorded telephone calls, Dontray JOHNSON agreed to sell Adrian Jamal SPENCE a firearm and ammunition.

(50)    On or about July 7, 2015, in a recorded telephone call, Adrian Jamal SPENCE told Dante BAILEY that he had heard "somebody might be tryin' to set me up or something." BAILEY asked whether SPENCE wanted "to turn it up." SPENCE told BAILEY "it could be anybody." BAILEY again offered "turn it up" on "whoever" SPENCE thought it might be.

(51)    On or about July 8, 2015, in a recorded telephone call, Jamal SMITH told Adrian Jamal SPENCE to call Jamal LOCKLEY and tell him that the police had stopped LOCKLEY's "boys" by the golf course on Forest Park Avenue. In a subsequent recorded telephone call, SPENCE relayed the message to LOCKLEY.

(52)    On or about July 9, 2015, in a recorded telephone call, Adrian Jamal SPENCE agreed to supply William JONES with 14 grams of heroin for distribution.

(53)    On or about July 9, 2015, in a recorded telephone call, Adrian Jamal SPENCE agreed to supply Jamal SMITH with 100 grams of heroin for distribution. SMITH also asked SPENCE if he could use SPENCE's phone while he was out of town in order to make more drug sales.

(54)     On or about July 12, 2015, in the District of Columbia, Dante BAILEY and two unindicted co-conspirators possessed a loaded Glock .40 caliber firearm (serial number MBS765).

(55)     On or about July 20, 2015, Adrian Jamal SPENCE possessed with intent to distribute approximately 608 grams of heroin in a "stash house" used to store and package heroin that SPENCE supplied to other members and associates of MMP.

(56)     On or about July 21, 2015, in a recorded telephone call, Takuma TATE advised Adrian Jamal SPENCE of a suspicious person taking photographs who might be a police officer.

(57)     On or about July 21, 2015, in a recorded telephone call, Dante BAILEY ordered a known MMP member who was incarcerated in the Baltimore City Detention Center to assault another inmate as retaliation for cooperating with law enforcement against Dontray JOHNSON.  BAILEY told the MMP member: "You supposed to slap the shit out shorty. . . . Punish that nig\*\*, yo!  Punish that nig\*\*!"   The MMP member agreed to carry out the assault.  BAILEY said, "I got you.  I'll send you a money order. . . . Destroy that nig\*\*, yo!"

(58)     On or about July 22, 2015, at the BP gas station in the 5200 block of Windsor Mill Road, Dante BAILEY, now-deceased BGF member Dominick Kane, a/k/a "Fish," and an unindicted co-conspirator attempted to murder L.S.  BAILEY engaged L.S. in conversation while Kane and the unindicted co-conspirator approached in a vehicle and shot L.S. multiple times. ·In response, L.S.'s associates returned fire from another vehicle and hit Maurice POLLOCK, a/k/a "Reese," and now-deceased MMP member Brian Johnson, a/k/a "Nutty B."

(59)     On or about July 23, 2015, in a recorded telephone call, Adrian Jamal SPENCE told Jarmal HARRID what had happened at the BP gas station the previous

night.  SPENCE explained that "there was a nig** out there with the jeans and shit" (referring to

L.S.), and "Big Man" (*i.e.*, Dante BAILEY) and them was tryin' to really fix him up," but "while

they fixin' him up," the "nig*as that was with him" began shooting back and "hit Reese and

Nutty."  SPENCE added: "It was basically a shootout, for real. . . . Nig**s was really dumpin',

for real."  SPENCE also advised HARRID that around ten minutes before the shootout, members

of MMP had assaulted another individual, D.S., because he was selling drugs on their turf.  As

SPENCE described it: "Nig**s knocked yo out.  Whole jaw was hanging in a big-ass puddle of

blood."

    (60)  On or about July 27, 2015, in a recorded telephone call, Adrian

Jamal SPENCE agreed to supply Maurice POLLOCK with 20 grams of heroin for distribution.

    (61)  On or about July 27, 2015, Dante BAILEY and Dontray

JOHNSON discussed a drug debt JOHNSON owed to BAILEY.  JOHNSON sent BAILEY a

text message saying, "Is that going to clear my bill if not I need it to make a few more licks cause

I dont hav no work bro I'm down right now n need to get back up."  BAILEY responded, "Bill

cleared."

    (62)  On July 27, 2015, William BANKS sent a text message to Dante

BAILEY advising him to remove incriminating content from his Instagram page because "the

Feds got Instagram dummy u know that."

    (63)  On or about July 30, 2015, in a recorded telephone call, Adrian

Jamal SPENCE asked to purchase 50 grams of heroin for $4,000 from Takuma TATE.  TATE

told SPENCE that Jamal LOCKLEY was on his way to see a supplier, and he would let SPENCE

know the price.

24

(64)      On or about July 31, 2015, Adrian Jamal SPENCE possessed an Israel .40 caliber firearm (serial number 34319036) and $26,250 in U.S. currency.

(65)      On or about July 31, 2015, Dontray JOHNSON possessed with intent to distribute approximately 28 grams of heroin.  JOHNSON also possessed 70 rounds of .22 caliber ammunition, a bullet-proof vest, $1,480 in U.S. currency, and an "owe sheet" with a tally of drug debts owed by various MMP members and associates.

(66)      Between in or about July 2015 and in or about April 2016, Dante BAILEY attempted to recruit another inmate at the Baltimore County Detention Center to join MMP.  In undated papers recovered from the inmate's jail cell on April 8, 2016, BAILEY wrote: "The science behind being 25% Piru 75% MOB is a representation of our roots which is Piru & our bloodline which is Mafia.  EMM$ come before all.  M1 P2, I will murder you for Piru." BAILEY also recounted the history of MMP, beginning with its creation on March 2, 2009, when "Bad Guy," who was an "OOOG of TTP," set out "to separate the real brothers from the fake" after "the Don of Tree Top told the Feds on his brothers."  BAILEY continued: "In 2010, Bad Guy & Wolf [BAILEY] finally reunited in USP Lee County & the structure of the MOBB was put into effect. . . . Bad Guy & Wolf made history together for the MOBB by smashing the New York & New Jersey Blood sets in USP Lee, sending a message to the Bloods on the East Coast that we, Murdaland Mafia, run Murdaland."  BAILEY explained that by 2012, "Mobsters had taken over Greenmount and Ilchester, 27th and Boone, Lauretta & Warwick, & a part of North & Pulaski."  BAILEY also wrote about tattoos MMP members could earn: an "M" for "taking the Mafia oath," a lightning bolt for "killing for the MOB," a "pink rose" for a "Mafia wife," a "badge of honor" for a "Made Man," a "wolf imprint" for a "direct descendant of Werewolf, who has killed," or a "Mafia shield" for a "Capo of the MOBB."

25

(67)     On or about August 10, 2015, PATisDOPE published a rap video and one-on-one interview with Dante BAILEY, a/k/a "Gutta Almighty," to the social media website YouTube.  The rap video features BAILEY, William JONES, Jamal LOCKLEY, Dwight JENKINS, William BANKS, and other MMP members wearing items of red clothing and making gang signs at the intersection of Windsor Mill and Forest Park.  In the interview following the rap video, BAILEY insisted that his rap is "just real talk."  He described his crew at "Forest Park and Windsor Mill" as "get money boys," explaining: "You get out of line, you get ran over. We got teams for money and murder—whatever you want to do.  At the end of the day it's all about this money. We get money. If y'all ain't doin' it, you get lost."

(68)     On or about August 14, 2015, in a recorded telephone call, William JONES told Melvin LASHLEY that people were paying him respect in jail because of his membership in MMP.  JONES said: "Nig**s really respect our Mob in here . . . And the first thing they say is, 'Yo, you know that—what's that big nig** name with the tattoos, yo? Gutta [*i.e.*, Dante BAILEY]—that's him.' Nig**s really scared of him."

(69)     On or about August 23, 2015, in a recorded telephone call, an unknown female advised Adrian Jamal SPENCE that Dante BAILEY was "sending threats and sh**, talking about nig**s got to give up $150 every week."

(70)     On or about August 27, 2015, in the 2200 block of Ellamont Street, Takuma TATE possessed with intent to distribute approximately 10 grams of heroin, and possessed $2,314 in U.S. currency.

(71)     On or about August 28, 2015, in a recorded telephone call, William JONES asked Melvin LASHLEY where Shakeen DAVIS was.  LASHLEY told JONES that DAVIS was driving around with a "shoulder strap" (*i.e.*, long gun).

26

(72)     On or about August 30, 2015, in a recorded telephone call, Dominick WEDLOCK asked now-deceased MMP member Maurice Braham for Randy BANKS' phone number. WEDLOCK explained that he needed somewhere to stay while on home detention, and that BANKS had told WEDLOCK he could stay at BANKS' house. Braham told WEDLOCK that BANKS "keeps switching his numbers."

(73)     On or about August 30, 2015, in a recorded telephone call, Melvin LASHLEY told Dominick WEDLOCK about a recent incident in which an individual stole a drug sale worth $850 from Jamal LOCKLEY, and Dontray JOHNSON and another individual "beat the fu** out of him, broke his jaw and all that" and "beat his sister and his mother up."

(74)     On or about September 29, 2015, Dontray JOHNSON murdered MMP member Brian Johnson, a/k/a "Nutty B," because he refused to pay gang dues JOHNSON was collecting for Dante BAILEY and Tiffany BAILEY.  Melvin LASHLEY and Sydni FRAZIER were present at the scene.  Afterward, JOHNSON visited BAILEY at the Baltimore County Detention Center and recounted what happened.  In a recorded conversation, BAILEY approved the murder, saying "I told you about this . . . Blow a fu**ing head off! Blow another nig**'s head off! I said I'm through. . . . Don't play with 'em. Make 'em scared!"  JOHNSON assured BAILEY he would continue enforcing the gang dues and ordering MMP members to "kick that money out."  BAILEY instructed JOHNSON to "holler at Randy [BANKS] and tell him we raising the fourth generation. . . . We going at everybody. . . . We ain't fu**ing with nothing."  BAILEY also promised to put together a list of "who is who" in the gang and give it to JOHNSON and Randy BANKS.

(75)     On or about September 30, 2015, in a recorded telephone call, Melvin LASHLEY advised William JONES that "Nutty B" had been killed.  An unknown male

27

joined the call and asked whether the killing was "within the circle." LASHLEY replied in the affirmative, adding that he would "have to see y'all nig**s in person" because "I ain't talking on this phone."

(76)     On or about January 1, 2016, Dante BAILEY posted a photograph to his Instagram account that pictured BAILEY with William JONES, Jamal SMITH, and others, along with the comment "5 LAWS never hate, never steal, ride hard, never snitch, and die hard. 2 RULES get money or get lost in your own brain sauce. 5deuce life."

(77)     On or about January 1, 2016, Dante BAILEY posted a photograph to his Instagram account that pictured BAILEY with Adrian Jamal SPENCE, William JONES, Maurice POLLOCK, Melvin LASHLEY, and others, along with the comment "Roses are red power is black long stroke the fed's, fu** em we still going to count racks.  One of us get shoot , a lot of nig**s get whacked.  One of us turn rotten…. SSHHH…. We D money that."

(78)     On or about February 1, 2016, Tiffany BAILEY sent a letter to Dante BAILEY at the Baltimore County Detention Center and enclosed photographs picturing Dante BAILEY, Randy BANKS, Devon DENT, Dontray JOHNSON, Jay GREER, Takuma TATE, now-deceased MMP member Maurice Braham, a/k/a "Mookie," and other MMP members standing together making MMP gang signs.

(79)     On or about February 5, 2016, in the 2400 block of E. Fayette Street, Maurice POLLOCK possessed with intent to distribute heroin.

(80)     In an undated letter, a known MMP member wrote to Dante BAILEY, asking him to tell Tiffany BAILEY to send pictures of an MMP party they attended together with MMP members Melvin LASHLEY, William JONES, and Jacob BOWLING, "when me and you had on that red."  The MMP member continued: "I am pressing who ever and

28

doing what they suppose to be doing when I come home. Going in nig**s pockets. Just green

light them G." The MMP member also advised BAILEY that he "got a few more tatts on me G.

I got the 5-point crown on the right side of my face, the M on the left side of my face, team cash

on my leg, GMB on my left, WB on my leg, and 5200 big baby."

(81)     On or about February 6, 2016, an incarcerated TTP leader wrote to

Dante BAILEY, advising him that he would soon be publishing a sequel to "Frienemies" (a list

of friends and enemies of the gang). The TTP leader enclosed pictures of the dust jackets of

several books he had written, including (1) "Frienemies: Who Kan You Trust???"; (2)

"Frienemies 2: Still Kan't Trust Nobody," featuring a composite of the TTP leader's face and

BAILEY's face and the numbers "887" and "667" (the telephone touchtone equivalents of

"TTP" and "MMP"); and (3) "Shhh Stop Snitchin." In the same letter, the TTP leader accused

an unknown associate of "gossip, keeping sh** going, lying etc." and advised BAILEY that he

"made a mistake putting him on."

(82)     On or about February 25, 2016, Shakeen DAVIS posted a

photograph to his Instagram account, "creams_dinero," that pictured DAVIS holding a firearm

with an extended magazine, along with the comment "30 piece."

(83)     On or about February 25, 2016, Shakeen DAVIS posted a

photograph to his Instagram account that pictured DAVIS making an MMP gang sign, along

with the comment "MURDERLAND MAFIA MOBB THE WORLD IS OURS."

(84)     On or about March 10, 2016, near the intersection of Elsinore

Avenue and Clifton Avenue, Jamal LOCKLEY distributed approximately 14 grams of cocaine

base.

29

(85)     On or about March 22, 2016, Maurice POLLOCK distributed heroin to an undercover officer who pulled up to the gasoline pumps at the BP gas station in the 5200 block of Windsor Mill Road.

(86)     On or about March 24, 2016, near the intersection of Carlisle Avenue and Denison Street, Maurice POLLOCK distributed approximately 5 grams of heroin to an undercover agent.

(87)     On or about April 3, 2016, in a series of recorded telephone calls, Devon DENT and Ayinde DELEON discussed MMP business. DELEON advised DENT that Dante BAILEY would be having a bail review soon. DENT, who was incarcerated on state drug charges, advised DELEON to be careful because the undercover officer involved in his case "still be coming up there video-ing sh\*\*" and "nig\*\*s still be giving it to him." DELEON expressed concern that he might be targeted by police, saying, "I be out this bit\*\* all day every day too, you know, you feel me?" DENT assured DELEON the police would not "fu\*\* with" him because they were busy "fu\*\*ing with" someone else. DENT also gave DELEON a detailed description of the undercover officer so that DELEON could avoid making drug sales to him. In a subsequent call, DENT reminisced about an MMP party attended by Dante BAILEY, Tiffany BAILEY, Corloyd ANDERSON, and others. DENT recalled that they brought "an ounce of molly" (*i.e.*, 3,4-methylenedioxy-methamphetamine, or "MDMA") and "a quarter pound of loud" (*i.e.*, marijuana), and that he spent over $5,000 on the trip. DELEON and DENT discussed an associate who was in a car accident. DENT said he "was going to put [his drug] charge on him if he was dead" because "dead nig\*\*s can't really talk."

30

**JA70**

(88)   On or about April 4, 2016, near the intersection of Haddon Avenue and Woodbine Avenue, Maurice POLLOCK distributed approximately 5 grams of heroin to an undercover agent.

(89)   On or about April 4, 2016, in a recorded telephone call, Devon DENT told an unknown male: "I might need you to handle something for me, yo" because "Murda is acting scared and soft, yo."

(90)   On or about April 13, 2016, Dante BAILEY posted a photograph to his Instagram account, "5almighty_gang2," depicting a group of people holding handguns and assault weapons, along with the comment, "YALL READY FOR THE TAKEOVER. MM100." William BANKS replied: "Yup."

(91)   On or about April 13, 2016, in a recorded telephone call, Ayinde DELEON discussed smuggling drugs into a Baltimore jail for an incarcerated MMP member.  In the same telephone call, the incarcerated MMP member told DELEON about a conversation he had with Randy BANKS regarding MMP members who are "not in compliance."  The incarcerated MMP member told DELEON: "If the higher motherfu**ers that's over me tell me bop bop bop bop bop, yeah, you feel me, that's my obligation, I know what I signed up for.  So if you can't keep these nig**s in compliance, there's no need for them to even be a part of what we doing.  Straight up.  Gone."  DELEON agreed, saying: "I came home to a big disappointment."

(92)   On or about April 13, 2016, in a recorded telephone call, Devon DENT told Ayinde DELEON to call "Lil Man" and tell him he owes DENT "a PayPal" and "if he ain't got it, yo, tell his bit**ass don't come around the way no more or y'all gonna beat him up."

31

(93)     On or about April 14, 2016, near the intersection of Liberty Heights Avenue and Gwynn Oak Avenue, Delante LEE distributed cocaine base.

(94)     On or about April 21, 2016, near the intersection of Liberty Heights Avenue and Gwynn Oak Avenue, Delante LEE distributed cocaine base.  In a recorded conversation, LEE said he was going to purchase "four and a half ounces" of cocaine for $4,200 later that day.  LEE also said he had raw heroin for sale for $90 per gram.

(95)     On or about April 23, 2016, in a recorded telephone call between Devon DENT and Ayinde DELEON, DENT reminisced about when he, Dante BAILEY, William BANKS, and now-deceased MMP member James Edwards "used to just pull up on the block" like they were "untouchable."  DENT continued: "We used to ride around like the police couldn't touch us, I'm talking broad daylight, I'm talking about main streets too," like "Monroe" "Pratt," "Monument Street," and "Pennsylvania Avenue."  DELEON asked if they would "just walk around with a joint out or something."  DENT said "no, like, handling situations" or "hopping out and putting nig**s in they place. . . . like, 'Everybody lay the fu** down.'"

(96)     On or about April 23, 2016, Dante BAILEY posted a photograph of a handgun to his Instagram account with the comment, "Still hands on pretty pretty bitches."

(97)     On or about April 26, 2016, near the intersection of Security Boulevard and Gwynn Oak Avenue, Shakeen DAVIS possessed a stolen Glock .40 caliber handgun (serial number HHC901) and a loaded AR-15 rifle (serial number F071734).

(98)     On or about April 28, 2016, Dante BAILEY and Jamal LOCKLEY armed themselves and went looking to retaliate against members of a rival drug organization they believed were responsible for killing MMP member Maurice Braham, a/k/a "Mookie." BAILEY and LOCKLEY drove to the rival drug organization's territory, where they observed

32

Anthony Hornes, who they suspected—wrongly—had been involved in Braham's murder. BAILEY shot Hornes in the head, killing him.  LOCKLEY was the getaway driver.

(99)      On or about May 2, 2016, in the 2000 block of North Forest Park Avenue, Sydni FRAZIER offered to sell an "eight ball" of crack cocaine to an undercover officer.

(100)     On or about May 3, 2016, Dante BAILEY and Tiffany BAILEY went to an indoor shooting range, where they purchased 150 rounds of ammunition and rented a Ruger .22 caliber firearm (serial number 363-75990), a Springfield .45 caliber firearm (serial number MG500105), and a Beretta 9mm caliber firearm (serial number BER659285).  Dante BAILEY posted a video of himself firing one of the handguns to his Instagram account with the comment "ALMIGHTY LIFE [emojis of revolvers, explosions, 1000] BLACK BLOOD BROTHERHOOD."

(101)     On or about May 9, 2016, Dante BAILEY, Jacob BOWLING, Randy BANKS, Ayinde DELEON, and other MMP members attended a funeral for slain MMP member Maurice Braham, a/k/a "Mookie," and conducted ritualistic honors for him.  DELEON brought a red banner emblazoned with the letters "MMP," which was draped over Braham's casket.  At the viewing on May 8, 2016, Dante BAILEY hung a diamond-studded "M" necklace around Braham's neck.

(102)     On or about May 17, 2016, Ayinde DELEON discussed selling a 9mm caliber firearm—one of two he said he owned—in exchange for $450.  On or about June 1, 2016, in a recorded conversation, DELEON indicated he no longer wanted to sell the 9mm caliber firearm because he "need[ed] them" both.

33

(103)    On or about May 17, 2016, Dante BAILEY and Tiffany BAILEY possessed with intent to distribute approximately 94 grams of heroin.  Dante BAILEY also possessed (a) letters to and from MMP members discussing MMP business, (b) an autobiographical screenplay featuring the members of MMP and describing acts of violence very similar to ones MMP members are known to have carried out, and (c) a handwritten note containing the MMP oath and a list of disciplinary actions for "Level 1," "Level 2," and "Level 3" violations.

(104)    On or about June 2, 2016, in the 2300 block of Lyndhurst Avenue, Jacob BOWLING distributed approximately 6 grams of cocaine base.

(105)    On or about June 22, 2016, in a recorded telephone call, Dante BAILEY instructed Tiffany BAILEY to facilitate a narcotics transaction between two unknown individuals.  Tiffany BAILEY agreed to pick up a quantity of narcotics from an unknown individual on Lyndhurst Avenue.

(106)    On or about June 26, 2016, Dante BAILEY assaulted another inmate at the Correctional Treatment Facility, causing multiple fractures to his face.  In a recorded telephone call after the incident, BAILEY recounted the incident to Tiffany BAILEY, telling her "these motherfu**ers . . . scared of me right now."

(107)    On or about July 2, 2016, in a recorded telephone call, Jamal LOCKLEY advised Dwight JENKINS that Melvin LASHLEY was "throwing threats to them nig**s" and "talking 'bout he gonna kill all y'all, I'm gonna kill all y'all."

(108)    On or about July 7, 2016, in a recorded telephone call, Ayinde DELEON discussed a plot to smuggle narcotics into the Eastern Correctional Institute for a known MMP member.

34

(109)   On or about July 8, 2016, in the 2300 block of Lyndhurst Avenue, Jacob BOWLING sold approximately 13 grams of cocaine base in exchange for $800.

(110)   On or about July 10, 2016, in a recorded telephone call, Malcolm LASHLEY told Jacob BOWLING that everyone was out making drug sales, and that BOWLING should join them because "we need that girl [*i.e.*, cocaine] out here."

(111)   On or about July 12, 2016, in a series of recorded telephone calls, an unknown person told Jacob BOWLING that he had found BOWLING's firearm in the couch and moved it to a cabinet.  BOWLING told the unknown person to be careful because the firearm was loaded with "one in the nose."

(112)   On or about July 12, 2016, in a recorded telephone call, Jacob BOWLING told a drug customer he had "eight balls" of cocaine base for sale.

(113)   On or about July 13, 2016, in a recorded telephone call, Malcolm LASHLEY told an unindicted co-conspirator that he was out every day making drug sales with Melvin LASHLEY and Jacob BOWLING.  He went on: "You know them two, they got the girl [*i.e.*, cocaine] right now; I'm the only one really with the boy [*i.e.*, heroin]."

(114)   On or about July 19, 2016, in a recorded telephone call, Malcolm LASHLEY told Jacob BOWLING that a drug customer was on her way and looking to buy four grams of cocaine base.  BOWLING said: "Alright, I'm 'bout to put it together now."

(115)   On or about July 24, 2016, in a recorded telephone call, William JONES told Jacob BOWLING that an incarcerated MMP member wanted William BANKS "to get sanctioned" because he had not followed through on a promise to put money on the MMP member's PayPal account.  BOWLING replied: "Alright, say no more. . . . I'm gonna take care of that."

(116)    On or about July 24, 2016, in a recorded telephone call, Jamal LOCKLEY told Melvin LASHLEY he was coming to get "cruddy cracks" from him. LASHLEY told LOCKLEY that they were already gone, but that he had $140 for LOCKLEY.

(117)    On or about July 26, 2016, Jamal LOCKLEY caused the distribution of heroin to S.R., who overdosed on the heroin and was resuscitated by paramedics.

(118)    On or about July 27, 2016, in a series of recorded telephone calls, Melvin LASHLEY and Jamal LOCKLEY discussed acquiring an additional supply of narcotics from a stash house operator.  LASHLEY advised Jamal LOCKLEY to be "careful" because of a vehicle in the area they believed was being operated by federal agents.

(119)    On or about July 28, 2016, in the 3100 block of Mondawmin Mall, Jacob BOWLING sold approximately 33 grams of cocaine base in exchange for $2,200.

(120)    On or about August 1, 2016, in a recorded telephone call, Jamal LOCKLEY told Corloyd ANDERSON he was "[t]rying to see what we can scrape up" so he could purchase a supply of narcotics.  ANDERSON told LOCKLEY he "definitely gotta holla at me today."

(121)    On or about August 3, 2016, in a recorded telephone call, Jamal LOCKLEY advised Corloyd ANDERSON that Jamal SMITH heard there was a rumor going around that ANDERSON was cooperating with law enforcement.  ANDERSON demanded to know who started the rumor.

(122)    On or about August 3, 2016, in a recorded telephone call, Jacob BOWLING told Corloyd ANDERSON he needed to get a supply of narcotics before "nine-o-clock when we open" the drug shop.

36

(123)    On or about August 4, 2016, Sydni FRAZIER sent a drug customer a text message accusing the customer of stealing from him, warning that he knew where the customer lived, and threatening to "make u feel this when I run into u."

(124)    On or about August 6, 2016, in a recorded telephone call, Melvin LASHLEY and William JONES talked about collecting money from MMP members to pay for JONES' legal fees.  LASHLEY said: "If nig**s don't have any money . . . they're going to get beat and rolled out."  LASHLEY said he would "holler at Creams," *i.e.*, Shakeen DAVIS, to see if he would contribute money.

(125)    On or about August 7, 2016, Ayinde DELEON offered to sell a quarter pound of marijuana to a customer for $950.

(126)    On or about August 9, 2016, in a recorded telephone call, Tiffany BAILEY told Jamal LOCKLEY that she needed LOCKLEY to put money on a Green Dot card. LOCKLEY agreed.

(127)    In or about August 2016, Dante BAILEY directed the murder of Ricardo Johnson based on a belief that he was cooperating with law enforcement.  On or about August 10, 2016, Sydni FRAZIER and one or more co-conspirators abducted, bound, and murdered Johnson, and then attempted to set his body on fire.  Later that day, FRAZIER fled from police and discarded the two murder weapons—a Smith & Wesson 9mm caliber firearm (serial number HAE0456) and a Taurus 9mm caliber firearm (serial number TJN73204).

(128)    On or about August 11, 2016, in a recorded telephone call, Jamal LOCKLEY agreed to sell two grams of heroin to a drug customer in exchange for $190.

(129)    On or about August 19, 2016, in a recorded telephone call, Dante BAILEY and Jamal LOCKLEY conspired to murder William BANKS based on a belief that he

37

was cooperating with law enforcement in a federal case against Adrian Jamal SPENCE.
BAILEY directed LOCKLEY to have a known MMP member carry out the murder.
Subsequently, Tiffany BAILEY encouraged BANKS to meet with the MMP member who Dante
BAILEY suggested should carry out the murder.

(130)   On or about August 25, 2016, in the 2800 block of Mohawk
Avenue, Jacob BOWLING sold approximately 58 grams of cocaine base in exchange for $2,800.

(131)   On or about September 21, 2016, in a recorded telephone call,
Maurice POLLOCK and Malcolm LASHLEY discussed MMP business.  POLLOCK asked
LASHLEY to put money on his jail phone account.  LASHLEY told POLLOCK that he was out
on Dickey Hill Road with Sydni FRAZIER trying to make drug sales.  LASHLEY talked about
the reopening of the BP gas station in the 5200 block of Windsor Mill Road, which had been
padlocked by Baltimore City earlier in the year due to persistent criminal activity on the
premises.  LASHLEY explained that ever since "the stores opened back up, . . . we been out
trying to get to whitey" (*i.e.*, trying to make drug sales).  LASHLEY recounted that "the other
day . . . we was all outside . . . on Forest Park . . . stopping the traffic."  He boasted that cocaine
sales were "picking back up" and that he had sold a full ounce of marijuana "in a day and a half .
. . all dimes, bagged up."  LASHLEY also used coded language to advise POLLOCK that "one
of the blickies"—*i.e.*, guns—"came up missing today . . . from up the laundry," where they had
stashed it.  POLLOCK said, "I hope it wasn't none of my blickies."

(132)   On or about September 22, 2016, in a recorded telephone call,
Ayinde DELEON discussed a plot to smuggle narcotics into a Baltimore City jail for Devon
DENT and another known MMP member.

38

(133)   On or about September 27, 2016, Corloyd ANDERSON possessed a loaded, stolen Glock 9mm firearm (serial number MNN356) and $2,500 in U.S. currency.

(134)   On or about September 27, 2016, Ayinde DELEON possessed with intent to distribute approximately 100 grams of marijuana and possessed drug trafficking paraphernalia, $1,301 in U.S. currency, a stun gun, and letters from Devon DENT instructing DELEON how to smuggle narcotics into jail for DENT by disguising it as legal mail.

(135)   On or about September 27, 2016, Jacob BOWLING possessed a Glock 9mm caliber magazine, drug trafficking paraphernalia, and photographs of himself with other members of MMP.

(136)   On or about October 13, 2016, in the 600 block of Winans Way, Malcolm LASHLEY distributed heroin to an undercover officer.

(137)   On or about October 17, 2016, in the 4300 block of Woodridge Avenue, Malcolm LASHLEY distributed fentanyl to an undercover officer.

(138)   On or about October 24, 2016, near the intersection of Crimea Road and Windsor Mill Road, Malcolm LASHLEY distributed fentanyl and cocaine base to an undercover officer.

(139)   On or about October 31, 2016, near the 5200 block of Windsor Mill Road, Malcolm LASHLEY distributed heroin to an undercover officer.

(140)   On or about November 3, 2016, in the parking lot of Beechfield Elementary School, Malcolm LASHLEY distributed fentanyl and heroin to an undercover officer.

(141)   On or about November 16, 2016, in the parking lot of Beechfield Elementary School, Malcolm LASHLEY distributed heroin to an undercover officer.

(142)   On or about November 22, 2016, Malcolm LASHLEY possessed with intent to distribute heroin and marijuana.

(143)   On or about December 27, 2016, Sydni FRAZIER distributed heroin to a drug customer who later sent FRAZIER a text message complaining about the quality of the heroin.  FRAZIER replied: "U can come get ya money and never call me cuz I know what i m working wit I watched my uncle shoot a small bit of that and almost OD so for u to say what your saying your lying."

(144)   On or about January 1, 2017, a known MMP member sent Tiffany BAILEY a direct message on Instagram saying he "shot at [an individual] and his home boys last night" and he "need[ed] big brother [*i.e.*, Dante BAILEY] to holla at me."  Tiffany BAILEY replied, "Erase this and I'm going to call u."

(145)   On or about January 5, 2017, Sydni FRAZIER sent a "blast" text message to numerous drug customers to advertise the quality of heroin he had for sale, saying: "hey wassup it's Perry from forest park BP I have a new phone and I'm giving out testers of the boy and it's super fire guaranteed satisfied."

(146)   On or about January 8, 2017, Delante LEE attempted to murder B.W. because he lingered on MMP's drug turf after being asked to leave.  LEE chased B.W. into oncoming traffic, firing multiple shots at him and striking him once in the arm.  Shortly afterward, LEE shot himself as he was attempting to put away the gun.

(147)   On or about January 22, 2017, Sydni FRAZIER distributed heroin to J.A., who overdosed on the heroin and required overnight hospitalization.  On January 23, 2017, J.A. sent FRAZIER text messages saying: "I'm in the hospital.  Whatever was in that stuff gave me a blood infection. . . . I'm in excruciating pain.  In 12 years of doin this I ain't never

40

seen nothing like this. . . ." FRAZIER replied, "what the fu** that's crazy," but then proceeded to advertise more heroin he had for sale.

(148)   On or about January 25, 2017, Sydni FRAZIER possessed with intent to distribute approximately 5 grams of heroin and fentanyl.

(149)   On or about January 26, 2017, in a recorded telephone call, Sydni FRAZIER asked Shakeen DAVIS to call one of FRAZIER's drug customers and collect a $1,000 drug debt for him. DAVIS agreed. FRAZIER added: "He know my name by my other name [*i.e.*, "Perry"]. He ain't gonna know my legit name."

(150)   On or about February 24, 2017, Shakeen DAVIS possessed with intent to distribute approximately 25 grams of cocaine base and possessed a loaded, stolen Sig Sauer .22 caliber firearm (serial number T148576) and $1,373 in U.S. currency.

(151)   In an undated letter, Dante BAILEY wrote to an unknown MMP member, advising him that he had "failed to follow the protocol" and that, "for the next 90 days I will keep a close eye on you." BAILEY went on to explain: "Everyone who says the Omerta Code is royalty. That is not for everyone anymore. When your cheeks get kissed, you become a Made Man. . . . You are a Made Man who runs his own table now. This means you need a U.B. [Under Boss], a Capo, & a LT [Lieutenant]. . . . Those 3 positions become Made Men also. You must kiss there [sic] cheeks. They must be able to spit the 2 M's." In a postscript to the letter, BAILEY wrote: "Fu** this case. No matter what happens, I'll still be a legend."

18 U.S.C. §1962(d)

41

## NOTICE OF SPECIAL SENTENCING FACTORS—COUNT ONE

From at least in or about 2011 through the date of this Second Superseding Indictment, in the

District of Maryland and elsewhere, the defendants herein,

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"
DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"
ADRIAN JAMAL SPENCE, a/k/a "Spittle," a/k/a "SP," a/k/a "AJ,"
RANDY BANKS, a/k/a "Dirt,"
AYINDE DELEON, a/k/a "Murda," a/k/a "Yin,"
JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid,"
JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"
CORLOYD ANDERSON, a/k/a "Bo,"
DEVON DENT, a/k/a "Tech,"
TIFFANY BAILEY, a/k/a "Tiff,"
TAKUMA TATE, a/k/a "Oop," a/k/a "Ook,"
MAURICE POLLOCK, a/k/a "Reese,"
SHAKEEN DAVIS, a/k/a "Creams,"
DELANTE LEE, a/k/a "Tay Tay,"
SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry," and
MALCOLM LASHLEY, a/k/a "Spook."**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with

others known and unknown to the Grand Jury to knowingly and intentionally distribute and

possess with intent to distribute one kilogram or more of a mixture or substance containing a

detectable amount of heroin, a Schedule I controlled substance, and 280 grams or more of a

mixture or substance containing a detectable amount of cocaine base, a Schedule II controlled

substance, in violation of Sections 841(a)(1), (b)(1)(A) and 846 of Title 21, United States Code.

42

## COUNT TWO
### (Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1–15 and 17–33 of Count One of this Second Superseding Indictment are re-alleged and incorporated by reference as though fully set forth herein.

2.      From at least in or about 2011 through the date of this Second Superseding Indictment, in the District of Maryland and elsewhere, the defendants herein,

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**
**DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**
**RANDY BANKS, a/k/a "Dirt,"**
**AYINDE DELEON, a/k/a "Murda," a/k/a "Yin,"**
**JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid,"**
**JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"**
**CORLOYD ANDERSON, a/k/a "Bo,"**
**DEVON DENT, a/k/a "Tech,"**
**TIFFANY BAILEY, a/k/a "Tiff,"**
**TAKUMA TATE, a/k/a "Oop," a/k/a "Ook,"**
**MAURICE POLLOCK, a/k/a "Reese,"**
**SHAKEEN DAVIS, a/k/a "Creams,"**
**DELANTE LEE, a/k/a "Tay Tay,"**
**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry," and**
**MALCOLM LASHLEY, a/k/a "Spook,"**

did knowingly and willfully combine, conspire, confederate, and agree with each other and with others known and unknown to the Grand Jury to knowingly and intentionally distribute and possess with intent to distribute one kilogram or more of a mixture or substance containing a detectable amount of heroin, a Schedule I controlled substance; 280 grams or more of a mixture or substance containing a detectable amount of cocaine base, a Schedule II controlled substance; a mixture or substance containing a detectable amount of fentanyl, a Schedule II controlled substance; a mixture or substance containing a detectable amount of cocaine, a Schedule II controlled substance, and a mixture or substance containing a detectable amount of marijuana, a Schedule I controlled substance; in violation of Section 841(a)(1), (b)(1)(A), (b)(1)(C) of Title 21, United States Code.

21 U.S.C. § 846

43

## COUNT THREE
### (Murder in Aid of Racketeering)

The Grand Jury for the District of Maryland further charges that:

1.     Paragraphs 1–15 and 17–33 of Count One are re-alleged and incorporated by reference as though fully set forth herein.

2.     At all times relevant to this Second Superseding Indictment, MMP, including its leadership, members, and associates, constituted an "enterprise" as defined in Section 1959(b)(2) of Title 18, United States Code, that is, a group of individuals associated in fact that engaged in, and the activities of which affected, interstate and foreign commerce.  The enterprise constitutes an ongoing organization whose members and associates function as a continuing unit for a common purpose of achieving the objectives of the enterprise.

3.     The MMP enterprise, through its members and associates, engaged in racketeering activity, as defined in Sections 1959(b)(1) and 1961(1) of Title 18, United States Code, that is, acts involving murder, extortion, and robbery, in violation of Maryland law; offenses involving dealing in controlled substances, in violation of Sections 841 and 846 of Title 21, United States Code, and acts of money laundering, witness tampering, and witness retaliation indictable under Sections 1512, 1513, and 1956 of Title 18, United States Code.

4.     On or about February 12, 2015, in the District of Maryland, the defendant,

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**

for the purpose of maintaining and increasing position in MMP, an enterprise engaged in racketeering activity, feloniously, willfully, and with deliberate premeditated malice, murdered James Edwards, by using a firearm to shoot James Edwards, which crime constituted murder under Maryland Code, Criminal Law §§ 2-201 and 2-204, and the Common Law of Maryland, all in violation of Section 1959(a)(1) of Title 18, United States Code.

18 U.S.C. § 1959(a)(1)
18 U.S.C. § 2

44

## **COUNT FOUR**

### (Use of a Firearm Resulting in Death During and in Relation to a Crime of Violence and in Furtherance of a Drug Trafficking Crime)

The Grand Jury for the District of Maryland further charges that:

On or about February 12, 2015, in the District of Maryland, the defendant,

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**

did knowingly use, carry, brandish and discharge a firearm during and in relation to a crime of

violence for which he may be prosecuted in a court of the United States—specifically, murder in

aid of racketeering, in violation of Section 1959(a)(1) of Title 18, United States Code, as set

forth in Count Three of this Second Superseding Indictment, which is incorporated herein; and

did knowingly, intentionally, and unlawfully possess, brandish, and discharge a firearm in

furtherance of a drug trafficking crime—specifically, conspiracy to distribute controlled

substances, in violation of Section 846 of Title 21, United States Code, as set forth in Count Two

of this Second Superseding Indictment, which is incorporated herein; and in the course of a

violation of Section 924(c) of Title 18, United States Code, did cause the death of a person,

James Edwards, through the use of a firearm, which killing constituted murder in the first degree,

as defined in Section 1111 of Title 18, United States Code.

18 U.S.C. § 924(c)
18 U.S.C. § 924(j)
18 U.S.C. § 1111
18 U.S.C. § 2

45

## COUNT FIVE

### (Possession with Intent to Distribute Heroin)

The Grand Jury for the District of Maryland charges that:

On or about July 31, 2015, in the District of Maryland, the defendant,

**DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**

knowingly and intentionally possessed with intent to distribute a mixture or substance containing

a detectable amount of heroin, a Schedule I controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

46

**JA86**

## COUNT SIX

**(Felon in Possession of Ammunition)**

The Grand Jury for the District of Maryland charges that:

On or about July 31, 2015, in the District of Maryland, the defendant,

**DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce 70 rounds of .22 caliber ammunition, in

violation of Section 922(g) of Title 18, United States Code.

18 U.S.C. § 922(g)

47

**JA87**

## COUNT SEVEN

**(Felon in Possession of a Firearm and Ammunition)**

The Grand Jury for the District of Maryland charges that:

On or about July 31, 2015, in the District of Maryland, the defendant,

**ADRIAN JAMAL SPENCE, a/k/a "Spittle," a/k/a "SP," a/k/a "AJ,"**

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce a firearm, that is, one Desert Eagle .40

caliber semi-automatic pistol with serial number 34319036, and ammunition, in violation of

Section 922(g) of Title 18, United States Code.

18 U.S.C. § 922(g)

48

**JA88**

## COUNT EIGHT

### (Murder in Aid of Racketeering)

The Grand Jury for the District of Maryland further charges that:

1.      Paragraphs 1–15 and 17–33 of Count One, and paragraphs 2 and 3 of Count

Three, are re-alleged and incorporated by reference as though fully set forth herein.

2.      On or about September 29, 2015, in the District of Maryland, the defendant,

**DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**

for the purpose of maintaining and increasing position in MMP, an enterprise engaged in

racketeering activity, feloniously, willfully, and with deliberate premeditated malice, murdered

Brian Johnson, by using a firearm to shoot Brian Johnson, which crime constituted murder under

Maryland Code, Criminal Law §§ 2-201 and 2-204, and the Common Law of Maryland, all in

violation of Section 1959(a)(1) of Title 18, United States Code.

18 U.S.C. § 1959(a)(1)
18 U.S.C. § 2

49

**JA89**

## COUNT NINE

**(Use of a Firearm Resulting in Death During and in Relation to a Crime of Violence and in Furtherance of a Drug Trafficking Crime)**

The Grand Jury for the District of Maryland further charges that:

On or about September 29, 2015, in the District of Maryland, the defendant,

**DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**

did knowingly use, carry, brandish and discharge a firearm during and in relation to a crime of

violence for which he may be prosecuted in a court of the United States—specifically, murder in

aid of racketeering, in violation of Section 1959(a)(1) of Title 18, United States Code, as set

forth in Count Eight of this Second Superseding Indictment, which is incorporated herein; and

did knowingly, intentionally, and unlawfully possess, brandish, and discharge a firearm in

furtherance of a drug trafficking crime—specifically, conspiracy to distribute controlled

substances, in violation of Section 846 of Title 21, United States Code, as set forth in Count Two

of this Second Superseding Indictment, which is incorporated herein; and in the course of a

violation of Section 924(c) of Title 18, United States Code, did cause the death of a person, Brian

Johnson, through the use of a firearm, which killing constituted murder in the first degree, as

defined in Section 1111 of Title 18, United States Code.

18 U.S.C. § 924(c)
18 U.S.C. § 924(j)
18 U.S.C. § 1111
18 U.S.C. § 2

50

**JA90**

## COUNT TEN

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about March 10, 2016, in the District of Maryland, the defendant,

### JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of cocaine base, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

51

**JA91**

## COUNT ELEVEN

### (Distribution of Heroin)

The Grand Jury for the District of Maryland charges that:

On or about March 22, 2016, in the District of Maryland, the defendant,

### MAURICE POLLOCK, a/k/a "Reese,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of heroin, a Schedule I controlled substance, in violation of Section 841(a)(1)

of Title 21, United States Code.

21 U.S.C. § 841

52

## COUNT TWELVE

**(Distribution of Heroin)**

The Grand Jury for the District of Maryland charges that:

On or about March 24, 2016, in the District of Maryland, the defendant,

**MAURICE POLLOCK, a/k/a "Reese,"**

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of heroin, a Schedule I controlled substance, in violation of Section 841(a)(1)

of Title 21, United States Code.

21 U.S.C. § 841

53

## **COUNT THIRTEEN**

### **(Distribution of Heroin)**

The Grand Jury for the District of Maryland charges that:

On or about April 4, 2016, in the District of Maryland, the defendant,

### **MAURICE POLLOCK, a/k/a "Reese,"**

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of heroin, a Schedule I controlled substance, in violation of Section 841(a)(1)

of Title 21, United States Code.

21 U.S.C. § 841

54

**JA94**

## COUNT FOURTEEN

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about April 14, 2016, in the District of Maryland, the defendant,

### DELANTE LEE, a/k/a "Tay Tay,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of cocaine base, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

55

**JA95**

## COUNT FIFTEEN

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about April 21, 2016, in the District of Maryland, the defendant,

### DELANTE LEE, a/k/a "Tay Tay,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of cocaine base, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

56

**JA96**

## COUNT SIXTEEN

### (Felon in Possession of Firearms and Ammunition)

The Grand Jury for the District of Maryland charges that:

On or about April 26, 2016, in the District of Maryland, the defendant,

### SHAKEEN DAVIS, a/k/a "Creams,"

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce the following firearms and ammunition:

a) a Glock .40 caliber handgun with serial number HHC901, and ammunition, and

b) an AR-15 rifle with serial number F071734, and ammunition,

in violation of Section 922(g) of Title 18, United States Code.

18 U.S.C. § 922(g)

57

## COUNT SEVENTEEN

### (Felon in Possession of Firearms and Ammunition)

The Grand Jury for the District of Maryland charges that:

On or about May 3, 2016, in the District of Maryland, the defendant,

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce the following firearms and ammunition:

    c)  a Ruger .22 caliber handgun with serial number 363-75990,

    d)  50 rounds of .22 caliber ammunition,

    e)  a Springfield .45ACP caliber handgun with serial number MG500105, and

    f)  50 rounds of 9mm caliber ammunition,

in violation of Section 922(g) of Title 18, United States Code.

18 U.S.C. § 922(g)

## COUNT EIGHTEEN

### (Possession with Intent to Distribute Heroin)

The Grand Jury for the District of Maryland charges that:

On or about May 17, 2016, in the District of Maryland, the defendants,

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf," and
TIFFANY BAILEY, a/k/a "Tiff,"**

knowingly and intentionally possessed with intent to distribute a mixture or substance containing

a detectable amount of heroin, a Schedule I controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841
18 U.S.C. § 2

59

**JA99**

## COUNT NINETEEN

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about June 2, 2016, in the District of Maryland, the defendant,

### JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of cocaine base, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

60

**JA100**

## <u>COUNT TWENTY</u>

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about July 8, 2016, in the District of Maryland, the defendant,

**JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"**

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of cocaine base, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

61

**JA101**

## COUNT TWENTY-ONE

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about July 28, 2016, in the District of Maryland, the defendant,

### JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"

knowingly, intentionally, and unlawfully distributed 28 grams or more of a mixture or substance

containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation

of Section 841(a)(1), (b)(1)(B) of Title 21, United States Code.

21 U.S.C. § 841

62

**JA102**

## COUNT TWENTY-TWO

### (Felon in Possession of Firearms and Ammunition)

The Grand Jury for the District of Maryland charges that:

On or about August 10, 2016, in the District of Maryland, the defendant

**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry,"**

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce, a Smith & Wesson MP 9mm caliber

firearm bearing serial number HAE0466, loaded with 18 rounds of ammunition, and a Taurus PT

111G2 9mm caliber firearm bearing serial number TJN73204, loaded with 12 rounds of

ammunition, in violation of Section 922(g) of Title 18, United States Code.

18 U.S.C. § 922(g).

**JA103**

## COUNT TWENTY-THREE

### (Distribution of Cocaine Base)

The Grand Jury for the District of Maryland charges that:

On or about August 25, 2016, in the District of Maryland, the defendant,

**JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"**

knowingly, intentionally, and unlawfully distributed 28 grams or more of a mixture or substance

containing a detectable amount of cocaine base, a Schedule II controlled substance, in violation

of Section 841(a)(1), (b)(1)(B) of Title 21, United States Code.

21 U.S.C. § 841

64

## COUNT TWENTY-FOUR

### (Felon in Possession of a Firearm and Ammunition)

The Grand Jury for the District of Maryland charges that:

On or about September 27, 2016, in the District of Maryland, the defendant,

### CORLOYD ANDERSON, a/k/a "Bo,"

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce a Glock 9mm caliber firearm with serial

number MNN356, and ammunition, in violation of Section 922(g) of Title 18, United States

Code.

18 U.S.C. § 922(g)

65

**JA105**

## COUNT TWENTY-FIVE

### (Possession with Intent to Distribute Marijuana)

The Grand Jury for the District of Maryland charges that:

On or about September 27, 2016, in the District of Maryland, the defendant,

### AYINDE DELEON, a/k/a "Murda," a/k/a "Yin,"

knowingly and intentionally possessed with intent to distribute a mixture or substance containing

a detectable amount of marijuana, a Schedule I controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

JA106

## COUNT TWENTY-SIX

### (Distribution of Fentanyl)

The Grand Jury for the District of Maryland charges that:

On or about October 17, 2016, in the District of Maryland, the defendant,

### MALCOLM LASHLEY, a/k/a "Spook,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of fentanyl, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

67

**JA107**

## COUNT TWENTY-SEVEN

### (Distribution of Heroin and Fentanyl)

The Grand Jury for the District of Maryland charges that:

On or about November 3, 2016, in the District of Maryland, the defendant,

### MALCOLM LASHLEY, a/k/a "Spook,"

knowingly, intentionally, and unlawfully distributed a mixture or substance containing a

detectable amount of heroin, a Schedule I controlled substance, and a detectable amount of

fentanyl, a Schedule II controlled substance, in violation of Section 841(a)(1) of Title 21, United

States Code.

21 U.S.C. § 841

68

## COUNT TWENTY-EIGHT

**(Possession and Discharging of a Firearm in Furtherance of a Drug Trafficking Crime)**

The Grand Jury for the District of Maryland charges that:

On or about January 8, 2017, in the District of Maryland, the defendant,

**DELANTE LEE, a/k/a "Tay Tay,"**

did knowingly possess and discharge a firearm in furtherance of a drug trafficking crime, to wit:

conspiracy to distribute and possess with intent to distribute controlled substances, in violation of

Section 846 of Title 21, United States Code, as charged in Count Two of this Second

Superseding Indictment, which is incorporated by reference.

18 U.S.C. § 924(c)
18 U.S.C. § 2
18 U.S.C. § 3

## COUNT TWENTY-NINE

### (Possession with Intent to Distribute Heroin and Fentanyl)

The Grand Jury for the District of Maryland charges that:

On or about January 25, 2017, in the District of Maryland, the defendant,

### SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry,"

knowingly and intentionally possessed with intent to distribute a mixture or substance containing

a detectable amount of heroin, a Schedule I controlled substance, and a detectable amount of

fentanyl, a Schedule II controlled substance, in violation of Section 841(a)(1) of Title 21, United

States Code.

21 U.S.C. § 841

70

## COUNT THIRTY

**(Felon in Possession of a Firearm and Ammunition)**

The Grand Jury for the District of Maryland charges that:

On or about February 24, 2017, in the District of Maryland, the defendant,

**SHAKEEN DAVIS, a/k/a "Creams,"**

having been convicted of a crime punishable by imprisonment for a term exceeding one year, did

knowingly possess in and affecting interstate commerce a Sig Sauer .22 caliber firearm with

serial number T148576, and ammunition, in violation of Section 922(g) of Title 18, United

States Code.

18 U.S.C. § 922(g)

71

**JA111**

## COUNT THIRTY-ONE

**(Possession with Intent to Distribute Cocaine Base)**

The Grand Jury for the District of Maryland charges that:

On or about February 24, 2017, in the District of Maryland, the defendant,

**SHAKEEN DAVIS, a/k/a "Creams,"**

knowingly and intentionally possessed with intent to distribute a mixture or substance containing

a detectable amount of cocaine base, a Schedule II controlled substance, in violation of Section

841(a)(1) of Title 21, United States Code.

21 U.S.C. § 841

**JA112**

## COUNT THIRTY-TWO

### (Possession of a Firearm in Furtherance of a Drug Trafficking Crime)

The Grand Jury for the District of Maryland charges that:

On or about February 24, 2017, in the District of Maryland, the defendant,

### SHAKEEN DAVIS, a/k/a "Creams,"

did knowingly possess a firearm in furtherance of a drug trafficking crime, to wit: conspiracy to

distribute and possess with intent to distribute controlled substances, in violation of Section 846

of Title 21, United States, as charged in Count Two of this Second Superseding Indictment; and

possession with intent to distribute cocaine base, in violation of Section 841 of Title 21, United

States Code, as charged in Count Thirty-One of this Second Superseding Indictment, both of

which are incorporated by reference.

18 U.S.C. § 924(c)

73

**JA113**

## **FORFEITURE**

RICO Forfeiture

1.      Pursuant to Section 1963 of Title 18, United States Code, upon conviction of an

offense in violation of Section 1962 of Title 18, United States Code, the defendants

**DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**
**DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**
**ADRIAN JAMAL SPENCE, a/k/a "Spittle," a/k/a "SP," a/k/a "AJ,"**
**RANDY BANKS, a/k/a "Dirt,"**
**AYINDE DELEON, a/k/a "Murda," a/k/a "Yin,"**
**JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid,"**
**JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"**
**CORLOYD ANDERSON, a/k/a "Bo,"**
**DEVON DENT, a/k/a "Tech,"**
**TIFFANY BAILEY, a/k/a "Tiff,"**
**TAKUMA TATE, a/k/a "Oop," a/k/a "Ook,"**
**MAURICE POLLOCK, a/k/a "Reese,"**
**SHAKEEN DAVIS, a/k/a "Creams,"**
**DELANTE LEE, a/k/a "Tay Tay,"**
**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry," and**
**MALCOLM LASHLEY, a/k/a "Spook,"**

shall forfeit to the United States of America:

a.      any interest acquired or maintained in violation of section 1962;

b.      any interest in, security of, claim against, or property or contractual right of any
        kind affording a source of influence over, any enterprise which the defendants
        established, operated, controlled, conducted, or participated in the conduct of, in
        violation of section 1962; and

c.      any property constituting, or derived from, any proceeds obtained, directly or
        indirectly, from racketeering activity or unlawful debt collection in violation of
        1962.

2.      The interests of the defendant subject to forfeiture to the United States pursuant to

Section 1963(a)(1), (a)(2), and (a)(3) of Title 18, United States Code, include, but are not limited

to a sum of money representing the amount of the gross proceeds received by the defendants

74

**JA114**

derived from racketeering activity as alleged in this Second Superseding Indictment, for which each of the defendants are jointly and severally liable.

Drug Trafficking Forfeiture

3.       Pursuant to Section 853 of Title 21, United States Code, upon the conviction of an offense in violation of Sections 841 or 846 of Title 21, United States Code, the defendants,

> **DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**
> **DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**
> **RANDY BANKS, a/k/a "Dirt,"**
> **AYINDE DELEON, a/k/a "Murda," a/k/a "Yin,"**
> **JAMAL LOCKLEY, a/k/a "T-Roy," a/k/a "Droid,"**
> **JACOB BOWLING, a/k/a "Jakey," a/k/a "Ghost," a/k/a "Fred,"**
> **CORLOYD ANDERSON, a/k/a "Bo,"**
> **MELVIN LASHLEY, a/k/a "Menace,"**
> **DEVON DENT, a/k/a "Tech,"**
> **TIFFANY BAILEY, a/k/a "Tiff,"**
> **TAKUMA TATE, a/k/a "Oop," a/k/a "Ook,"**
> **MAURICE POLLOCK, a/k/a "Reese,"**
> **SHAKEEN DAVIS, a/k/a "Creams,"**
> **DELANTE LEE, a/k/a "Tay Tay,"**
> **SYDNI FRAZIER, a/k/a "Sid," a/k/a "Perry," and**
> **MALCOLM LASHLEY, a/k/a "Spook,"**

shall forfeit to the United States:

a.       Any property constituting, or derived from, any proceeds obtained directly or indirectly as the result of the offense; and

b.       Any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense.

4.       Such property shall include, but not be limited to, a sum of money equal to the proceeds obtained, directly or indirectly, as the result of the violations of Section 846 of Title 21, United States Code, as charged in Count Two of this Second Superseding Indictment, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained as a result of the conspiracy to violate the Controlled Substances Act, for which the defendants are jointly and severally liable.

**JA115**

Firearm Forfeiture

5.      Upon conviction of the offenses in violation of Sections 922(g) and 924(c) of

Title 18, United States Code, set forth in Counts Four, Five, Seven, Eight, Ten, Eleven, Eighteen,

Nineteen, Twenty-Four, Twenty-Six, Thirty, Thirty-Two, and Thirty-Four of this Second

Superseding Indictment, the defendants,

> **DANTE BAILEY, a/k/a "Gutta," a/k/a "Almighty," a/k/a "Wolf,"**
> **DONTRAY JOHNSON, a/k/a "Gambino," a/k/a "Bino," a/k/a "Tray,"**
> **ADRIAN JAMAL SPENCE, a/k/a "Spittle," a/k/a "SP," a/k/a "AJ,"**
> **CORLOYD ANDERSON, a/k/a "Bo,"**
> **SHAKEEN DAVIS, a/k/a "Creams,"**

shall forfeit to the United States pursuant to Section 924(d) of Title 18, United States Code, and

Section 2461(c) of Title 28, United States Code, any firearms and ammunition involved in the

commission of the offenses.

Substitute Assets

6.      If any of the property described above, as a result of any act or omission of the

defendants:

>     a.   cannot be located upon the exercise of due diligence;
>
>     b.   has been transferred or sold to, or deposited with, a third party;
>
>     c.   has been placed beyond the jurisdiction of the court;
>
>     d.   has been substantially diminished in value; or
>
>     e.   has been commingled with other property that cannot be divided without
>
>          difficulty;

76

the United States shall be entitled to forfeiture of substitute property pursuant to Sections 853(p)

of Title 21, United States Code, and Section 1963(m) of Title 18, United States Code, as

incorporated by Section 2461(c) of Title 28, United States Code.

21 U.S.C. § 853
18 U.S.C. § 1963
28 U.S.C. § 2461(c)
18 U.S.C. § 924(d)

_Stephen Schenning / CAlt_

_____
STEPHEN M. SCHENNING
ACTING UNITED STATES ATTORNEY

A TRUE BILL:

_6/1/17_____
Date

**SIGNATURE REDACTED**

_____
Foreperson

77

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Criminal No. CCB-16-0267 |
| | * | |
| DANTE D. BAILEY, *et al*. | * | |
| | ******* | |

## ORDER

For the reasons stated in open court on April 15, 2019, and with the consent of defendant Sydni Frazier, a mistrial for manifest necessity is declared as to Mr. Frazier only. The charges against Mr. Frazier are severed. A retrial will be scheduled at a later date. *See United States v. Von Spivey*, 895 F.2d 176 (4th Cir. 1990).

Further, the oral motions for mistrial made on behalf of defendants Randy Banks, Jamal Lockley, and Corloyd Anderson are denied. As explained on the record, most of the evidence against Mr. Frazier would have been admissible against his alleged co-conspirators even if he had not been participating in the trial up until today. Appropriate jury instructions will be given to eliminate any minimal risk of unfair prejudice.

So Ordered this _15_ day of April, 2019.

_____
/s/
Catherine C. Blake
United States District Judge

1

**JA118**



CAH/LEP USAO#2016R00363

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2019 JUL 30  PM 4: 29

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

AT BALTIMORE

BY_____DEPUTY

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Criminal No. CCB-16-0267** |
| **v.** | : | |
| | : | **(Conspiracy to Distribute Controlled** |
| **SYDNI FRAZIER,** | : | **Substances, 21 U.S.C. § 846;** |
| a/k/a "Sid," | : | **Possession of a Firearm in** |
| a/k/a "Junior Boss," | : | **Furtherance of a Drug Trafficking** |
| a/k/a "Perry," | : | **Crime Resulting in Death, 18 U.S.C. §** |
| **Defendant.** | | **924(j); Possession with Intent to** |
| | | **Distribute Controlled Substances, 21** |
| | | **U.S.C. § 841; Possession of Firearms** |
| | | **by a Felon, 18 U.S.C. § 922(g); Aiding** |
| | | **and Abetting, 18 U.S.C. § 2;** |
| | | **Forfeiture)** |

## THIRD SUPERSEDING INDICTMENT

### COUNT ONE

**(Conspiracy to Distribute and Possess with Intent to Distribute Controlled Substances)**

The Grand Jury for the District of Maryland charges that:

From at least in or about 2011 through the date of this Third Superseding Indictment, in

the District of Maryland and elsewhere, the defendant,

**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Junior Boss," a/k/a "Perry,"**

did knowingly and willfully combine, conspire, confederate, and agree with others known and

unknown to the Grand Jury to knowingly and intentionally distribute and possess with intent to

distribute one kilogram or more of a mixture or substance containing a detectable amount of

heroin, a Schedule I controlled substance; 280 grams or more of a mixture or substance

containing a detectable amount of cocaine base, a Schedule II controlled substance; a mixture or

1

substance containing a detectable amount of fentanyl, a Schedule II controlled substance; and a

mixture or substance containing a detectable amount of cocaine, a Schedule II controlled

substance, in violation of Section 841(a)(1), (b)(1)(A), (b)(1)(C) of Title 21, United States Code.

21 U.S.C. § 846

2

## COUNT TWO

### (Possession of a Firearm in Furtherance of a Drug Trafficking Crime Resulting in Death)

The Grand Jury for the District of Maryland further charges that:

On or about August 10, 2016, in the District of Maryland, the defendant,

### SYDNI FRAZIER, a/k/a "Sid," a/k/a "Junior Boss," a/k/a "Perry,"

did knowingly, intentionally, and unlawfully possess, brandish, and discharge a firearm in

furtherance of a drug trafficking crime—specifically, conspiracy to distribute controlled

substances, in violation of Section 846 of Title 21, United States Code, as set forth in Count One

of this Third Superseding Indictment, which is incorporated herein; and in the course of a

violation of Section 924(c) of Title 18, United States Code, did cause the death of a person,

Ricardo Johnson, through the use of a firearm, which killing constituted murder in the first

degree, as defined in Section 1111 of Title 18, United States Code.

18 U.S.C. § 924(c)
18 U.S.C. § 924(j)
18 U.S.C. § 1111
18 U.S.C. § 2

3

**JA121**

## COUNT THREE

### (Felon in Possession of Firearms)

The Grand Jury for the District of Maryland charges that:

On or about August 10, 2016, in the District of Maryland, the defendant,

**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Junior Boss," a/k/a "Perry,"**

knowing he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year, knowingly possessed firearms, namely, a Smith & Wesson MP 9mm caliber firearm bearing serial number HAE0466, and a Taurus PT 111G2 9mm caliber firearm bearing serial number TJN73204, and the possession of the firearms was in and affecting interstate commerce, in violation of Section 922(g) of Title 18, United States Code.

18 U.S.C. § 922(g).

4

**JA122**

## COUNT FOUR

**(Possession with Intent to Distribute Heroin and Fentanyl)**

The Grand Jury for the District of Maryland charges that:

On or about January 25, 2017, in the District of Maryland, the defendant,

**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Junior Boss," a/k/a "Perry,"**

knowingly and intentionally possessed with intent to distribute a mixture or substance containing

a detectable amount of heroin, a Schedule I controlled substance, and a detectable amount of

fentanyl, a Schedule II controlled substance, in violation of Section 841(a)(1) of Title 21, United

States Code.

21 U.S.C. § 841

5

**JA123**

## FORFEITURE

### Drug Trafficking Forfeiture

1.      Pursuant to Section 853 of Title 21, United States Code, upon the conviction of an offense in violation of Sections 841 or 846 of Title 21, United States Code, the defendant,

**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Junior Boss," a/k/a "Perry,"**

shall forfeit to the United States:

    a.      Any property constituting, or derived from, any proceeds obtained directly or indirectly as the result of the offense; and

    b.      Any property used or intended to be used, in any manner or part, to commit, or to facilitate the commission of, such offense.

2.      Such property shall include, but not be limited to, a sum of money equal to the proceeds obtained, directly or indirectly, as the result of the violations of Section 846 of Title 21, United States Code, as charged in Count One of this Third Superseding Indictment, and all interest and proceeds traceable thereto, representing the amount of proceeds obtained as a result of the conspiracy to violate the Controlled Substances Act, for which the defendants are jointly and severally liable.

### Firearm Forfeiture

3.      Upon conviction of the offenses in violation of Sections 922(g) and 924(j) of Title 18, United States Code, set forth in Counts Two and Three of this Third Superseding Indictment, the defendant,

**SYDNI FRAZIER, a/k/a "Sid," a/k/a "Junior Boss," a/k/a "Perry,"**

shall forfeit to the United States pursuant to Section 924(d) of Title 18, United States Code, and Section 2461(c) of Title 28, United States Code, any firearms and ammunition involved in the commission of the offenses.

**JA124**

Substitute Assets

4.       If any of the property described above, as a result of any act or omission of the

defendant:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property that cannot be divided without

      difficulty;

the United States shall be entitled to forfeiture of substitute property pursuant to Sections 853(p)

of Title 21, United States Code, and Section 1963(m) of Title 18, United States Code, as

incorporated by Section 2461(c) of Title 28, United States Code.

21 U.S.C. § 853
18 U.S.C. § 1963
28 U.S.C. § 2461(c)
18 U.S.C. § 924(d)


*Robert K Hur / up*

ROBERT K. HUR
UNITED STATES ATTORNEY

A TRUE BILL:

*30 JUL / 9*
_____
Date

**SIGNATURE REDACTED**
_____
Foreperson

7

**JA125**

### UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF MARYLAND

**UNITED STATES OF AMERICA**          :

     **v.**                                      :

                        **Crim. No.:  CCB-16-cr-267**

**SYDNI FRAZIER**                          :

### MOTION TO SUPPRESS TANGIBLE EVIDENCE

Sydni Frazier, through counsel, moves this Honorable Court to suppress all tangible evidence seized as a result of the warrantless search of 961 Bennett Place, Baltimore, Maryland.  In support he states the following.

### STATEMENT OF FACTS

1.  On November 15, 2017, at approximately 4:36 PM, Detective Sean Suiter died of a self-inflicted gunshot wound to his head.  This occurred in the rear yard of 961 Bennett Place, in Baltimore, Maryland.

2.  According to body camera footage obtained from the Baltimore City Swat Team that entered 961 Bennett Place, the house was forcibly entered on November 16, 2017 at 14:48 pm.[1]  This was a warrantless entry of the house.  After this illegal entry and subsequent illegal search, a search warrant was obtained.  *See*, Ex. 1. The affidavit in support of the search warrant included details of the Swat Team's observations from the warrantless entry. *See*, Ex. 1 at page 4.

---

[1] This time stamp from the body camera must be in error because the warrant was executed at 11:40 am on November 16, 2017. *See*, Ex 1 at page 5.  The affidavit for the warrant references observations made in the house prior to obtaining the warrant.  The Swat team used a crow bar device to break the door open.   The Swat Team was obviously the first law enforcement team to enter the house.

3.   According to the affidavit submitted in support of the search warrant,

Detective Joseph Brown, Jr. wrote, "Due to the proximity of this location and

evidence of suspected blood leading to this location, said dwelling was entered for

emergency and well-being check of a possible secondary victim." *See* Ex. 1 at page

4.  The affidavit described the house as "a three-story vacant dwelling with a stucco

exterior, ..." *Id.*

4.   The house had new windows which were covered (from the inside of the

house) with plywood.  The front entrance had a modern door with two locks,

including a deadbolt lock.  The window to the right of the door had a "No

Trespassing" sign in it.  Clearly the intent of those in control of the house was to

keep people from looking inside, as well as preventing them from entering.

5.   The Swat Team forcibly entered the house through the front door.  Once

inside, they saw that the house was being renovated.  There were several types of

tools, bags of concrete mix, tiles, and rolls of insulation.  The house was being

rewired.  There was couch in one room and clothing thrown in another room.  The

officers observed a Taurus box for a firearm, .25 caliber ammunition, .38 caliber

ammunition, suspected CDS and paraphernalia, cell phones, a laptop, and a safe.

All of this information was detailed in the affidavit filed in support of the search

warrant.  *See*, Ex.1 at page 4.

6.   The house was owned by an acquaintance of Frazier's mother.  Sydni

Frazier, his mom and her boyfriend, the owner of the home, all lived there together

as Sydni was growing up.  The owner went to jail and while incarcerated, gave the

2

**JA127**

house to the Sydni's Mom in exchange for her paying taxes on the property.  Mr.

Frazier was actively assisting in the renovations of the house up until his arrest in

January of 2017.  He had a key to enter the premises, as well as permission to come

and go as he pleased.

7.  Malcolm Lashley testified at trial that he met Frazier at that location on a

couple of occasions. He saw Frazier go into the house, but he did not go into the

house with Frazier.

8.  The statement in the affidavit that there was "suspected blood leading to

this location, was deceptive at best.  While there was blood in the backyard, it did

not lead to the dwelling.

## ARGUMENT

A. *STANDING*

9.  In order to have standing to object to a search on Fourth Amendment

grounds, the defendant must have a "reasonable expectation of privacy in the place

to be searched." *See Rakas v. Illinois,* 439 U.S. 128, 143 (1978). The relevant inquiry

becomes 1) whether the defendant has a subjective expectation of privacy in the

place to be searched; and 2) whether that expectation is objectively reasonable. *See*

*United States v. Horowitz,* 806 F.2d 122, 1225 (4th Cir. 1986).

10.  Here, Frazier was actively involved in renovating the house.  He had

permission to enter and work on the house and he had a key to enter the locked

dwelling.  This is not a situation where the house was abandoned.  Frazier kept

tools and work materials in the house and his ATM card was located within the premises.

B.  *The Warrantless Search Was Illegal*

11.  The most basic principle of Fourth Amendment jurisprudence is that warrantless searches and seizures are presumptively illegal.  *Brigham City v. Stuart,* 547 U.S. 398, 403, 126 S.Ct. 1943, 164 L.Ed.2d 650 (2006). There are, of course, exceptions to the warrant requirement when exigent circumstances justify the warrantless entry of a home.  *Mincey v. Arizona,* 437 U.S. 385, 392–94, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978).

12.  In *Kentucky v. King*, 563 U.S. 452, the Supreme Court noted that there are three broad categories of "exigent circumstances" which serve as exceptions to the warrant requirement.  One of the exceptions is the "emergency aid" exception, permitting entry to render emergency assistance to an injured occupant or to protect an occupant from imminent injury.  *Id.*  at 459-62.  Under this more general emergency-as-exigency approach, in order for a warrantless search to pass constitutional muster, "the person making entry must have had an objectively reasonable belief that an emergency existed that required immediate entry to render assistance or prevent harm to persons or property within**."** *United States v. Moss,* 963 F.2d 673, 678 (4th Cir. 1992). An objectively reasonable belief must be based on specific articulable facts and reasonable inferences that could have been drawn therefrom. See *Mora v. City of Gaithersburg, 519 F.3d 216, 224* (4th Cir. 2008) *(citing Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

13.  For example, in *United States v.* Taylor, 624 F.3d 626, 630-633 (2011) the Fourth Circuit concluded that exigent circumstances permitted an officer to enter a residence to return a four-year-old child found wondering along a busy street in order to determine if her caretaker required assistance.

14.  In this case, the officers had not a single articulable fact that someone might be in the residence **and** that individual may require aid.  Indeed, Detective Brown described the premise as "vacant" and his statement that there was "suspected blood leading to this location" was not accurate.  Furthermore, the warrantless entry was made a day after the incident in the backyard.  There simply was no exigent circumstance justifying the warrantless search.

## <u>CONCLUSION</u>

For the reasons stated herein, Mr. Frazier moves this Court to suppress all evidence recovered as a result of the warrantless, illegal search of 961 Bennett Place.


Respectfully submitted,


/s/_____
Christopher M. Davis #23441
Counsel for Sydni Frazier

Davis & Davis
1350 Connecticut Avenue, NW
Suite 202
Washington, DC 20036
202.234.7300

**JA130**

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of this motion was served upon all counsel of record via the Court's CM/ECF System on this 14th day of August 2019.

/s/_____
Christopher M. Davis

CIRCUIT COURT

OR

DISTRICT COURT OF MARYLAND FOR BALTIMORE CITY

*WAtch Contbr control #*
*37180*

APPLICATION FOR SEARCH AND SEIZURE WARRANT
FORM 02 / 188

To the Honorable Judge (a) _Devr Russell_ of the (b) _Dstrt Ct_
the undersigned being duly sworn deposes and says that he (they) has (have) reason to believe

that on the premises known as (c) __961 Bennett Place is described as a three story vacant dwelling with a stucco exterior, with a white side entry door and the numbers "961" affixed to same__

in the City of Baltimore there is now being concealed certain property, namely;

(d) __: One Taurus box for a firearm, multiple .25 caliber Magtech ammunition, multiple .38 caliber ammunition, a wheel to a .38 caliber firearm, suspected CDS and paraphernalia, multiple cell phones, a laptop, and a safe and any and all evidence__

which is (are) evidence relating to the commission of a crime pertaining to (e) __Attempted 1st Degree Murder of Sean Suiter__

AND that the facts tending to establish grounds for issuance of Search Warrant are set forth in the Affidavit (s) attached thereto and made a part thereof WHEREFORE your Affiant(s) pray(s) that a Search and Seizure Warrant be issued for said

(f) __961 Bennett Place is described as a three story vacant dwelling with a stucco exterior, with a white side entry door and the numbers "961" affixed to same__

(g) _____ _6573_
Signature of Affiant

(h) ___Detective___
Official Rank or Title (if any)

Sworn to before me and subscribed to in my presence this _16th_ day of _March_, 20_17_

_____
JUDGE

Date: 11/16/2017

**JA132**

# CIRCUIT COURT FOR BALTIMORE CITY
## OR
## DISTRICT COURT OF MARYLAND FOR BALTIMORE CITY

SEARCH AND SEIZURE WARRANT
FORM 02 / 187

TO:      Any Police Officer of Baltimore City:

The affidavit having been made before me by  (a)   Detective Joseph Brown, Jr  , said Affidavit being incorporated by reference into this warrant and made a part thereof, that he (they) has (have) reason to believe that on the premises known as  (b)   961 Bennett Place is described as a three story vacant dwelling with a stucco exterior, with a white side entry door and the numbers "961" affixed to same

in the City of Baltimore, there is now being concealed certain property, namely;
(c)   One Taurus box for a firearm, multiple .25 caliber Magtech ammunition, multiple .38 caliber ammunition, a wheel to a .38 caliber firearm, suspected CDS  and paraphernalia, multiple cell phones, a laptop, and a safe

which is (are)    evidence relating to the commission of a crime pertaining to

(d)    Attempted 1st Degree Murder of Sean Suiter CR 2 202

and I am satisfied that there is probable cause to believe that the property so described is being concealed on the **person** above described and that the foregoing grounds for issuance of the search warrant exists.
You are therefore commanded, with the necessary and proper assistance, to search forthwith the **person** herein above described for the property specified, executing this warrant and making the search; and if the property be found there, to seize it; and if upon execution of this warrant, there are found persons then and there engaged in the commission of a crime, arrest those so participating; leaving a copy of this warrant with the inventory of the property seized and returning copy of said warrant and inventory, if any, to me within ten days after execution of this warrant; or, if not served, to return this warrant to me promptly, but not later than five days after this expiration, as required by law.

Dated this (e) _____ 16 _____ day of ___ November ___, __ 17 __

SIGNED _____
JUDGE

**Unannounced Entry Authorization**
Good cause being shown therefore, the executing law enforcement officers are authorized to enter the premises to be searched without giving notice of their authority and purpose.

Dated this (e) _____ day of _____, _____

SIGNED _____
JUDGE

Date. 11/16/2017

**JA133**

## EXPERTISE

Your Affiant Detective Joseph Brown, Jr. has been a duly sworn police officer with the Baltimore Police Department since January 10, 2000.  During that time your Affiant has worked both uniformed and plain clothes capacities. Your Affiant's current assignment is in the Criminal Investigation Division investigating homicides, non-fatal shootings, robberies (armed/unarmed), serious aggravated assaults, parental abductions and burglaries.  Your Affiant has received the following training; interview and interrogation, recovering deoxyribonucleic acid through non intrusive oral swabs as well as the 40 hours of annual in-service training through the Education and Training Section of the Baltimore Police Department.  Prior to my current assignment your Affiant was assigned to the Northwest District Drug Enforcement Unit tasked with the duties of investigation various levels of narcotics related activity.  Your Affiant has been qualified in the Circuit, District and Juvenile Courts to testify as it relates to the investigation of non-fatal shootings, robberies (armed/unarmed), serious aggravated assaults, parental abductions and burglaries.  Your Affiant has authored over 30 search and seizures warrants during my tenure as a Police Officer.

**JA134**

### AFFADIVIT

On Wednesday, November 15, 2017 at 4:36 PM, the Homicide Section was contacted and advised that Western District Units were on the scene of an officer involved shooting in the 900 block of Bennett Place. Members of the Homicide Section responded and assumed command of the investigation of the incident. The victim being identified as Baltimore Police Detective Sean Suiter who was being transported to University of Maryland Shock Trauma Center for treatment of a gunshot wound to the head.

The scene was located and secured within the rear yard of 961 Bennett Place, where the victim was located and consisted of the following evidence Detective Suiter's departmental firearm and departmental radio. The dwelling of 961 Bennett Place is described as a three story vacant dwelling with a stucco exterior, with a white side entry door and the numbers "961" affixed to same.

Due to the close proximity of this location and evidence of suspected blood leading to this location, said dwelling was entered for emergency and well-being check of a possible secondary victim. Once entry was made investigators observed in plain view the following items were located on the main level; One Taurus box for a firearm, multiple .25 caliber Magtech ammunition, multiple .38 caliber ammunition, a wheel to a .38 caliber firearm, suspected CDS and paraphernalia, multiple cell phones, a laptop, and a safe were also observed in the unoccupied dwelling.

Based upon the aforementioned items being observed your affiant is requesting a search and seizure warrant to recover said items in efforts to identify possible witnesses and or suspects as same may relate as evidence in the Attempted Murder of Baltimore Police Detective Sean Suiter. This dwelling identified as 961 Bennett Place is described as a three story vacant dwelling with a stucco exterior, with a white side entry door and the numbers "961" affixed to same is located in Baltimore City, Maryland.

_6 577_

_____
Signature of Affiant

Sworn to before me and subscribed to in my presence this _16_ day of _November_, 2017

_____
JUDGE

**JA135**

## RETURN

I received the attached Search Warrant (f) __November 6th__ , 20_17_

and have executed it as follows:

On (g) _November 16th_, 20_17_ , at __11:40__  o'clock __AM__

I searched the **premises** described in the warrant and I left a copy of the warrant containing
the inventory with (h) __Left at dwelling__

(name of person searched or name of owner "at the place of search")

The following is an inventory taken pursuant to the warant:

(i)

| | |
|---|---|
| 17041644 | Various packaging materials |
| 17041645 | Candle |
| 17041648 | ATM Card |
| 17041653 | Black Sentry Safe Serial # X105PJ02801352256A |
| 17041655 | Black frame mirror with residue |
| 17041656 | Live cartridge (1) |
| 17041657 (1) | Swabs of suspected blood |
| 17041657 (2) | Swabs of suspected DNA |
| 17041683 | Empty Taurus Box |
| 17041684 | Gateway Laptop |
| 17041685 | Black Springfield Amory Holster |
| 17041686 | Black Sidekick Holster |
| 17041687 | Black/Blue phone |
| 17041688 | Clear plastic gloves (2) |
| 17041689 | Verizon Jetpack |
| 17041690 | Clear plastic gloves |
| 17041691 (1) | Box of 42 live cartridges |
| 17041691 (2) | Live cartridge |
| 17041691 (3) | Saucony shoebox cont. one loose live round, one empty magazine, one clear plastic bag with 8 live cartridges, and one box of twenty-one live cartridges |
| 17041691 (4) | Revolver cylinder |

This inventory was made in the presence of (j) __Det. Frank Miller__  and  __MCLT Lombard__

I swear that this inventory is a true and detailed account of all property taken by me on
the warrant.

(k) _____

Signature of affiant

Subscribed, sworn to and returned before me this _____ day

of _____ , 20 _____

_____
JUDGE

Date: 11/27/2017

# JA136

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 1:16-cr-00267-CCB** |
| | : | |
| **SYDNI FRAZIER,** | : | |
| | : | |
| **Defendant** | : | |

### DEFENDANT'S REPLY IN SUPPORT OF
### MOTION TO SUPPRESS EVIDENCE SEIZED FROM 961 BENNETT PLACE

On November 16, 2017, a team of Baltimore Police Department officers broke down the locked front door of 961 Bennett Place, and searched that home without a warrant. Rather than argue that this intrusion was permissible under the Fourth Amendment, the Government contends that Sydni Frazier lacks standing to contest this entry because he did not have a legitimate, reasonable expectation of privacy in the home. This argument misconstrues the facts and relevant law.

**I.    Mr. Frazier had a reasonable expectation of privacy in 961 Bennett Place based on his renovation of the home at the owner's request.**

It is undisputed that at the time the police entered and searched the home at 961 Bennett Place, Karim Faruq was named on the deed as the owner of that property. Faruq had previously lived at that home with Mr. Frazier and Mr. Frazier's mother, Lisa Bess. Bess will testify at the motions hearing that she planned to redevelop the house for use as an assisted living facility. She will further testify that in 2017 she had Faruq's permission to use and renovate the house, that she had power of attorney for matters related to the house, and, crucially, that Mr. Frazier was carrying out renovations to the house at her behest prior to his arrest.

There is documentary support for Bess's claim of interest in the home. First, on September 27, 2017 (less than two months before the warrantless entry), Bess and Faruq filed a

letter with the Baltimore City Circuit Court asking for an extension of time in which to pay back taxes on the property. *See* Correspondence from Bess and Faruq, attached hereto as Exhibit A. Notably, in the letter Bess said that she has "had this property for 25 years" and "have invested in the property." Ex. A at 1. Second, during the relevant period, the Housing Authority of Baltimore City continued to send notices of housing code violations at 961 Bennett Place to Karim Enterprises (a venture connected to Faruq). For example, in March 2016 the City sent Karim Enterprises a citation for failing to file an annual registration of a vacant structure. In fact, the Housing Authority sent a code violation to Karim Enterprises as recently as December 2019. *See* Exhibit 12 to Government's Opposition to the Defendant's Motion to Suppress Evidence Seized From 961 Bennett Place, p. 16-20.

The observations of the SWAT officers who entered the home on November 16 confirm that it was secured against intruders and that renovations were underway. Footage from the body-worn digital cameras of the officers who conducted the search makes clear that they were entering a building with new windows and a front door with a functioning lock. Once inside the home, the officers saw building supplies such as concrete mix, tiles, and rolls of insulation. One of the officers stated the obvious when he said, "Looks like there's no walls—it's under construction."

Bess and Faruq's authorization for Mr. Frazier to renovate the home, and especially their giving him a key to the functioning lock on the front door, distinguishes Mr. Frazier's circumstances from those in the cases the Government cites concerning what constitutes a reasonable expectation of privacy. Mr. Frazier does not resemble, for example, the bootlegger in *Chicco v. United States*, 284 F. 434 (4th Cir. 1922), who stored contraband liquor on the property of another and "disclaimed any connection with or relationship to the premises from

which [the incriminating evidence] w[as] obtained." *Id.* at 436. Mr. Frazier asserts emphatically his connection to these premises.

Mr. Frazier's deep connection to 961 Bennett Place likewise distinguishes him from the defendants who were using properties in which they had no proprietary interest solely for illicit purposes. Here, there is evidence supporting the fact that the property at issue was Mr. Frazier's childhood home, that up to the time of his arrest, Mr. Frazier continued to sometimes stay there overnight[1], and that Mr. Frazier was renovating the house for use as an assisted care facility on behalf of the owners. Notably, the cases the Government cites where courts found no reasonable expectation of privacy involve fact patterns where defendants were using the property of another *solely* as a place to commit crimes. *See, e.g., United States v. Gray*, 491 F.3d 138, 154 (4th Cir. 2007) ("Askew's purpose at 4511 Altizer Avenue was patently commercial"); *Minnesota v. Carter*, 525 U.S. 83, 90, (1998) (defendants were using another person's apartment "simply [as] a place to do business); *United States v. Gamez–Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) ("[a]n individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location"). While there may be evidence suggesting that drugs were used or distributed at the house, evidence of illicit activity does not vitiate a person's reasonable expectation of privacy in a property they have used as a home. (Indeed, it is commonly the discovery of evidence of illicit activity that prompts an individual's assertion of his Fourth Amendment rights. *See United States v. Rock*, No. 10-CR-247, 2011 WL 2945801, *3

---

[1] The fact that Mr. Frazier *sometimes* stayed at the home of his girlfriend and her mother in Catonsville does not prove that he *never* stayed at 961 Bennett Place. Indeed, the facts that the Government points to in order to support its allegation that Mr. Frazier was using 961 Bennett Place as a location from which to sell drugs, in particular, the allegation that Mr. Frazier incorporated the street address into his email address (lilsid961@gmail.com), point to Mr. Frazier's close association with that home.

(E.D. Wisc. May 26, 2011)). Here, while the evidence may show that Mr. Frazier had illicit

purposes in occupying 961 Bennett Place, actually relevant to the instant motion is that the

evidence clearly demonstrates that this was the home in which he had grown up, which his

mother continued to control, and which he still occupied for the purposes of conducting

renovations to the property and as an occasional overnight guest. These circumstances make Mr.

Frazier's subjective expectation of privacy objectively reasonable, whereas the expectations of

the defendants from the cases the Government cites were not.

**II.      Mr. Frazier did not voluntarily abandon 961 Bennett Place.**

The Government argues that Mr. Frazier voluntarily relinquished any expectation of

privacy in 961 Bennett Place when he did not return to the home while he was incarcerated. The

argument fails because Mr. Frazier's absence was not voluntary.

Almost all search and seizure cases where the abandonment exception to the warrant

requirement arises concern relatively small things like backpacks, which a suspect might throw

while running from the police. "The privacy interest in a dwelling is not so easily extinguished."

*United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). As such, "[b]efore the government

may cross the threshold of a home without a warrant, there must be clear, unequivocal

and unmistakable evidence that the property has been abandoned. Only then will such a search

be permitted." *United States v. Harrison*, 689 F.3d 301, 309 (3d Cir. 2012)

The primary case on which the Government relies for this point is *United States v.*

*Stevenson*, 396 F.3d 538 (4th Cir. 2005). There, the police arrested Stevenson on January 20. The

next day, Stevenson wrote his ex-girlfriend and expressly transferred to her ownership of all

property he had left behind in her apartment. In the letter he also described himself as "the

former renter" of the apartment. *Id*. at 541. Three days thereafter, police searched the apartment.

The Fourth Circuit affirmed the district court's denial of the motion to suppress, finding that

Stevenson's voluntary and express disclaimer of any interest in the apartment or its contents

made his expectation of privacy in the apartment unreasonable. Mr. Frazier took no such steps

vis-à-vis 961 Bennett Place and any property he might have stored therein. His arrest and

incarceration were not voluntary. As such, his involuntary "abandonment" of the home cannot be

considered "clear, unequivocal, and unmistakable."

**III.    The Baltimore Police did not have a reasonable belief that they were entering an abandoned home when the breached the door at 961 Bennett Place.**

Mr. Frazier has established—as evidenced by his mother's possessory interest in the

home, the intact doors and windows that kept intruders out of the home, the key he had that

allowed him to come and go from the home as he pleased, and his efforts to renovate the house

and store renovation materials in the home—that he had a reasonable expectation of privacy in

961 Bennett Place. These facts also demonstrate that 961 Bennett Place was not abandoned. The

Government can still prevail, however, if the Government can show that the officers reasonably

believed that the house was abandoned. *See Harrison*, 689 F.3d at 309. But in the circumstances

present here, such a belief would not have been reasonable.

The facts that establish the reasonableness of Mr. Frazier's expectation of privacy in 961

Bennett Place all mitigate against the reasonableness of the officers' belief that the property was

abandoned. Of particular import is the fact that the doors to the house were secured with

functional locks and the windows were intact and backed by plywood. *Contra McKenney v.

Harrison*, 635 F.3d 354 (8th Cir. 2011) (officers reasonably believed building was abandoned

where house was in state of disrepair and back door was open allowing officers to see inside and

observe signs that building was deserted). Additionally, the decrepitude of a home by itself does

not support a reasonable belief that the home was abandoned. In a similar context, the Third

Circuit noted:

> It is unreasonable to assume that a poorly maintained home is an abandoned
> home. A one-time look at 2114 North Franklin Street in its dilapidated condition
> would not justify the police entering it without a warrant because a reasonably
> cautious officer would only assume that the person who occupied the home did
> not maintain it as they should, not that they had clearly manifested an intent to
> relinquish their expectation of privacy in the house. There simply is no
> "trashy house exception" to the warrant requirement.

*Harrison*, 689 F.3d at 311.

Finally, the Housing Authority's determination that this was an abandoned property, and

the efforts by that agency to take possession of the property that the Government chronicles in its

brief, are immaterial unless this history was known to the officers at the time they entered the

building. In this way, the facts here distinguish this case from *Harrison*, in which the Third

Circuit permitted the search in large part because the officer entering the building had been in it

before and knew the inside to be as dilapidated as the outside.

The most similar case to the facts at issue here is *United States v. Spence*, No. CR 16-

20622, 2017 WL 877339 (E.D. Mich. Mar. 6, 2017). In *Spence*, Detroit police chased a man with

a gun into a house, arrested him, brought him out of the house, then reentered the house to search

for the gun. The house was in deplorable condition: there was no rear door; the lot was

overgrown and littered with garbage; the electric meter was missing and the house was without

electricity; there were several holes in the ceiling; a refrigerator was taped shut "with what

sounded like a rat inside"; and the toilet and bathtub were full of apparent urine and feces.

Notwithstanding the property's condition, the district court granted the defendant's motion to

suppress contraband the police recovered during their second foray into the house. The court

found unreasonable the officers' belief that the house was abandoned. *Id.* at *8. The court noted

the officers had no prior knowledge of the property; did not review readily available ownership records; and the house was secured by intact, closed windows and closed doors with bars. *Id*.

Similarly instructive is *State v. Brown*, 83 A.3d 45 (N.J. 2014), where the New Jersey Supreme Court affirmed a lower court's suppression of contraband seized from a house law enforcement believed was abandoned. In *Brown*, state troopers began surveillance after two confidential informants and a concerned citizen reported that an abandoned house in Camden was being used for drug sales. The troopers later testified they believed the house was abandoned based on the reports from the three citizens, as well as the ramshackle condition of the house. Specifically, they observed the electric meter was missing, one of the two front windows on the house was broken, the front door was padlocked, and the rear door was off its hinges and propped closed. Through the broken window troopers could see the living room was in "disarray" and unlit, and trash was strewn in the living room. Over two days of surveillance, troopers repeatedly observed the same behavior: a buyer gave money to one of the men in front of the house, one of the men unlocked a padlock on the house, went in briefly, then come out and handed a small object consistent with drugs to the buyer. Troopers then moved in and arrested several of the men in front of the house. A trooper took keys from one of the men and used them to open the padlock on the door to the house.

The New Jersey Supreme Court held the troopers did not have an objectively reasonable basis to believe the building was abandoned. The court pointed out that one reason not to assume a decrepit house is an abandoned house is that "[t]here are impoverished citizens who live in squalor and dilapidated housing, with interiors in disarray and in deplorable conditions, and yet these residences are their homes." *Id*. at 60. The court noted "the boarding of windows and bolting of doors" was consistent with an intent to keep people out, and therefore undercut the

conclusion that the building was abandoned. *Id*. Also important to the court was the fact that law enforcement made no effort to learn who owned the house, a fact readily ascertainable from public records. *Id*. at 63.

Together, *Spence* and *Brown* illustrate the unreasonableness of the officers' assumption here that the house they were breaking into was abandoned. In those cases, as well as the case at bar, the houses were decrepit, but also secured against intrusion. In all three cases the officers lacked personal knowledge of whether anyone was living inside, and made no effort to find out through city, tax, or utility records whether the house was in fact abandoned. In all three cases the officers entered someone's home without a warrant. In all three cases the officers violated the Fourth Amendment.

For the reasons set forth in this Reply and the original Motion, Mr. Frazier respectfully moves this Court to suppress all evidence recovered as a result of the warrantless search of his long-time home, 961 Bennett Place.

Respectfully submitted,

_____/S/_____

Adam D. Harris
Bar No. 20246
Law Office of Adam D. Harris, L.L.C.
600 Jefferson Plaza, Suite 201
Rockville, MD 20852
(301) 960-5005
adam@adamharrislawfirm.com

_____/S/_____
Christopher M. Davis
Bar No. 23441
Davis & Davis
1350 Connecticut Ave., NW
Suite 202
Washington, DC 20036
(202) 234-7300
cmdavisdc@gmail.com

Attorneys for Sydni Frazier

## CERTIFICATE OF SERVICE

    I HEREBY CERTIFY that on February 12, 2020, I served a copy of the foregoing Defendant's Reply To Government's Opposition To Motion To Suppress Evidence Seized From 961 Bennett Place on Assistant United States Attorney Christina Hoffman at the United States Attorney's Office for the District of Maryland via ECF.

_____/S/_____
Adam D. Harris

**JA145**

9/27/17        24-C-16-004,751

Emergency Extension of Time
To Pay the Property Tax

Dear : Sir/Madam judge I am
asking for this extension because I
need some more time to come up with
the rest of the money I've had this
Property for 25 years and I don't
want to lose it. I have invested
in this Property. Please concider
giving me an extension.

Thanking you.

Sincerly

Karine Farug
Lisa Bess

**JA146**

2923 Rosalind Ave
Baltimore, Maryland 21215
410-900-5351 - Lisa Bess
443-454-3738 - Karim Farug
10000 Villiag Green Drive
Woodstock MD. 211163

## CERTIFICATE OF SERVICE

I hereby certify that on this _27_ day of _September_

20_17_, I mailed a copy of the foregoing _____

(Description of paper/pleading)

to: _Emergency Extension of Time to Pay the Property Tax_

_Nauman Aaron_
Name of opposing party/attorney

_Suit 202_
Address

_25 Hooks Lane_
Address (continued)

_Baltimore, Maryland 21208_
City, State and Zip

_Karim Farug_
(Signature)
_Lisa Bess_

2923 Rosalind Ave — Lisa Bess
Baltimore, Md. 21215

10000 Villiage Green Drive — Karim
Woodstock MS. 211163                Farug

```
 1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
 2                          NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,              )
 4                               )
          vs.                    ) CRIMINAL CASE NO. CCB-16-0267
 5                               )
     SYDNI FRAZIER,               )
 6        Defendant.              )
     _____)

 7

 8
                          Tuesday, February 18, 2020
 9                            Courtroom 7D
                            Baltimore, Maryland
10

11          BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE

12

13      MOTION-TO-SUPPRESS HEARING AND RULINGS OF THE COURT AND
               ARRAIGNMENT ON THIRD SUPERSEDING INDICTMENT
14
     For the Plaintiff:
15
     Christina Hoffman, Esquire
16   Lauren Perry, Esquire
     Christopher Rigali, Esquire
17   Assistant United States Attorneys

18   For the Defendant:

19   Christopher Davis, Esquire
     Adam Harris, Esquire
20

21   _____

22
                          Reported by:
23
                    Douglas J. Zweizig, RDR, CRR, FCRR
24                   Federal Official Court Reporter
                    101 W. Lombard Street, 4th Floor
25                      Baltimore, Maryland  21201
```

```
 1                    P R O C E E D I N G S

 2          (10:10 a.m.)

 3          THE COURT:  Good morning, everyone.  You can be

 4   seated, please.

 5          Do you want to call the case.

 6          MS. HOFFMAN:  This is United States versus

 7   Sydni Frazier, Case No. CCB-16-0267.

 8          I'm Christina Hoffman on behalf of the United States.

 9   With me here at counsel tables are AUSA Lauren Perry and

10   Christopher Rigali and Detective Gary Niedermeier of the

11   Baltimore City Police Department.

12          THE COURT:  Good morning, everybody.

13          MR. DAVIS:  Good morning, Your Honor,

14   Christopher Davis on behalf of Sydni Frazier, who is seated to

15   my right.  And I am joined by Adam Harris, my co-counsel.

16          THE COURT:  All right.  Thank you.

17          All right.  We're here for a motions hearing for

18   Mr. Frazier.

19          Let me start with one matter just to put on the

20   record.

21          I did receive an e-mail from a Baltimore Sun reporter

22   asking about the fact that the Government's response to

23   Mr. Frazier's motion was filed under seal.  There is a motion,

24   hasn't been ruled on yet.

25          And I guess what I would like to say to the Government
```

1  is that it appears to me that there may be portions of it that

2  legitimately need to be sealed and others that don't.

3         And perhaps after -- particularly after today, when we

4  see what we need to have on the record to resolve these matters

5  anyway, you could, within the next few days, perhaps file a

6  redacted version and justify anything that you really think

7  does need to be under seal.

8         **MS. HOFFMAN:**  We'd be happy to do that.

9         **THE COURT:**  Okay.  All right.  So we have two motions.

10  One is just legal argument, I believe, the motion to dismiss

11  Count 2, which, counsel, I'm happy to hear from you on if you

12  want to be heard.

13         And then obviously the evidentiary one about

14  Mr. Frazier's standing, which perhaps we should go forward with

15  that.  I assume there will be evidence, Mr. Davis.

16         **MR. DAVIS:**  Yes, Your Honor.  I have one witness I

17  would like to call on the evidentiary matter.  And with respect

18  to the motion to dismiss, we'll just submit on the papers on

19  that.

20         **THE COURT:**  All right.

21         **MS. HOFFMAN:**  And we'll submit on the papers as well

22  with respect to the motion to dismiss.

23         I did just want to put on the record, I had a chance

24  to discuss briefly with Mr. Davis before the hearing started

25  that we would like to have Detective Niedermeier sit here

```
 1    during the hearing, and Mr. Davis said he did not object to

 2    Detective Niedermeier remaining in the courtroom while the

 3    defense witnesses testify.

 4              THE COURT:  All right.  He's your case agent for --

 5              MS. HOFFMAN:  For the day.

 6              THE COURT:  -- for purpose of this hearing.  All

 7    right.

 8              MS. HOFFMAN:  Thank you.

 9              THE COURT:  Mr. Davis.

10              MR. DAVIS:  Thank you, Your Honor.

11              At this time we call Lisa Bess to the stand.

12              THE COURT:  Okay.

13              THE CLERK:  Please raise your right hand.

14                LISA BESS, DEFENDANT'S WITNESS, SWORN.

15              THE CLERK:  Please be seated.

16              Please speak directly into the microphone.

17              State and spell your full name for the record, please.

18              THE WITNESS:  Lisa Bess, L-I-S-A, B-E-S-S.

19              THE CLERK:  Thank you.

20                        DIRECT EXAMINATION

21    BY MR. DAVIS:

22    Q.   Good morning, Ms. Bess.

23         Could you state your relationship to Sydni Frazier.

24    A.   I'm Sydni's mother.

25    Q.   And directing your attention to 961 Bennett Place in
```

1  Baltimore, did you ever live there?

2  **A.**   Yes.

3  **Q.**   And with whom did you live at 961 Bennett Place?

4  **A.**   My kids.

5  **Q.**   And can you identify your children.

6  **A.**   I have a daughter Tiffany, George, Barakat, Sydni,

7  Antonio.

8  **Q.**   And how long did you reside at 961 Bennett Place?

9  **A.**   Like 16, 17 years.

10  **Q.**   And did there come a time when you left Bennett Place?

11  **A.**   Yes.

12  **Q.**   And would you tell us why you left Bennett Place.

13  **A.**   I was evicted due to personal issues.

14  **Q.**   Now, who owned 961 Bennett Place at that time?

15  **A.**   Karim Faruq.

16       **THE COURT:**  I'm sorry.  What year are we speaking of,

17  ma'am?

18       **THE WITNESS:**  I think it was two thousand -- I

19  don't -- like, '14.  I'm not quite -- I don't remember the

20  exact.

21       **THE COURT:**  Well, perhaps Mr. Davis will have

22  something that will bring that up.

23       **MR. DAVIS:**  Yes, Your Honor.

24  **BY MR. DAVIS:**

25  **Q.**   So you were evicted by Mr. Faruq?

**JA153**

1   **A.**   Yes.

2   **Q.**   Now, was it actually Mr. Faruq that evicted you?

3   **A.**   Well, he -- he put in the order to -- for it to happen

4   through his sister.

5   **Q.**   Now, directing your attention to the summer and fall of

6   2016, what connection did you have to 961 Bennett Place?

7   **A.**   I regained -- I then regained the house back.  Karim gave

8   it to me as a gift 'cause I wanted to open it up for assisted

9   living.

10  **Q.**   And what actions did you take to that end to open the

11  house up as an assisted living facility?

12  **A.**   I start going into the house, you know, rerenovating it,

13  you know, gutting the house out.  You know, I did some

14  electrical work in there.  I put a roof on the house.  You

15  know, doing the things to get the house, you know, in the

16  standards of what I needed it to be in to open up the house.

17  **Q.**   Now, you indicated the house was given to you as a gift.

18       Did you have permission from Mr. Faruq to renovate

19  961 Bennett Place?

20  **A.**   Yes, I did.

21  **Q.**   Now, was Sydni a part of this project?

22  **A.**   Yes.

23  **Q.**   Can you tell us what he did.

24  **A.**   Well, Sydni helped me do some of the gutting, gutting work

25  out.  And, also, he got a few friends of his to help me come in

1    to do, you know, work in the house 'cause he knew how important

2    it was for me to have this assisted living in the house.  So he

3    was -- he was a major part of, you know, helping me fix the

4    house up.

5    **Q.**   And during the summer and fall of 2016, was he working in

6    the house?

7    **A.**   Yes.

8    **Q.**   Now, I'm going to show you what's been marked as Frazier

9    No. 2.

10        Do you recognize that photo?

11   **A.**   Yes.

12   **Q.**   And can you tell us what that photo is of, what that photo

13   represents?

14   **A.**   That's the -- that's the window that's located on

15   Schroeder Street.  There's two windows on Schroeder Street, and

16   that's the window in front of the house.

17   **Q.**   Now, I'm putting my cursor on a point in that picture of

18   the window just below the midline of the window.  What is that?

19   **A.**   That's an ADT sticker.  I put that on the window because,

20   you know, by me, you know, not being there, you know, in and

21   out of the house, I didn't want nobody to go, you know, in the

22   house.  I wanted them to think that I had an alarm system in

23   the house.

24   **Q.**   Now, is that a functional window there?

25   **A.**   Actually, that window right there is -- has -- it's --

1   it's been busted out.  That's why I put that board up in the --

2   in the house so that no one could look inside and see the

3   materials that I had in the house, along with my personal --

4   you know, personal items.

5   Q.   I'm going to show you what's been marked as Frazier No. 3.

6        Could you identify that photograph.

7   A.   That's the window on the side of Bennett Place.  Like,

8   it's right above the basement, the basement entry.  And there's

9   a "no trespassing" sign I had put in that window because, you

10  know, I mean, I was doing work in there and I had stuff in

11  there.  I didn't want people to, you know, go in and out to try

12  to, you know, steal my stuff that I had in it.

13  Q.   Now, I'm going to show you what's been marked as Frazier

14  No. 4.

15       Can you identify that photograph?

16  A.   Yes.  That's the actual door, the entry door to the house.

17  Q.   Now, did you put that door on that house?  Did you have

18  that installed?

19  A.   Yes, I did.

20  Q.   And what type of locks were on that door?

21  A.   It's a deadbolt lock, and it's a knob lock.

22  Q.   Now, who had keys to the house?

23  A.   Myself and Sydni.

24  Q.   Were you aware of anyone else having access to the

25  house --

1   **A.**   No.

2   **Q.**   -- during the summer and fall of 2016?

3   **A.**   No.

4   **Q.**   Now, your son was incarcerated in January of 2017.  Did

5   you continue the work at the house at Bennett Place?

6   **A.**   Yes.  I would go in every now and then to do some -- do

7   some things.  I had people going in doing electrical work.

8   **Q.**   Now, were you aware of an incident at your house on

9   November 16th of 2017?

10  **A.**   Yes, I was.

11  **Q.**   And what was that?

12  **A.**   With the officer shoot -- that got killed.

13  **Q.**   Now, I'm going to show you what's been marked as Frazier

14  No. 6.

15       (Video was played but not reported.)

16  **BY MR. DAVIS:**

17  **Q.**   Now, I stopped this video at 7 seconds.

18       Do you see in the right-hand corner there are things

19  stacked up (indicating)?

20  **A.**   Yes.

21  **Q.**   What are those materials?

22  **A.**   Well, right there it was insulation material I had right

23  there and also -- insulation material and other, you know, home

24  improvement items.

25       (Video was played but not reported.)

*L. Bess - Direct*

1   **BY MR. DAVIS:**

2   **Q.**   Now, I'm going to show you what's been marked as Frazier

3   No. 7.  If you could take a moment to watch this video.

4      (Video was played but not reported.)

5   **BY MR. DAVIS:**

6   **Q.**   Now, I stopped the video at three seconds.

7      I have a cursor in the upper left-hand corner of that

8   video.  What is that item in there (indicating)?

9   **A.**   That's a couch.

10   **Q.**   And whose couch is that?

11   **A.**   Mine.  It was a loveseat and a -- and an actual couch.  It

12   was two of 'em.

13      (Video was played but not reported.)

14   **BY MR. DAVIS:**

15   **Q.**   Now, I have a cursor on a door near the front door in the

16   midpart of this depiction on this video.  Where does that door

17   go to?

18   **A.**   That's not -- it's -- it's actually not a door.  It's a

19   entry to the front room, the living room -- the front room

20   area.

21   **Q.**   And what was that room used for?

22   **A.**   At the -- at the time I had stored my personal clothes in

23   it 'cause I had my stuff -- I had stuff in storage, so I

24   need -- the bill was costing me.  So I took my personal items

25   out of storage and put 'em in 961.

1   **Q.**   And how were they stored?

2   **A.**   In plastic bags.

3        (Video was played but not reported.)

4   **BY MR. DAVIS:**

5   **Q.**   And did you hear that comment on the video where the

6   officer stated he was surprised to see all that stuff in there?

7   What stuff is he referring to?

8   **A.**   He talking about my personal stuff, the things that I had

9   that belong to me, in the house.

10  **Q.**   Now, I'm going to show you Frazier 8 and ask you a few

11  questions as we go through this video.

12       (Video was played but not reporter.)

13  **BY MR. DAVIS:**

14  **Q.**   Now, first of all, this is your front door that's being

15  knocked down; correct?

16  **A.**   Yes.  Yes, it is.

17       (Video was played but not reported.)

18  **BY MR. DAVIS:**

19  **Q.**   Did you authorize anybody to enter the home in this

20  fashion?

21  **A.**   No, I didn't.

22       (Video was played but not reported.)

23  **BY MR. DAVIS:**

24  **Q.**   Did anyone contact you before this home was entered in

25  this fashion?

1    **A.**   No.

2          (Video was played but not reported.)

3    **BY MR. DAVIS:**

4    **Q.**   Now, you just heard the officer state that upstairs there

5    were no walls; it was under construction.

6    **A.**   Yes.

7    **Q.**   Did you -- now, what type of work were you doing upstairs

8    at that time?

9    **A.**   Actually, the walls were taken -- take -- actually, the

10   house was in a fire.  So in order for me to get the proper

11   electrical work done to this house, I had to, you know, take

12   all of the walls down so they could re- -- you know, redo the

13   electrical work so it could be -- you know, pass the inspection

14   for the inspection to be passed.

15         (Video was played but not reported.)

16            **MR. DAVIS:**  I'm going to move this ahead a little bit.

17         (Video was played but not reported.)

18   **BY MR. DAVIS:**

19   **Q.**   Now, directing your attention to the video at 2 minutes

20   and 55 seconds, do you see the windows?

21   **A.**   Yes.

22   **Q.**   And directing your attention to the upper right-hand

23   corner of the video, there's a sticker on the windows.

24         Can you explain what that sticker is.

25   **A.**   It look like the sticker that comes with the window.

1   **Q.**   And are those windows new?

2   **A.**   Yes.

3   **Q.**   And did you purchase those windows?

4   **A.**   Yes, I did.

5        (Video was played but not reported.)

6   **BY MR. DAVIS:**

7   **Q.**   Now, I've stopped the video at 3 minutes and 6 seconds,

8   and I have the cursor at mid-point in the video.  There's a

9   blue box there.

10        Could you tell us what that blue box is.

11  **A.**   That's the electrical switch for the lights.

12  **Q.**   And did you have that installed?

13  **A.**   Yes, I did.

14  **Q.**   And we see -- I stopped it at 3 minutes and 6 seconds.  Do

15  you see that other blue box to the left of the screen

16  (indicating)?

17  **A.**   Yes.

18  **Q.**   And what is that?

19  **A.**   That's a outlet for the plug-in, electrical outlet.

20  **Q.**   Now, I have my cursor in this same picture still of the

21  video at 3 minutes and 6 seconds.

22        Can you tell us what that is (indicating)?

23  **A.**   That was the -- the plumbing work 'cause it was a bath --

24  that was a bathroom.  I was gutting that whole area out to put

25  a closet right there.  So that was a bathroom right there where

1    the toilet was at.

2         (Video was played but not reported.)

3    **BY MR. DAVIS:**

4    **Q.**   And, again, another blue box.  Could you tell us what that

5    is.

6    **A.**   That was a light switch.  That is a light switch.

7    **Q.**   And I'm stopped at 3 minutes and 20 seconds in Frazier 8.

8         Directing your attention to the top of the video, I have

9    my cursor kind of to the left of the top of the video.  There's

10   a blue circular device at the top.  Could you tell us what that

11   is.

12   **A.**   That's another light -- that's -- actually, that would

13   actually be where the light -- you know, where you put the

14   lightbulb at.  This is the hallway.

15        (Video was played but not reported.)

16   **A.**   And the back is where the bathroom was going to be located

17   at.

18        **MR. DAVIS:**  I'm going to stop this at 3 minutes and

19   40 seconds.  I've got to move it back for a second.

20   **BY MR. DAVIS:**

21   **Q.**   At 3 minutes and 37 seconds, I have the cursor in the

22   upper portion of the picture, slightly to the right.  Could you

23   identify what that is (indicating).

24   **A.**   If I'm not mistaken, that's where the fan used to be for

25   the bathroom.

1    **Q.**    Okay.

2    **A.**    If I'm not mistaken.  Yeah.

3          (Video was played but not reported.)

4    **A.**    If that's in the back, that might be where the bathroom --

5    part of where the bathroom was going to be because I was, you

6    know, reframing -- the bathroom was going to be in the back,

7    and right there where the bathroom used to be was where I was

8    going to make a closet, a walk-in closet.

9    **Q.**    Now, Frazier 8, which we're watching right now -- and

10   we're on the second floor of 961 Bennett Place -- there are no

11   walls up there; is that correct?

12   **A.**    No.  This the third floor.

13   **Q.**    Third floor?

14   **A.**    Yes.

15   **Q.**    And did you remove those walls?

16   **A.**    Yes.

17   **Q.**    And did Sydni Frazier assist you in doing that?

18   **A.**    Yes, he did.

19          (Video was played but not reported.)

20   **BY MR. DAVIS:**

21   **Q.**    Now, Ms. Bess, I'm going to show you what's been marked as

22   Frazier No. 9.  If you give me a second here to get this in

23   here completely.

24          Can you identify Frazier No. 9?

25   **A.**    Yes.  That's a letter that I wrote to -- to try to get

1    extension on the -- the property taxes 'cause I was running out

2    of time, and I didn't have the rest of the money to pay the

3    property taxes.

4    **Q.**   And what is the date of that letter that you sent?

5    **A.**   9/27/17.

6    **Q.**   And had you been paying taxes prior to that time?

7    **A.**   Yes.  I'm basically the only person that's been paying the

8    taxes on that house since that house has been there.

9    **Q.**   Were you successful in keeping the house?

10   **A.**   No, I wasn't.

11   **Q.**   Do you know when you lost the house?

12   **A.**   Around -- around the time of the officer gettin' killed.

13   Like, about a few months later after that, that's when I lost

14   it.

15   **Q.**   A few months after --

16   **A.**   Yes.

17   **Q.**   -- Officer Suiter being killed?

18   **A.**   Yes.

19          **MR. DAVIS:**  I have no further questions.  Thank you,

20   Ms. Bess.

21          **THE COURT:**  Thank you.

22          We'll see if the Government has some questions.

23

24                          **CROSS-EXAMINATION**

25   **BY MS. HOFFMAN:**

1   **Q.**   Good morning, Ms. Bess.

2   **A.**   Good morning.

3   **Q.**   You testified that you were once in a relationship with

4   Karim Faruq?

5   **A.**   I have a son by him.

6   **Q.**   And you lived with Mr. Faruq for a period of time at

7   961 Bennett Place?

8   **A.**   No, I didn't say that.

9   **Q.**   You --

10  **A.**   His son, me and his son lived there.

11  **Q.**   Okay.  And when did you start living at 961 Bennett Place?

12  **A.**   I don't know the exact -- the exact year, but I've been

13  there since he was about 3.

14  **Q.**   Okay.  Maybe sometime in the late 1980s, does that sound

15  right?

16  **A.**   Yes.

17  **Q.**   And in 1990, Faruq was arrested and charged with federal

18  offenses; is that right?

19  **A.**   Yes.

20  **Q.**   And in 1993, Faruq was sentenced to over 30 years in

21  prison?

22  **A.**   Yes.

23  **Q.**   And it's your testimony that Faruq -- well, that Faruq

24  owned 961 Bennett Place; right?

25  **A.**   Yes.

```
 1   Q.   And it's your testimony that he allowed you to continue

 2   living in 961 Bennett Place after he was incarcerated?

 3   A.   Yes.

 4   Q.   And that was on the condition that you pay -- pay rent and

 5   property taxes?

 6   A.   Yes.

 7   Q.   And maintain the property?

 8   A.   Yes.

 9   Q.   So you continued living there?

10   A.   Yes.

11   Q.   And did you live there through -- do you know when you

12   lived there through?

13   A.   I don't quite remember the year that he -- he had me -- he

14   had me evicted, I don't remember that year, but from that

15   point, I was removed for a few years.  And then the house was

16   sittin' and he asked me did I want it.

17        And I said, Yes.

18        And he said, Well, you can have it.

19        So it's a period of time that I don't remember the actual

20   year that I went back and left.

21   Q.   But you lived at 961 Bennett Place from somewhere around

22   1990 through the time when you were evicted; is that right?

23   A.   Yes.

24   Q.   And your son Sydni was born in January of 1994 --

25   A.   Yes.
```

*L. Bess - Cross*

1   **Q.**   -- is that right?

2   **A.**   Yes.

3   **Q.**   And his father is not Faruq?

4   **A.**   No.

5   **Q.**   Faruq was already in prison when Sydni was born?

6   **A.**   Yes.

7   **Q.**   And you have had other children since Sydni?

8   **A.**   Yes.

9   **Q.**   And those children are also not with Faruq?

10  **A.**   Right.

11  **Q.**   Is it fair to say you were no longer in a relationship

12  with Faruq after he went to prison?

13  **A.**   That's fair.

14  **Q.**   And -- but it's your testimony he allowed you to continue

15  living there on the condition that you pay rent and property

16  taxes?

17  **A.**   Yes.  Actually, Karim allowed me to live there 'cause I

18  was the mother of his child.  And he said as long as I was the

19  mother of his child, he wanted to make sure that his child --

20  his son and the son of his mother [sic] had a place to stay.

21  **Q.**   Is it fair to say, though, that you fell behind on

22  property taxes?

23  **A.**   Yes, it is.

24  **Q.**   And Faruq was in danger of losing the property?

25  **A.**   Around -- around which time?

1    **Q.**   Well, let's take 2006.

2    **A.**   Yeah.  Yes.

3    **Q.**   And in late 2006, Faruq filed a lawsuit to evict you from

4    961 Bennett Place; right?

5    **A.**   Yes.

6    **Q.**   And I'm going to put up here on the screen --

7         **MS. HOFFMAN:**  Ms. Moyé, is it possible to turn the

8    document camera on over here?

9         **THE CLERK:**  It's on.

10        **MS. HOFFMAN:**  It doesn't seem to be coming up.

11        **THE COURT:**  Why don't we take a five-minute break, see

12   if you can fix it.

13        **MS. HOFFMAN:**  That would be great.  Thank you.

14      (Recess taken.)

15        **THE COURT:**  You can be seated, please.

16        I believe we have a temporary solution.

17        If you'd like to proceed.

18   **BY MS. HOFFMAN:**

19   **Q.**   Ms. Bess, when we broke, I was asking you about the

20   eviction lawsuit that Mr. Faruq filed against you in 2006.

21      And I've pulled up here -- this will be

22   Government's Exhibit 1.  Does this appear to you to be the case

23   record of that eviction lawsuit?

24   **A.**   I don't see anything.

25        **THE COURT:**  Her screen is blank.

```
 1            THE CLERK:  Can you see it now?

 2            THE WITNESS:  No.  No, I don't.

 3            THE COURT:  Do you have paper copies?

 4            THE WITNESS:  Okay.  It's on.

 5            THE CLERK:  You do see it.

 6            THE WITNESS:  I see it, but I can barely see it.  But

 7   it's up here.

 8            MS. HOFFMAN:  I'll approach and show you

 9   Government's Exhibit 1.

10            THE WITNESS:  Okay.

11            MS. HOFFMAN:  (Handing.)

12            THE COURT:  Is it by any chance something that you

13   provided as an attachment to your memo, Ms. Hoffman?  I can't

14   read it.

15            MS. HOFFMAN:  It was.  It was Exhibit 16 to the

16   Government's opposition.

17            THE COURT:  Okay.

18   BY MS. HOFFMAN:

19   Q.   Ms. Bess, does that appear to be the case record for the

20   eviction lawsuit that was filed against you?

21   A.   Yes.

22   Q.   And that was in late 2006 that that was filed?

23   A.   Yes.

24   Q.   And there are a lot of requirements in order to evict

25   someone from a property; isn't that right?
```

1    **A.**    Yes.

2    **Q.**    Faruq had to give you notice?

3    **A.**    Say it again.

4    **Q.**    He had to give you notice?

5    **A.**    Yes, uh-huh.

6    **Q.**    And he had to show that you had failed to make the

7    required payments over some period of time?

8    **A.**    That's true.

9    **Q.**    And there was a trial?

10   **A.**    Yes, there was.

11   **Q.**    And he was successful.  He won that lawsuit; right?

12   **A.**    Yes, he did.

13   **Q.**    And you were, in fact, evicted from 961 Bennett Place on

14   February 27th of 2007; is that right?

15   **A.**    Yes.

16   **Q.**    Your son Sydni would have been 13 years old at the time?

17   **A.**    Yes.

18   **Q.**    And you went to live somewhere else after that?

19   **A.**    Yes.

20   **Q.**    And your son Sydni went with you?

21   **A.**    Yes.

22   **Q.**    So you weren't living at 961 Bennett Place after 2007; is

23   that right?

24   **A.**    That's correct.

25   **Q.**    And you'd been evicted, meaning you had absolutely no

1  right to be there?

2  **A.**   Around -- at that time, yes.

3  **Q.**   Going back there would have been trespassing?

4  **A.**   Yes.

5  **Q.**   But it's your testimony that, despite all that, Faruq gave

6  you control of 961 Bennett Place in 2016; is that right?

7  **A.**   It -- it was before 2016.  I don't have the correct year.

8  But he did give me control back into the property.

9  **Q.**   And he did that, despite the fact that you hadn't paid

10  taxes?

11  **A.**   Well, years had -- time had passed.  Me and -- him and I,

12  we regained -- you know, regained our friendship.  And, you

13  know, it was no issues with us.  So he -- we were -- we were

14  good.

15  **Q.**   Was there any documentation of him giving you power over

16  961 Bennett Place?

17  **A.**   Yes, it -- yes, it was.

18  **Q.**   And did you bring that documentation with you today?

19  **A.**   No, I did not.  It's actually in 961 Bennett Place.  I had

20  put it -- 'cause the house was -- was given to me, so I had --

21  had some personal things in that house.  So I had took the

22  letter that he sent to me from being incarcerated.  You know,

23  he got it notarized and everything saying that I could -- you

24  know, I had the right to be in the house.

25  **Q.**   Well, you did know that you were going to be coming in

1  here to testify today.

2  **A.**   Yes.

3  **Q.**   And you met with the defense attorneys in advance?

4  **A.**   No, I didn't.

5  **Q.**   Did you speak with them?

6  **A.**   Yes.

7  **Q.**   And they went over the questions that they would be asking

8  you today; is that right?

9  **A.**   Yes.

10 **Q.**   But you weren't able to locate any documentation of Faruq

11 giving you power over 961 Bennett Place?

12 **A.**   Once again, I stated the documentation is in 961.  I

13 cannot regain the right to be in the house.

14 **Q.**   And it's your testimony that Faruq, he gave you permission

15 to renovate the property as an assisted living facility?

16 **A.**   Yes.

17 **Q.**   Did he give you permission to use the property to store

18 guns and drugs?

19 **A.**   I don't have no knowledge of none of that being in that

20 house.  That wasn't -- no, no, there was no --

21 **Q.**   Did he give you permission to use the house to store guns

22 and drugs?

23 **A.**   No, that -- that -- no.

24 **Q.**   Did you give your son Sydni permission to store guns and

25 drugs in the house?

1   **A.**   I've been in that house.  I haven't -- I've never seen any

2   guns in that house.

3   **Q.**   My question is:  Did you give your son Sydni --

4   **A.**   No.

5   **Q.**   -- permission?

6        After you got evicted from 961 Bennett Place, ultimately

7   you went to live at 2923 Rosalind Avenue in North Baltimore; is

8   that right?

9   **A.**   Yes.  No, not -- once I got evicted, I didn't go directly

10   to that address.  That's -- that wasn't my -- no.  I was living

11   somewhere else before there.

12   **Q.**   And later in -- at some point later, did you move to

13   2923 Rosalind?

14   **A.**   Yes.

15   **Q.**   And I'm going to pull up -- this will be

16   Government's Exhibit 2.

17        Can you see that on your screen?

18   **A.**   Yes.

19   **Q.**   And do you recognize this photo here?

20   **A.**   Yes.

21   **Q.**   Is this 2923 Rosalind?

22   **A.**   Yes, it is.

23   **Q.**   And you testified that your son Sydni, he moved with you

24   after you were evicted; right?

25   **A.**   Yes.

**JA173**

1   **Q.**   Did he live with you here at 2923 Rosalind?

2   **A.**   When I got evicted, I did not move to this address.

3   **Q.**   Did -- when you did move to this address, Sydni did live

4   here with you; is that right?

5   **A.**   Yes, from time to time.  It wasn't -- you know, he was

6   there.

7   **Q.**   And you were living there in July of 2012; right?

8   **A.**   2012 . . .

9        I believe -- I think so.  I'm not good with actual, you

10   know, keeping a record of dates and the year, so I'm not going

11   to be accurate.

12   **Q.**   Are you still living there now?

13   **A.**   Yes.

14   **Q.**   So you were living there in January 2017 as well; right?

15   **A.**   Correct.

16   **Q.**   And are you aware that your son Sydni provided that

17   address to law enforcement when he was interviewed in

18   January of 2017?

19   **A.**   Am I aware of that?  That he provided this address?

20   **Q.**   Are you aware of that?

21   **A.**   I mean, Sydni, he -- I'm his mother, and that's -- that's

22   his residence as well if -- if he needs somewhere to stay, I'm

23   going to let him stay at the house -- stay there.

24   **Q.**   Now, after you were evicted from 961 Bennett Place, it

25   became a vacant property; right?

1  **A.**   No, it didn't.

2  **Q.**   Well, there was no one living there; right?

3  **A.**   I mean, I had my personal things in there 'cause the --

4  the plan was for me to move back into that house.  As I was

5  gettin' the house renovated for assisted living, I was going to

6  be moving in that house.

7  **Q.**   Well, is it fair to say that no one was living in

8  961 Bennett Place?

9  **A.**   I mean, yes.  It was not livable.  I was renovating it.

10  **Q.**   And you weren't -- property taxes were still not -- were

11  still not being paid after 2007; is that right?

12  **A.**   After 2007?  Well, actually, I don't think that's correct

13  'cause he -- before -- it was a period of time that there were

14  some tenants living in that house.  He was rent -- there were

15  rooms being rented out by -- by another family friend, so taxes

16  were being paid.

17  **Q.**   Well, at some point --

18  **A.**   Okay.  I got evicted -- from the time I got evicted --

19  **Q.**   Well, let me ask you this, Ms. Bess:  At some point the

20  Baltimore City Housing Department deemed the property at

21  961 Bennett Place to be vacant; isn't that right?

22  **A.**   Yes.

23  **Q.**   And the property had fallen into disrepair; is that right?

24  **A.**   I don't know nothin' about all that.  I mean, I don't even

25  know what that is.

1  **Q.**   Well, are you aware that as early as 2013, Baltimore City

2  began issuing vacant building notices with respect to the

3  property?

4  **A.**   No, I wasn't aware.

5  **Q.**   Well, are you aware that when a vacant building notice is

6  issued, it's actually posted on the front door of the property?

7  **A.**   I never saw a notice on the front door.

8  **Q.**   So -- but it's your testimony that you had belongings in

9  961 Bennett Place; right?

10  **A.**   Right.  Right.

11  **Q.**   And you said you went there periodically?

12  **A.**   Yes.

13  **Q.**   You never saw a vacant building notice posted on the front

14  door?

15  **A.**   No, I didn't.

16  **Q.**   Well, I'm going to show you -- this is going to be from

17  Exhibit 12 to the Government's opposition, ECF-1406.  And I

18  want to see if you recognize this.

19      Does that appear to be the front door of

20  961 Bennett Place?

21  **A.**   Yes.

22  **Q.**   And that's a vacant building notice posted to the front

23  door, isn't it?

24  **A.**   That's what it appears to be.

25          **THE COURT:**  I'm sorry.  Which exhibit is that?

```
 1              MS. HOFFMAN:  This will be Government's Exhibit --

 2    it's Government's Exhibit 12 to the motions response.

 3              THE COURT:  Okay.

 4              MS. HOFFMAN:  And this is Page 33 of that exhibit.

 5    BY MS. HOFFMAN:

 6    Q.   And do you see the date here, Ms. Bess, is October 22nd of

 7    2014?

 8    A.   Yes.

 9    Q.   And it says, "Notice posted to front door of property"?

10    A.   Yes.

11    Q.   So it's your testimony that you never saw -- you never saw

12    any of these vacant building notices when they were posted to

13    the --

14    A.   No.  I never saw that notice.

15    Q.   Ms. Bess, you learned that on May 16th of 2016, the City,

16    Baltimore City, sold 961 Bennett Place to a third party LLC in

17    a tax sale; isn't that right?

18    A.   May of '16.  I don't -- all I know that -- I know the

19    taxes was in -- the property taxes was in -- it was in trouble,

20    so I was trying to pay the taxes 'cause you have a certain

21    amount of time to regain your taxes back.  As far as the actual

22    date, I don't know if it was in May or not.

23    Q.   Well, it's your testimony that you were -- during this

24    period of time, Faruq had given you control of the property;

25    right?
```

1    **A.**   Yes.

2    **Q.**   And so you would have been aware that it had been sold to

3    a third party in May of 2016; right?

4    **A.**   I -- I mean, yes -- I mean, even though it was sold, that

5    doesn't mean you lose it.  You can still have time to regain

6    your property back.

7    **Q.**   Well, were you aware that under the --

8          **MR. DAVIS:**  Objection.  I believe she's asking for a

9    legal --

10   **BY MS. HOFFMAN:**

11   **Q.**   Were you aware that Baltimore City took possession of the

12   property in May of 2016?

13   **A.**   No, I wasn't.

14   **Q.**   Well, let me ask you this:  You were in contact with your

15   son Sydni during this time period; right?

16   **A.**   (Nods head.)

17   **Q.**   And how would you communicate with Sydni?

18   **A.**   Through phone.  I mean, he'll come past the house.

19   **Q.**   Did you have a cell phone that you would use?

20   **A.**   Yes.

21   **Q.**   And what was your cell phone number?

22   **A.**   (410) 900-5351.

23   **Q.**   Isn't it true, Ms. Bess, that not long after that tax sale

24   happened, you texted your son and told him not to go to

25   961 Bennett Place; and if he had anything there, he should get

```
 1   it out?
 2   A.   Oh.  I didn't know that -- I mean -- meaning his personal
 3   stuff, clothes and things, 'cause I -- I mean, I knew the
 4   property was up for taxes.  And, I mean, if he had any clothes
 5   and anything, he needed to get 'em.
 6   Q.   So you agree that you did send him that text message?
 7   A.   I don't remember, but, I mean --
 8   Q.   Would it refresh your recollection to see the
 9   text message?
10   A.   Sure.
11   Q.   This is going to be Government's Exhibit 15 from the --
12   no.  I'm sorry.  I'm sorry.  This is Government's Exhibit 3 to
13   the Government's motions response.
14          THE COURT:  What exhibit is it, for the purpose of the
15   hearing?
16          MS. HOFFMAN:  This is also Government's Exhibit 3 for
17   purposes of the hearing.
18          THE COURT:  Okay.  And you said it was --
19          MS. HOFFMAN:  And this will be Page 15.
20   BY MS. HOFFMAN:
21   Q.   And, Ms. Bess, this is your phone number here,
22   (410) 900-5351 (indicating); right?
23   A.   Yes.
24   Q.   And this is a text message from July 12th of 2016
25   (indicating)?  Is that right?
```

1    **A.**    (No response.)

2    **Q.**    Ms. Bess, can you read the date for me there.

3    **A.**    I'm reading -- oh.  July the 12th, 2016.

4    **Q.**    And do you see the highlighted text here where it says

5    [reading]:  Do not going in that house.  And if you have

6    anything in there, get it out?

7    **A.**    Yes.  Uh-huh.

8    **Q.**    You didn't tell him in that text that you wanted help with

9    renovations, did you?

10   **A.**    Say it again.

11   **Q.**    You didn't tell him that you wanted help with renovations?

12   **A.**    I don't understand what you saying.

13   **Q.**    That text message doesn't mention anything about

14   renovations, does it?

15   **A.**    No, it doesn't.

16   **Q.**    You just told him [reading]:  Don't go there and get your

17   stuff out?

18   **A.**    I was mad with Sydni.

19   **Q.**    You knew the City possessed the property now, didn't you?

20   **A.**    No, I did not.  No, I did not.  I mean, that happened in

21   May, and I still was trying to regain the property back

22   9/27/2017, so I didn't know that they gained full, you know,

23   custody of the property.

24   **Q.**    Ms. Bess, you testified that at some point you began

25   renovation work on the property?

1    **A.**    Yes.

2    **Q.**    And you said that your son Sydni was actively assisting

3    with renovations at the property?

4    **A.**    Yes.

5    **Q.**    You're aware that you need a licensed contractor in

6    Baltimore City to do any kind of -- any kind of demolition or

7    renovation work?

8    **A.**    You need a licensed contractor if you doing, like -- if

9    you adding on to the house -- it depends.  Some things you

10   don't have to be licensed for --

11   **Q.**    For electrical work, for example, do you need a licensed

12   contractor?

13   **A.**    Yes.

14   **Q.**    And for demolition, you need a licensed contractor?

15   **A.**    Just to gut the house out and clean the house out?

16   **Q.**    For demolition, yeah.

17   **A.**    I didn't know that.

18   **Q.**    Did you hire a licensed contractor?

19   **A.**    Yes.

20   **Q.**    Who did you hire?

21   **A.**    It was a guy.  He said he was licensed, and I never got

22   all his information from him.

23   **Q.**    What was his name?

24   **A.**    I don't remember.

25   **Q.**    Is Sydni a licensed contractor?

1    **A.**    Sydni ain't do no electrical work in there.

2    **Q.**    Does he have any kind of training in rehab work?

3    **A.**    No.  He was helping -- just helping out as a family -- you

4    know, for a family --

5    **Q.**    Was he working with a licensed contractor or on his own?

6    **A.**    No.  How he going to help with the electrical if he is not

7    licensed?  He can't -- a licensed electrician is not even going

8    back in and help him.

9    **Q.**    Was he reporting to somebody on -- about his renovation

10   work?

11   **A.**    Who, Sydni?

12   **Q.**    Uh-huh.

13   **A.**    He was helping -- it's affect -- this was a family

14   project, so he was helping me.

15   **Q.**    Who was supervising it?

16   **A.**    Supervising, he -- he's not a kid.  He's an adult.  I

17   didn't need to supervise him because he said he was -- I mean,

18   he was down there helping me, you know, clean the house out and

19   gut the house out.  So I didn't know that he needed to be

20   supervised.

21   **Q.**    And presumably, you communicated with Sydni about the

22   renovation work that he was doing?

23   **A.**    Repeat that.

24   **Q.**    Well, if Sydni was helping with the renovation work at the

25   house, you would have been in communication with him about

1  that; right?

2  **A.**   Yes.  I stated that Sydni was gut -- helping me clean the

3  house out.  You see, we knocked walls down.

4  **Q.**   Are you aware that several cell phones of your son's have

5  been recovered in this investigation?

6  **A.**   No, I'm not.  No, I'm not aware of that.

7            **MR. DAVIS:**  Objection as to characterization of --

8            **THE COURT:**  I'm sorry?

9            **MR. DAVIS:**  Objection as to the characterization of

10  several cell phones belonging to Sydni Frazier.

11            **THE COURT:**  All right.

12  **BY MS. HOFFMAN:**

13  **Q.**   Ms. Bess, would it surprise you to learn that there have

14  been no text messages discovered in which you've texted with

15  Sydni about renovation work?  Did you ever text with him about

16  renovation work?

17  **A.**   So you're asking me did I text -- did I, you know,

18  periodically text him in reference to the work that he was

19  doing down at the house?  Is that what you're asking?

20  **Q.**   Did you ever talk to him about it?

21  **A.**   Yes.  I don't -- I mean, yes, face to face.  We talked

22  face to face.  We didn't always have to be on the phone

23  communicating.

24  **Q.**   Always face to face?

25  **A.**   I mean, whenever we talk, we talk.

1   **Q.**   So it's your testimony that during 2016 and 2017, Sydni

2   was using the house for purposes of assisting with renovations?

3   **A.**   Around that time, I was doing things trying to renovate

4   the house.  It wasn't on a constant basis.  But, yes, Sydni was

5   helping me.

6   **Q.**   And that's why he was there, not for any other purpose?

7   **A.**   I don't know about anything else.  I know that he was down

8   there helping me with the renovation from time to time.  He

9   also would have other people, you know, guys coming in and help

10  do things.

11  **Q.**   But that was the purpose for which he was authorized to be

12  there, to do renovation work?

13  **A.**   Yes.

14  **Q.**   No other purpose?

15  **A.**   No.

16       **MS. HOFFMAN:**   Thank you, Ms. Bess.  I have no further

17  questions.

18       **THE COURT:**   Thank you, Ms. Hoffman.  We'll just see if

19  Mr. Davis has any.

20       **MR. DAVIS:**   I just have a couple of questions,

21  Your Honor.

22       **THE COURT:**   Go ahead.

23                      **REDIRECT EXAMINATION**

24  **BY MR. DAVIS:**

25  **Q.**   Ms. Bess, what type of paperwork did you have indicating

1   that you had authorization to access and control that house?

2   **A.**    A letter from Mr. Faruq from him when -- he had sent me a

3   letter from being incarcerated.  He had got the letter

4   notarized stating that he was giving me the house as a gift.

5   **Q.**    And where did you store that letter?  Where was it

6   located?

7   **A.**    In that house, it's a white -- like a storage drawer right

8   as you go in where the couch is, and I put it in one of those

9   drawers.

10  **Q.**    And did you have --

11          **MR. DAVIS:**  Court's indulgence.

12  **BY MR. DAVIS:**

13  **Q.**    I'm going to show you -- bear with me for one second.

14          I'm going to show you Frazier Exhibit No. 8, and I'm going

15  to move it up a little bit.

16          (Video was played but not reported.)

17  **BY MR. DAVIS:**

18  **Q.**    Now, this is a picture of coming in the front door of

19  961 Bennett Place.  Could you stop me when you see where

20  that --

21  **A.**    Can you move back right -- right there in the corner, this

22  white container right here.

23  **Q.**    I have my cursor on a white container in the bottom

24  right --

25  **A.**    Right there.  That white container, yes.

1  **Q.**   Is that where the notarized letter from Mr. Faruq is
2  located?
3  **A.**   That's where I -- that's where I put it.
4  **Q.**   Now, I'm going to show you Frazier Exhibit No. 4.
5      You previously testified that's the front door to
6  961 Bennett Place; correct?
7  **A.**   Yes.
8  **Q.**   And this is dated -- this photograph is the day that that
9  house was searched; correct?
10  **A.**   Correct.
11  **Q.**   And this picture shows a heavily armed law enforcement
12  officer breaking the door down; correct?
13  **A.**   Correct.
14  **Q.**   Because the door was locked with two locks; correct?
15  **A.**   Correct.
16  **Q.**   And, again, you didn't authorize anyone to go in there,
17  did you?
18  **A.**   No, I didn't.
19  **Q.**   Now, do you see any notice on that door?
20  **A.**   No, I don't.
21  **Q.**   I show you Frazier No. 9.
22      Now, again, you wrote this letter for what reason?
23  **A.**   To get extension -- get more time to pay the property
24  taxes on 961 Bennett Place.
25  **Q.**   Now, you're not a lawyer, are you?

**JA186**

```
 1   A.   No, I'm not.

 2   Q.   And you don't handle a lot of real estate, do you?

 3   A.   No, I do not.

 4   Q.   Have you ever heard the term "right of redemption"?

 5   A.   Yes.  That's what it was based on.

 6   Q.   And from your perspective, what did that mean?

 7   A.   That I have time to redeem the property back.

 8   Q.   And that's what you were trying to do --

 9   A.   Yes.

10   Q.   -- in . . .

11        And when did you learn that you were unable to redeem the

12   property back?

13   A.   Right after officer -- the officer got killed.

14   Q.   Shortly after that?

15   A.   Yes.

16        MR. DAVIS:  I have no further questions.  Thank you,

17   Ms. Bess.

18        THE COURT:  Anything else?

19        MS. HOFFMAN:  Just very briefly.

20                    RECROSS-EXAMINATION

21   BY MS. HOFFMAN:

22   Q.   The letter that we've just been talking about, this motion

23   for an extension of time to pay the taxes, that was denied as

24   moot in early October of 2017; is that right?

25   A.   It was October -- yes, I do believe so.
```

1  **Q.**   It was denied as moot prior to the search of the

2  residence?

3  **A.**   Excuse me?

4  **Q.**   This -- the motion for an extension that you filed was

5  denied as moot in early October of 2017?

6  **A.**   It was denied.  I don't know when, but it was denied.

7        **MS. HOFFMAN:**  Thank you.

8        **THE COURT:**  Okay.  Thank you very much, Ms. Bess.

9        **THE WITNESS:**  You're welcome.  Do you want this back?

10       **THE COURT:**  Sure.  Yes.

11       **THE WITNESS:**  (Handing.)

12     (Witness excused.)

13       **THE COURT:**  Just to be clear, you're not expecting to

14  call Ms. Bess back any further?

15       **MR. DAVIS:**  I am not, Your Honor.

16       **THE COURT:**  So she can remain in the courtroom.

17       All right.  Mr. Davis, would you be presenting any

18  other evidence?

19       **MR. DAVIS:**  No, Your Honor.

20       **THE COURT:**  All right.  Does the Government wish to

21  present any additional evidence?

22       **MS. HOFFMAN:**  Your Honor, may I have just a minute to

23  confer with counsel?

24       **THE COURT:**  Sure.

25       **MS. HOFFMAN:**  Your Honor, we are not going to call a

1    witness.

2           **THE COURT:**  Okay.  All right.  Then I'll be happy to

3    hear argument.

4           **MR. HARRIS:**  Court's indulgence.

5           **MR. DAVIS:**  Your Honor, I do have two exhibits to

6    move, Exhibit No. 1, which is a transcript of

7    Detective Niedermeier.  It's a short segment out of

8    Detective Niedermeier's testimony identifying where

9    Sydni Frazier resides.

10          And then Defendant's Exhibit No. 5, which is an MECU

11   card found in 961 on the day of the search in the name of

12   Sydni Frazier with an expiration date of 5/17.

13          And I think Your Honor has those in front of her.

14   They're hard copies.

15          **THE COURT:**  I do.

16          **MS. HOFFMAN:**  Your Honor, I don't object to those

17   exhibits being moved in.  I do object to the characterization

18   of Detective Niedermeier's testimony.  He did not testify that

19   Sydni Frazier resided at 961 Bennett Place.  He did testify he

20   was aware that address had been used by Frazier.

21          **THE COURT:**  Right.  I'll take that as -- I mean, if

22   that's what you want me to do, just to consider this piece of

23   this testimony, the answer is he has used two addresses,

24   2923 Rosalind Avenue and 961 Bennett Place.  And he did not say

25   that he resided in either of those.

**JA189**

1          **MR. DAVIS:**  Actually, I think the question was at

2    Line 8 [reading]:  And where did he reside?

3          **THE COURT:**  Precisely, but that's not -- exactly, but

4    the point is that that's not -- in answering it, the detective

5    says he had used two addresses.

6          If you want me to take that as meaning that the

7    detective knew that he lived at those addresses, I --

8          **MR. DAVIS:**  I don't think that that's what it means,

9    but I think it means that he -- that Sydni Frazier has

10   referenced 961 and 2923 as places he's associated with.

11         **THE COURT:**  Referenced as places he's associated with.

12         **MR. DAVIS:**  Yes.

13         **THE COURT:**  Okay.  That's fine.

14         **MR. HARRIS:**  Your Honor, in the exact --

15         **THE COURT:**  Mr. Harris.

16         **MR. HARRIS:**  I'm sorry?

17         **THE COURT:**  I just said "Mr. Harris."

18         **MR. HARRIS:**  Thank you.

19         In the exact same context, the New Jersey

20   Supreme Court has said [reading]:  The constitutional

21   protections afforded to the home make no distinction between a

22   manor estate in an affluent town and a ramshackle hovel in an

23   impoverished city.

24         That's <u>State versus Brown</u> from 2014 that we cited in

25   our brief.

1          Yet the Government's argument here hinges on the Court

2    classifying this house because of its condition as one where

3    the people who use that house are not entitled to

4    constitutional protections in it.

5          There are two questions here that are at the core of

6    this hearing.

7          The first is whether Mr. Frazier's expectation of

8    privacy in 961 Bennett Place was reasonable.  And the second is

9    if, in fact, that expectation was objectively reasonable,

10   whether the Baltimore Police Department had a reasonable belief

11   that the house was abandoned when they broke down the front

12   door in November of 2017.

13         There are a number of factors that suggest that,

14   indeed -- and indeed establish that Mr. Frazier not only had an

15   expectation of privacy, but that expectation was reasonable.

16         The first is that, unlike almost all of the cases that

17   the Government cites, this was his home.  This was the home

18   where, at least up till the time that he was 13, he and his

19   siblings and his mother lived in.

20         So this is not like the case where someone is in this

21   house for a short period of time as merely an invitee.

22         **THE COURT:**  But, Mr. Harris, that was through 2006.

23   We are talking, what, 11 years later?

24         **MR. HARRIS:**  Sure.  Well, there are a couple things.

25         Number one is Ms. Bess retained her possessory

1  interest in the house.  And so it's telling -- the language

2  that she used back in 2017 when she wrote to the City is:  I've

3  had this property for 25 years, and I don't want to lose it.

4       So she had -- and that's long before the litigation in

5  this case.

6       So she had manifested a belief, quite independent of

7  this criminal case, that she had a possessory interest in the

8  case.  And it's reasonable to think that she imparted that to

9  Mr. Frazier, as her son.

10      So he --

11      **THE COURT:**  Wait a minute.  But is her belief that she

12  has a possessory interest -- I mean, we also know that she was

13  evicted in 2006.

14      **MR. HARRIS:**  Right.

15      **THE COURT:**  Which would have disrupted the possessory

16  interest.

17      **MR. HARRIS:**  That's right.

18      And then she testified today that that was restored

19  when Mr. Faruq, while he was incarcerated, wrote her a

20  Certified Letter or a -- some kind of official document

21  saying -- notarized document saying that, notwithstanding the

22  action that he took to evict her, that he now wished to gift to

23  her the home.

24      And so --

25      **THE COURT:**  There's no -- I understand the reasoning

1    for that particular piece of paper not being available, that

2    it's in the house.

3         Am I also correct that there's never any record?  I

4    mean, presumably if there was something in the land records,

5    you could have brought that forward, so I'm assuming that there

6    isn't anything.

7         **MR. HARRIS:**  Right.  I believe that there isn't

8    anything.  I think this was an informal agreement between these

9    two people who had a long standing relationship with one

10   another and with the property where he simply said, I'm in

11   prison.  I'm not -- I mean, I haven't seen the document.  I

12   don't have any reason to think the document exists anymore.

13   But my understanding, essentially, of the contents was:  I'm in

14   prison.  I'm going to be in prison for a long time.  You and my

15   son have lived at this house.  We had our differences in the

16   past, and now you may use the house for whatever purpose you

17   wish.

18        And so there's a period of interruption there.  But by

19   2017, it is Ms. Bess who has the clearest possession of the

20   house, or at least that is her -- that is her understanding and

21   the understanding that she shares with Mr. Frazier.

22        And he continued to associate with that address, even

23   using the Gmail address, lilsid961@gmail, so he closely

24   identifies with the house up to 2017.

25        Moreover, there are the steps that Ms. Bess explained

1  that she laid out as to how Mr. Frazier was assisting her with

2  the renovation of the house.  And the Court can see in the

3  video that -- from the body-worn camera when the police go in

4  in November that, indeed, that appears to be a house that is

5  under renovation.

6        The Court can see, for example, the insulation rolls

7  and the steps that have been taken to gut part of the house, to

8  get basic electricity.  So the house is being made ready or had

9  been made ready for further renovation.

10        The most important reason that the expectation of

11  privacy was reasonable and objectively so is the steps that

12  Ms. Bess and Mr. Frazier took to exclude intruders from the

13  house.

14        So this is not a house where the door is falling off;

15  the windows are open.  Here you can see that glass is intact,

16  and some of the windows are new.  It still has the stickers on

17  from the store where they came from.  But the doors are locked.

18  The doors are intact.  And the locks work.

19        So the house has been made safe against intruders,

20  which is the very gravamen of a claim for an expectation of

21  privacy.  That's -- there can be no more compelling evidence of

22  that expectation than securing that house from in -- from

23  outsiders, and putting the plywood up in front of the windows

24  is an important part of that.

25        Moreover, Mr. -- the evidence is that the only people

1  who had a key to that house were Ms. Bess herself and

2  Mr. Frazier, so this is someone who can come and go as he

3  pleases.

4          Whatever the City has -- whatever steps the City has

5  taken to seize the property, notwithstanding, he has a key, so

6  he has access to the house.

7          Moreover, the final formal foreclosure did not happen

8  until after the search.  So the search is November 16th, 2017,

9  but Government's Exhibit 11 to the Government's opposition to

10  our motion shows that the formal foreclosure of the right of

11  redemption didn't occur until December 2017, so a month after

12  the entry into the house is when the City takes the final step

13  in seizing the house.

14          Up to that house [sic], Mr. Frazier has every reason

15  to think that that is his mother's house, a house where he can

16  keep his belongings, a house where he can stay occasionally,

17  and a house where he has a reasonable expectation of privacy.

18          Finally, on this point, Mr. Frazier isn't the only

19  person who regarded himself as a resident of that.  Depending

20  on how you read the testimony of Detective Niedermeier, it

21  appeared that he regarded 961 Bennett as Mr. Frazier's

22  residence as well.

23          And in terms of the securing the house against

24  intruders, I wanted to add the "no trespassing" sign and the

25  "secured by ADT" sticker which are on the windows is one more

1  step that they have taken to say, This is our property.  Stay

2  out of it.

3       **THE COURT:**  Sure.  Mr. Harris, you're using the word

4  "they" and "our."  I heard that Ms. Bess did that.  I didn't

5  hear that Mr. Frazier did that.

6       **MR. HARRIS:**  Well, you heard evidence from Ms. Bess,

7  testimony from Ms. Bess that she was working in conjunction

8  with Mr. Frazier to repair the house, that he was someone who

9  had access to the house who was working at her behest.  I mean,

10  he's clearly not a licensed contractor, but that's, I think,

11  quite immaterial.  He is the person that she has turned to to

12  help her turn this house into one that is suitable for an

13  assisted living facility.

14       And so in so doing, he has access to the house; he has

15  the ability to keep his things there; and indeed he did keep

16  his things there.  There's, for example, his banking card which

17  is found in the house and which was still valid at the time

18  that he was arrested in January of 2017.

19       So he has possessions there.  He is clearly working at

20  her behest to maintain that property, restore that property.

21       So -- and then there's no voluntary abandonment of

22  this house.  The Government argues, depending on the Stevenson

23  case, that because he wasn't around in November 2017 to

24  safeguard the house and its belongings, that he has no standing

25  to live there -- or, excuse me, no standing to assert the

1   constitutional right against a search of that residence; but,

2   of course, he was incarcerated at that time.  He was hardly --

3   it was hardly a voluntary giving up of -- relinquishment of his

4   property rights.

5           And the Stevenson case which the Government relied on

6   involves a case where it's a former renter, not the former

7   resident, who dis -- who expressly disclaims any property

8   interest in the property in question there.

9           So he has -- it is reasonable for him to expect, given

10  the steps that he and -- that he and his mother took to protect

11  the house against intruders, to maintain that house, and to

12  repair it for commercial use that he has an expectation -- the

13  expectation of privacy in the house and, therefore, standing to

14  contest a search of that house.

15          But that doesn't quite finish the inquiry if the Court

16  finds that the Government has proven that Baltimore Police

17  Department had a reasonable belief that the house was abandoned

18  at the time they came into it in November 2017.

19          A couple points on this.

20          The first is that, although there is plenty of

21  evidence in front of the Court that the City Housing Authority

22  has taken steps to condemn the house and that perhaps -- and

23  surely they had concluded by 2017 that the house was abandoned,

24  there's no evidence whatsoever that that -- that the police

25  officers who came through the door in November had access to

1   that information.

2        This -- now, certainly they could have found that

3   information out, and I would argue that the kind of prudent

4   investigation that precedes busting down someone's door entails

5   finding out that kind of information.

6        It's easy enough to find out.  You merely have to call

7   the Housing Authority, look up the kinds of public records that

8   the Government provided the Court in preparation for this

9   motions hearing to see that the City has classified this as an

10  abandoned house.  But there's no reason to ascribe that

11  knowledge to the officers who came through the door.

12       The Court -- to assess the reasonableness of their

13  mind-set, I think the Court has to look at the information that

14  was available to them.  And there's no evidence whatsoever that

15  they were aware that the City had taken these steps.

16       As we can see, there is no -- on the day they come

17  into the house, there is no placard on the door saying that

18  this is an abandoned property.  What we see instead is a "no

19  trespassing" sign and an ADT sticker.  So it certainly appears

20  that in 2014, there was such a sticker on the door.  But in

21  2017, when the officers come through, there is no such sticker

22  on the door.

23       The other thing to keep in mind is, as the

24  Third Circuit said in Harrison, there's no "trashy house"

25  exception to the warrant requirement.  And the Court in

1    Harrison said [reading]:  It is unreasonable to assume that a

2    poorly maintained house is an abandoned house.

3           And that's at best what we have here.

4           This isn't -- from the outside it's not a particularly

5    trashy house.  The door -- as I said, the doors and the

6    windows, you can see for yourself, the outside of the house,

7    it's not -- it's nothing fancy, but it is not particularly

8    dilapidated, unlike the cases in which courts have found that

9    an officer could reasonably -- reasonably believe that the

10   house they're entering is abandoned.

11          And for those reasons and because of the similarities

12   between these cases and the case that we cited in our brief,

13   United States v. Spence from the Eastern District of Michigan

14   and then the Brown, which I cited at the beginning of my

15   discussion, that the -- that merely because the house is not in

16   the condition that one would -- that a homeowner would like to

17   have the house in -- merely because the house is somewhat run

18   down does not mean that the police have carte blanche to enter

19   the house and search it.

20          **THE COURT:**  Thank you.  I appreciate that.

21          **MR. DAVIS:**  Your Honor, I brought up

22   Government's Exhibit No. 11 to their motion.  That's the

23   document that Mr. Harris was referring to, that the right of

24   redemption wasn't foreclosed until December 19th of 2017.

25   That's when Mr. Faruq and Ms. Bess lost control of the home.

1    **THE COURT:**  That's when the right of redemption became

2   final.  I don't think we've gotten into exactly what anybody's

3   legal right to control the property may have been after the

4   City declared it abandoned, apparently, or a vacant house.

5    But I appreciate the final -- it hasn't actually been

6   introduced at the hearing, but it's fine.  This was one of the

7   documents that the Government --

8    **MR. DAVIS:**  That's correct.  The actual deed is also

9   in the -- attached to the Government's filing as an exhibit.

10  And the actual deed transfer does not take place until May of

11  2018.

12    **THE COURT:**  Well, I think we should clarify this.

13    Are you suggesting, Mr. Davis, that I should take note

14  of all the Government's exhibits that were attached to their

15  opposition and consider them as part of this hearing?

16    **MR. DAVIS:**  I am assuming that they were since they

17  were filed as part of their pleading.  But if not, I would ask

18  that they -- and as well as the exhibit that was attached to my

19  original motion, which is the search warrant that was executed

20  subsequent to the search that we were talking about today.

21    **THE COURT:**  Okay.  Any objection to that?

22    **MS. HOFFMAN:**  No objection.  Thank you.

23    We would also ask the Court to consider the exhibits

24  that were attached to our motion.

25    And I would note that the certified judgment of

**JA200**

1  foreclosing rights of redemption that Mr. Davis just pulled up

2  is the same document that indicates that Ms. Bess' emergency

3  motion for an extension of time to file taxes was denied as

4  moot in, I believe it was, October 4th of 2017, so before the

5  search here took place.

6          Your Honor, I want to start by taking a step back and

7  explaining why this issue is important.

8          The gun box that was recovered from 961 Bennett Place

9  is a key piece of evidence in the case.  I think by now

10  Your Honor is familiar with the basic facts of the case, but

11  I'll recount them briefly.

12          Ricardo Johnson's body was found in the back of a

13  stolen van parked by the Light Rail tracks in Westport at

14  approximately 6:05 a.m. on August 10th of 2016.

15          He'd been bound by his wrists and ankles, blindfolded,

16  and shot more than 20 times.

17          Roughly 11 hours later on the other side of town in

18  the 2100 block of Tucker Lane, police -- Baltimore police

19  officers attempted to arrest an individual for riding an

20  illegal dirt bike.  That person turned out to be the defendant,

21  Sydni Frazier, although they didn't know it at the time.

22          He fled from the officers and wasn't arrested on that

23  day; but in the process of fleeing, he dropped a backpack and a

24  pair of gloves that he'd been wearing.

25          The backpack contained the two murder weapons:  a

1    Taurus 9-millimeter-caliber firearm and a Smith & Wesson

2    9-millimeter-caliber firearm.

3         And it also contained two of Sydni Frazier's

4    cell phones and a jacket with his DNA on it.

5         The gloves had Frazier's DNA on the outside -- I'm

6    sorry, Frazier's DNA on the insides and the victim,

7    Ricardo Johnson's, DNA on the outsides.

8         Mr. Frazier's defense at trial is going to be that he

9    was an accessory after the fact.  He's going to claim that he

10   wasn't involved in abducting Ricardo Johnson and tying him up

11   and shooting him to death.  He was just the unfortunate flunky

12   who the killers called up after the fact to dispose of the

13   evidence.

14        And the gun box demolishes that argument.  There's

15   other evidence that undercuts it, but the gun box puts the nail

16   in the coffin.  It proves that the Taurus 9-millimeter gun that

17   was used to kill Ricardo Johnson was Frazier's gun.  It came

18   from his stash house at 961 Bennett Place.

19        And lo and behold, the box with the matching serial

20   number is still there in the vacant house ten months after he's

21   arrested.

22        Now, defense counsel faulted us in their reply brief

23   for not addressing the merits of the warrantless entry into

24   961 Bennett Place.  And the reason we didn't address the merits

25   in our brief is that the standing issue is clear and it's

1   dispositive, and there's simply no need to wade into the facts

2   of a completely unrelated investigation into

3   Detective Sean Suiter's death.

4        **THE COURT:**  Let me just interrupt for one second

5   because I think we should be clear.  I appreciate your giving

6   me the background.  Obviously, whether what was retrieved is

7   important or not, important to your case, is not something for

8   me to consider when I make a ruling on the standing question.

9        **MS. HOFFMAN:**  I agree completely, Your Honor.

10       Your Honor, Sydni Frazier has not come close to

11  meeting his burden of showing that he had an objectively

12  reasonable expectation of privacy in the vacant house at

13  961 Bennett Place when it was searched on November 16th of

14  2017.

15       First of all, he had no legal authority to be on the

16  property.

17       Frazier's claim is that he had a property interest in

18  961 Bennett Place that was derivative of his mother, whose

19  property interest was in turn derivative of her one-time

20  boyfriend, Karim Faruq, whose long-since-defunct corporation,

21  Karim Enterprises, purchased the property in 1989 and defaulted

22  on the taxes.

23       There are several big problems with this argument.

24       First of all, Karim Faruq did not have possession of

25  the property on November 16th, 2017, when the search took

1   place.

2        Defense counsel doesn't dispute this, and it's

3   dispositive of the standing question.

4        Frazier couldn't acquire a property interest in

5   961 Bennett Place from someone who had no authority to give it.

6        Defense counsel doesn't dispute that on May 16th of

7   2016, the City of Baltimore sold the property to Maryland Tax

8   Properties 2016, LLC, in a tax sale.  And because the property

9   was not occupied by the owner, the City had the right of

10  immediate possession of the property upon completion of the

11  sale pursuant to Maryland Tax Property Code, Section 14-830,

12  subsection (e).

13       So from May 16th, 2016, until the search, Faruq did

14  not possess 961 Bennett Place.  The City possessed

15  961 Bennett Place.

16       And it makes sense that the tax property code is

17  written in this way.  It's written such that people don't get

18  kicked out of their homes that they're actually living in

19  during the redemption period.

20       If the defaulted owner is still living in the house,

21  they continue to have the right of possession up until the

22  judgment foreclosing the right of redemption.

23       But when the defaulted owner isn't living in the

24  house, when it's vacant, like here, the Legislature was less

25  concerned with the defaulted owner's possessory interests and

1    made a determination to favor the City so the City can attempt

2    to abate the nuisance of vacant -- of a vacant, unsafe

3    property.

4            The Maryland Court of Appeals has discussed the

5    purpose behind Baltimore City's tax sale process in dealing

6    with a different provision of the statute.

7            In <u>Canaj</u> -- I'm probably pronouncing that wrong --

8    <u>Canaj, Incorporated, versus Baker and Division Phase III</u> --

9    this is 391 Md. 374, a 2006 case, the Court observed that,

10   quote [reading]:  There are literally thousands, 5,000 or more,

11   of abandoned or vacant homes creating such severe problems for

12   the City of Baltimore that it is attempting to resolve some of

13   them by the tax sale process.

14           And the Court of Appeals went on to discuss the

15   legislative history of the statute at some length, quoting from

16   the testimony of the commissioner of the Baltimore Housing

17   Department before the House Ways and Means Committee.

18           The Court said, quote [reading]:  The kind of damage

19   that an abandoned house inflicts on its neighborhood is well

20   known.  There is nothing that contributes so swiftly or

21   substantially to neighborhood decline as an abandoned house,

22   whether it's boarded up or left wide open to passersby.

23           An abandoned house guarantees a drop in area property

24   values and, consequently, a drop in the City's tax base.

25           It collects trash and harbors rats.  It attracts

**JA205**

1  criminals, vandals and arsonists and drug dealers and other

2  people engaged in dangerous and detrimental activity.  The

3  vacant property thus precipitates and contributes to a

4  spiraling decline in the quality of urban life throughout the

5  neighborhood.

6           House Bill 1251 restores the tax sale as a valuable

7  tool for both tax collection and property acquisition by

8  would-be rehabbers.

9           So in this case, Maryland's tax property code was

10  working exactly as it should.  When the tax sale happened on

11  May 16th of 2016, the City had the immediate right of

12  possession so that it could rehabilitate the property.

13          Faruq no longer possessed 961 Bennett Place after

14  May 2016 and any reasonable expectation of privacy was

15  extinguished.

16          **THE COURT:**  That was May 16th of 2016 --

17          **MS. HOFFMAN:**  May 16th of 2016.

18          **THE COURT:**  -- for tax sale.  Okay.

19          **MS. HOFFMAN:**  So that's hurdle number 1 that the

20  defendant can't surmount, and the inquiry could stop there.

21          But, second, even if the defendant could surmount that

22  obstacle, even if Faruq had some possessory interest in the

23  property to convey, the defendant hasn't met his burden of

24  showing that Faruq gave his mother or him permission to be on

25  the property.

1           There's one person who's conspicuously absent from

2   this hearing, and that's the purported owner, Faruq.  Faruq

3   didn't testify.  In fact, the last record that we have of any

4   interaction between Lisa Bess and Karim Faruq is an eviction

5   lawsuit in 2007.  It was started in 2006.  She was evicted in

6   2007.  So despite being in prison, Faruq went through the

7   trouble of filing a lawsuit to evict Ms. Bess from the

8   premises.

9           Now, defense counsel tried to resuscitate her property

10  interest by pointing to the emergency motion for an extension

11  to pay property taxes that Ms. Bess filed in September of 2017,

12  but it's nothing more than a handwritten letter which she

13  admits she filed.  It doesn't have Faruq's signature on it.

14          Faruq was back out on the street at that point in time

15  in September of 2017.  She could have gotten him to sign it.

16  His signature is missing from the document.

17          And, in any event, that petition, that emergency

18  petition, was denied as moot, as I mentioned, in early

19  October 2017, a month before the search took place.

20          And there's nothing in this record indicating that

21  Faruq gave Bess or Frazier permission to be at

22  961 Bennett Place after 2007.

23          To the contrary, there is evidence that Lisa Bess and

24  Sydni Frazier knew that they didn't have permission to be

25  there.

1        On July 16th, 2016, Lisa Bess sent a text message to

2   her son, Frazier, saying:  Do not go in that house.  And if you

3   have anything in there, get it out.

4        It's hard to imagine clearer evidence that Frazier did

5   not have a reasonable expectation of privacy in

6   961 Bennett Place.

7        Over a year before the search, he was on notice that

8   he had no right to be there and that he was taking his chances

9   with any items he left there.

10       All we have at this hearing indicating that Faruq gave

11  Bess or Frazier permission to be there is the self-serving

12  testimony of the defendant and his mother.  And their testimony

13  is severely undercut by Faruq's eviction lawsuit; by the

14  text message from July 16th, 2016; and by other lies that

15  Frazier has been caught in over the course of this

16  investigation, which we discussed in our motions response.

17       On this record, the defendant simply hasn't shown that

18  the purported owner of the property gave him permission to be

19  there for any purpose.  So that's obstacle number 2, which is

20  also dispositive.

21       So to recap, Faruq didn't have possession of

22  961 Bennett Place after May 16th of 2016, so he couldn't have

23  conveyed a possessory interest in it to Frazier.

24       And, number two, even if he did have possession,

25  there's no credible evidence that Faruq gave Bess or Frazier

1    permission to use the property.

2         And what that means is that Frazier hasn't met his

3    burden of showing that he had lawful authority to be on the

4    premises, which means that he's no different from the

5    bootlegger in the Fourth Circuit's decision in Chico, who

6    surreptitiously had made a key to his friend's father's

7    storeroom and used it to store liquor.  He's no different from

8    the illegal gambler in the Fourth Circuit's decision in Jackson

9    who put his belongings in a vacant house.

10        He's no different from the drug trafficker in Simmons,

11   the Fourth Circuit's decision in Simmons, who claimed that his

12   girlfriend was renting the apartment for him, but the rental

13   agreement was for a different apartment in the same building.

14        Even if Frazier could get past these obstacles and

15   show that he had permission to be there from the lawful owner,

16   the evidence is clear that his purpose for being there was

17   commercial and not social.  He was a purely business visitor,

18   not an overnight guest along the lines of the defendants in

19   Minnesota versus Olson or Jones versus United States.

20        In fact, there's been no testimony at this hearing

21   that Mr. Frazier ever stayed at the residence after 2007.

22        The only testimony we have from his mother is that he

23   was authorized to conduct renovations at the property.  We have

24   no testimony that he ever slept there.

25        I also want to be clear that there is no credible

1  evidence to support the theory that Mr. Frazier was actually

2  assisting with the rehab work at the property.  We haven't seen

3  any work permits.  We haven't seen any blueprints.  We haven't

4  seen any evidence of a contractor.  Ms. Bess says she doesn't

5  remember who she hired.  There is no plumbing or no

6  Porta Potties outside the residence, which you would think

7  would be a necessity for a long-term construction project such

8  as this.

9          Mr. Frazier has no training in rehabbing properties.

10         His phones are full of text messages about selling

11  drugs from the property and not a single one about renovations.

12         Thousands and thousands of text messages and not a

13  single one about the rehab work that Ms. Bess claims he was

14  doing there on a regular basis.

15         So the rehab claim is a fabrication.

16         There's one and only one purpose for which

17  Sydni Frazier used the vacant property at 961 Bennett Place,

18  and that was to run his drug-trafficking business.

19         His phones are chock-full of evidence that he

20  regularly told drug customers to meet him there to purchase

21  drugs.  We've attached excerpts from his cell phones as

22  Exhibits 1 and 3 to the motions response.

23         He told Undercover Officer Chris Faller, who testified

24  at the last trial, to meet him in the 900 block of

25  Bennett Place to buy drugs in May of 2016.

```
1          The search itself confirmed that the house was being

2    used as a stash location.  There was virtually nothing in the

3    house other than the telltale signs of drug

4    trafficking:  drugs, gelcaps, sifters, razor blades,

5    ammunition, gun holsters.  No beds, no wardrobe, no toiletries,

6    no toothbrush.

7          Another witness, who I'll refer to as ML, testified at

8    the last trial that he met Sydni Frazier at a vacant house on

9    the corner of Bennett Place several times to buy drugs in 2016.

10         ML also specifically testified at the last trial that

11   he believed the dwelling was vacant.  He used that word.

12         In other words, that Sydni Frazier was not living

13   there; he was simply using it as a stash house.

14         And that puts Frazier squarely in the same camp as the

15   defendants in Minnesota versus Carter and United States versus

16   Gray.

17         In both cases, the Court -- Supreme Court in

18   Minnesota v. Carter and the Fourth Circuit in

19   United States versus Gray, held that a defendant who uses a

20   friend's residence to package and distribute drugs has no

21   legitimate expectation of privacy in the residence.

22         It didn't matter in those cases that the defendants

23   were there with the owner's permission.  It didn't matter that

24   the defendant in Gray was a repeat visitor, somebody who had

25   been seen distributing drugs from the residence on prior
```

**JA211**

1  occasions.

2       The Fourth Circuit has interpreted the Supreme Court's

3  decision in <u>Minnesota v. Carter</u> to mean that there's a clear

4  distinction between the status of individuals present at a

5  residence for social purposes and those present for business or

6  commercial matters.

7       Even if we were to believe Frazier's claim that he was

8  actively assisting with renovations at the property, it

9  wouldn't change the fact that he was a business visitor and not

10  a social guest.

11      Let's say I hire a contractor to do renovations on my

12  house and I give him a key and permission to come and go as he

13  pleases to work on the house.

14      Let's say he's there every day hammering and sawing.

15      And one day he stashes a bloody knife under my sink.

16  And the police come to my house, and I give them consent to

17  search the house.  And they recover the bloody knife, and they

18  charge the contractor with murder.

19      The contractor, I think we can all agree, would not

20  have standing to contest the search because he's purely a

21  business visitor at my house.

22      The same is true here.  Even if Faruq and Lisa Bess

23  gave Frazier permission to come and go as he pleased to do

24  rehab work, it wouldn't convert him into a social guest with a

25  reasonable expectation of privacy in the premises.

**JA212**

1        The Supreme Court explained in <u>Minnesota versus Olson</u>

2    and again in <u>Minnesota versus Carter</u> that the overnight guest

3    exception is meant to recognize that staying overnight in

4    another's home is a long-standing social custom that serves

5    functions recognized as valuable by society, such as house

6    sitting or visiting relatives.

7        Those are not the circumstances -- these are not the

8    circumstances in which the overnight guest exception is meant

9    to apply.  Here the weight of the evidence demonstrates that

10   Frazier purposely chose a location that he could easily

11   distance himself from, a vacant property where he was not

12   residing, to use as a stash for drugs and guns.  We know he was

13   residing elsewhere.  We know he was residing elsewhere because

14   he told Detective Niedermeier on January 3rd in a recorded

15   interview that he was living at 2923 Rosalind Avenue with his

16   mother.

17       We know because on January 25th, 2017, he was arrested

18   coming out of his girlfriend's house at 7002 Upper Mills Circle

19   at 9:30 in the morning, having clearly slept there the night

20   before.

21       He told the arresting officers unequivocally that he

22   was staying there with his girlfriend.  His girlfriend and her

23   mother confirmed it.

24       The search warrant confirmed it.  His clothes in her

25   bedroom.

1          And remember, too, that he was arrested in the dead of

2     winter, on January 25th.  There was no heat at

3     961 Bennett Place.  There was no electricity, no working

4     electricity to charge his phones, no toilet to go to the

5     bathroom.  There were no beds.

6          His girlfriend's house had heat and running water.

7     His mom's house had heat and running water.

8          That's where he was living, not at 961 Bennett Place.

9          Finally, even if Sydni Frazier had a reasonable

10    expectation of privacy prior to his arrest on January 25th of

11    2017, it was extinguished by the time of the search on

12    November 16th of 2017.

13         And defense counsel framed this up as an abandonment

14    argument, but it's not quite that.  It's even more basic.

15         The point is that whether you're an overnight guest or

16    a business visitor, any reasonable expectation of privacy that

17    you have in someone else's home lasts only so long as your

18    overnight guest or business visitor status lasts.

19         When you stop being an overnight guest or a business

20    visitor at someone else's home, you no longer have a reasonable

21    expectation of privacy there.

22         And that's clear from the hotel/motel case law.  The

23    Fourth Circuit in <u>Kitchens</u>, which we cited in our brief, held

24    that defendants have no legitimate expectation of privacy in a

25    rented hotel room after checkout time, even though they had

**JA214**

1   left property behind.

2         Here, Sydni Frazier had been incarcerated for ten

3   months when police searched the house pursuant to a completely

4   unrelated investigation.

5         Whether his absence was voluntary or not, it's

6   undisputed that he was neither a social guest nor business

7   visitor at the time the search was conducted.

8         I think the Fourth Circuit's decision in <u>Stevenson</u>,

9   which we talked about in our brief, is instructive because in

10  that case, the defendant was more than an overnight guest.  He

11  was an actual paying tenant, and only four days had elapsed

12  since his arrest when the police searched the apartment.

13        And the Fourth Circuit held that the defendant no

14  longer had any reasonable expectation of privacy in the

15  apartment simply because he had written a letter to his

16  girlfriend referring to himself as the former renter and giving

17  her permission to take his property from the premises.

18        As compared to the defendant in <u>Stevenson</u>, Frazier has

19  a far weaker connection to the searched property, and a far

20  longer period of time had elapsed since he last set foot on the

21  premises.

22        Defense counsel hasn't cited any cases, and I'm not

23  aware of any holding that a one-time overnight guest or here

24  business visitor to someone else's home retains a reasonable

25  expectation of privacy months after ever setting foot there.

1   And I think such a rule would defy our everyday understandings

2   of what society recognizes as reasonable.

3          So for all these reasons, Mr. Frazier didn't have a

4   reasonable expectation of privacy in 961 Bennett Place.  Faruq

5   was no longer in possession of the property after May 2016, so

6   he couldn't get -- he couldn't give Frazier permission to be

7   there.

8          In any event, Frazier hasn't put forward any credible

9   evidence that Faruq gave his mother or him permission to be

10  there after 2007.

11         To the contrary, there is evidence that he was on

12  notice that he was not permitted to be there as of July 2016,

13  and he was using the vacant dwelling for an exclusively

14  commercial purpose to run his drug-trafficking business.

15         For all those reasons, he has no reasonable

16  expectation of privacy, and I am happy to address the merits

17  arguments if Your Honor would like.

18         **THE COURT:**  Not at this point.

19         Any reply, Mr. Harris?

20         **MR. HARRIS:**  Briefly.  Thank you, Your Honor.

21         Initially, Your Honor, I think the Government, by

22  saying that Mr. Frazier hasn't proven to the Court that he had

23  a reasonable expectation of privacy, the Government gets the

24  burden wrong.

25         Having raised the issue of standing and made a case

1  for standing, it is the Government's obligation to show that

2  that expectation was unreasonable.

3       And --

4       **THE COURT:**  Can you cite me to that, Mr. Harris?  I

5  thought on the issue of expectation of privacy that the

6  defendant had to show a reasonable expectation of privacy.

7       **MR. HARRIS:**  Well, I think -- the evidence here, I --

8  forgive me.  I got that wrong.

9       The -- Court's indulgence, please.

10      (Counsel conferred.)

11      **MR. HARRIS:**  Well, the -- a warrantless entry is

12  presumptively unreasonable, and so given -- and of a residence,

13  of a property.  And so the fact that the police chose here to

14  proceed without a warrant is a presumptively unreasonable

15  action.  The Government has to show that, indeed, it was

16  reasonable.

17      **THE COURT:**  If we get to that.

18      **MR. HARRIS:**  That's right.

19      **THE COURT:**  But only a person with standing, which is

20  a reasonable expectation of privacy, has the right to make that

21  argument.

22      **MR. HARRIS:**  That's right.

23      **THE COURT:**  Okay.

24      **MR. HARRIS:**  There is plenty of evidence, as I've

25  previously laid out, as to why his expectation of privacy is

1    reasonable.  And it is that expectation that controls here.

2          So as the Government goes through the minutia of

3    Maryland case law and statutes when it comes to property, I

4    think that is -- none of that is material here because none of

5    that was in Mr. Frazier's mind or Ms. Bess' mind as he -- as to

6    whether they have a reasonable expectation of privacy in this

7    property.

8          **THE COURT:**  But, Mr. Harris, that would suggest that

9    someone could have a completely made-up expectation of privacy

10   in his neighbor's house.  We would not recognize that as

11   reasonable, I assume.

12         **MR. HARRIS:**  Sure.  But it has to be reasonable.  So

13   the question here is, notwithstanding Section 14-830,

14   Paragraph (e), and what that says about abandoned houses and

15   the legislative history on abandoned houses, none of that makes

16   their expectation unreasonable.

17         Ms. Bess believed from Mr. Faruq that she was able to

18   live in the house and restore the house.

19         Mr. Frazier believed from Ms. Bess that he was able to

20   stay at the house, keep property at the house.

21         And as long as the Court finds that that belief was

22   reasonable, then he has standing to contest entry into that

23   house.

24         So it was reasonable for her to believe that because

25   Mr. Faruq had communicated it to her.  It was reasonable for

1   Mr. Frazier to believe it because -- and clearly she did

2   actually believe it.  She wouldn't have written the 2017 letter

3   to the Court saying this is, you know, Please let me keep my

4   home, the place that I've had for the past 25 years.  She

5   wouldn't have written that to the Baltimore City Circuit Court

6   if she hadn't actually believed it.  And there was reason --

7   there was good reason for her to believe it.  It was reasonable

8   for her to have that belief.  And her belief is the same as

9   Mr. Frazier's belief.

10          So he is unlike all -- he is unlike, say, a hotel

11   guest or a business associate in that this was his home.  This

12   was a place that he had lived.  And this was a place, as far as

13   he knew, that his mother continued to own and have dominion

14   over.

15          Moreover, they had keys to the place.

16          So unlike the hypothetical where you have a totally

17   unreasonable expectation of privacy because you just believe

18   that you're entitled to your neighbor's home, here they

19   actually manifested that belief by keeping property in the

20   home, having access to the home, actually going in and out of

21   the home.

22          So this is nothing like the cases where we have the

23   one-time business invitee who comes in.  This is nothing like

24   the hypothetical that the Government spins about if I have a

25   contractor and that person works for me five days of the week

1   and he secretes some contraband in my house, he has no

2   expectation of privacy.  But that person never stays overnight.

3   That person never lived in the house.  That person wasn't

4   raised in the house.

5         And so Mr. Frazier's in a far different position than

6   the business invitees that come up in the cases the Government

7   cites.

8         **THE COURT:**  Mr. Harris, I understand probably what you

9   meant is that Mr. -- I mean, Mr. Frazier presumably used to

10  sleep there as a child.  Did I miss something?  Is there any

11  evidence in the record that he was sleeping at Bennett Place

12  for the relevant time period?

13        **MR. HARRIS:**  So there's the couch -- so there's not --

14  there's no testimony that he -- that he stayed there.  I agree

15  with the Court.

16        But there is testimony that he had the opportunity to

17  do so, that he -- because the couch was there, because he had a

18  key.  There were other places, no doubt, in this period of time

19  that he was staying, for example, the address in Catonsville

20  where he was arrested.  But that's not to say that he never

21  stayed there.  And it's not to say that he didn't have an

22  expectation -- reasonable expectation of privacy in the

23  property that he left behind even if he wasn't staying there on

24  a regular basis.

25        With regard to the July 2016 text message where

1  Ms. Bess said, Get your property out and don't go back to the

2  property, all that proves is that as of July 12th, he wasn't

3  able to live there or able to keep his property there.

4        So if the raid had happened on July 13th, then I think

5  the Government would be in a much stronger position to say she

6  had said expressly, You cannot live there.  You cannot stay

7  there.  You cannot leave your things there.  And so, therefore,

8  on July 13th, he has no expectation of privacy.

9        But Ms. Bess testified that this happened -- this

10  happened more -- a year and a half, roughly, before the raid,

11  that text wasn't the only means by which she communicated with

12  Mr. Frazier, and that this -- she -- she sent that text at a

13  time that she was angry with him.  They subsequently got over

14  that.

15        She talked to him in person, not just by text, about

16  whether he could use the house.  And her testimony was that

17  after that date, he was able to use the house as he saw fit,

18  including to keep property there.

19        The Government argues essentially that the

20  rehabilitation is fake, that there's -- because he doesn't

21  discuss the rehab in his text messages, he wasn't actually

22  carrying out any rehab and because he wasn't a licensed

23  contractor, he wasn't carrying out -- carrying out -- he --

24  because he wasn't a licensed contractor, he wasn't actually

25  carrying out any rehabilitation.

1          So it is conceivable that people operate without a

2     license.  It is conceivable that people rehabilitate houses,

3     especially if they don't have a lot of money to spend on the

4     rehabilitation, especially if they're relying on family members

5     to carry out the rehabilitation, that they would do so without

6     a license.

7          So the fact that Mr. Frazier didn't seek a license in

8     this case does not indicate that he wasn't actually carrying

9     out the rehabilitation.

10         Moreover, there's no explaining the presence of rehab

11    materials, such as insulation and new wiring, except for the

12    fact that the house was, in fact, being renovated.

13         And to the extent that they were actually carrying out

14    renovations, as a final point, that shows that indeed this was

15    a reasonable expectation of privacy.  They believed reasonably

16    that they could use the house; they could store things in the

17    house.

18         And apart from the legal status of the house, they had

19    a reasonable belief that they could -- that they could use the

20    house and, therefore, a reasonable expectation of privacy in

21    it.

22         **THE COURT:**  All right.  Thank you.

23         Anything else?

24         **MS. HOFFMAN:**  Not unless the Court has questions.

25         **THE COURT:**  Okay.  All right.  Let's see.  I'm going

**JA222**

1   to take a recess until about 12:30.  And those are the only

2   motions, right, the motion to dismiss and the motion to

3   suppress?

4            **MR. DAVIS:**  On behalf of Mr. Frazier, yes, Your Honor.

5            **MS. HOFFMAN:**  There is the consent motion to admit the

6   readback of testimony by --

7            **THE COURT:**  Right, which is a consent motion.

8            **MS. HOFFMAN:**  Yeah.

9            **THE COURT:**  And we are, I believe, scheduled -- I

10  actually have a pretrial in this matter after the motions

11  hearing is over; is that right?

12           **MR. DAVIS:**  It is.

13           **THE COURT:**  I think in chambers.

14           **MR. DAVIS:**  That is my understanding.

15           **THE COURT:**  So we can take up that consent motion at

16  that point.

17           All right.  We'll take a recess until 12:30.

18       (Recess taken.)

19           **THE COURT:**  All right.  You can be seated, please.

20           I gather that Mr. Frazier has not actually been

21  arraigned on the third superseding indictment, so perhaps we

22  should do that.

23           **THE CLERK:**  Mr. Frazier, please stand.

24                     SYDNI FRAZIER, SWORN

25           **THE CLERK:**  Please state your full name for the

 1 │ record.

 2 │         **THE DEFENDANT:**  Sydni Frazier.

 3 │         **THE CLERK:**  What is your age?

 4 │         **THE DEFENDANT:**  26.

 5 │         **THE CLERK:**  What year were you born?

 6 │         **THE DEFENDANT:**  '94.

 7 │         **THE CLERK:**  Mr. Frazier, how do you wish to plead to

 8 │ Counts 1 through 4 of the third superseding indictment?

 9 │         **THE DEFENDANT:**  Not guilty.

10 │         **THE CLERK:**  Thank you.

11 │         **THE COURT:**  All right.  Thank you.  You can be seated.

12 │         I'm going to give you oral rulings on the two motions,

13 │ and I will reserve the right to edit these for the mistakes of

14 │ grammar and style I'm sure I'm about to make, without any

15 │ substantive changes.

16 │         And I should also say in regard to the motion to

17 │ suppress that I have considered and am incorporating in my

18 │ findings all the exhibits that have been offered by both sides,

19 │ either today or in their papers, even if I don't specifically

20 │ refer to them.

21 │         First, on the defendant's motion to dismiss Count 2 of

22 │ the third superseding indictment, Count 2 is a charge of

23 │ possession and use of a firearm in furtherance of a

24 │ drug-trafficking crime resulting in death.

25 │         And there was a motion to dismiss, essentially relying

1   on the violation of the constitutional right to speedy trial

2   that has been opposed by the Government.

3        There are various factors that a defendant has to show

4   to establish a constitutional violation of the right to speedy

5   trial.

6        I'm looking at a case called United States

7   versus Shealey from the Fourth Circuit, 641 F.3d 627, which

8   discusses the factors being delay, whether that was uncommonly

9   long; what the reason was for the delay; whether there was an

10  assertion of a right to a speedy trial; and also whether a

11  prejudice resulted to the defendant which seems to incorporate

12  the notion that's also discussed in other case law about

13  whether there was some tactical advantage that the Government

14  was trying to obtain.

15       So based on the parties' papers and the record in this

16  case, first of all, it does not appear to me that there was any

17  unreasonable delay in the sense that the facts underlying the

18  charge in this case essentially have not changed or they may

19  have been added to, but the basics of the events that

20  Mr. Frazier was on notice of hasn't changed.  It relates to the

21  alleged -- the abduction and murder of Mr. Johnson, and that's

22  been constant throughout.

23       The Government, after a mistrial, which was one done

24  for manifest necessity and with Mr. Frazier's consent, decided

25  that rather than having to prove the entire RICO count with

**JA225**

1  Mr. Frazier just in the case, that they would dismiss that case

2  and substitute the 924(j).  That is a reason that does not

3  suggest trying to get tactical advantage.

4         Most important, there is no prejudice that's been

5  shown by Mr. Frazier, particularly in regard to any issues of

6  evidence or witnesses or anything like that.

7         Again, he's been on notice of what the charge is since

8  the beginning.  So I don't find any unreasonable delay, and I

9  don't find any prejudice or tactical advantage to the

10 Government.

11        So I will deny the motion to dismiss Count 2 of the

12 third superseding indictment.

13        The motion to suppress the evidence found at

14 961 Bennett Place has obviously been the focus of the hearing

15 this morning.  We're talking about a search that took place in

16 November of 2017, after the death of Detective Sean Suiter.

17        It was a warrantless arrest of that house that was

18 made by the Baltimore City Police.  And as the defense

19 correctly indicates, if that's what we were looking at, simply

20 the warrantless arrest, I would be expecting the Government to

21 justify that warrantless arrest.

22        But there is a preceding question, which is whether

23 the defendant, whose burden it is, has been able to show a

24 legitimate expectation of privacy in that residence.  And I

25 think the discussion in <u>United States versus Gray</u> at

1  491 F.3d 138, the Fourth Circuit case from 2007, incorporates

2  the relevant principles, including those from the

3  Supreme Court.

4       First of all, it's not enough that an individual have

5  a subjective expectation of privacy.  It has to be an

6  expectation that the law recognizes as legitimate.  That means

7  it has to be an objectively reasonable expectation of privacy.

8       Again, the burden is on the defendant.  Not every

9  visitor, even if they are there with the consent of the person

10 that actually owns or rents or has the right to control the

11 property, not every visitor has a legitimate expectation of

12 privacy.  And the Supreme Court as well as the Fourth Circuit

13 in Gray have made a significant distinction between people that

14 are essentially present for a business transaction and those

15 that are there as a social guest.

16      And people present for a business transaction,

17 generally speaking, don't have a legitimate expectation of

18 privacy in the home or apartment of a third party.

19      What the facts show here is that Ms. Bess and her son,

20 Mr. Frazier, did live at this address on Bennett Place through

21 approximately February of 2007 when they were evicted by the

22 then-owner, Karim Faruq, or perhaps an LLC, but I'll just say

23 "Mr. Faruq."

24      I will certainly, for purposes of this motion, accept

25 Ms. Bess's testimony that at some point before 2016, Mr. Faruq

1   sent her a letter saying that she could have this property and

2   renovate it.  However, there is no evidence that there was any

3   legal transfer of title at that time or, indeed, at any time to

4   Ms. Bess.  But at that point, it seems that Mr. Faruq was still

5   the owner and could have allowed her access to this property.

6          And certainly it does appear that she was attempting

7   to do some degree of renovation at times.  It's not exactly

8   clear when, but there's certainly evidence of renovation still

9   present on the premises at the time of the search in November

10  of 2017.

11         However, in May of 2016, this property was sold to

12  another LLC for nonpayment of taxes.  While Mr. Faruq

13  presumably still had the right to redeem that property for a

14  period of time if the taxes had been paid, it does not appear

15  that he any longer had the right to possess the property.  He

16  was not living at the property.  He was not the owner of the

17  property.

18         But very critical also is that as of the actual search

19  in November of 2017, it continued to be the case that Mr. Faruq

20  did not have any right to allow either Ms. Bess or anyone else

21  onto that property.  It was very close to the final redemption

22  sale.

23         Ms. Bess's emergency attempt to get an extension to

24  pay the taxes, she sent that letter in September of 2017.  The

25  motion was denied in October of 2017.

1          So even though the final redemption sale -- I find the

2   sale did not apparently become absolutely final until December

3   of 2017, according to the documents.  Certainly as of the

4   search, Mr. Faruq had no right to allow either Ms. Bess or

5   Mr. Frazier on the property, and they had no reasonable

6   expectation of privacy -- certainly Mr. Frazier did not -- in

7   the house at that time.

8          Beyond that, assuming, again, that Mr. Faruq did write

9   Ms. Bess the letter, allowed her to renovate the property, that

10  it appears that she and Mr. Frazier at one point had keys and

11  permission to be on, she did, and she gave Mr. Frazier some

12  limited permission to be on.  That permission, according to the

13  evidence, was only to assist with the renovation.

14         Now, it's very unclear what renovation work

15  Mr. Frazier was doing.  We know he was not doing the electrical

16  work because he didn't have a license to do that.

17         But, in any event, Ms. Bess did not give him

18  permission to live there.  There is simply no evidence that he

19  ever slept there after 2007.  Indeed, Ms. Bess said in her

20  testimony that the house was uninhabitable.

21         As of January of 2017, which would have been the last

22  time that Mr. Frazier could have been there prior to his being

23  arrested at the end of the month, you know, there's no heat.

24  There's no plumbing.  It's not habitable.  So there's no

25  evidence that at any point, frankly, that he was a social

1    guest, that he left his clothes there, that he slept there.

2    That's simply not there at all.

3        Beyond the fact that Ms. Bess gave permission,

4    assuming it was hers to give, for one very limited and

5    commercial purpose, that permission was revoked by the

6    text message in July of 2016, which made sense because it

7    coincided with the tax sale in May of 2016.  She explicitly

8    told Mr. Frazier not to go there and to get his stuff out of

9    the house, and I did not hear any evidence of that permission

10   being given back, again, even assuming it was her right to give

11   back.

12        At best, at the very best, Mr. Frazier had some

13   limited permission, through his mother, to be on the property

14   to do some renovation, and that was it.  I think actually that

15   the Government's analogy to a contractor that comes on your

16   property to do some sort of renovation is pretty apt.  I don't

17   think that society recognizes that it's a reasonable

18   expectation that the contractor thereby has an expectation of

19   privacy in the house.  I don't think that's reasonable, and

20   certainly we don't even have those facts here.

21        Even in addition to that, there are approximately ten

22   months that pass after Mr. Frazier is arrested and before this

23   search takes place.

24        Given that he was not even a social guest -- he

25   certainly was never paying rent or anything like that --

1    whatever limited expectation of right to be in the house that

2    he hypothetically might have had as of January of 2017, he

3    would no longer reasonably or objectively expect to possess

4    that ten months later.  He was certainly not doing any

5    renovation work while he was locked up.

6            Finally, I'll mention the reference in Detective

7    Niedermeier's testimony that yes, he was asked whether he knew,

8    or words to that effect, where Mr. Frazier resided.  His answer

9    was that he was aware that Mr. Frazier had used the address of

10   Bennett Place and the other one that was given.  I do not take

11   that as any evidence of his actually living at the property.

12   There is ample evidence through the text messages that he used

13   the property for drug dealing, but not as a residence.

14           So for those reasons, I am denying the motion to

15   suppress the tangible evidence found in the course of the

16   search in November of 2017.

17           Anything I've left out?  Anything I haven't addressed?

18           **MS. HOFFMAN:**  No.  Thank you.

19           **THE COURT:**  Okay.  Would counsel like to come back

20   immediately, or would you like to come back at 2 o'clock for

21   the pretrial conference?

22           **MS. HOFFMAN:**  We're flexible.  Whatever works best for

23   the parties.

24           **MR. DAVIS:**  We're at the Court's disposal.  We're

25   here.

1          **THE COURT:**  All right.  Well, why don't we adjourn for

2     now, and why don't we say 2 o'clock for the pretrial conference

3     in chambers.

4          **MR. DAVIS:**  Sure.

5          **MS. HOFFMAN:**  Thank you.

6          **THE COURT:**  All right.  Thank you.

7          (Court adjourned at 12:44 p.m.)

8                              I N D E X

9     <u>WITNESSES:</u>                                      <u>Page</u>

10    LISA BESS
           Direct by Mr. Davis                      4
11         Cross by Ms. Hoffman                     16
           Redirect by Mr. Davis                    36
12         Recross by Ms. Hoffman                   39

13

14         I, Douglas J. Zweizig, RDR, CRR, FCRR, do hereby certify

15    that the foregoing is a correct transcript from the

16    stenographic record of proceedings in the above-entitled

17    matter.

18
                              _____
                                        /s/
19
                        Douglas J. Zweizig, RDR, CRR, FCRR
20                         Registered Diplomate Reporter
                           Certified Realtime Reporter
21                          DATE:  September 28, 2022

22

23

24

25

## UNITED STATES v. SYDNI FRAZIER

## EXHIBIT SHEET

Case No:  CCB-16cr0267                                    Defendant
Exhibits

| No. | Description | I.D. | Adm. | | Deposition or Witness |
|-----|-------------|------|------|---|----------------------|
| 1 | Niedermier's Testimony on 4/9/19 | 2/18/2020 | 2/18/2020 | | |
| 2 | New Windows – Bars - Boarded | 2/18/2020 | 2/18/2020 | | |
| 3 | No Trespass Sign | 2/18/2020 | 2/18/2020 | | |
| 4 | Forcible Entry | 2/18/2020 | 2/18/2020 | | |
| 5 | MECU Card 05-17 | 2/18/2020 | 2/18/2020 | | |
| 6 | Video 5 .57 to 1.11 X81124465 Under construction | 2/18/2020 | 2/18/2020 | | |
| 7 | Video 5 4.29-4.43 X81124465 Couch-construct-surprised | 2/18/2020 | 2/18/2020 | | |
| 8 | Video Electrical work | 2/18/2020 | 2/18/2020 | | |
| 9 | Redemption Letter | 2/18/2020 | 2/18/2020 | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND
2020 FEB 19  AM 8: 52
CLERK'S OFFICE
AT BALTIMORE
BY_____ DEPUTY

**JA233**

```
 1              IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MARYLAND
 2                     NORTHERN DIVISION

 3   UNITED STATES OF AMERICA,    )
          Plaintiff,             )
 4                                )
          vs.                    )  CRIMINAL CASE NO. CCB-16-0267
 5                                )
     DANTE BAILEY, et al.,        )
 6        Defendants.             )
 7   _____)

 8

 9                     Tuesday, April 9, 2019
                         Courtroom 1A
10                     Baltimore, Maryland

11        BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                    (AND A JURY)
12

13                       VOLUME XIII

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Assistant United States Attorneys

17   For the Defendant Dante Bailey:

18   Paul Enzinna, Esquire
     Teresa Whalen, Esquire
19

20   _____

21

22
                       Reported by:
23
                 Douglas J. Zweizig, RDR, CRR, FCRR
24               Federal Official Court Reporter
                 101 W. Lombard Street, 4th Floor
25                Baltimore, Maryland  21201
```

*Douglas J. Zweizig, RDR, CRR - Federal Official Court Reporter*

1   of the signed warrant, and swabs were taken from his cheek.

2   **Q.**   And were those swabs submitted to the BPD laboratory for

3   testing?

4   **A.**   Yes.

5   **Q.**   During the course of your investigation, were you able to

6   determine where Sydni Frazier resided?

7   **A.**   Yes.

8   **Q.**   And where did he reside?

9   **A.**   He had used two addresses, 2923 Roslyn Avenue in

10   Northwest Baltimore and 961 Bennett Place in West Baltimore.

11   **Q.**   And I want to direct your attention to November 16th of

12   2017.

13      Did you have an occasion to conduct a search warrant at

14   961 Bennett Place on that day?

15   **A.**   Yes.

16   **Q.**   And was that search warrant conducted pursuant to a

17   related or an unrelated investigation?

18   **A.**   The search warrant was in reference to an unrelated

19   incident.

20   **Q.**   At the time the warrant was executed, where was

21   Mr. Frazier?

22   **A.**   Incarcerated.

23   **Q.**   And was the residence occupied at that time?

24   **A.**   No. It didn't appear to be so.

25   **Q.**   Did you recover anything of relevance to the investigation



2017-11-16 T14:52:52Z
AXON BODY 2 X81083614

POLICE

-08:03

JA236



2017-11-16 T14:58:54Z
AXON BODY 2 X81167623

NO TRESPASSING

POLICE



JA238



| GOVT. EXHIBIT NO. | SW12I |
| CASE NO. | CCB-16-0267 |
| IDENTIFICATION | |
| ADMITTED | |

**JA239**

9/27/17

24-C-16-004,751

Emergency Extension of Time

To Pay the Property Tax

Dear : Sir / Madan gudge I am asking for this extension because I need some more time to come up with the rest of the money I've had this Property for 25 years and I don't want to loose it I have invested in this Property. Please concider giving me an extension.

Thanking you.

Sincerly

Karine Farug

Lisa Bess

2923 Rosalind Ave
Baltimore, Maryland 21215
410 - 900 - 5351 - Lisa Bess
443 - 454 - 3738 - Karim Farug
10000 Villiag Green Drive
Woodstock MD. 211163

## CERTIFICATE OF SERVICE

I hereby certify that on this ___27___ day of _September_

20_17_, I mailed a copy of the foregoing _____
                                          (Description of paper/pleading)
to: _Emergency Extension of Time to Pay the_
_Property Tax_

_Nauman Aaron_
Name of opposing party/attorney

_Suit 202_
Address

_25 Hooks Lane_
Address (continued)

_Baltimore, Maryland 21208_
City, State and Zip


_Karim Faruq_
(Signature)
_Lisa Bess_

_2923 Rosalind Ave — Lisa Bess_
_Baltimore, Md. 21215_

_10000 Villiage Green Drive — Karim_
_Woodstock MD. 211163                Faruq_

**JA242**

-1-

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. CCB-16-0267** |
| | ) | |
| **SYDNI FRAZIER,** | ) | **FILED UNDER SEAL** |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM 961 BENNETT PLACE

The Defendant, Sydni Frazier, has moved to suppress evidence seized from a vacant home at 961 Bennett Place in Baltimore, Maryland on November 16, 2017.  ECF 1265.  This motion should be denied.  Frazier had no ownership or legitimate possessory interest in 961 Bennett Place, a vacant dwelling that was in tax foreclosure proceedings and had been sold by the city to a third party in May 2016—18 months before the search took place.  Even if he had permission to enter from the owner, a wealth of evidence establishes that Frazier lived elsewhere and used the vacant dwelling solely as a stash location for guns, drugs, and other contraband.  Furthermore, during the roughly ten months between his arrest and the search of the building, Frazier made no effort to claim any belongings that remained and evinced no intention to return there.  For all these reasons, he did not have a reasonable expectation of privacy in the vacant dwelling.

The Government reserves the right to make non-standing arguments should the Court determine that Frazier has met his burden of demonstrating a reasonable expectation of privacy in 961 Bennett Place.

-2-

# I.  RELEVANT FACTUAL BACKGROUND

## A. Murder of Ricardo Johnson

On August 10, 2016, at roughly 6:25 a.m., the body of Ricardo Johnson was discovered in the backseat of a stolen van parked beside the light rail tracks in the 2200 block of Kloman Street in Baltimore.  Johnson's wrists and ankles had been bound, and he had been shot over twenty times in the head, neck, torso, and buttocks.  Numerous 9mm caliber casings and projectiles were recovered from in and around the van.  The investigation revealed that Johnson had been abducted outside his residence at 1101 West Lanvale Street at roughly 2:30 a.m. that morning while he was on the phone with his girlfriend.  Johnson's girlfriend heard what sounded like a scuffle and impassioned voices, and then the phone abruptly hung up.  She immediately called 911 and ran to the scene, but neither she nor police could locate Johnson.

At roughly 5:17 p.m. on August 10, less than twelve hours after Johnson's body had been found, members of the Baltimore Police Department ("BPD") Dirt Bike Task Force were in the area of 2100 Tucker Lane when they observed an unknown black male—later identified as Sydni Frazier—riding a dirt bike.  Because the use of dirt bikes is illegal in Baltimore City, the officers attempted to stop Frazier and confiscate the bike.  Frazier fled on foot and, in the process, abandoned the dirt bike as well as a backpack and gloves he had been wearing.  Frazier was able to evade arrest, but the officers obtained video footage of Frazier on the dirt bike from nearby surveillance cameras.

The backpack Frazier abandoned was found to contain a jacket, two cell phones, and two loaded 9mm caliber handguns—a Smith & Wesson 9mm caliber semi-automatic handgun with serial number HAE0456 and a Taurus 9mm caliber semi-automatic handgun with serial number

**JA244**

-3-

TJN73204.  Both guns were a ballistic match to the 9mm caliber casings recovered from the murder scene.  In addition, the BPD DNA and Serology laboratory determined that Frazier's DNA profile matched DNA from the *insides* of the gloves, and the *victim's* DNA profile matched DNA from the *outsides* of the gloves.

The cell phones found in the backpack contained additional evidence linking Frazier to the murder.  For instance, five days before the murder, on August 5, 2016, Frazier received text messages from phone number (410) 831-5525 instructing him to "Get a box of rubber gloves" because "We don't want to touch nuffn."  Exhibit 1 (Cell Phone Excerpts), at 11.  Frazier replied, "that's a mandatory."  *Id.*  On August 10, 2016, at 11:18 a.m.—roughly five hours after Johnson's body was discovered—the same phone number sent Frazier another text message attaching a screenshot of a news article about the murder, titled, "Search for witnesses after man found fatally shot in back of minivan by light rail station."  *Id.* at 13.  (At the time, police had not yet identified the victim as Ricardo Johnson.)

As discussed further below, in addition to the text messages tying Frazier to the murder, the cell phones contained text messages demonstrating that Frazier was in the business of distributing heroin.  Witness testimony has established that Frazier's involvement in drug trafficking related to his motive for committing the murder.  At Frazier's initial trial in Spring 2019,[1] ▮ testified that Ricardo Johnson was "known to have a lot of drugs," and Frazier "wanted the drugs."  According to ▮, Frazier was affiliated with a Bloods gang known as

---

[1]    The Defendant went to trial with five co-defendants on March 18, 2019.  In the fifth week of trial, the Defendant's court-appointed attorney, Christopher Davis, had a medical emergency that made it impossible for him to continue in the case.  The Court declared a mistrial as to the Defendant due to manifest necessity, severed the Defendant from the case, and scheduled a retrial for February 24, 2020.  *See* ECF 1130.

-4-

Murdaland Mafia Piru (MMP), and, in the days leading up to the murder, Frazier told other members of the gang that he wanted to "kidnap" Johnson and rob him of his drug stash. In the days following the murder, ██████ heard Frazier admit to killing Johnson, and he also observed Frazier with an unusually large quantity of heroin, which Frazier shared with other members of MMP.

Robbery was not the only motive for the murder, however. ████████ testified that the leader of MMP had authorized Johnson's murder because Johnson was rumored to be cooperating with law enforcement. Wiretap evidence introduced at trial confirmed that members of MMP wanted Johnson dead in the weeks leading up to his murder. In summary, the evidence established that Frazier had two motives for killing Johnson: to rob him of his drug stash, and to eliminate a potential witness against the gang.

**B. Arrest of Sydni Frazier on January 25, 2017**

On January 25, 2017, in connection with the Ricardo Johnson murder investigation, members of the Bureau of Alcohol, Tobacco, Firearms & Explosives ("ATF") executed a federal arrest warrant charging Frazier with possession of firearms and ammunition by a felon. At the time of his arrest, Frazier was residing with his girlfriend (Ariel Johnson) and their 9-month-old daughter at 7002 Upper Mills Circle in Catonsville, Maryland. At approximately 9:30 a.m., Special Agent Timothy Moore observed Frazier and Ms. Johnson exit the residence and approach a Honda Accord parked outside while carrying an empty baby car seat. ATF agents approached Frazier and placed him under arrest. Agent Moore delivered *Miranda* warnings, which Frazier verbally acknowledged and waived.

-5-

In a search of Frazier's person, ATF agents recovered a clear plastic bag containing a mixture of heroin and fentanyl weighing approximately five grams, three cell phones, and a set of house keys for 7002 Upper Mills Circle.  The keys were returned to Ms. Johnson at her request. Frazier advised Agent Moore that he stayed at 7002 Upper Mills Circle.  *Id.* at 3.  Ms. Johnson confirmed that she was Frazier's girlfriend and that he stayed with her at the residence on a regular basis.  She added that he kept his clothing there.  Agent Moore also spoke to Ms. Johnson's mother, Ms. Tina Halloway, who arrived at the residence shortly after Frazier was arrested.  Ms. Halloway advised that she was the owner of the property.  She confirmed that Frazier stayed at the house with his girlfriend—her daughter, Ariel Johnson.  She also asked how she could get Frazier "put out" of the house because she no longer wanted him living there.

Investigators executed a search warrant at 7002 Upper Mills Circle following Frazier's arrest.  In the front bedroom on the main floor, they located photographs of Ms. Johnson and mail addressed to her.  They also located clothing in a men's size small, consistent with Frazier living there.

After his arrest, Frazier was brought to the ATF building in Baltimore, where he signed a *Miranda* waiver form and agreed to take part in a videotaped interview.  During the interview, Frazier made a series of demonstrably false statements.  For instance, when asked about the dirt bike chase on August 10, 2016, Frazier claimed that the person on the bike was not him, and that he never rode dirt bikes or wore gloves.  But publicly accessible Facebook and Instagram photographs show Frazier sitting atop dirt bikes, while wearing gloves.  In addition, when shown a photograph of the victim, Frazier denied knowing him.  However, wiretap evidence demonstrates that Frazier did know Ricardo Johnson, and, in fact, that Johnson owed Frazier money shortly

-6-

before the murder.   Finally, Frazier denied ever being in the 1100 block of West Lanvale Street,

but cell site location information establishes that Frazier's cell phone was pinging off a cell tower

in the area of the 1100 block of West Lanvale Street around the time Johnson was abducted.

## C. Frazier's Stash House at 961 Bennett Place

Although Frazier was living at 7002 Upper Mills Circle in Catonsville at the time of his

arrest, a wealth of evidence establishes that he was using a vacant residence at 961 Bennett Place

in Baltimore to conduct his drug trafficking operation.

For instance, in May 2016, Frazier directed an undercover officer posing as a drug user to

meet him in the 900 block of Bennett Place to purchase drugs.   ATF Task Force Officer

Christopher Faller testified at trial that he encountered Frazier while working in an undercover

capacity in the 2000 block of Forest Park Avenue on May 2, 2016.  TFO Faller asked Frazier much

it would cost to buy "an eight ball" of "girl"—coded language for an eighth of an ounce of crack

cocaine.  Frazier initially told TFO Faller that he would charge $250, but TFO Faller negotiated

the price down to $200.  In the coming days, Frazier and TFO Faller exchanged text messages

about meeting up to conduct the transaction, and Frazier directed TFO Faller to meet him at "945

Bennett place."[2] *See* Exhibit 2 (ATF Report #114), at 6.

In addition, ▮▮▮ testified at trial that he purchased heroin from Frazier in the area of

Bennett Place on multiple occasions.  ▮▮▮ testified that he would sometimes meet Frazier on a

particular block on Bennett Place, and, on at least one occasion, he saw Frazier go inside of a house

on the block and exit with heroin that he then sold ▮▮▮.  ▮▮▮ testified that he purchased heroin

from Frazier on four or five occasions, and he typically purchased between five and ten grams of

---

[2]     They did not ultimately carry out the transaction because Frazier became worried that his potential customer was "police."  *Id.* at 3.

-7-

heroin from Frazier at a time.  During roughly this same period of time, an undercover officer

conducted a series of controlled purchases of heroin and fentanyl from █████.

Consistent with █████'s testimony, the cell phones discarded by Frazier on August 10, 2016

contained numerous text messages indicating that Frazier would meet drug customers in the area

of 961 Bennett Place to sell them drugs.  For instance, on July 6, 2016, a customer using phone

number (717) 387-0051 sent Frazier a text message asking whether Frazier could "spot" him "a

gram" of heroin for $50 if the customer provided the remaining $50 the following day.  *See* Exhibit

3 (Cell Phone Excerpts), at 9.  The customer asked whether he should go to "bennett or forest"

(*i.e.*, Bennett Place and Forest Park Avenue).  *See id.*  Later, the customer advised, "Yo im here

parked behind your caR bennett is closed."  *Id.* at 10.  After the transaction was completed, the

customer complained about the quality of the drugs, saying: "Dude that white shit was trash man

. . . got my girls nose bleedin."  *See id*.

On July 9, 2016, a drug customer using phone number (443) 850-8939 sent Frazier a text

message asking whether Frazier was "dwn bennett"—*i.e.*, on Bennett Place—and saying he

"need[ed]" Frazier.  *See id.* at 13.  Later, the customer told Frazier he was ready to come to Bennett

Place to get "2 pills" of heroin.  *See id.*  On July 14, 2016, the same customer sent Frazier text

messages indicating that he wanted to buy a specific quantity of heroin for a specific amount of

money.  *See id.* at 16.  Later, the customer advised that he was on Bennett Place and asked how

long it would take Frazier to get there.  *See id.* ("How long til u get dwn benn . . . Im right here

bro.").  On July 19, 2016, the same drug customer sent Frazier a text message saying he was ready

to "come holla" at Frazier and asking where Frazier was.  *See id.* at 20.  Frazier said he was "Down

ben"—*i.e.*, on Bennett Place.  *See id.* at 26.

-8-

On July 16, 2016, a drug customer using phone number (540) 836-7103 sent Frazier a text message asking, "You good?"  *Id.* at 16.  Frazier said "Yes" and asked, "What u need[?]"  *See id.* at 23.  The customer stated that he was going to pick up the "3 pills" of heroin that Frazier owed him and that he "want[ed] 2 more."  *See id.* at 16.  Later, the customer advised that he was "here on benett" and then clarified that he was "[i]n front of 1000 benett."  *Id.* at 16.  Frazier said, "Coming to u now."  *See id.* at 23.  The following day, the same customer asked Frazier whether he was "good for a 12 for 10."  *Id.* at 18.  Frazier said "Yes."  *See id.* at 24.  Later, the customer advised, "I'm here at 1000 Bennett."  *Id.* at 18.

On July 24, 2016, Frazier directed another individual to meet him at "961 Bennett Place." *See* Exhibit 1, at 3.  Frazier also used the email address "lilsid961@gmail.com."  *Id.* at 1.

**D.  Search Warrant Executed at 961 Bennett Place on November 16, 2017**

Since his arrest on January 25, 2017, Frazier has been incarcerated at the Chesapeake Detention Facility in Baltimore, Maryland.  Roughly ten months later, on November 16, 2017, members of the Baltimore Police Department searched the vacant dwelling at 961 Bennett Place in connection with an unrelated homicide investigation.

On November 15, 2017, at approximately 4:36 p.m., BPD Detective Sean Suiter was fatally shot in the rear yard of 961 Bennett Place.  *See* Report to the Commissioner of the Police Department of Baltimore Concerning an Independent Review of the November 15, 2017 Incident and Its Aftermath, *available at* https://assets.documentcloud.org/documents/4793351/Suiter-Report-Public.pdf (last visited February 1, 2020), at 1.[3]  He was pronounced dead at the University of Maryland Shock Trauma Center the following day.  *Id.* at 53.

---

[3]      The Report accurately describes the rear yard of 961 Bennett Place as the "vacant lot immediately west of 959 Bennett Place."  *Id.* at 1, 11, 27.  As shown in Figure 7, it is the grassy

-9-

In the immediate aftermath of the shooting, investigators did not know who had shot Detective Suiter or why. *See generally id.* at 1–39.  At the time of the incident, Detective Suiter had been investigating a triple homicide in the Harlem Park neighborhood with BPD Detective David Bomenka.  *Id.* at 19.  According to Detective Bomenka, shortly before the shooting, Detective Suiter reported seeing a suspicious person in the area.  *Id.* at 24.  Detective Bomenka saw Detective Suiter run toward the vacant lot at 961 Bennett Place and begin to unholster his gun. *Id.* at 29–30.  He heard Detective Suiter shout "Stop! Stop! Stop! Police!" and then heard several gunshots.  *Id.* at 31.  Detective Suiter's radio transmitted a brief unintelligible sound before going dead.  *Id.* at 31–32.  Detective Bomenka found Detective Suiter lying face down in the vacant lot, with his gun drawn and his radio in his left hand, suffering from a gunshot wound to the head.  *Id.* at 31–37.  Based on these facts and circumstances, investigators reasonably believed that there was an active shooter in the area.  *Id.* at 36; *see also id.* at 1.

The following morning, November 16, 2017, at approximately 9:53 a.m.,[4] a BPD Swat Team made entry into the vacant building at 961 Bennett Place on an emergency basis in order to check for additional victims or suspects.  The officers activated their body-worn cameras prior to entering the building.  They made an orderly sweep of each room of the house, determined that there was no one inside, and exited the dwelling at approximately 10:00 a.m.

The body-worn camera footage depicts all the telltale signs of a vacant property. Photographs from the footage are attached as Exhibit 4.  The grass in the rear yard is overgrown,

---

area immediately east of 961 Bennett Place (pictured on the right) and immediately west of 959 Bennett Place (pictured on the left).  *See id.* at 30.  It is enclosed by a fence that marks the outer boundary of 961 Bennett Place.

[4]  The time stamp from the body worn camera shows initial entry at approximately 14:53 Zulu time, which is equivalent to 9:53 a.m. in Eastern Standard Time.  Exhibit 4, at 5.

-10-

and there is litter strewn about.  The windows are boarded up, and the numbers on the front door ("961") are faded almost beyond recognition.  There is a "No Trespassing" sign posted in the window to the right of the door.  In the window to the left of the door, there is a notice that appears to have the City of Baltimore insignia on it—possibly a Vacant Building Notice.  Many of the rooms inside do not have proper walls or even floors.  There do not appear to be working lights or plumbing.  Loose wires hang from some of the walls.  There is bulk refuse at the base of the stairs and in a back room.  There are no beds or futons or anything resembling an area where a person might sleep.  As the officers make their way through the building, they say things like, "If anybody steps in here, watch this hole," and, "Looks like there's no walls, it's under construction."

Although the house was unfit for human habitation, the officers observed evidence of illegal drug trafficking activity in plain view at the base of the stairs, including suspected drugs and drug paraphernalia, a box for a Taurus gun, and multiple rounds of ammunition.  The body-worn camera footage shows what looks like a spoon with white powder residue sitting on top of a package of insulation material.  One officer says, "Hey just a heads up, there's a pistol holster right here on the ground."  Another officer chimes in: "There's another one over here along the wall."  Later, an officer can be heard saying, "There's a bunch of packaging material here too."

Because the officers had observed contraband in plain view inside the residence, they applied for a warrant to search the residence for evidence relating to the shooting of Detective Suiter.  The search warrant was issued later that morning by the Honorable Devy Russell of the District Court of Maryland for Baltimore City.  *See* Exhibit 5 (Search Warrant).

BPD officers executed the warrant at approximately 11:40 a.m. on November 16, 2017.  Photographs from the execution of the search warrant are attached as Exhibit 6.  Among other

-11-

evidence, law enforcement officers recovered a Taurus gun box, a box of Magtech .25 caliber

ammunition, additional .38 caliber ammunition, two gun holsters, a spoon with white powder

residue, two sifters, plastic gloves, bags of empty vials and gelatin capsules of the type commonly

used to package narcotics, razor blades with white powder residue, gelatin capsules containing

white powder, and an expired ATM card in the name of "Sydni D. Frazier." The ATM card was

sitting on top of a mirror coated in white powder residue amidst all the other contraband. *See id.*

at 9. The serial number on the Taurus gun box—TJN73204—matched the serial number on the

Taurus 9mm caliber firearm recovered from Frazier's backpack and used to kill Ricardo Johnson.

In the same area as the contraband at the base of the stairs, the photographs depict a Baltimore City

Housing Department notice advising that a certificate of occupancy requires certain building

inspections prior to issuance, and that "electrical, mechanical, plumbing and H.V.A.C.& R.

permits" require certain building inspections. *See id.* at 5.

### E. Housing and Property Records for 961 Bennett Place

Contrary to the Defendant's claims, neither Sydni Frazier nor anyone in his family owned

or legally resided at 961 Bennett Place in 2016 or 2017. In fact, the property was deemed "vacant"

and "unfit for human habitation" by the Baltimore City Housing Department as of April 2013 at

the latest.

Property and housing records show that on November 24, 1987, Gladys Williams and her

husband Charles Williams acquired the title to 961 Bennett Place after having purchased it from

the Director of Finance and Collector of State Taxes for the City of Baltimore. *See* Exhibit 7 (1987

Deed for 961 Bennett Place). On April 28, 1989, Gladys Williams and Charles Williams conveyed

the property to Karim Enterprises, Inc., a Maryland Corporation registered to Charles Williams of

-12-

4637 York Road, Baltimore, MD 21212. *See* Exhibit 8 (1989 Deed for 961 Bennett Place). Not

long afterward, on October 11, 1989, Karim Enterprises, Inc. forfeited its corporate status. *See*

Exhibit 9 (Karim Enterprises Corporate Status).

In the early 1990s, Charles Williams, who now went by "Karim Faruq," was arrested in

connection with a federal drug trafficking investigation. In 1993, he was convicted of conspiracy

to distribute heroin, possession of a firearm by a felon, income tax evasion, and money laundering,

and sentenced to 385 months in prison. *See United States v. Karim Faruq*, Criminal No. CCB-91-

0217.[5] While incarcerated, he stopped paying property taxes for 961 Bennett Place.

On May 16, 2016, the Director of Finance and Collector of State Taxes for the City of

Baltimore sold 961 Bennett Place to MD Tax Properties 2016, LLC in tax foreclosure proceedings.

*See* Exhibit 10 (2018 Deed for 961 Bennett Place). On August 24, 2016, MD Tax Properties 2016,

LLC filed a complaint against Faruq to foreclose rights of redemption, and a notice was posted to

the property the same day. *See* Exhibit 11 (Certified Judgment Foreclosing Rights of Redemption),

at 4. On December 19, 2017, the Circuit Court for Baltimore City issued a judgment decreeing

that the title to 961 Bennett Place had vested in MD Tax Properties 2016, LLC based on the

proceedings in *MD Tax Properties 2016, LLC vs. Charles Williams a/k/a Karim Faruq*. *See id.* at

1. On April 23, 2018, the Director of Finance and Collector of State Taxes for the City of

Baltimore conveyed 961 Bennett Place to MD Tax Properties 2016, LLC. *See* Exhibit 10.

Meanwhile, in early April 2013, the Baltimore City Housing Department inspected 961

Bennett Place and determined that it was a vacant building. *See* Exhibit 12 (Certified Housing

---

[5]     Faruq was granted a sentencing reduction on November 18, 2015, at which time his
sentence was reduced to 349 months in the Bureau of Prisons. He was released on May 3, 2017,
and his supervised release was terminated on November 18, 2019. *See* CCB-91-0217, ECF 357.

-13-

Department Documents), at 16–21.[6]  The Department issued a Code Violation Notice and Order

Number 947040A concluding that 961 Bennett Place was "in violation of the Building, Fire and

Related Codes of Baltimore City" and "unfit for human habitation."  *Id.* at 16.  Between 2013 and

2018, Department officials periodically inspected the property, took photographs, and ensured that

the property was kept clean and clear.  *See id.* at 9–15, 21–41.  For instance, photographs from

October 22, 2014 show the aforementioned code violation notice posted to the front door of the

property.  *Id.* at 32–33.  On March 3, 2016, the Baltimore City Housing Department issued Citation

Number 54288345 with respect to 961 Bennett Place for failure to register a Vacant Building

Notice.  *See* Exhibit 13 (VBN Citation).  Photographs from December 2015, February 2017, March

2017, August 2017, and October of 2017 show that the property was boarded up and unoccupied.

Exhibit 12, at 36–40.  Again on July 17, 2018, the City Council of Baltimore issued Code Violation

Notice and Order Number 1697593A-1 concluding that 961 Bennett Place was "in violation of the

Building, Fire and Related Codes of Baltimore City" and "unfit for human habitation."  *Id.* at 4.

The Baltimore City Housing Department still to this day lists 961 Bennett Place as a vacant

building.  There are no records of the Department ever issuing a rental license for 961 Bennett

Place.  *See* Exhibit 14 (Certified Records of Rental Licensing).  There are no records of Department

issuing any work permits to conduct alterations between 2013 and 2019.  *See* Exhibit 15 (Baltimore

Housing Work Permit Search).

---

[6]      Inspection records from April 1, 2013 state: "Property boarded throughout front, side and rear --- third floor windows open (no glass in panes) --- T/D in rear yard --- no BG&E service --- has water service though no usage --- property unoccupied."  *Id.* at 21.

-14-

## F. Frazier's Prior Residences

There is some evidence that Frazier lived at 961 Bennett Place with his mother in the mid-2000s. When Frazier was arrested by members of BPD on September 15, 2005, at the age of 11, he provided 961 Bennett place as his address to the arresting officers. In addition, in late 2006, Faruq filed a successful lawsuit against Frazier's mother, Lisa Bess, alleging that she was a tenant holding over at 961 Bennett Place. *See* Exhibit 16 (Eviction Lawsuit). Bess was evicted on February 27, 2007, when Frazier was 13 years old. *See id.*

The government is not aware of any evidence that Frazier resided at 961 Bennett Place—legally or otherwise—since the eviction lawsuit. Indeed, of the twenty-four times that Sydni Frazier has been arrested by members of BPD over the past roughly eight years, he has never provided 961 Bennett Place as his address to arresting officers. He has provided the address 2923 Rosalyn Avenue (or some spelling variation thereof) eighteen times, the address 2123 Rosalyn Avenue (or some spelling variation thereof) two times; the address 2923 Rogers Avenue three times; and the address 4850 Clifton Avenue one time. Most recently, on January 3, 2017, when BPD Homicide Detective Gary Niedermeier executed a search warrant for Frazier's DNA in connection with the instant case, Frazier provided his address as 2923 Rosalind Avenue, Baltimore, Maryland 21215. As discussed above, at the time of his arrest by ATF on January 25, 2017, Frazier was living with his girlfriend at 7002 Upper Mills Circle in Catonsville.

## II. ARGUMENT

Fourth Amendment rights "may not be vicariously asserted." *Rakas v. Illinois*, 439 U.S. 128, 133–34 (1978). The "capacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection . . . has a legitimate expectation of privacy in

-15-

the invaded place." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998). The burden of showing a reasonable expectation of privacy in the area searched rests with the defendant. *Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980).

To be legitimate, an expectation of privacy must be objectively reasonable and must flow from "a source outside the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." *Carter*, 525 U.S. at 88; *see also United States v. Castellanos*, 716 F.3d 828, 831 (4th Cir. 2013) (defendant's Fourth Amendment claim failed because he did not demonstrate any "ownership or possessory interest" in the searched vehicle); *Grainger v. United States*, 158 F.2d 236, 238 (4th Cir. 1946) ("[O]ne who is not the owner, lessee, or lawful occupant of premises searched cannot raise the question whether there has been an unlawful search and seizure.") (citing 47 Am. Jur. 508). By definition, a trespasser, or one who is unlawfully on another's property, does not have standing to contest a search of the property. *See United States v. Jackson*, 585 F.2d 653, 658 (4th Cir. 1978) ("[A]n individual [who] places his effects upon premises where he has no legitimate expectation of privacy (for example, in an abandoned shack or as a trespasser upon another's property) . . . has no legitimate reasonable expectation that they will remain undisturbed upon these premises and consequently has no standing or right to contest a search."); *Chicco v. United States*, 284 F. 434, 436–37 (4th Cir. 1922) (bootlegger could not object to search of premises he "unlawfully and clandestinely occupied . . . as a cache for contraband liquor"); *United States v. Gale*, 136 F.3d 192, 195–96 (D.C. Cir. 1998) (defendant who changed the lock of apartment rented to another and used it for packaging drugs did not have a legitimate expectation of privacy in the apartment because he did not have legal authority to be there).

-16-

In some circumstances an overnight guest may have a legitimate expectation of privacy in his host's home. *See Minnesota v. Olson*, 495 U.S. 91 (1990). The rationale for such protection is that "[s]taying overnight in another's home is a longstanding social custom that serves functions recognized as valuable by society." *See id.* at 98–99. Examples of such functions include house-sitting for a friend, *see Jones v. United States*, 362 U.S. 257, 259 (1960), or providing care to the elderly, *see Bonner v. Anderson*, 81 F.3d 472, 475 (4th Cir. 1996).

On the other hand, a visitor who is "essentially present for a business transaction" does not have a legitimate expectation of privacy. *Carter*, 525 U.S. at 90. Thus, in *Carter*, the Supreme Court held that visitors who used a friend's apartment "simply [as] a place to do business"—specifically, to package cocaine—had no legitimate expectation of privacy. *Id.*; *see also United States v. Gray*, 491 F.3d 138, 145 (4th Cir. 2007) (defendant present in residence of another for purpose of distributing drugs did not have reasonable expectation of privacy and therefore lacked standing to challenge unlawful search), *cert. denied*, 552 U.S. 1190 (2008); *United States v. Rhiger*, 315 F.3d 1283, 1286 (10th Cir. 2003) (interpreting *Carter* to create "a clear distinction between the status of individuals present at a residence for social purposes and those present for business or commercial matters"); *United States v. Gamez–Orduño*, 235 F.3d 453, 458 (9th Cir. 2000) (interpreting *Carter* to hold that "[a]n individual whose presence on another's premises is purely commercial in nature . . . has no legitimate expectation of privacy in that location").

Here, Frazier claims that the owner—Faruq—gave him a key and permission to enter 961 Bennett Place, and that he was actively assisting with renovations on the property in the months leading up to his arrest. ECF 1266, at 3. Frazier further claims that despite his arrest in January

-17-

2017, he retained a reasonable expectation of privacy for the ensuing ten months, until the search

of 961 Bennett Place in November 2017.  Frazier cannot meet his burden.

As a preliminary matter, it does not appear that Faruq was the owner or had legal authority

to convey a possessory interest in the property to Frazier during this time period.  Although Faruq

was still named on the deed, he had defaulted on his property taxes, and Baltimore City had sold

961 Bennett place to MD Tax Properties 2016, LLC in May 2016.  Maryland tax law indicates that

in these circumstances, where the property is not owner-occupied, the possessory interest in the

property immediately transfers to Baltimore City upon completion of the sale.  *See* Md. Tax-

Property Code Ann. § 14-830(e) ("[E]xcept as to property actually occupied by the owner if a

certificate of sale is held by the Mayor and City Council of Baltimore City …, then the Mayor and

City Council of Baltimore City … has the right of immediate possession of the property

represented by the certificate of sale …, without the necessity of receivership proceedings.").

Since Faruq unquestionably did not live in 961 Bennett Place at the time of the tax sale (he was

incarcerated through May 2017), the possessory interest in the property transferred to Baltimore

City on May 16, 2016.  *See* Exhibit 10.  After that date, Frazier was, at best, a trespasser, and one

to whom the Fourth Amendment's protections do not extend.[7]  *See Jackson*, 585 F.2d at 658

(defendant who stashed evidence of an illegal gambling business "in an empty room in [a] vacant

house in which he had concededly neither a proprietary nor a possessory interest . . . had no more

---

[7]      Even if Faruq retained a possessory interest in the property up until December 2017 when
the judgment foreclosing rights of redemption was issued, *see* Exhibit 11, Baltimore City Housing
Department records establish that he had *neither* a license to operate the property as a rental
dwelling *nor* a work permit to renovate the property.  *See* Exhibits 14 & 15.  Therefore, he had no
legal authority to allow Frazier to reside there or assist with renovations.  Because Frazier could
not derive an interest in 961 Bennett Place from someone who had no legal authority to give it, he
cannot claim Fourth Amendment protection in the vacant building.

-18-

expectation of privacy than if he had placed the bag in plain view in a public place”); *United States v. Simmons*, 43 Fed. App’x 614, 618–19 (4th Cir. 2002) (unpub.) (defendant lacked standing to contest the search of an apartment he claimed his girlfriend was renting for him, where the rental agreement was for a different apartment in the building, and the district court found that the defendant was “living there illegally”); *United States v. McRae*, 156 F.3d 708, 711 (6th Cir. 1998) (defendant lacked standing to challenge the warrantless search of a vacant house that he had stayed in for a week, but did not own or rent); *United States v. Dodds*, 946 F.2d 726 (10th Cir. 1991) (defendant did not have a legitimate expectation of privacy in an abandoned apartment where he said he sometimes slept, but as to which he had no ownership or possessory interest or lawful right to be there).

Even if Faruq *was* the rightful owner of 961 Bennett Place and *did* give Frazier lawful authority to enter, Frazier did not have an objectively reasonable expectation of privacy because he used the vacant dwelling exclusively for business purposes—to run his illegal drug trafficking operation—and not as an overnight guest.  The evidence conclusively establishes that Frazier was not staying at 961 Bennett Place at the time of his arrest in January 2017 or at the time of the search in November 2017.  Frazier admitted that he was living with his girlfriend in Catonsville at the time of his arrest, and his girlfriend and her mother confirmed it.  He remained incarcerated for nearly ten months until the property was searched in connection with an unrelated investigation.  Moreover, the Baltimore City Housing Department had officially noticed 961 Bennett Place as a vacant property, and it bore all the telltale signs of a vacant property: boarded up windows, structural deficiencies, lack of electricity or plumbing, and the absence of furniture that could be used for sleeping.  There is no evidence Frazier kept any belongings at 961 Bennett Place aside

**JA260**

-19-

from the tools of his drug trafficking operation.  Although his ATM card was located in the residence, the manner in which it was found—amidst other drug paraphernalia, covered in drug residue—indicates that it was not being used for its intended purpose, but rather to cut drugs with its sharp edge.  The testimony of witnesses, the cell phone evidence, and the items ultimately recovered during the search, all demonstrate that Frazier used the vacant property for the sole purpose of stashing guns and drugs and conducting drug transactions.  In short, there was nothing tying Frazier to 961 Bennett Place other than his illegal drug trafficking operation.  Accordingly, he did not have a legitimate expectation of privacy there.  *See Carter*, 525 U.S. at 88–91; *Gray*, 491 F.3d at 145–46.[8]

The Fourth Circuit's decision in *Gray* is instructive.  In that case, the defendant was arrested in an associate's apartment after neighbors complained that certain individuals were running a drug ring out of the home.  *Gray*, 491 F.3d at 146–47.  Police found the defendant and others standing beside a table containing digital scales and cocaine base, and the defendant had $8,000 and additional cocaine base on his person.  *Id.*  During the arrest, a drug customer showed up to the residence looking to buy drugs.  *Id.* at 142.  The customer later testified that he had seen the defendant packaging cocaine base in the apartment on prior occasions.  *Id.*  Although it was undisputed that the defendant had the owner's permission to be there, the Fourth Circuit held that the defendant did not have a reasonable expectation of privacy in the apartment because he was using it for a commercial purpose—drug dealing—and was "a business, not a social guest."  *Id.* at 146–47.  Here, as in *Gray*, Frazier cannot challenge the search of 961 Bennett Place because he

---

[8]     Even if Frazier was assisting with (unpermitted) renovations at 961 Bennett Place—a claim unsupported by the evidence—he still would have no reasonable expectation of privacy in a property that he used for a quintessentially business purpose.  *See id.*

-20-

used the premises exclusively for the commercial purpose of dealing drugs.  Indeed, Frazier's

connection to 961 Bennett Place is even farther removed from the "social" side of the dividing line

because there was *no one* living on the premises: it was a vacant property whose owner had been

incarcerated for decades.

Finally, even if Frazier did have a reasonable expectation of privacy in 961 Bennett Place

prior to his arrest on January 25, 2017, it was extinguished by the time of the search on November

16, 2017.  When a person voluntarily abandons or disclaims interest in property, his subjective

expectation of privacy becomes unreasonable, and he is precluded from seeking to suppress

evidence seized from it.  *See United States v. Leshuk*, 65 F.3d 1105, 1111 (4th Cir. 1995); *see also*

*Abel v. United States*, 362 U.S. 217, 241 (1960) ("There can be nothing unlawful in the

Government's appropriation of . . . abandoned property").  Here, Frazier left incriminating

evidence in a vacant house and failed to make any efforts to claim it for the nearly ten months that

elapsed between his arrest and the search.  As such, he abandoned any reasonable expectation of

privacy he once had.  *See Gray*, 491 F.3d at 146 ("Someone who hides illegal activity in a vacant

field or abandoned warehouse . . . takes his or her chances that law enforcement officials will

happen upon incriminating evidence."); *cf. United States v. Kitchens*, 114 F.3d 29, 31 (4th Cir.

1997) (reasonable expectation of privacy in a hotel room ends "after [the] rental period has

terminated," even if the guest leaves property behind).

In *United States v. Stevenson*, 396 F.3d 538, 540–41 (4th Cir. 2005), police obtained

consent from the defendant's landlord to search the defendant's apartment just four days after his

arrest.  The Fourth Circuit held that the defendant no longer had any reasonable expectation of

privacy in the apartment because he had fallen behind in rent and, following his arrest, had written

-21-

a letter to his girlfriend referring to himself as the "former renter" and giving her permission to take possession of his personal property in the apartment. *See id.* at 544–48. As compared to *Stevenson*, Frazier had a far weaker connection to the searched property (he was a business visitor, rather than a renter), and a far longer period of time had elapsed since he last set foot on the premises (ten months as opposed to four days). The government is not aware of any case holding that a onetime business visitor to another's home retains a reasonable expectation of privacy in the premises for months on end after ceasing to conduct business there. Such a rule would stretch the Fourth Amendment beyond its breaking point.

For all of these reasons, Frazier cannot meet his burden of demonstrating a reasonable expectation of privacy in 961 Bennett Place at the time of the search.

## III. CONCLUSION

For the foregoing reasons, we respectfully request that the Court deny the Defendant's motion to suppress evidence seized from 961 Bennett Place.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:_____/s/_____
      Christina A. Hoffman
      Lauren E. Perry
      Christopher M. Rigali
      Assistant United States Attorneys
      36 South Charles Street, Fourth Floor
      Baltimore, Maryland 21201
      (410) 209-4800

-22-

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that a copy of the foregoing Government's Opposition to the Defendant's Motion to Suppress Evidence Seized from 961 Bennett Place was filed electronically with the Court using the CM/ECF system and served using the CM/ECF system via e-mail to all counsel of record.

_____/s/_____<br>
Christina A. Hoffman<br>
Assistant United States Attorney

**JA264**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA          :
                                  :
        v.                        :          Criminal No.  CCB-16-267
                                  :
SYDNI FRAZIER                     :
                              ...o0o...

### ORDER

For the reasons stated on the record in open court on February 19, 2020 following an

evidentiary hearing and oral argument, it is hereby Ordered that:

1.  the defendant's motion to dismiss Count Two (ECF 1265) is **Denied**;

2.  the defendant's motion to suppress tangible evidence (ECF 1266) is **Denied**;

3.  in light of the redacted version filed February 21, 2020 (ECF 1425), the government's

    motion to seal the unredacted version of its opposition to the motion to suppress (ECF

    1405) is **Granted** to protect the identity of witnesses; and

4.  the consent motion to admit testimony (ECF 1411) is **Granted**.


_2/21/20_
　Date

_CCB_
Catherine C. Blake
United States District Judge


**JA265**

```
1                  IN THE UNITED STATES DISTRICT COURT
                     FOR THE DISTRICT OF MARYLAND
2                          NORTHERN DIVISION

3   UNITED STATES OF AMERICA,    )
         Plaintiff,              )
4                                )
         vs.                     ) CRIMINAL CASE NO. CCB-16-0267
5                                )
    SYDNI FRAZIER,               )
6        Defendant.              )
    _____)
7


8
                        Tuesday, February 25, 2020
9                          Courtroom 7D
                         Baltimore, Maryland
10

11        BEFORE:  THE HONORABLE CATHERINE C. BLAKE, JUDGE
                     (AND A JURY)
12

13                           VOLUME II

14   For the Plaintiff:

15   Christina Hoffman, Esquire
     Lauren Perry, Esquire
16   Christopher Rigali, Esquire
     Assistant United States Attorneys
17
     For the Defendant:
18
     Christopher Davis, Esquire
19   Adam Harris, Esquire

20   Also Present:

21   Special Agent Timothy Moore, ATF
22   _____

                           Reported by:
23
                    Douglas J. Zweizig, RDR, CRR, FCRR
24                   Federal Official Court Reporter
                    101 W. Lombard Street, 4th Floor
25                      Baltimore, Maryland  21201
```

**JA266**

*Det. G. Niedermeier - Direct*

*******

```
 1              Glad to see all of you.

 2              I believe we are about ready to begin the evidence.

 3    The Government will be calling a witness.

 4              MR. RIGALI:  Thank you, Your Honor.

 5              The Government calls Detective Gary Niedermeier.

 6              THE COURT:  All right.

 7              THE CLERK:  Please raise your right hand.

 8         DETECTIVE GARY NIEDERMEIER, GOVERNMENT'S WITNESS, SWORN.

 9              THE CLERK:  Please be seated.

10              Please speak directly into the microphone.

11              State and spell your full name for the record, please.

12              THE WITNESS:  Detective Gary Niedermeier.  G-A-R-Y; N,

13    as in Nancy; I-E; D, as in David; E-R; M, as in Mary; E-I-E-R.

14              THE CLERK:  Thank you.

15                         DIRECT EXAMINATION

16    BY MR. RIGALI:

17    Q.    Good morning, sir.  How are you?

18    A.    Good morning, sir.

19    Q.    Sir, where are you employed?

20    A.    Baltimore City Police Department.

21    Q.    And how long have you been employed by the Baltimore City

22    Police Department?

23    A.    I'm in my 24th year.

24    Q.    And I may refer to the Baltimore City Police Department as

25    BPD, if that's okay with you.
```

1    **A.**   That's fine.

2    **Q.**   Okay.  What is your current unit and title?

3    **A.**   I'm a detective in the Homicide Unit.

4    **Q.**   How long have you been in the Homicide Unit?

5    **A.**   I'm in my 19th year.

6    **Q.**   Okay.  In your 19 years as a Homicide detective,

7    approximately how many homicide investigations have you taken

8    part in?

9    **A.**   Taken part in?

10   **Q.**   Sure.  Let's say taken part in and second would be as lead

11   investigator.

12   **A.**   Probably participated in a couple thousand investigations

13   at some point or another.  Been the lead investigator in

14   approximately 130 cases.

15   **Q.**   I want to direct your attention to now,

16   Detective Niedermeier, to August 10th of 2016.

17       Were you the primary detective on a homicide that occurred

18   that day?

19   **A.**   Yes.

20   **Q.**   Who was the victim?

21   **A.**   He was later identified as Ricardo Johnson.

22   **Q.**   And I'm going to show you Government's Exhibit IND-1.

23       Sir, do you recognize the individual depicted in

24   Government's Exhibit IND-1?

25   **A.**   Yes.

*Det. G. Niedermeier - Direct*

1    **Q.**    And who is that?

2    **A.**    That's Ricardo Johnson, the victim from August 10th, 2016.

3    **Q.**    Okay.  Sir, what time was the homicide reported of

4    Ricardo Johnson?

5    **A.**    It was reported approximately 6:05 a.m.

6    **Q.**    And when were you alerted?

7    **A.**    Approximately 6:25 a.m. our office was called.

8    **Q.**    Where was the victim's body when it was found?

9    **A.**    It was reported to be in the 2200 block of Kloman Street.

10   **Q.**    Okay.  And I'm going to show you what's been marked as

11   Government's Exhibit MAP-1.

12        Sir, can you see Government's Exhibit MAP-1?

13   **A.**    Yes.

14   **Q.**    Can you generally describe for the jury what we're looking

15   at here.

16   **A.**    It's an overview mostly of South Baltimore with the pin,

17   the little red dot, approximately in the 2200 block of

18   Kloman Street.

19   **Q.**    Okay.  Now I'm going to show you Government's Exhibit

20   MAP-2.

21        And what are we looking at here?

22   **A.**    Looks like a Google -- Google Map video -- or view of

23   South Baltimore.  Once again, with the red pin depicting

24   approximately where the 2200 block of Kloman Street is.

25   **Q.**    Okay.  And I'm going to zoom in once more for

1    Government's Exhibit MAP-3.

2         Can you describe what's depicted in Government's Exhibit

3    MAP-3.

4    **A.**    Once again, it's a -- appears to be a Google Map closer

5    view of Kloman Street and South Baltimore.

6    **Q.**    Okay.  And can you see what appears to be a

7    north-south-ish-running road marked as Kloman Street?

8    **A.**    Yes.

9    **Q.**    Okay.  And you see what appears to be a commercial

10   facility there or somewhat of a desolate area?

11   **A.**    Yes.

12   **Q.**    Okay.  Can you describe what we're looking at in that

13   area, the commercial area there.  What type of facility is

14   that?

15   **A.**    Right there is a BG&E substation.  It's an unmanned

16   substation.

17   **Q.**    And are you able to indicate on the map there?  Can you

18   circle?

19   **A.**    (Witness complies.)

20   **Q.**    That's the BG&E substation?

21   **A.**    Yes.

22   **Q.**    Okay.  Did you respond to the 2200 block of Kloman Street

23   the morning of August 10th?

24   **A.**    I did.

25   **Q.**    And what time did you arrive?

*Det. G. Niedermeier - Direct*

1   **A.**   Approximately 7:00 a.m.

2   **Q.**   Can you tell the jurors what you observed when you arrived

3   at the 2200 block of Kloman Street.

4   **A.**   Yeah.  Upon my arrival, there was MTA police and

5   Baltimore City uniformed police officers were there.

6        Along the -- I would describe it the north side of

7   Kloman Street are Light Rail railroad tracks, and there was a

8   green Dodge van parked right along the rail line.

9        Closer inspection revealed that inside the van was a male

10  who was not identified at that time, and he had multiple

11  apparent gunshot wounds.

12  **Q.**   Where was the male in relation to the van?

13  **A.**   So he was located -- the -- if the van was, I'd say,

14  facing westward on Kloman Street --

15  **Q.**   And can I ask you to indicate, actually, on the map

16  what -- where -- where approximately the van was parked.

17  **A.**   Approximately right here (indicating).

18  **Q.**   Okay.  Thank you.

19        You can continue.

20  **A.**   So the van was pulled along the tracks, so the driver's

21  side would have been out towards Kloman Street with the

22  passenger side of the vehicle right along the tracks.

23        The side sliding door, not the front passenger door, but

24  the slide siding [sic] door was opened.  The victim was located

25  lying facedown across the vehicle.  He was bound -- his feet

1  were bound, and his hands were bound behind his back.

2      He also had a blue bandanna tied around his eyes and face.

3  **Q.**  Were photographs taken on the scene that day?

4  **A.**  They were.

5  **Q.**  Would you recognize those photographs if I showed them to

6  you?

7  **A.**  Yes.

8  **Q.**  All right.  I'm going to pull up Government's Exhibit

9  CS-1.

10      Sir, do you recognize Government's Exhibit CS-1?  I'm

11  sorry.  Can you touch the bottom of the screen there to clear

12  it.  Thank you.

13  **A.**  Where it says "clear"?

14  **Q.**  Yes.

15      Can you describe what's depicted here as Government's

16  Exhibit CS-1.

17  **A.**  This is a view taken -- a photo taken by crime lab on

18  August 6th -- or August 10th, 2016, in the 2200 block of

19  Kloman Street.  That's the van where the victim was located.

20  **Q.**  Now I'm going to pull up Government's Exhibit CS-2.

21      Is this just a different angle of the same van?

22  **A.**  It is.

23  **Q.**  Okay.  And I'll pull up CS-3.

24      Can you describe what we're looking at in Government's

25  Exhibit CS-3?

1    **A.**   Once again, a photograph taken by crime lab.  This time

2    you can see the passenger side of the van with the sliding door

3    open, and you actually see the victim's feet hanging out.

4    **Q.**   What injuries, if any, did you observe that the victim had

5    when you were on-scene that morning?

6    **A.**   It was apparent to me that he had sustained multiple

7    gunshot wounds.

8    **Q.**   And where were those gunshot wounds, approximately?

9    **A.**   His legs, his back, his buttocks, he had wounds to his

10   head.

11   **Q.**   Okay.  And I think you might have mentioned this a bit

12   earlier, but how was the victim dressed?

13   **A.**   He was wearing a -- he was clad only in a pair of shorts

14   and a T-shirt.

15   **Q.**   And you mentioned that his extremities were bound; is that

16   correct?

17   **A.**   Correct.

18   **Q.**   And how were they bound?

19   **A.**   They were bound by shoelaces.

20   **Q.**   I'm going to show you Government's Exhibit CS-4.

21       Can you describe what we're looking at in Government's

22   Exhibit CS-4.

23   **A.**   Yes.  It's a view with a crime lab technician standing,

24   like, at the tracks facing across the vehicle.

25   **Q.**   Is this how the victim was found when police arrived that

1    morning?

2    **A.**    Yes.

3    **Q.**    And his hands and feet are still bound; these were the

4    conditions they were both in?

5    **A.**    Yes.

6    **Q.**    I'm going to pull up Government's Exhibit CS-5.

7          Okay.  And what are we looking at here?

8    **A.**    A close-up of the victim.  You can see that his hands are

9    bound.  There was one zip tie tied around -- I'm sorry -- tied

10   around his wrist, but the wrists are actually bound by what

11   appear to be shoelaces.

12         You can also see the blue bandanna tied around his eyes.

13   **Q.**    Detective Niedermeier, what else are we seeing in this

14   photo?

15   **A.**    I believe you can see a shell casing and a brown glove.

16   **Q.**    I'll come back to that in just a moment.

17         I'm going to pull up Government's Exhibit CS-7.

18         And what do we see in Government's Exhibit CS-7?

19   **A.**    This is a photo taken of the victim after he'd been

20   removed from the vehicle by the Medical Examiner's

21   investigators.

22   **Q.**    Okay.  And you can see some injuries on his face; is that

23   correct?

24   **A.**    Correct.

25   **Q.**    And Government's Exhibit CS-8.

*Det. G. Niedermeier - Direct*

1      And is this just a closer-up photograph of the last one?

2  **A.**   Yes.

3  **Q.**   Okay.  Was anything recovered from Ricardo Johnson's

4  person that morning?

5  **A.**   No.

6  **Q.**   Wallet?

7  **A.**   No.

8  **Q.**   Keys?

9  **A.**   No.

10 **Q.**   Cell phone?

11 **A.**   No.

12 **Q.**   Jewelry?

13 **A.**   No.

14 **Q.**   If he had no wallet, I take it he had no ID; is that

15 correct?

16 **A.**   That's correct.

17 **Q.**   Okay.  How was he identified, then?

18 **A.**   So he was transported to the Medical Examiner's; and after

19 they performed the autopsy, he was identified by his

20 fingerprints.

21 **Q.**   When did -- at any point did law enforcement notify next

22 of kin?

23 **A.**   Yes.

24 **Q.**   When would that have happened?

25 **A.**   I notified next of kin late in the afternoon on

1    August 10th, after we had finally identified Mr. Johnson.

2    **Q.**    Late in the afternoon on August 10th?

3    **A.**    Yes.

4    **Q.**    Okay.  What's police policy with respect to releasing the

5    identity of a victim in relation to identify -- notification of

6    next of kin?

7    **A.**    Policy is that no identification is released to the public

8    or to the press until next of kin has been located and

9    notified.

10   **Q.**    Detective Niedermeier, can you generally describe -- and

11   we've already observed some of it.

12        Can you generally describe what evidence was recovered

13   from in and around the van the morning of August 10th.

14   **A.**    From the Kloman Street location, we recovered 21

15   9-millimeter shell casings.  And most of them just outside that

16   sliding door around the stone area just outside the vehicle.

17        A few were recovered from inside the vehicle.

18        There was two projectiles recovered, one from inside the

19   van and one from actually the driver's side near the rear tire.

20   Based on the scene and the way the victim was found, it

21   appeared that the round had been fired through the victim,

22   through the floor of the vehicle to get onto the far side.  The

23   only way it could have gotten over there is to go through the

24   vehicle, and it came to rest near the rear tire on the driver's

25   side.

*Det. G. Niedermeier - Direct*

1        From inside the van, there was a set of brown gloves.

2   There was an iced tea bottle, a sneaker with no shoelace, and a

3   few zip ties, black zip ties.

4   **Q.**   I want to talk a little bit more about the van.

5        Did anything stand out to you about that van?

6   **A.**   Yeah.  Inspection of the van, there was two things that

7   stood out immediately at the scene.

8        We noticed that the ignition had been tampered with or

9   popped, and it appeared that the driver's window or door had

10  been pried back, common -- commonly done when you steal a

11  vehicle.  You pop the ignition -- they bend the door back to

12  gain entry and then pop the ignition.

13       The second thing that we noticed was the gas tank was

14  open.  In the gas tank, we found paper stuffed into the gas

15  tank.  It had been partially burned like somebody had attempted

16  to light the vehicle on fire.

17  **Q.**   I'm going to show you a number of exhibits now,

18  Detective Niedermeier.

19       I'm going to start with Government's Exhibit CS-9.

20       And I'll actually just jump ahead to CS-10.

21       Okay.  Sir, what are we looking at in

22  Government's Exhibit CS-10?

23  **A.**   You can actually -- there's two things that you can

24  actually see in this photograph.

25       One, the way that we found the gas tank open with the cap

55

1   not on it.  And you can see burned residue in the actual gas

2   tank.

3       And then between the front and rear tire, approximately

4   maybe 2 feet in front of that rear tire to the right, you can

5   barely see what I believe is the projectile that was recovered

6   from that side of the vehicle that morning.

7   **Q.**   I'm now showing you Government's Exhibit CS-11.

8       Okay.  And can you describe what we're looking at here.

9   **A.**   That's a close-up of the gas tank with the burned paper

10  residue.

11  **Q.**   Okay.  Pulling up Government's Exhibit CS-12.

12      Can you tell the jurors what's depicted in CS-12.

13  **A.**   When crime lab comes out, after they've taken over all,

14  they mark evidence with the yellow markers you're seeing there,

15  and you see the multiple yellow markers.  Each one of those

16  outside of the van is a shell casing that was recovered that

17  day.

18  **Q.**   Pulling up CS-13.

19      Is this a close-up of pretty much what was CS-12?

20  **A.**   Yes.  You can see the -- in some of the ones, you can see

21  where the casings are actually located near the yellow markers.

22  **Q.**   Pulling up CS-14.

23      What do we see in CS-14?

24  **A.**   That's the projectile that was located outside of the

25  vehicle.

1   **Q.**   And CS-15.

2      What do we see in CS-15?

3   **A.**   Those are two of the 9-millimeter -- 9-millimeter

4   shell casings that were recovered outside of the vehicle on

5   that day.

6          **THE COURT:**  Can I ask -- this is probably obvious, but

7   when you say "projectile," is that what we might commonly call

8   a bullet?

9          **THE WITNESS:**  Yes, ma'am, I'm sorry.

10          **THE COURT:**  Thank you.

11   **BY MR. RIGALI:**

12   **Q.**   I'm pulling up Government's Exhibit CS-16.

13      All right.  I think you described some of this earlier,

14   but why don't you tell us what we're looking at in CS-16.

15   **A.**   CS- -- this photograph is after the victim had been

16   removed from that compartment.

17      The seats you see to the right are the driver and front

18   passenger seats and the bench seat to the back, so that was

19   where the victim had actually been laying.

20      The markings in these ones, 17 is the sneaker with no

21   shoelace.

22      18, I believe, is the projectile recovered from in there.

23      You see the iced tea bottle in the lower right.

24      20 marks the brown gloves that were located in there.

25      And 19, I believe, is a shell casing.

*Det. G. Niedermeier - Direct*

1  **Q.**   Pulling up CS-17.

2       Is this one of the projectiles recovered from inside the

3  vehicle?

4  **A.**   Yeah, one of the bullets, projectiles.

5  **Q.**   And CS-18.

6       What do we see here?

7  **A.**   That's one of the shell casings recovered from inside the

8  vehicle.

9  **Q.**   Okay.  Detective Niedermeier, what happened to the van

10  after the body was secured and the evidence was recovered from

11  the van?

12  **A.**   We recovered all the evidence that was in plain view.

13       The vehicle was then, after the victim was removed, was

14  towed to the southeast district and we obtained a

15  search-and-seizure warrant for the vehicle to determine if

16  there was any other evidence which was inside the vehicle.

17  **Q.**   And was there any other evidence?

18  **A.**   Yes.

19  **Q.**   What was that?

20  **A.**   Another projectile and another shell casing and two

21  additional black zip ties were found in the vehicle when it was

22  executed on August 10th.

23  **Q.**   I'm going to pull up Government's Exhibit CS-20.

24       Okay.  What's shown in CS-20?

25  **A.**   So this is the van after it had been towed to the

58

1    Southeast District processing bay.

2        You can see the driver's door where the window has been

3    pried out of the tracks that it would normally ride in to go up

4    and down.

5    **Q.**   And CS-21.

6        What are we looking at here?

7    **A.**   That's where the ignition would be.  The entire ignition

8    had been removed.

9            **MR. RIGALI:**  Your Honor, if I could approach the

10   witness with Government's Exhibit P-1, which is some

11   shell casings.

12           **THE COURT:**  Sure.

13   **BY MR. RIGALI:**

14   **Q.**   Detective Niedermeier, I'm showing you what's been marked

15   as Government's Exhibit P-1.  If you could take and remove the

16   contents.

17       Well, first, tell us if you recognize

18   Government's Exhibit P-1.

19   **A.**   Yes.  These are the shell casings recovered from

20   Kloman Street on August 10th by crime lab and submitted to the

21   firearms unit.

22           **MR. RIGALI:**  And with the Court's permission, I'd have

23   the witness take out the -- remove the contents of the envelope

24   there and show the jury.

25           **THE COURT:**  All right.

**JA281**

*Det. G. Niedermeier - Direct*

BY MR. RIGALI:

**Q.**   Can you just talk us through a few of what's inside
Government's Exhibit P-1.

**A.**   So these are each of the shell casings marked by a number
and recovered.  On each envelope with the shell casing in them
is depicted what -- where that shell casing was recovered.

       **MR. RIGALI:**  And I'm going to approach the witness
with Government's Exhibit P-2.

       **THE COURT:**  All right.

BY MR. RIGALI:

**Q.**   Sir, do you recognize Government's Exhibit P-2?  Feel free
to remove the contents.

**A.**   Yes.

**Q.**   Okay.  And what's Government's Exhibit P-2?

**A.**   This is the shell casing and projectile recovered during
the search-and-seizure warrant later in the morning that was
conducted on the van.

**Q.**   Okay.  And can you remove those and show those to the jury
as well.

**A.**   Once again, one small metal fragment and one shell casing
(indicating).

**Q.**   Detective Niedermeier, just if it wasn't clear, can you
describe what a shell casing is.

**A.**   So every round is made up of a casing, which is a metal --
metal part of the entire projectile, bullet.  It's capped with

60

*Det. G. Niedermeier - Direct*

1    a bullet.

2         In the casing is the metal part where the gunpowder is

3    kept and the primer.

4         Once the round is fired, the primer is struck, the

5    projectile is fired down range; the shell casing remains.

6         This case was indicative of semi-automatic handguns being

7    used, one, because the amount of shell casings and, two,

8    because when you have a revolver, the empty casings, after

9    they're fired, remain in the firearm.

10        In a semi-automatic, each time you fire the gun, the

11   bullet goes down range; the shell casing's ejected out of the

12   gun; and another round is chambered.  And as fast as you can

13   pull the trigger, you can fire rounds.

14   **Q.**   And I put up on the screen here what's already been

15   admitted as Government's Exhibit CS-15.

16        And is that an indication that the evidence markers 5 and

17   6 are those shell casings there?

18   **A.**   Yes.

19   **Q.**   Okay.  What, if anything, was done with the shell casings

20   and projectiles that were recovered from the van and during the

21   search warrant?

22   **A.**   They were all submitted to the Baltimore City Police

23   Department's firearms unit.

24   **Q.**   Why did you do that?

25   **A.**   When you have, especially semi-automatic handguns, there's

**JA283**

1  a computer system.  And the shell casings are entered into the

2  computer system to see if there's any matches between any

3  cases.  Or if handguns are recovered, they're also test-fired;

4  and a shell casing from them are entered into this computer

5  system to see if there's any matches between cases or firearms.

6  **Q.**   In your experience as a homicide investigator, can

7  shell casings be used to link a certain shell casing to a

8  certain firearm?

9  **A.**   Yes.

10  **Q.**   Okay.  What about the other evidence?  So in addition to

11  the shell casings and the projectiles, we saw that -- those

12  pair of brown gloves.  Did you do anything with those?

13  **A.**   Yeah; they were recovered and submitted to evidence

14  control.

15  **Q.**   Okay.  The shoelaces that were used to bind the victim's

16  hands?

17  **A.**   Yes.  They were recovered at autopsy.

18  **Q.**   Okay.  Was the van dusted for fingerprints at all?

19  **A.**   It was.

20  **Q.**   Okay.  And what were the results of that attempt?

21  **A.**   Upon processing the van, it became evident that the

22  persons that committed this crime were probably wearing gloves

23  due to lack of fingerprints in areas where you would normally

24  see them.  There's impressions left, but there's no ridge

25  detail which would indicate that people are wearing gloves.

*Det. G. Niedermeier - Direct*

1  **Q.**  Was there an attempt to identify or gather any DNA from

2  the van?

3  **A.**  Yes.  Multiple areas were swabbed.  Not including blood

4  samples from the victim -- what were presumed to be the victim,

5  but also steering wheel, door handles, places where you would

6  normally be touched in a vehicle.

7  **Q.**  I hate to ask an obvious question, but why would you swab

8  that van for DNA?

9  **A.**  Well, due to the fact there was no eyewitnesses to how the

10  incident had occurred, it became apparent to me that the

11  physical evidence, any DNA evidence, fingerprints would

12  probably be the most likely way that this case could be solved.

13  **Q.**  Before I transition topics just a bit, what did this

14  evidence, the shell casings outside of the van, et cetera, all

15  the evidence you observed that morning, what did that evidence

16  indicate to you as to where Ricardo Johnson had been murdered?

17        **MR. HARRIS:**  Objection.

18        **THE COURT:**  Do you want to approach the bench?

19        **MR. HARRIS:**  Thank you.

20     (Bench conference on the record:

21        **MR. HARRIS:**  I think this question gets close to

22  asking him to give an opinion that could only be given by an

23  expert.

24        So I think we are -- it is close getting over the line

25  for Rule 701 because it is not something that kind of a

1  layperson could give an opinion on.  It's something on which

2  the detective is drawing on his particularized experience; and

3  because he hasn't been noted as an expert, he shouldn't be able

4  to give an opinion in that area.

5      THE COURT:  And what are you expecting him to say?

6      MR. RIGALI:  I expect him to say that he believes the

7  victim was killed there, and I think that's personally

8  within -- A, it's based on his personal observations, and I

9  don't think it requires specialized training or knowledge.

10 There's 20 shell casings right outside the vehicle.

11     It's pretty much common sense that one person's not

12 going to be able to bind a 6-foot, 190-pound man, drive him in

13 a van somewhere.  And we're going to hear evidence that two

14 guns were used, so I don't think any of that is really based on

15 specialized knowledge or experience.

16     THE COURT:  Well, I think if he's basing it on what

17 he's already testified to in terms of the number of casings and

18 the location of the victim and so forth, that would be his

19 reasonable experience of 19 years as a Homicide detective.  And

20 I don't think it crosses the line into something for which he

21 needs to be qualified as an expert, although he certainly could

22 be.  Nor do I think there's any surprise or unfair prejudice

23 since this gentleman, his identity and his background, and

24 likely testimony, has been known to the defense for some time.

25     So I'll overrule the objection.

**JA286**

1          **MR. HARRIS:**  Thank you.)

2          (Bench conference concluded.)

3     **BY MR. RIGALI:**

4     **Q.**   Detective Niedermeier, I'll ask you again:  What did the

5     evidence that you observed on the morning of August 10th, 2016,

6     indicate to you as to where Ricardo Johnson had been murdered?

7     **A.**   Well, based on where the shell casings were located, the

8     way the victim was found in the vehicle, and the projectile on

9     the far side, it became apparent to me that he was killed right

10    there.

11    **Q.**   Now, transitioning just a bit, you noted a few

12    irregularities with the van, the missing ignition; correct?

13    **A.**   Correct.

14    **Q.**   And the window pried back?

15    **A.**   Correct.

16    **Q.**   You testified a moment ago that that indicated to you that

17    the van may have been stolen; is that right?

18    **A.**   Yes.

19    **Q.**   Did you attempt to identify who that van belonged to?

20    **A.**   Yes.

21    **Q.**   Okay.  Who did that van belong to?

22    **A.**   Matthew McCorkle.

23    **Q.**   I'm sorry.  Who?

24    **A.**   I'm sorry.  His name is escaping me.  Matthew -- I don't

25    recall.

*Det. G. Niedermeier - Direct*

1  **Q.**  That's fine.

2      Do you recall where this individual lived?

3  **A.**  1829 South Hanover Street.

4  **Q.**  Okay.  And I'm going to pull up Government's Exhibit

5  IND-2.

6  **A.**  Mr. McCormick.  I'm sorry.  It just came to me.

7  Matthew McCormick was the registered vehicle owner.

8  **Q.**  Okay.  I've got IND-2 up on the screen.  Is that

9  Mr. McCormick?

10  **A.**  Yes.

11  **Q.**  Were any attempts made to contact Mr. McCormick?

12  **A.**  Yes.  While we were still at the scene, we sent officers

13  right over there once we ran the tag and it came back to

14  Mr. McCormick and we had an address.

15  **Q.**  And what did you learn about Mr. McCormick's van?

16  **A.**  He did not know that the van was missing.  He parked it

17  the evening before or the afternoon before.  Officers conducted

18  an area canvass around there and were able to determine that

19  the van was last seen on August 9th --

20      **MR. HARRIS:**  Objection.

21      **THE COURT:**  Sustained unless you have a hearsay

22  exception.

23      **MR. RIGALI:**  No, Your Honor.  That's fine.

24  BY MR. RIGALI:

25  **Q.**  Sir, what investigative steps, if any, did you take with

 1  respect to the van?

 2  **A.**   So based on Mr. McCormick not knowing that his van had

 3  been missing on the morning of August 10th, we went and did an

 4  area canvass around where he had parked in the rear of his --

 5  of 1829 South Hanover Street.  Located back there was a

 6  business, a mechanic shop, that did have video cameras.

 7       But upon viewing those cameras, it was determined we

 8  couldn't see where he had actually parked the vehicle.  They

 9  didn't cover where the vehicle had been parked on August 9th,

10  so we weren't able to recover any video or anything of the

11  vehicle being stolen.

12  **Q.**   While we're on the topic of surveillance video, going back

13  to the 2200 block of Kloman Street where the van was, were any

14  attempts made to locate or identify any surveillance video from

15  that area?

16  **A.**   Yes.

17  **Q.**   Can you describe those attempts.

18  **A.**   Well, 2200 block of Kloman Street is -- there's no

19  residence there.  There's the BG&E substation that side of the

20  street and the water on the other side.

21       The only cameras that we were able to locate, the BG&E

22  substation had cameras.  We contacted them and were advised

23  that they all point inward, and those cameras are all

24  motion-activated.

25       It's not a manned substation, so they're monitored from an

67

1    off-site.  And if an alarm sounds, they observe the video at

2    that point and determine if the police or if someone needs to

3    go out and attend something.

4        And so they don't cover anything outside of the BG&E

5    property.

6        Additionally, a little further to the -- I call it west,

7    but towards the bottom of Kloman, we located a camera that was

8    designed and set up to capture illegal dumping, which is also

9    motion-activated.

10        And we observed that, and the quality was so poor that you

11   couldn't see anything on it.  So we were unable to locate any

12   video surveillance of any part of the incident.

13   **Q.**   I'm going to turn back to Ricardo Johnson for a moment.

14        Was an autopsy conducted?

15   **A.**   It was.

16   **Q.**   When was that conducted?

17   **A.**   Later in the morning on August 10th, 2016.

18   **Q.**   Was additional evidence recovered during that autopsy?

19   **A.**   Yes.

20   **Q.**   Can you describe that evidence?

21   **A.**   The victim's shirt and shorts were recovered.  The

22   bindings used to tie his hands and feet.  The blue bandanna

23   tied around his eyes.  A blood card.  Nail clippings from the

24   victim.  The clippers.  And 15 new projectiles and one artifact

25   were all -- projectile, bullet, were recovered from

1  Mr. Johnson's body at autopsy on that date.

2  **Q.**  Now, you mentioned a blood card.  What is that?

3  **A.**  Homicide victims or questionable deaths, anything where

4  you think at some point down the future you may need a DNA

5  sample from the victim are recovered at autopsy.

6       Basically, it's a trifold piece of paper with two circles

7  on it.  And what the Medical Examiner does is takes a blood

8  sample from the victim and dabs each of those circles.  It's

9  allowed to dry so that it won't spoil over time.  We used to

10 collect tubes of blood, and they had to be refrigerated and

11 they would go bad.  At some point down the line if you needed

12 that for DNA, it was no good.  So they've gone to obtaining a

13 blood card.

14      So you get that property, and you submit it to evidence

15 control.

16 **Q.**  And you mentioned some -- a few moments ago you mentioned

17 some projectiles or bullets that were recovered during the

18 autopsy as well.

19 **A.**  Correct.

20      **MR. RIGALI:**  I'm going to approach the witness with

21 Government's Exhibit P-3.

22      **THE COURT:**  All right.

23 **BY MR. RIGALI:**

24 **Q.**  (Handing.)

25      Sir, do you recognize Government's Exhibit P-3?

1    **A.**    Yes.

2    **Q.**    And what is Government's Exhibit P-3?

3    **A.**    These are the projectiles, the 15 new projectiles

4    recovered at autopsy by myself and submitted to evidence

5    control.

6            **MR. RIGALI:**  May I show them to the jury?

7            **THE COURT:**  You may.

8        (Displaying to the jury.)

9            **THE WITNESS:**  So each one would have its own envelope.

10    Firearms would get these, and they're placed into the plastic

11    bag and marked for identification by the firearms unit.  And

12    each one of these is a projectile, a bullet recovered from

13    Ricardo Johnson at autopsy on August 10th, 2016.

14    **BY MR. RIGALI:**

15    **Q.**    Sir, you can go ahead and just set those back in the bag

16    for me.  I'll come collect them in a moment.

17        Detective Niedermeier, were you able to determine during

18    the course of your investigation where the victim lived?

19    **A.**    Yes.

20    **Q.**    Where was that?

21    **A.**    1101 West Lanvale Street.

22    **Q.**    Were there any calls for service made to that location

23    during the early morning hours of August 10th, 2016?

24    **A.**    Yes.

25    **Q.**    Can you describe those?

1    **A.**    After -- after Mr. Johnson was identified, we began to

2    look into his background.  We discovered 1101 West Lanvale was

3    an address he had used.

4        Checking calls around for the last 24, 48 hours around

5    that time, we discovered that in the early morning hours of

6    August 10th, 2016, approximately 02:30, or 2:30 a.m., a 9-1-1

7    call was placed to 1101 West Lanvale, kind of a

8    check-the-well-being someone had called.

9    **Q.**    Do you recall who made that call?

10   **A.**    Yes.

11   **Q.**    And who was that?

12   **A.**    That was later identified as Miaa Calene.

13   **Q.**    And what is her relationship to the victim?

14   **A.**    She was the victim's girlfriend.

15   **Q.**    Was that the only 9-1-1 call that Ms. Calene made that

16   night?

17   **A.**    No.  An additional call was located at 4:00 a.m., once

18   again, from Miaa Calene to the same location.

19   **Q.**    Would you recognize those 9-1-1 calls if I played them for

20   you?

21   **A.**    Yes.

22        **MR. RIGALI:**  Your Honor, if I may pass out the

23   transcript books to the jurors.

24        **THE COURT:**  All right.  Do they have more than one

25   transcript in them?

1          **MR. RIGALI:**  They do, Your Honor.

2          **THE COURT:**  Okay.

3          **MR. RIGALI:**  And for Detective Niedermeier, I think we

4    would be focusing on just the two 9-1-1 calls.

5          **THE COURT:**  Okay.  So, ladies and gentlemen, they're

6    going to be passing out these transcript books.

7               I'll just remind you that the actual evidence is the

8    9-1-1 call, the recording, what you hear on the recording.

9               The transcript is an aid.  It's a guide to help you

10   understand what's going on in that call, but the call itself is

11   the evidence.

12              So if you hear something different as you're listening

13   to it, then that is what would control.

14              The other thing to keep in mind about the transcript

15   books, tempting as it might be, please don't start flipping

16   ahead, reading whatever else might be in the transcript book.

17   Just look at the ones that you're directed to.  The others will

18   come in time.

19              If you'd like to go ahead and hand out the books.

20         **MR. RIGALI:**  Thank you, Your Honor.

21   **BY MR. RIGALI:**

22   **Q.**   All right.  Detective Niedermeier, I'm going to pull up

23   what's been marked as Government's Exhibit CAD-1, that's CAD-1.

24        Detective Niedermeier, can you see that transcript on the

25   screen as well?

**JA294**

1    **A.**   Yes.

2    **Q.**   Okay.  I'm going to play Government's Exhibit CAD-1.

3         And, sir, before I do that, can you go ahead and remind us

4    the date and time of this call?

5    **A.**   So this call was placed on August 10th, 2016, at 2:33 a.m.

6         (Audio was played but not reported.)

7    **BY MR. RIGALI:**

8    **Q.**   Okay.  There, sir, we heard the caller say she swears she

9    heard him walk into his building and some people jumped him or

10   there was an altercation; is that correct?

11   **A.**   Correct.

12   **Q.**   Okay.  And then at the end, she says she's on her way

13   there as well; correct?

14   **A.**   Correct.

15        **MR. RIGALI:**  Okay.  I'm going to pull up

16   Government's Exhibit CAD-2, as well as the transcript.

17        **THE COURT:**  And if you want to look in the book, it's

18   CAD-2T.

19   **BY MR. RIGALI:**

20   **Q.**   Okay.  And, sir, again, can you tell us what is the date

21   and time of this call here?

22   **A.**   Once again, August 10th, 2016.  This is the 9-1-1 --

23   excuse me, 9-1-1 call at 4:00 a.m.

24   **Q.**   So about an hour and a half after the last call we just

25   heard?

*Det. G. Niedermeier - Direct*

```
 1   A.    Correct.

 2   Q.    Same caller?

 3   A.    Yes.

 4         MR. RIGALI:  Playing Government's Exhibit CAD-2.

 5         (Audio was played but not reported.)

 6   BY MR. RIGALI:

 7   Q.    Sir, at any point did law enforcement go to

 8   1101 West Lanvale?

 9   A.    Yes.

10   Q.    I'm going to show you Government's Exhibit CS-22.

11         What are we looking at in CS-22?

12   A.    That's a front view of 1101 West Lanvale Street.

13   Q.    And that's where you learned Ricardo Johnson resided?

14   A.    Yes.

15   Q.    Pulling up CS-23.

16         What's depicted here?

17   A.    It's a close-up view of the exterior door of

18   1101 West Lanvale.  Through the window on the right, you can

19   see the interior door, second doorway needed to gain entrance

20   into the actual location, so the building divided into

21   apartments or condos.

22   Q.    And I'm pulling up Government's Exhibit CS-24.

23         Okay.  And is that what you were just describing there?

24   A.    Yeah; this is an interior view towards the exterior.  You

25   see the interior second set of doors, and then the exterior
```

1    door is beyond that from this view.

2    **Q.**    Was Mr. Johnson's apartment ever searched?

3    **A.**    Yes.

4    **Q.**    During the search of his apartment, were any cell phones

5    recovered?

6    **A.**    Yes.

7    **Q.**    How many cell phones, if you recall?

8    **A.**    Approximately four from his residence.

9         **MR. RIGALI:**    I'm going to approach the witness with

10   Government's Exhibit CELL-1.

11   **BY MR. RIGALI::**

12   **Q.**    Detective Niedermeier, I'm removing from Government's

13   Exhibit CELL-1 an item.

14        Can you describe -- first of all, do you recognize

15   Government's Exhibit CELL-1?

16   **A.**    The entire package?

17   **Q.**    No, sir, just the item I removed.

18   **A.**    Yes.

19   **Q.**    What is Government's Exhibit CELL-1?

20   **A.**    This is one of the cell phones recovered from

21   1101 West Lanvale.

22   **Q.**    Okay.  And can you show it to the jury, please, and

23   describe it.

24   **A.**    It's a -- it's a flip cell phone.  I believe it's gold in

25   color or rose gold in color.

75

1   **Q.**   All right.  Was that phone submitted as evidence?

2   **A.**   Yes.

3   **Q.**   And that was recovered from 1101 West Lanvale,

4   Ricardo Johnson's apartment; is that right?

5   **A.**   Correct.

6   **Q.**   I'm going to come grab the exhibits.

7        Detective Niedermeier, in your experience as a Homicide

8   detective, do you ever have occasion to review social media

9   accounts?

10  **A.**   Yes.

11  **Q.**   And why would you do that as a Homicide detective?

12  **A.**   Especially now, social media is a way that you can

13  identify people's lifestyles, friends, possible witnesses.

14       Additionally, a lot of times you're able to locate

15  evidentiary photographs from social media.

16  **Q.**   Such as where someone's been?

17  **A.**   Where they've been, where they're going.  Sometimes people

18  even post pictures of themselves committing crimes.

19  **Q.**   Who they're with?

20  **A.**   Yes.

21  **Q.**   Did you attempt to locate any social media accounts

22  operated by Ricardo Johnson?

23  **A.**   Yes.

24  **Q.**   Were you successful?

25  **A.**   Yes.

**JA298**

1   **Q.**   All right.  I'm going to pull up

2   Government's Exhibit IG-1.

3        Sir, what is Government's Exhibit IG-1?

4   **A.**   It's a snapshot, I guess you'd call it, of

5   sai_ricky_johnson, which is Ricardo Johnson's Instagram

6   account.

7   **Q.**   Okay.  Can you read what appears to be the post there?

8   **A.**   It says [reading]:  TB the cut.  Doing that 33 years the

9   hard way.  Jewelry and all.  Wasn't a lot of niggas who could

10  wear their jewelry and gators in that Cutt.  I did both.

11  **Q.**   Pulling up Government's Exhibit IG-2.

12       What is this?

13  **A.**   Once again, from the Instagram page of Ricky --

14  Ricardo Johnson, it's a photograph of Mr. Johnson wearing a

15  large necklace, belt buckle, and watch.

16  **Q.**   And does there appear to be a post by Mr. Johnson's

17  account?

18  **A.**   Yes.

19  **Q.**   And what does that say?

20  **A.**   It says [reading]:  Tb waiting on my bags of money -- or

21  money signs.

22  **Q.**   Pulling up Government's Exhibit IG-3.

23       Do you recognize this?

24  **A.**   Yes.

25  **Q.**   Is this a photo taken from Ricardo Johnson's Instagram

 1   account?

 2   **A.**   Yes, it is.

 3   **Q.**   Pulling up IG-4.

 4        What do we see here?

 5   **A.**   It's a photograph that appears, possibly on a plane, of

 6   Ricardo Johnson and then a caption he posts [reading]:

 7   California bound.

 8   **Q.**   Pulling up IG-5.

 9        Is this another post from that same account?

10   **A.**   It is.

11   **Q.**   What are we looking at here?

12   **A.**   It's a photo of Louis Vuitton shoes.

13   **Q.**   And what does the post there say?

14   **A.**   [Reading]:  Getting my summer together.

15   **Q.**   Pulling up IG-6.

16        Is this another post from that account?

17   **A.**   It is.

18   **Q.**   And what are we looking at here?

19   **A.**   Appears to be a photo of expensive alligator shoes.

20   **Q.**   What does the post say?

21   **A.**   It says [reading]:  Undecided white linen.  Either way.

22   **Q.**   Pulling up IG-7.

23        What are we looking at here?

24   **A.**   Once again, expensive -- what appear to be expensive

25   alligator shoes, and the caption reads [reading]:  Shoe game on

1    1000.

2    **Q.**    Also a post from Ricardo Johnson's Instagram account?

3    **A.**    Correct.

4    **Q.**    Pulling up IG-8.

5        What about this one?

6    **A.**    A photograph of some very expensive shoes and -- from

7    Mr. Johnson's IG-account, and the caption reads [reading]:

8    Summer shit coming together.

9    **Q.**    Pulling up IG-9.

10        What do we see in IG-9?

11   **A.**    A photograph of a Rolex watch.  And in the caption from

12   Ricky Johnson's Instagram account, it says [reading]:  Rolex

13   Number 2.

14   **Q.**    IG-10, what do we see here, another post?

15   **A.**    It's a post from his, once again, his IG-accounts and an

16   up-close video of the Rolex or of a Rolex.  And the post he

17   wrote states [reading]:  She just touched down from

18   New York City.  On my way.

19   **Q.**    Did you do any research --

20   **A.**    [Reading]:  Omw.

21        I'm sorry.

22   **Q.**    I'm sorry.  Did you do any research into this Rolex watch?

23   **A.**    Yes.

24   **Q.**    Do you know how much it costs?

25   **A.**    Approximately $30,000 is what I found.

79

1   **Q.**   And when the victim's body was found, was he wearing any

2   jewelry?

3   **A.**   No.

4   **Q.**   Pulling up IG-11.

5       What do we see here?

6   **A.**   It's a photograph, once again, from Ricardo Johnson's

7   Instagram, and it appears on the hood of his Mercedes-Benz, a

8   pile of jewelry, watch.

9   **Q.**   And what does the post say?

10  **A.**   He posted [reading]:  My life.

11  **Q.**   Pulling up IG-12, and what do we see here?

12  **A.**   It's a Mercedes-Benz that Ricardo Johnson was known to

13  drive.

14  **Q.**   Would you read the post for us.

15  **A.**   And he -- he posts about this [reading]:  Only one in the

16  city, S-400 hybrid.

17  **Q.**   Sir, did you look into what, if any, jobs that Mr. Johnson

18  had around the time he was murdered?

19  **A.**   Yes.

20  **Q.**   What did you learn?

21  **A.**   Mr. Johnson was unemployed, basically.  He had small

22  part-time jobs from time to time.

23  **Q.**   And final question for now, Detective Niedermeier:  What

24  did the evidence that you gathered on August 10th and in the

25  days and weeks that followed, what did that evidence indicate

**JA302**

*Det. G. Niedermeier - Direct*

1  to you as to the number of people who might have been involved

2  in this crime?

3         **MR. HARRIS:**  Objection.

4         **THE COURT:**  Same basis?

5         **MR. HARRIS:**  As before, yes.

6         **THE COURT:**  Okay.  Overruled.

7  **BY MR. RIGALI:**

8  **Q.**  I'll ask it again.

9      What did the evidence indicate to you as to the number of

10  people who may have been involved in this crime?

11  **A.**  Based on the way the crime was committed, Mr. Johnson's

12  history -- he was 6-foot, 190 pounds.  He was a pretty big guy.

13  The coordination that would have been needed to steal the van

14  and orchestrate everything, I would estimate three to five

15  people would at least be needed to pull this off.

16         **MR. RIGALI:**  Just one moment, Your Honor.

17         No further questions at this time, Your Honor.

18         **THE COURT:**  All right.  Thank you.

19         I guess we'll just mention you're reserving the right

20  to recall?

21         **MR. RIGALI:**  That's our intention, Your Honor, yes.

22         **THE COURT:**  -- the witness.

23         But for right now, however, I will turn to Mr. Harris.

24         **MR. HARRIS:**  Thank you, Your Honor.

25

*Det. G. Niedermeier - Cross*

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | **BY MR. HARRIS:** |
| 3 | **Q.**   Good morning, Detective. |
| 4 | **A.**   Good morning, sir. |
| 5 | **Q.**   I want to start with what you found when you came to |
| 6 | 2200 Kloman Street back in 2016; all right? |
| 7 | **A.**   Yes, sir. |
| 8 | **Q.**   So you were the lead detective who responded that morning? |
| 9 | **A.**   Correct. |
| 10 | **Q.**   But you weren't the first police officer who came to the |
| 11 | scene? |
| 12 | **A.**   No. |
| 13 | **Q.**   There were already transit officers there? |
| 14 | **A.**   Yes. |
| 15 | **Q.**   And there were Baltimore City police officers there? |
| 16 | **A.**   Yes. |
| 17 | **Q.**   And their job was to make sure that that scene remained as |
| 18 | much as possible pristine until you got there; right? |
| 19 | **A.**   Yes. |
| 20 | **Q.**   Part of their job was to make sure nobody comes onto that |
| 21 | scene; right?  Nobody's who's not authorized comes onto the |
| 22 | scene? |
| 23 | **A.**   Yes, it's part of the job. |
| 24 | **Q.**   So that the -- any evidence that's there can be collected; |
| 25 | right? |

**JA304**

*Det. G. Niedermeier - Cross*

1   **A.**   Correct.

2   **Q.**   And that the evidence that's collected is uncontaminated;

3   right?

4   **A.**   Correct.

5   **Q.**   As much as possible, you want to preserve that scene for

6   further investigation?

7   **A.**   Yes.

8   **Q.**   And as far as you could tell when you arrived that morning

9   at about 7:00 a.m., the officers who were there were doing

10  their job; right?

11  **A.**   Yes, what I observed, yes.

12  **Q.**   That is, they were preserving the scene as much as

13  possible?

14  **A.**   Yes.

15  **Q.**   All right.  And once you arrived, you essentially were in

16  charge of how the investigation was going to proceed; is that

17  right?

18  **A.**   There's supervisors on the scene.  As lead detective, I am

19  tasked with the investigative part.  There's also supervisory

20  duties that they do.  But as far as the investigation goes, I,

21  in conjunction with possibly those supervisors if they had

22  suggestions or we may bounce ideas off each other.

23  **Q.**   But in terms of what steps to take at the investigation --

24  at the crime scene, you are making those decisions; right?

25  **A.**   Yes.

1  **Q.**   Okay.  And you are familiar with the resources that the

2  Baltimore Police Department has; right?

3  **A.**   Correct.

4  **Q.**   In terms of forensics?

5  **A.**   Yes.

6  **Q.**   Specialized units like the firearms examination unit;

7  right?

8  **A.**   Correct.

9  **Q.**   The resources that the crime lab has; right?

10  **A.**   Yes.

11  **Q.**   And part of your job that morning was to gather evidence;

12  right?

13  **A.**   Yeah, part of that job, yes.

14  **Q.**   Okay.

15  **A.**   Conduct an investigation, but part of that being the

16  evidence which was to be collected.

17  **Q.**   So part of your job is to keep the evidence, again, as

18  much as possible, untrampled and uncontaminated; right?

19  **A.**   Yes.

20  **Q.**   That's your training?

21  **A.**   Yes.

22  **Q.**   That's the training of the other officers who were

23  present?

24  **A.**   Yes.

25  **Q.**   And you carried out your duties that morning, consistent

*Det. G. Niedermeier - Cross*

1  with your training, didn't you?

2  **A.**  Yes, to the best of my knowledge, yep.

3  **Q.**  So the evidence that you recovered included the van

4  itself; right?

5  **A.**  Yes.

6  **Q.**  The van -- you did an initial examination of the van

7  on-scene?

8  **A.**  Correct.

9  **Q.**  And then you directed that the van be taken to another

10  location?

11  **A.**  Yes.

12  **Q.**  That was a Baltimore Police Department facility?

13  **A.**  Yes.

14  **Q.**  You got a search warrant for the van?

15  **A.**  Yes.

16  **Q.**  And you searched the van further at that facility?

17  **A.**  Yes.

18  **Q.**  You had occasion to examine the part of the door that

19  appeared to have been broken into?

20  **A.**  Made observations, yes.

21  **Q.**  You were able to take any samples that you wanted from

22  that part of the van?  You were able to, for example, dust that

23  for prints; right?

24  **A.**  Yes.

25  **Q.**  You were able to -- you saw that the ignition had been

85

1  popped?

2  **A.**    That was observed on-scene; but yes.

3  **Q.**    You were able to gain access to that part of the vehicle;

4  right?

5  **A.**    To the ignition?

6  **Q.**    Yeah.  That was something you could access in order to

7  examine it for evidence; right?

8  **A.**    Yes.

9  **Q.**    Such as to look for prints.

10 **A.**    I don't believe that you're going to recover any prints

11 from inside the ignition.

12 **Q.**    The surface -- so the surface area of -- that's on the

13 ignition, that was something that you could have looked for a

14 print on -- you could have looked there for prints; right?

15 Regardless of --

16 **A.**    I don't recall the surface area on the ignition that would

17 have been suitable to recover prints.

18 **Q.**    All right.  There was -- now, inside the van, there was an

19 iced tea bottle?

20 **A.**    Yes.

21 **Q.**    There were the brown gloves?

22 **A.**    Correct.

23 **Q.**    There were the -- a number of shell casings; right?

24 **A.**    Correct.

25 **Q.**    These are all things that you seized?

1    **A.**    Yes.

2    **Q.**    All things that you submitted for testing?

3    **A.**    Yeah.  Crime lab recovered them, yes.

4    **Q.**    Okay.  At your direction?

5    **A.**    In conjunction, yes.

6    **Q.**    And there were no prints belonging to Sydni Frazier on any

7    of that evidence?

8    **A.**    No.

9    **Q.**    There was no DNA belonging to Sydni Frazier on any of that

10   evidence?

11   **A.**    No, not on that evidence.

12   **Q.**    There was no sign whatsoever at that scene of

13   Sydni Frazier; isn't that right?

14   **A.**    Correct.

15   **Q.**    Okay.  Now, I want to talk about the neighborhood in which

16   you recovered Mr. Johnson's body, the area around 2200 Kloman.

17       As we saw from the overhead, Government's Exhibit MAP-3,

18   there are no houses on Kloman itself; right?

19   **A.**    No.

20   **Q.**    But just on the other side of the tracks is the Westport

21   neighborhood of Baltimore; correct?

22   **A.**    No, not on the other -- well, I guess further down, it

23   might be.  You would have to go beyond the BG&E plant to get

24   into the neighborhood.

25   **Q.**    Right.  One block over is Cedley Street; right?

1    **A.**    Yes.

2    **Q.**    Cedley is a residential neighborhood?

3    **A.**    It is.

4    **Q.**    Mostly two-story homes?

5    **A.**    I believe so.

6    **Q.**    And there are some vacants in that neighborhood; right?

7    **A.**    I would imagine at least some.

8    **Q.**    And you'd consider that a rough neighborhood, wouldn't

9    you?

10   **A.**    No.

11   **Q.**    You testified previously in this case, didn't you, sir?

12   **A.**    Yes.

13        **MR. HARRIS:**  Okay.  Court's indulgence.

14   **BY MR. HARRIS:**

15   **Q.**    I'll ask you, at the previous hearing, did you not testify

16   that this was a, in your words, a rough neighborhood?

17   **A.**    No, I don't believe so.

18        **MR. HARRIS:**  Court's indulgence.

19        **THE WITNESS:**  I believe we were talking about

20   Cherry Hill.

21   **BY MR. HARRIS:**

22   **Q.**    I'm going to get to Cherry Hill in a second.

23        (Counsel conferred.)

24   **BY MR. HARRIS:**

25   **Q.**    So immediately south -- the area that we're talking about

1   is Westport.  Immediately south or kind of southeast is the

2   Cherry Hill neighborhood; correct?

3   **A.**   If you could pull the map up.  Cherry Hill is south of

4   Westport.

5   **Q.**   Yeah?

6          **MR. HARRIS:**  If we could have, please,

7   Government's Exhibit MAP-3, I'd appreciate that.  Or actually

8   the one that's further out.

9          Perfect.

10  **BY MR. HARRIS::**

11  **Q.**   All right.  So the red symbol there, that represents

12  2200 Kloman; right?

13  **A.**   Yes.

14  **Q.**   And we see just west of there is Baltimore-Washington

15  Parkway; right?

16  **A.**   Yes.

17  **Q.**   And the area between the water and BW Parkway, that's what

18  we're talking about is the Westport neighborhood; right?

19  **A.**   Yeah, both -- I believe it goes on the other side of 295

20  just -- just a little bit right there, but it's a relatively

21  small area.

22  **Q.**   Right.

23         And if one continued to the southeast for just a couple of

24  blocks, that's Cherry Hill; right?

25  **A.**   I would say it's a little further than a couple of blocks,

1    but, yeah, not -- not too far.

2    **Q.**    A short jog, fair to say?

3    **A.**    Yeah.  You could run it if you had to.

4    **Q.**    All right.  If you were trying to get away from a murder

5    scene, for example, you could -- you could run to Cherry Hill

6    in short order; right?

7    **A.**    You could.  I would prefer to drive.

8    **Q.**    And you would agree that there's a lot of crime associated

9    with Cherry Hill.

10   **A.**    I believe 2019 -- 2019 or 2018 was the first year that

11   they had no murders, but Cherry Hill is historically one of the

12   higher-crime areas of the city, yes.

13   **Q.**    It's an area of the city that you were very familiar with

14   as a longstanding Homicide detective.

15   **A.**    I've been there, yes.

16   **Q.**    I mean, you've more than been there; you've investigated

17   murders there, haven't you?

18   **A.**    Yes.

19   **Q.**    Okay.  You were aware from your experience working in

20   Baltimore City that that's a place where drug dealing occurred?

21   **A.**    Unfortunately, it seems to occur all over the city.

22   **Q.**    Unquestionably.

23         But it is certainly concentrated in some parts of the

24   city; right?

25   **A.**    No.  It's throughout the city, unfortunately.

1   **Q.**   So is it your testimony that the level of drug dealing is

2   uniform across the city of Baltimore?

3   **A.**   My testimony is throughout the city of Baltimore, there is

4   a lot of drug dealing going on all day long.

5   **Q.**   Fair enough.

6      And violence occurs in the Cherry Hill neighborhood as

7   a -- on a regular basis.

8   **A.**   Once again, your definition, but there has been violence

9   that has occurred in Cherry Hill.

10  **Q.**   I want to talk about the evidence that you recovered from

11  the autopsy.

12     You were present for that autopsy?

13  **A.**   I was not when it was conducted.

14  **Q.**   You picked up the evidence immediately -- that the

15  Medical Examiner recovered --

16  **A.**   I did.

17  **Q.**   -- during the course of the autopsy?

18  **A.**   Yes.

19  **Q.**   That was transferred directly from Dr. Titus to you?

20  **A.**   It was.

21  **Q.**   And preserved in such a way that enabled for future

22  testing?

23  **A.**   Correct.

24  **Q.**   You've said that you recovered, I think, 15 projectiles

25  that were taken at the time of the autopsy; correct?

*Det. G. Niedermeier - Cross*

1   **A.**   15 new projectiles.

2   **Q.**   And then one that was not new?

3   **A.**   Correct.

4   **Q.**   One that you described as an artifact?

5   **A.**   Correct.

6   **Q.**   That was taken from Mr. Johnson's right thigh?

7   **A.**   Yeah, I believe so.  It was his leg.  I believe it was his

8   right one.

9   **Q.**   That indicated that he'd been previously shot; right?

10  **A.**   Yes.

11  **Q.**   Now, Baltimore Police maintains records from past crime

12  reports; right?

13  **A.**   Yes.

14  **Q.**   You can access that --

15  **A.**   Yes.

16  **Q.**   -- as a detective.

17       You can search by the name of a victim; right?

18  **A.**   Yes.

19  **Q.**   So you are able to see if Ricardo Johnson had previously

20  been reported as a crime victim of a shooting; right?

21  **A.**   Correct.

22  **Q.**   All right.  Did you investigate whether Mr. Johnson's name

23  came up in connection with this previous bullet wound?

24  **A.**   Yes.

25  **Q.**   And had it?

*Det. G. Niedermeier - Cross*

1   **A.**   Yes.

2   **Q.**   And was that -- was there a conviction as a result of

3   that, of the shooting --

4   **A.**   I don't recall if anybody was charged in that incident.

5   **Q.**   All right.  So --

6   **A.**   He was shot in 1988.

7   **Q.**   All right.  So someone in 1988, it appeared, tried to kill

8   Mr. Johnson; right?

9   **A.**   I don't know the particulars.  I don't know if he was an

10  innocent bystander.  He was -- he was a gunshot victim in 1988.

11  **Q.**   All right.  We can say that one way or -- well, strike

12  that.

13      It could have been that he was shot accidentally, right,

14  that that was a possibility?

15  **A.**   Yeah.  It's a possibility he could have been the intended.

16  I don't know.

17  **Q.**   And it -- that's the next -- my next question.

18      It could have been that someone was trying to kill him;

19  right?

20  **A.**   It could have been.

21  **Q.**   Okay.  And it could have been that that same person still

22  wanted to kill him in 2016; right?

23  **A.**   I find that unlikely.

24  **Q.**   But that's -- that is possible --

25          **THE COURT:**  I'm sustaining the objection to that

**JA315**

 1   question.  It's obviously calling for speculation.

 2        **MR. HARRIS:**  Thank you.

 3   **BY MR. HARRIS:**

 4   **Q.**   I want to talk about the pictures that you got off of

 5   Instagram for Mr. Johnson.

 6        Did you need a password to access those Instagram records?

 7   **A.**   No.  I believe they were public.

 8   **Q.**   So anyone at all can look and see the pictures that

 9   Mr. Johnson is putting on the Web; is that right?

10   **A.**   I believe so.

11   **Q.**   Anyone at all could see --

12   **A.**   If they're still up, but, yes.

13   **Q.**   Well, I'm not talking about today.

14   **A.**   Okay.

15   **Q.**   I'm talking about in 2016.  At that time anyone in the

16   world could see the pictures that Mr. Johnson was putting up on

17   the Web; right?

18   **A.**   Yes; if you knew where to look.

19   **Q.**   All right.  And the -- Mr. Johnson was essentially

20   bragging to the world, with pictures, of his wealth; right?

21        **MR. RIGALI:**  Objection.

22        **THE COURT:**  Basis?

23        **MR. RIGALI:**  Whether it's bragging or not is not

24   factual, Your Honor.

25        **MR. HARRIS:**  I'll use a different verb.

```
 1              THE COURT:  Use a different verb.
 2    BY MR. HARRIS:
 3    Q.    He was broadcasting to the world his wealth, wasn't he?
 4    A.    I would say that he was posting to the world a projection
 5    of himself that he wanted everybody else to see.
 6    Q.    Okay.  Very good.
 7          And the projection that he was making was of someone who
 8    was wealthy; right?
 9    A.    Someone who had nice taste or nice things, yes.
10    Q.    And by "nice," really, we mean expensive; right?
11    A.    Yeah, I would agree with that, but --
12    Q.    I mean, I don't know about you; I would regard a $30,000
13    watch as expensive.
14    A.    I would.  But I would also not wear blue alligator shoes,
15    so --
16    Q.    Agreed.
17          They're symbols of wealth; right?
18              THE COURT:  I think we've gotten the point.  Let's
19    move on.
20              MR. HARRIS:  Court's indulgence, please.
21              No more questions.
22              THE COURT:  Any redirect?
23              MR. RIGALI:  Just very briefly, Your Honor.
24
25
```

95

1        REDIRECT EXAMINATION

2   **BY MR. RIGALI:**

3   **Q.**   Detective Niedermeier, Mr. Harris was asking you about

4   whether the ignition that had been removed had been dusted for

5   fingerprints; correct?

6   **A.**   Correct.

7   **Q.**   But your testimony a couple of minutes ago was that it

8   appeared the perpetrators may have worn gloves?

9   **A.**   Yes.

10  **Q.**   And that was based on what?

11  **A.**   When the vehicle was processed for latent prints, a lack

12  of prints or -- prints are made up of moisture in your

13  fingertips, and each print is unique.  There are swirls around

14  your fingers.

15       There was evidence that there was print marks there, but

16  there was no swirls, which suggests that whoever was there was

17  wearing gloves.

18       The fact that no latent prints were recovered throughout

19  the vehicle -- you would expect to find some.

20  **Q.**   While we're on the topic of gloves, Mr. Harris also

21  mentioned the pair of brown gloves that were recovered in the

22  van; correct?

23  **A.**   Correct.

24  **Q.**   Did you investigate those gloves?

25  **A.**   Yes.

**JA318**

1  **Q.**   What did you learn about those gloves?

2  **A.**   They were the property of Mr. McCormick, the 86-year-old

3  owner of the vehicle.

4  **Q.**   Detective Niedermeier, is it fair to say you investigated

5  this homicide for a number of months?

6  **A.**   Yes.

7  **Q.**   Anything come up during the course of that months-long

8  investigation suggesting that the shooting that had occurred 18

9  years prior was linked to the murder of Ricardo Johnson in

10  2016?

11  **A.**   No, nothing.

12           **MR. RIGALI:**  Nothing further, Your Honor.

13           **THE COURT:**  Okay.  Anything else at this point?

14                    **RECROSS-EXAMINATION**

15  **BY MR. HARRIS:**

16  **Q.**   If you're not looking for something, you're not going to

17  find it; isn't that right, sir?

18  **A.**   No.  Sometimes it finds you.

19           **MR. HARRIS:**  No more questions.

20           **THE COURT:**  Okay.  Thank you, sir.  You're excused,

21  subject to recall.

22      (Witness excused.)

23           **THE COURT:**  And I think we'll perhaps just take the

24  mid-morning recess before the next witness.

25           I assume you have somebody ready to go?

1    excuse the jury, and then we can bring in Mr. Lashley and just

2    have him seated here.

3             **MS. PERRY:**  My apologies, Your Honor.

4             **THE COURT:**  That's fine.)

5        (Bench conference concluded.)

6             **THE COURT:**  Okay.  There will be just a minute, ladies

7    and gentlemen.  But I'm going to ask you to step back into the

8    jury room for just a minute, and then we'll be ready.

9        (Jury left the courtroom at 12:02 p.m.)

10            **THE COURT:**  All right.  You can be seated.

11            Is somebody ready to walk him in?

12            All right.  We can bring in the jury.

13       (Jury entered the courtroom at 12:05 p.m.)

14            **THE COURT:**  Okay.  You can all be seated.

15            All right.

16            **THE CLERK:**  Mr. Lashley, please stand.  Please raise

17   your right hand.

18          MALCOLM LASHLEY, GOVERNMENT'S WITNESS, SWORN.

19            **THE CLERK:**  Please speak directly into the microphone.

20            State and spell your full name for the record, please.

21            **THE WITNESS:**  Malcolm Lashley.

22            **THE CLERK:**  Spell your full name.

23            **THE WITNESS:**  M-A-L-C-O-L-M, L-A-S-H-L-E-Y.

24            **THE CLERK:**  Thank you.

25            **THE COURT:**  If you'd like to proceed.

**JA320**

| 1 | **MS. PERRY:**  Thank you, Your Honor. |
| 2 | **DIRECT EXAMINATION** |
| 3 | **BY MS. PERRY:** |
| 4 | **Q.**  Mr. Lashley, could you just pull a little closer to the |
| 5 | microphone so we can all hear you.  Thank you. |
| 6 | How old are you, sir? |
| 7 | **A.**  29. |
| 8 | **Q.**  And do you go by other names besides Malcolm Lashley? |
| 9 | **A.**  Yes. |
| 10 | **Q.**  What name is that? |
| 11 | **A.**  Spook. |
| 12 | **Q.**  Mr. Lashley, are you currently under the supervision of |
| 13 | the U.S. Department of Probation? |
| 14 | **A.**  Yes. |
| 15 | **Q.**  And is that because you've recently finished serving a |
| 16 | sentence for a crime? |
| 17 | **A.**  Yes. |
| 18 | **Q.**  What crimes were you convicted of? |
| 19 | **A.**  Racketeering, drug conspiracy. |
| 20 | **Q.**  Did you plead guilty to those charges? |
| 21 | **A.**  Yes. |
| 22 | **Q.**  About when was that? |
| 23 | **A.**  2018. |
| 24 | **Q.**  And when you pled guilty to those charges, did you sign a |
| 25 | cooperation agreement? |

**Malcolm Lashley - Direct**

1   **A.**   Yes.

2   **Q.**   What sentence did you ultimately receive, Mr. Lashley?

3   **A.**   Time served.

4   **Q.**   And how much time did you serve on those convictions?

5   **A.**   Two years and some months.

6   **Q.**   And have you finished serving that sentence, and that's

7   why you're now on probation?

8   **A.**   Yes.

9   **Q.**   And is one of the conditions of your supervision that you

10  continue to cooperate and testify truthfully during this

11  proceeding?

12  **A.**   Yes.

13  **Q.**   What happens if you don't testify truthfully in this

14  proceeding, in your understanding?

15  **A.**   I could violate probation, be tooken to jail.

16  **Q.**   Do you expect to receive any additional benefit from your

17  testimony here today?

18  **A.**   No.

19  **Q.**   And what is the condition of your cooperation here?  What

20  are you required to do?

21  **A.**   Tell the truth.

22  **Q.**   Mr. Lashley, in addition to the criminal convictions we've

23  just talked about, do you have any others?

24  **A.**   Yes.

25  **Q.**   Can you just summarize them very briefly for us.

*Malcolm Lashley - Direct*

1  **A.**   Some drug charges, traffic, and a witness intimidation

2  charge.

3  **Q.**   Mr. Lashley, where did you grow up?

4  **A.**   West Baltimore.

5  **Q.**   And did there come a time when you moved to the

6  Forest Park-Windsor Mill neighborhood of Baltimore City?

7  **A.**   Yes.

8  **Q.**   About when was that?

9  **A.**   About 2000, 2001.

10  **Q.**   And when you were living in the Forest Park-Windsor Mill

11  neighborhood, how were you making money?

12  **A.**   By selling drugs.

13  **Q.**   What kind of drugs were you selling?

14  **A.**   Cocaine, heroin.

15  **Q.**   And when did you start selling cocaine and heroin,

16  approximately?

17  **A.**   About 2014, '13, '14.

18  **Q.**   Mr. Lashley, in the neighborhood of Windsor Mill and

19  Forest Park, what was a common word or name that heroin went

20  by?  What did you say you would sell?

21  **A.**   Boy or girl.

22  **Q.**   And what is boy?

23  **A.**   Just another word for heroin.

24  **Q.**   And what about girl?

25  **A.**   That's another name for cocaine.

**JA323**

120

*Malcolm Lashley - Direct*

1  Q.   Now, during this time, where in the neighborhood were you

2  selling drugs?

3  A.   Where?

4  Q.   Where.

5  A.   In apartments, the gas station.  Just all around there.

6  Q.   All around the area of Windsor Mill and Forest Park?

7  A.   Yes.

8  Q.   Was there a particular block that you would sell in

9  routinely?

10  A.   Yes.  The 5200 block of Windsor Mill and Forest Park.

11  Q.   Now, I'm going to show you Government's Exhibit MAP-8.

12       Can you tell us what we're looking at here?

13  A.   That's a map of the neighborhood.

14  Q.   And what neighborhood is that?

15  A.   The Forest Park neighborhood.

16  Q.   And looking at Government's Exhibit MAP-8, can you tell us

17  what areas you were selling drugs in.

18  A.   At the BP and the Windsor Forest Apartments.

19  Q.   So the BP is indicated sort of over here (indicating)?

20  Can you see that?

21  A.   Yes.

22  Q.   And when you say the Forest Park -- the "Windsor Forest

23  Apartments," where are you talking about?

24  A.   The apartments right down the street.

25  Q.   And that would be over here (indicating)?

**JA324**

1   **A.**   Yes.

2   **Q.**   Now, looking back to where the BP is, what else is at that

3   BP station?  What else is in that area?

4   **A.**   It's other stores right there.

5   **Q.**   What kind of stores?

6   **A.**   A food store, like a grocery store, convenience store.

7   **Q.**   Was there a Subway restaurant there at one point?

8   **A.**   Yes.

9   **Q.**   Now, Mr. Lashley, I want to direct your attention to the

10  time frame between around 2011 and 2017.

11       How often were you outside in this area of Windsor Mill

12  and Forest Park?

13  **A.**   Every day.

14  **Q.**   And can you tell the members of the jury what it was like

15  during these years?

16  **A.**   Just a lot of drug selling.

17  **Q.**   Were -- you said you were out there every day.  Would you

18  see other people out in the area?

19  **A.**   Yeah.

20  **Q.**   How often?

21  **A.**   I mean, every day.

22  **Q.**   And how many people would be out selling in the area?

23  **A.**   It was a bunch of us.

24  **Q.**   And can you tell us how the drug sales would happen?

25  **A.**   People just pull up or call you and come by.

*Malcolm Lashley - Direct*

1   **Q.**   When you say people pull up, do you mean in cars?

2   **A.**   Yes.

3   **Q.**   And would the individuals in the area or you sell drugs to

4   the people in the cars?

5   **A.**   Yes.

6   **Q.**   And you said "call you."  Can you describe how that would

7   work.

8   **A.**   If they had your number, you can just call and they'll let

9   you know they're on the way down and come buy something.

10  **Q.**   And so they would use your phone to arrange a sale?

11  **A.**   Yes.

12  **Q.**   And did you sometimes communicate with drug customers

13  using text messages?

14  **A.**   Yes.

15  **Q.**   And, by the way, what were some of the names you would use

16  for a drug customer?

17  **A.**   We call 'em sales, sales or a play.

18  **Q.**   Mr. Lashley, during the time that you were selling drugs

19  in the area of Windsor Mill and Forest Park, did you become

20  friendly with or friends with other people who sold drugs and

21  hung out in the area?

22  **A.**   Yes.

23  **Q.**   And was there a name that people who were from this

24  neighborhood and who sold drugs in this neighborhood refer to

25  themselves as?

*Malcolm Lashley - Direct*

1    **A.**   Can you say that again.

2    **Q.**   Was there a name that people went by who sold drugs in

3    this area who were from the area?

4    **A.**   Oh, yes.

5    **Q.**   What was that?

6    **A.**   GMB or just a 5200 boy.

7    **Q.**   And let's start with GMB.  What did GMB stand for?

8    **A.**   Get Money Boys.

9    **Q.**   And who were Get Money Boys?  What did that mean?

10   **A.**   If you was from around the neighborhood, that's just what

11   we called ourself.

12   **Q.**   And when you say "if you were from around the

13   neighborhood," could anyone from the neighborhood be a Get

14   Money Boy?  Or was it just someone who was from around the

15   neighborhood and sold drugs in the neighborhood?

16   **A.**   Yeah, that, not just anybody.

17   **Q.**   And what about 5200 boy; what does that stand for?

18   **A.**   Well, 5200, that's just the number of the street, of the

19   block that we was on.

20   **Q.**   And so is the BP actually in the 5200 block of

21   Windsor Mill?

22   **A.**   Yes.

23   **Q.**   And so who referred to themselves as 5200 boys?  Who was a

24   5200 boy?

25   **A.**   Any one of us that was outside -- that was from around

1   there that was selling drugs.

2   **Q.**  Mr. Lashley, would you consider yourself a 5200 boy?

3   **A.**  Yes.

4   **Q.**  And what about a Get Money Boy?

5   **A.**  Yes.

6   **Q.**  Now, you told us that you became familiar with people who

7   hung out in that area.

8   I want to show you Government's Exhibit IND-3.

9   Do you recognize this person?

10  **A.**  Yes.

11  **Q.**  Who is this?

12  **A.**  That's Syd.

13  **Q.**  And how do you know Syd?

14  **A.**  Just from around the neighborhood.

15  **Q.**  And if you saw Syd again, would you recognize him?

16  **A.**  Yes.

17  **Q.**  Can you tell us if you see Syd in the courtroom today?

18  **A.**  Yes.

19  **Q.**  Can you point to him and indicate what he's wearing?

20  **A.**  A white shirt at the defendant table.

21  **MR. DAVIS:**  No objection, Your Honor.

22  **THE COURT:**  The record will reflect that Mr. Frazier

23  has been identified.

24  **BY MS. PERRY:**

25  **Q.**  Now, Mr. Lashley, did Syd go by any other names that you

1   knew?

2   **A.**   Yes.

3   **Q.**   What other names?

4   **A.**   Perry.

5   **Q.**   Were there any others that you knew?

6   **A.**   Oh, sometimes we would call him Jr. Boss.

7   **Q.**   Now, I'm going to come back to the name Perry in a few

8   minutes.

9       But I want to talk again about the time between around

10  2011, 2017.  How often did you see Syd during that time frame?

11  **A.**   Like every day.

12  **Q.**   And how did you contact Syd?

13  **A.**   How did I contact him?

14  **Q.**   Yes.

15  **A.**   On the cell phone.

16  **Q.**   Did you see him in person sometimes as well?

17  **A.**   Yes.

18  **Q.**   And when you would contact him on the phone, do you

19  remember what your phone number was around that time?

20  **A.**   Yes.

21  **Q.**   What was that?

22  **A.**   It was a (410) 258 number.  The last four was 9219.

23  **Q.**   Now, Mr. Lashley, I'm going to show you what's been marked

24  as Government's Exhibit IND-4.

25      Do you recognize this person?

```
 1   A.   Yes.

 2   Q.   Who is this?

 3   A.   Another dude from around the way, Creams.

 4   Q.   And how did you know Creams?

 5   A.   From being from around there.

 6   Q.   Was Syd a 5200 boy?

 7   A.   Yes.

 8   Q.   And was he a GMB, a Get Money Boy?

 9   A.   Yes.

10   Q.   And what about Creams?

11   A.   Yeah.

12   Q.   He was both of those as well?

13   A.   Yes.

14   Q.   Now, do you know if Syd and Creams knew each other?

15   A.   Yes.

16   Q.   How do you know?

17   A.   From being around the neighborhood and them being

18   together.

19   Q.   How often would you see Syd and Creams together?

20   A.   Very often.

21   Q.   Were they together a lot?

22   A.   Yes.

23   Q.   And when you saw Syd and Creams together, what were they

24   doing?

25   A.   Just being outside, selling drugs.
```

1   **Q.**   Now, Mr. Lashley, you testified that you had been outside

2   often and that you saw Syd and Creams often.

3         Did Syd have a job?

4   **A.**   No, not that I know of.

5   **Q.**   How did he make money?

6   **A.**   Doing what we all did, sell drugs.

7   **Q.**   And what kind of drugs was Syd selling?

8   **A.**   Heroin.

9   **Q.**   How do you know?

10  **A.**   Just from being outside with him.

11  **Q.**   Now did you see Syd when you were outside selling

12  individually to people or was he a supplier?

13  **A.**   Both.

14  **Q.**   How do you know?

15  **A.**   From actually buying from him before.

16  **Q.**   And would you actually see him selling to other people?

17  **A.**   Yes.

18  **Q.**   Mr. Lashley, just generally, did people who sold drugs in

19  the area of Forest Park and Windsor Mill give drug buyers a

20  different name often?

21  **A.**   Yes.

22  **Q.**   Did you give drug buyers a different name?

23  **A.**   Yes.

24  **Q.**   What name would you give?

25  **A.**   Tech.

**JA331**

*Malcolm Lashley - Direct*

1   **Q.**   And why would you do that?

2   **A.**   Just so they wouldn't know my real name.

3   **Q.**   Why didn't you want your drug customers to know your real

4   name?

5   **A.**   In case they told the police.

6   **Q.**   Did you ever hear Syd give drug customers a different

7   name?

8   **A.**   Yes.

9   **Q.**   What name would Syd give?

10  **A.**   He would use Perry.

11  **Q.**   Now, you testified that Syd sold heroin.  Do you know

12  where Syd got his heroin?

13  **A.**   I know just one dude.

14  **Q.**   Were you ever with him when he purchased heroin?

15  **A.**   Yes; once before.

16  **Q.**   Can you tell us about when that was?

17  **A.**   About 2016.

18  **Q.**   And what happened?

19  **A.**   We just went to meet someone he was gettin' something

20  from.

21  **Q.**   When you say "we," who are you talking about?

22  **A.**   Me and Syd.

23  **Q.**   Where did you go?

24  **A.**   It was in the Park Heights area.

25  **Q.**   And what happened when you got to the Park Heights area?

*Malcolm Lashley - Direct*

1   **A.**   We met up with someone he was buying from.

2   **Q.**   Do you know that person's name?

3   **A.**   He went by the name Black.

4   **Q.**   And when you got there and met up with Black, just

5   describe for us what happened.

6   **A.**   We pulled up and Syd got what he had came for, got back in

7   the car, and then we went back to the neighborhood.

8   **Q.**   And when you say he got what he came for and got back in

9   the car, how do you know that he got something during that

10   meeting?

11   **A.**   I seened [sic] it.

12   **Q.**   What was it?

13   **A.**   Just a bag of heroin.

14   **Q.**   About how much was it?

15   **A.**   I don't know exact amount from that day, but it was a

16   nice-sized bag.

17   **Q.**   And can you, using your hands, indicate for us about how

18   big a bag it was?

19   **A.**   It was a nice-sized bag (indicating).

20   **Q.**   Was this the only time that you went with Syd to meet

21   Black?

22   **A.**   Yes.

23   **Q.**   Now, I believe you told us, Mr. Lashley, that Syd supplied

24   you on occasion.

25   **A.**   Yes.

*Malcolm Lashley - Direct*

1  **Q.**   What did he supply you with?

2  **A.**   Heroin.

3  **Q.**   And about how many times did Syd supply you with heroin?

4  **A.**   Maybe about five times.

5  **Q.**   And when he supplied you, what quantities would he supply

6  you with?

7  **A.**   I would buy anywhere from about, like, 10 grams of heroin.

8  **Q.**   And what did he charge you?

9  **A.**   70 or $80 a gram.

10  **Q.**   So he would charge you 70 or $80 per gram, and you

11  purchase approximately ten at a time?

12  **A.**   Yes.

13  **Q.**   How much could you sell a gram for on the streets in

14  Windsor Mill and Forest Park?

15  **A.**   The most, $120.

16  **Q.**   And what quantities would you sell heroin in on the

17  streets in Windsor Mill-Forest Park?  What would customers

18  usually buy at a time amount-wise?

19  **A.**   Oh, grams.

20  **Q.**   Did you ever see where Syd kept his heroin?

21  **A.**   Yes.

22  **Q.**   Can you explain?

23  **A.**   I was going to buy from him one day, and he went in an

24  abandoned house to get it.

25  **Q.**   Do you know where that abandoned house was?

**JA334**

1   **A.**   A street called Bennett Place.

2   **Q.**   And how did you end up on Bennett Place?

3   **A.**   That's where he told me to come.

4   **Q.**   So did you meet him there?

5   **A.**   Yes.

6   **Q.**   What happened when you got there?

7   **A.**   I was coming to buy something from him.  He went and got

8   it for me, came back, and gave it to me.

9   **Q.**   Where did he go to get it?

10  **A.**   In an abandoned house on the corner.

11  **Q.**   Did you see him go -- how did you see him get into the

12  house?

13  **A.**   Walk through the front door.

14  **Q.**   And if you saw that house again, would you recognize it?

15  **A.**   Yes.

16  **Q.**   I'm going to show you MAP-10.

17      Can you tell us what we're looking at here.

18  **A.**   That's the abandoned house I used to stop by.

19  **Q.**   I'm also going to show you MAP-12.

20      What are we looking at here?

21  **A.**   That's the same house.

22  **Q.**   Now, can you tell us when you saw -- when you were here

23  with Syd, where did you see him go?

24  **A.**   Up the steps, through the front door.

25  **Q.**   And looking at MAP-12, is this what the house looked like

*Malcolm Lashley - Direct*

```
 1   when you were there with Syd?
 2   A.   Yes.  I mean, the front door wasn't boarded up.  There was
 3   an actual door on it.
 4   Q.   And when was it that you went with Syd to this particular
 5   location?
 6   A.   Around 2016.
 7   Q.   How many times had you been to this location with Syd?
 8   A.   Maybe about three times.
 9   Q.   And you told us he went inside and came back out.  What
10   happened after he came back out of the house?
11   A.   He could give me what I came for, and I would leave.
12   Q.   And what was that?
13   A.   Heroin.
14   Q.   Now, Mr. Lashley, before I want to move on, I want to ask
15   you a couple of more -- before I move on, I want to ask you a
16   few more questions about heroin.
17        Are you familiar with the term "fire"?
18   A.   Yes.
19   Q.   What's fire?
20   A.   That's just something we might say to tell you like it's
21   good; it's some good stuff.
22   Q.   And what about bomb; what's bomb?
23   A.   That mean, like, the same thing.
24   Q.   And what about missile?  Have you heard that term?
25   A.   Yes.
```

1  **Q.**   What's missile?

2  **A.**   Just saying you got good stuff.

3  **Q.**   What about lick, Mr. Lashley?  Have you heard that term

4  before?

5  **A.**   Lick?

6  **Q.**   Yes.

7  **A.**   Yes.

8  **Q.**   What's lick?

9  **A.**   Just a word people use to, like, if you're ready to go on,

10  like, a robbery or something.

11  **Q.**   And how would someone use the term "lick" in your

12  experience?

13  **A.**   Like, I'm going to go hit a lick.

14  **Q.**   Now, Mr. Lashley, I want to switch gears for a minute and

15  ask you about an individual who went by the name of Uncle Rick.

16      Did you know Uncle Rick?

17  **A.**   Yes.

18  **Q.**   I'm going to show you Government's Exhibit IND-1.

19      Do you recognize this person?

20  **A.**   Yes.

21  **Q.**   Who is that?

22  **A.**   That's Uncle Rick.

23  **Q.**   And when did you first meet Uncle Rick?

24  **A.**   Like back in, like, 2011.

25  **Q.**   And how did you meet Uncle Rick?

134

*Malcolm Lashley - Direct*

1  **A.**   I was introduced to him by another guy around the

2  neighborhood.

3  **Q.**   Who is that?

4  **A.**   His name was Huggie.

5  **Q.**   Can you describe what Uncle Rick was like?

6  **A.**   Just a standout dude, very flashy.

7  **Q.**   When you say "flashy," what do you mean?

8  **A.**   Like, just flashy.

9  **Q.**   Did he appear to you as though he had money?

10  **A.**   Yes.

11  **Q.**   And did it appear to you that he had expensive things?

12  **A.**   Yes.  He wore jewelry and stuff like that.

13  **Q.**   Do you know what kind of car he drove?

14  **A.**   Yes.  At the time he was driving a Benz.

15  **Q.**   Mr. Lashley, how did Uncle Rick make money?

16  **A.**   He sold drugs.

17  **Q.**   Do you know if Syd knew Uncle Rick?

18  **A.**   Yes.

19  **Q.**   How do you know?

20  **A.**   From being around the neighborhood.

21  **Q.**   Did you ever have a conversation with Syd about

22  Uncle Rick?

23  **A.**   Yes.

24  **Q.**   Now, before you tell us about the conversation, where did

25  this conversation take place?

**JA338**

*Malcolm Lashley - Direct*

1   **A.**   Outside in a neighborhood, around Windsor Forest.

2   **Q.**   Around the apartments at Windsor Forest you told us about

3   earlier?

4   **A.**   Yes.

5   **Q.**   And who was there?

6   **A.**   Me, my brother, Syd, Creams.  It was a couple of us

7   outside.

8   **Q.**   You said your brother.  What's your brother's name?

9   **A.**   Melvin.

10  **Q.**   And what happened when you were all hanging out there in

11  that apartment complex?

12  **A.**   We were just outside, and there was a conversation brought

13  up that Syd said he wanted to rob him.

14  **Q.**   Syd said he wanted to rob who?

15  **A.**   Rick.

16  **Q.**   And who was Syd telling this to?

17  **A.**   To us.

18  **Q.**   Did he say what he was going to do?

19  **A.**   Yes.

20  **Q.**   What did he say?

21  **A.**   He said he was going to kidnap him and rob him.

22  **Q.**   Why would Syd want to rob Rick?

23          **MR. DAVIS:**  Objection.

24          **THE WITNESS:**  For money.

25          **MR. DAVIS:**  Objection.

**JA339**

*Malcolm Lashley - Direct*

1        **THE COURT:**  Sustained to the form of the question.

2    **BY MS. PERRY:**

3    **Q.**   Mr. Lashley, did there come a time when you heard that

4    something happened to Uncle Rick?

5    **A.**   Yes; about two days later.

6    **Q.**   Who did you hear it from?

7    **A.**   I was outside walking with my brother --

8        **MR. DAVIS:**  Objection.  Objection.

9        **THE COURT:**  Do you want to come up to the bench?

10       **MR. DAVIS:**  Sure.

11      (Bench conference on the record:

12       **MR. DAVIS:**  This is the issue I flagged with the Court

13   during the pretrial before we came in.  I believe the testimony

14   that the prosecutor is attempting to elicit is that his brother

15   told him that Frazier, something to that extent, those little

16   ends, got him.  And I don't think that's in furtherance.  I

17   think it's rank hearsay, and it's -- and I object to it.

18       **MS. PERRY:**  I do not intend to elicit from him what

19   his brother told him other than his brother told him that Rick

20   had been killed.  I don't intend to elicit any of the

21   particulars of the conversation.  I don't intend to elicit that

22   his brother told him what he believed to be Syd did it; just

23   did you learn about the murder and from whom?  And would he say

24   Rick got killed.  That's it.  I don't think that that's

25   hearsay.  I think that that's just an explanation of the

**JA340**

1  circumstances.

2       MR. DAVIS:  I think she's going to have to make --

3  because he just started to testify, My brother --

4       THE COURT:  You're suggesting that she lead him on

5  that point.

6       MS. PERRY:  Sure.

7       THE COURT:  Okay.)

8      (Bench conference concluded.)

9       THE COURT:  Just rephrase.

10       MS. PERRY:  Sure.

11  BY MS. PERRY:

12  Q.   Now, Mr. Lashley, I think you just told us that there came

13  a time when you heard that something happened to Uncle Rick.

14       Did you hear that something happened to Uncle Rick from

15  your brother?

16  A.   Yes.

17  Q.   And did your brother tell you that Uncle Rick had been

18  killed?

19  A.   Yes.

20  Q.   How long after this conversation you described with Syd

21  was this -- did you learn this information from your brother?

22  A.   About two days.

23  Q.   Now, after you learned from your brother that Uncle Rick

24  had been killed, did you have another conversation with Syd?

25  A.   Yes.

Malcolm Lashley - Direct

1    **Q.**   Can you describe what was happening that day?

2    **A.**   He pulled up around our way and offered to sell me some

3    drugs, and he said that he had got him.

4    **Q.**   And when he said he had got him, who did you believe he

5    was referring to?

6    **A.**   The same person he was just talkin' about two days ago.

7    **Q.**   And that would be Uncle Rick?

8    **A.**   Yes.

9    **Q.**   So you were out -- you said you were out.  Where were you?

10   **A.**   In Windsor Forest.

11   **Q.**   And who was with you?

12   **A.**   Me, Creams -- it was about five of us outside.  I can't

13   remember exactly everyone that was out.

14   **Q.**   And when Syd arrived, what did he have with him?

15   **A.**   He had drugs with him.

16   **Q.**   Can you describe what those drugs look like?

17   **A.**   Just a bag of brown substances.

18   **Q.**   And what did you believe it to be?

19   **A.**   Heroin.

20   **Q.**   How big was the bag?

21   **A.**   It was a big bag (indicating).

22   **Q.**   Was this a usual or unusual amount of drugs for you to see

23   Syd with?

24   **A.**   Unusual.

25   **Q.**   Why is that?

**JA342**

*Malcolm Lashley - Direct*

1   **A.**   I mean, it was the most I seen him with at one time.

2   **Q.**   And what was he doing with those drugs?

3   **A.**   Trying to get rid of it.

4   **Q.**   Who was he trying to give them to?

5   **A.**   Whoever wanted to buy it from him.

6   **Q.**   Was that other Get Money Boys and other 5200 boys in the

7   area?

8   **A.**   Yes.

9   **Q.**   Was he trying to give them to you as well?

10   **A.**   Yes.

11   **Q.**   And while he had these drugs, what did he say to you?

12   **A.**   He told me that he had got him.

13   **Q.**   Now, Mr. Lashley, when you had these conversations with

14   Syd, did he tell you why he wanted to get Uncle Rick?

15   **A.**   No, I don't think he said why.

16   **Q.**   But when he came back around after you learned about

17   Rick's death, he told you he had --

18         **MR. DAVIS:**   Objection; leading.

19         **THE COURT:**   Overruled.

20   BY MS. PERRY:

21   **Q.**   When he came back around after, what did he have with him?

22   **A.**   Drugs.

23   **Q.**   And you believed that to be an unusual amount of drugs?

24   **A.**   Yes.

25         **MR. DAVIS:**   Objection; asked and answered.

**JA343**

1          **THE COURT:**  Overruled.

2     **BY MS. PERRY:**

3     **Q.**   Now, Mr. Lashley, I want to direct your attention to a

4     time when you were, again, around the apartments there and this

5     particular time when you saw Syd on a dirt bike.

6          Do you recall that occasion?

7     **A.**   Yes.

8     **Q.**   Can you describe what you were doing on that particular

9     day.

10    **A.**   Just outside in the neighborhood.

11    **Q.**   And what, if anything, happened on that particular day?

12    **A.**   Say that again.

13    **Q.**   What happened on that particular day?

14    **A.**   Oh, we was outside, and Syd was on a dirt bike.  It was a

15    nice day outside.  He pulled up to where we was at standing

16    outside for a second, maybe five minutes.  And he pulled a gun

17    out.  And before he took off, he put it in the bag and rolled

18    off.

19    **Q.**   What kind of bag did he have?

20    **A.**   Like a school bag, like a book bag.

21    **Q.**   You said he rode up on a dirt bike.  Was it usual or

22    unusual for you to see Syd on a dirt bike?

23    **A.**   No.  I seened [sic] him on a bike before.

24    **Q.**   And on this particular day, can you describe what the bike

25    looked like.

**JA344**

*Malcolm Lashley - Direct*

1   **A.**   It was just green and white.

2   **Q.**   And when he rode up, did you have any conversation with

3   him?

4   **A.**   Maybe a split conversation.

5   **Q.**   And what was he doing?

6   **A.**   Well, he was talkin' to all of us that was standing

7   outside, but maybe five minutes before he rolled out.

8   **Q.**   And what did he have on him?

9   **A.**   He pulled a gun out.

10  **Q.**   Can you describe what the gun looked like?

11  **A.**   Just a black handgun.

12  **Q.**   And you said he had a backpack?

13  **A.**   Yes.

14  **Q.**   And then I believe you said that he at some point rode

15  away; is that right?

16  **A.**   Yes, he rode off.

17  **Q.**   I'm going to show you again MAP-8.

18       Can you just indicate for us where you were when you saw

19  Mr. -- where you saw Syd that particular day.

20  **A.**   On Dickey Hill Road.

21  **Q.**   And are you referring to -- I'm just going to circle --

22  this apartment complex up here (indicating)?

23  **A.**   Yes.

24  **Q.**   And you said you were on Dickey Hill Road.  Is that the

25  road that we see sort of on the top of the screen?

**JA345**

1  **A.**  Yes.

2  **Q.**  After Syd rode away, what happened?

3  **A.**  I'm going to say we was outside maybe 30, 45 minutes,

4  somewhere in between there, before he came back on feet saying

5  that he had got chased by the police.

6  **Q.**  And what else did he tell you when he came back?

7  **A.**  He -- he think that they had -- might have found the bag

8  that he threw while he was on the -- on the dirt bike gettin'

9  chased.

10  **Q.**  Did he tell you -- when he came back, did he have the

11  dirt bike?

12  **A.**  No.

13  **Q.**  Did he have the backpack?

14  **A.**  No.

15  **Q.**  And did he tell you what happened to the backpack?

16  **A.**  He just thought that it was -- it was found by the police.

17  **Q.**  Now, Mr. Lashley, when was this particular day that you're

18  describing in relation to your conversations with Syd about

19  Uncle Rick?

20  **A.**  All within that same week.

21  **Q.**  It was all around the same time?

22  **A.**  Yes.

23      **MS. PERRY:**  Court's indulgence.

24      Nothing further.  Thank you.

25      **THE COURT:**  All right.  Thank you.

1                 Mr. Davis.

2            **MR. DAVIS:**  Thank you, Your Honor.

3            Court's indulgence for one moment.

4            It's going to take me a second to get set up here.

5            **THE COURT:**  That's fine.

6                          **CROSS-EXAMINATION**

7    **BY MR. DAVIS:**

8    **Q.**   Mr. Lashley, you spoke about a time that you went with

9    Sydni Frazier to meet with an individual named Black.  Is it

10   your testimony that Mr. Frazier took you to his source of

11   supply?

12   **A.**   Yes.

13   **Q.**   And he showed you what he bought from his source of

14   supply.

15   **A.**   Yes.

16   **Q.**   Did you go back to that source of supply and cut

17   Mr. Frazier out for your future heroin purchases?

18   **A.**   No.

19   **Q.**   And where did this take place?

20   **A.**   Park Heights area.

21   **Q.**   And where in the Park Heights area?

22   **A.**   By a tire shop.

23   **Q.**   And was the man out on the street, or was he in the tire

24   shop?

25   **A.**   No.  He was in his car.

1   **Q.**   And were you in a car or were you out on foot?

2   **A.**   No.  I was in the car.

3   **Q.**   And what type of car were you in?

4   **A.**   I don't remember what kind of car he was driving at that

5   time.

6   **Q.**   So it was Mr. Frazier's car?

7   **A.**   I guess so, yes.

8   **Q.**   So Mr. Frazier just came up to you and said, Would you

9   like to go with me while I purchase heroin from my source of

10  supply?

11  **A.**   No.

12  **Q.**   He was a customer of his?

13  **A.**   I was with him before he was going.

14  **Q.**   And you've also talked about a big bag of heroin that he

15  was walking around with after Uncle Rick was killed?

16  **A.**   Well, he pulled up with it, yes.

17  **Q.**   Could you show us -- I didn't see your hands.  Could you

18  put your hands up and show us.

19  **A.**   It's just a regular size -- nice-sized bag (indicating).

20  **Q.**   We can't -- I can't see your hands.  Could you put them

21  above your head to show?

22  **A.**   (Witness complies.)

23  **Q.**   Okay.  So you've got a bag like this (indicating); right?

24  **A.**   Like this (indicating).

25          **THE COURT:**  His hands are a little closer together

1    than yours, I think, Mr. Davis.

2    **BY MR. DAVIS:**

3    **Q.**    And how deep was the bag with powder?

4    **A.**    This was a big bag.

5    **Q.**    So it's a bag like that (indicating); right?

6    **A.**    Yes.

7    **Q.**    And I've got about 12 inches between my hands.

8         And how deep with powder was it?

9    **A.**    Well, the --

10   **Q.**    You can demonstrate for us.

11   **A.**    How the substances is, it's just -- it just is round

12   (indicating).

13   **Q.**    So it was round?

14   **A.**    Yes.

15   **Q.**    And it was powder (indicating)?

16   **A.**    Yes.

17   **Q.**    Do you know if it was a quart bag?

18   **A.**    A who?

19   **Q.**    A quart bag.

20   **A.**    Quart bag?

21   **Q.**    Yes.

22   **A.**    I don't know what that is.

23   **Q.**    Was it a sandwich bag?

24   **A.**    No.  It was like a market bag.

25   **Q.**    It's bigger than a sandwich bag?

1   **A.**   Yes.

2   **Q.**   We're talking a lot of heroin; correct?

3   **A.**   No.  It was in a sandwich bag, but it was in another bag

4   (indicating) he was carrying.

5   **Q.**   And he's just walking around with this for everyone to

6   see?

7   **A.**   Well, at the time he pulled up.

8   **Q.**   Now, you've been convicted of drug trafficking before;

9   correct?

10  **A.**   Yes.

11  **Q.**   And you've been convicted of witness intimidation?

12  **A.**   Yes.

13  **Q.**   You're a big guy, aren't you?

14  **A.**   Yes.

15  **Q.**   And you pled guilty to RICO, racketeering conspiracy;

16  correct?

17  **A.**   Yes.

18  **Q.**   And you pled guilty to a narcotics trafficking conspiracy?

19  **A.**   Yes.

20  **Q.**   Now, is it your testimony that most of the neighborhood

21  was out there selling drugs in that area -- in the 5200 block

22  of Windsor Mill Road?

23  **A.**   Yes.

24  **Q.**   And that was the whole time you lived there?

25  **A.**   Yes.

**JA350**

1  **Q.**   So basically, the kids you grew up with, most of them

2  gravitated towards selling drugs in the 5200 block of

3  Windsor Mill; correct?

4  **A.**   It would go like that sometimes.

5  **Q.**   And the reason 5200 block of Windsor Mill was convenient

6  was, is it was an easy access point for people to come in to

7  make purchases; correct?

8  **A.**   I guess you could say that.

9  **Q.**   I mean, they'd just pull up into the BP gas station;

10  right?

11  **A.**   Yes.

12          **MR. DAVIS:**  I'm not getting anything on the VGA

13  laptop.

14          **THE CLERK:**  Are you connected?

15          **MR. DAVIS:**  I believe I am.  I've got a parallel --

16  there we go.

17  **BY MR. DAVIS:**

18  **Q.**   Now, United States showed you MAP No. 8, Government's

19  Exhibit MAP No. 8.  And take a minute to look at that.  Now,

20  you see the BP on there; right?

21  **A.**   Yes.

22  **Q.**   And that's where people would sell the drugs; correct?

23  **A.**   Yes.

24  **Q.**   And, again, the reason that people gravitated towards

25  there is because it was an easy-access place; right?

1   **A.**   Yes.

2   **Q.**   Now, you weren't a member of a gang back then, were you?

3   **A.**   No, sir.

4   **Q.**   And Syd wasn't a member of a gang either, was he?

5   **A.**   No.

6   **Q.**   You were an independent drug seller?

7   **A.**   Me?

8   **Q.**   Yes.

9   **A.**   Yes.

10  **Q.**   You didn't have a boss.

11  **A.**   No.

12  **Q.**   If you wanted to sell heroin, you would buy heroin from

13  someone and you would sell it; right?

14  **A.**   Yes.

15  **Q.**   Reese was one of your friends; correct?

16  **A.**   Who?

17  **Q.**   Reese.

18  **A.**   Yes.

19  **Q.**   Maurice Pollock, you bought a lot of heroin from him;

20  correct?

21  **A.**   Yes.

22  **Q.**   You'd buy it and you'd resell it; right?

23  **A.**   Yes.

24  **Q.**   Maurice had no control over you -- where you sold or what

25  you did with it, did he?

**JA352**

1   **A.**   No.

2   **Q.**   And that's the way a lot of those kids from the

3   neighborhood operated, the ones you refer to as the 5200 boys;

4   right?

5   **A.**   Yes.

6   **Q.**   They'd just go out, and they're just trying to make a

7   living; correct?

8   **A.**   Yes.

9   **Q.**   Selling drugs?

10  **A.**   Right.

11  **Q.**   At the BP station?

12  **A.**   Yes.

13  **Q.**   Now, where did you live in 2016, what area?

14  **A.**   I was living around, like, Edmondson Village.

15  **Q.**   So you didn't live in the area of Windsor Forest

16  Apartments; correct?

17  **A.**   No.

18  **Q.**   But you're familiar with that area; correct?

19  **A.**   Yes.

20  **Q.**   And there's a school out there; right?

21  **A.**   Yes.  I went to that school.

22  **Q.**   You went to Windsor Forest Apartments -- you went to the

23  elementary school there; right?

24  **A.**   It was a middle school.

25  **Q.**   Yeah.  Is it elementary and middle or is it just middle?

1   **A.**   It's elementary and middle.

2   **Q.**   And did you go there with Sydni Frazier?

3   **A.**   No.

4   **Q.**   You didn't?

5   **A.**   I'm older than him.

6   **Q.**   How old are you now?

7   **A.**   29.

8   **Q.**   A couple of years older; right?

9   **A.**   Yes.

10  **Q.**   You went with a lot of the other guys from up in the area;

11  right?

12  **A.**   Not many.

13  **Q.**   Now, when -- I've circled an area on the map involving the

14  school and two buildings across from the school.

15      Are you familiar with that area?

16  **A.**   Yes.

17  **Q.**   And do you see those two buildings at the top right

18  directly across from the school?

19  **A.**   Yes.

20  **Q.**   Now, there's a space in between those buildings; right?

21  **A.**   Yes.

22  **Q.**   And people would hang out in there, wouldn't they?

23  **A.**   Yes.

24  **Q.**   Now, on the days that you're talking about Mr. Frazier

25  coming up on a dirt bike, is that where you were?

*Malcolm Lashley - Cross*

1   **A.**  Yes.

2   **Q.**  Now, were you in between the buildings or were you down --

3   were you in between the buildings?

4   **A.**  No.  We was in front of the building.

5   **Q.**  In front of the building.

6      So you're very familiar with this area; correct?

7   **A.**  Yes.

8   **Q.**  I'm going to show you what's been marked Defense Exhibit

9   No. 1.

10      Well, first of all, I'm going to show you what's been

11   marked as Defense Exhibit No. 1i.

12        **MR. DAVIS:**  Court's indulgence.

13      (Counsel conferred.)

14   **BY MR. DAVIS:**

15   **Q.**  So first I'm going to show you what's been marked as

16   Defense Exhibit 1i.

17      Now, that's the school you went to, isn't it?

18   **A.**  Yes.

19   **Q.**  And these things, they're mailboxes; right?

20   **A.**  Yes.

21   **Q.**  And you said that you were right out in that area;

22   correct?

23   **A.**  Yes.

24   **Q.**  I'm going to show you what's been marked as

25   Defense Exhibit 1a.  And that's the area right across the

*Malcolm Lashley - Cross*

1  street from the school; right?

2  **A.**   Yes.

3  **Q.**   Now I'm going to show you what's been marked 1b, and

4  that's the building to the right of the mailboxes?

5  **A.**   Yes.

6  **Q.**   I'm going to show you what's been marked Defense Exhibit

7  Number 1c.

8      And that's the corner of that building to the right of

9  where you were standing.

10 **A.**   Okay.

11 **Q.**   What's that?

12 **A.**   It's a camera.

13 **Q.**   Is it your practice to be out there selling drugs in front

14 of cameras in the apartment complex?

15 **A.**   We might be on the back side, but not going to stand right

16 under the camera.

17 **Q.**   Those cameras are circular; right?

18 **A.**   I think they just on the sides of the building.

19 **Q.**   So now you're stepping back from being out up around right

20 off the street.  You're stepping back and you're moving away

21 from the camera view now; right?  That's what you're telling

22 us?

23 **A.**   I just be all up and around there.

24 **Q.**   And stepping back.  Now, this is where you originally told

25 us a few moments ago you were up near the street; right?

*Malcolm Lashley - Cross*

1    Because you said Mr. Frazier pulled up; right?

2    **A.**   Yes.

3    **Q.**   So that's up towards the street.

4         Let me show you Defense Exhibit 1e.

5         That's looking to the left building; right?

6    **A.**   Yeah.

7    **Q.**   Let's go to 1f.  Another picture of the building to the

8    left; right?  There's the mailboxes.

9    **A.**   Yeah.

10   **Q.**   Now, this is looking back, right in the middle of that

11   cut, back to the parking lot.

12   **A.**   Uh-huh.

13   **Q.**   And then, finally, well, 1h, a little bit closer to the

14   back where that parking lot is; right?

15   **A.**   Uh-huh.

16   **Q.**   And then, finally, the one where you identified the school

17   with the mailboxes?

18   **A.**   Right.

19   **Q.**   And this is all very familiar to you, that area; right?

20   **A.**   Yes.

21   **Q.**   And there are cameras all over those apartment complexes,

22   aren't there?

23   **A.**   Yeah.

24   **Q.**   But it's your testimony you were out there selling drugs

25   that day and that Sydni Frazier pulls up on a dirt bike and

1   shows you a gun.

2   **A.**   Yes.

3   **Q.**   Did you view any video footage of Mr. Frazier pulling up

4   and showing you a gun when you met with the United States

5   during your debriefings?

6   **A.**   No.

7   **Q.**   Did you tell them about the cameras out there?

8   **A.**   No.

9   **Q.**   Now, when you were interviewed by the United States back

10  on September 28th of 2018, you indicated to them that Reese

11  fronted you heroin.  Could you tell us what "front" means.

12  **A.**   Like, give it to you on consignment.

13  **Q.**   So you didn't have to pay him; right?  You didn't have to

14  buy it from him.  He just gave it to you, and you paid him

15  back; right?

16  **A.**   Yeah.

17  **Q.**   And he was a good source for you; correct?

18  **A.**   Well, you could say that.

19  **Q.**   And back on September 28th of 2018, when you met with the

20  prosecutors and the agents in the case, you told them that you

21  bought heroin from Sydni Frazier in late 2016; do you recall

22  that?

23  **A.**   Yes.

24  **Q.**   Let's step back a minute.

25          You were arrested in June of 2017; correct?

1   **A.**   Yeah.

2   **Q.**   Today you've indicated that you purchased from

3   Sydni Frazier about five times; correct?

4   **A.**   Yes.

5   **Q.**   Now, you testified at another proceeding on April 11th of

6   2019.  And I'm going to read a question and answer to you, and

7   I'm going to ask you a question about them.

8           **MS. PERRY:**  Objection.

9           **THE COURT:**  Do you want to come up to the bench.

10          (Bench conference on the record:

11          **MS. PERRY:**  Just before he does, I'm not sure; I

12   believe there's been an inconsistent statement made.

13          **MR. DAVIS:**  He was asked if he purchased heroin from

14   Sydni Frazier, and he said, "Yes; once."

15          **THE COURT:**  Okay.  So, I mean, I think, right, you

16   would normally ask if you --

17          **MR. DAVIS:**  I was getting ready to do that.

18          **THE COURT:**  Well, you were about to go into the

19   question and answer.  I think what she's saying is that

20   normally you would ask, Do you recall when you testified at

21   that trial, that you were asked --

22          **MR. DAVIS:**  Oh, I'm going -- I was going there.

23          **THE COURT:**  It didn't sound like you were -- thank

24   you.  And give them the line and page.)

25          (Bench conference concluded.)

1    BY MR. DAVIS:

2    Q.   Now, Mr. Lashley, you testified in another proceeding back

3    on April 11th of 2019.  Your testimony was sworn and under oath

4    as it is here today.

5         Do you recall that?

6    A.   Yes.

7    Q.   And you were asked a question -- and if you bear with me

8    one second, I'll find it.

9         Now --

10            MR. DAVIS:  And for counsel's reference, it's at

11   Page 156 of the transcript from 4/11/2019, and that's Lines 7

12   through 12.

13   BY MR. DAVIS:

14   Q.   [Reading]:  Now, was there anyone else who supplied you

15   with heroin?

16        [Reading]:  Yes.

17        [Reading]:  Who else?

18        Answer:  A few guys.  I would probably buy some from Reese

19   sometimes.  I bought some from Syd one time.

20        Now, can you tell us which is accurate, your testimony

21   here today that you purchased from him five times or your

22   testimony back on April --

23            MS. PERRY:  Objection, Your Honor.

24            THE COURT:  Do you want to come up to the bench.

25   Bring the transcript.

```
 1          (Bench conference on the record:

 2          MR. DAVIS:  He gives multiple answers.  I'm going to

 3   take him through them all, but this is what I just asked him

 4   (indicating).

 5          THE COURT:  I'm sorry.  Which one did you ask him?

 6          MR. DAVIS:  Right here (indicating).

 7          THE COURT:  Line?

 8          MS. PERRY:  Oh, I'm sorry.  It's two pages before

 9   that.

10          MR. DAVIS:  Lines 7 through 12.

11          THE COURT:  Lines 7 --

12          MR. DAVIS:  Through 12.

13          THE COURT:  -- through 12.  Okay.

14          MR. DAVIS:  He gives about four different answers, so

15   I'm going to take him through them.

16          THE COURT:  Okay.  So is there an objection as long as

17   we get to what's on Page 158?

18          MS. PERRY:  Right.  I believe what's on Page 158 is

19   consistent with what he testified to today.

20          MR. DAVIS:  I haven't gotten there yet.  I just

21   started with the inconsistency.

22          But I'm going to go there.

23          THE COURT:  Back to where we were -- oh, and

24   apparently you and I didn't communicate.  I thought what you

25   were going to do was ask him whether he recalled being asked
```

 1    how, you know, how often --

 2            **MR. DAVIS:**  I'm not refreshing his recollection,

 3    Your Honor.  I was impeaching him with this --

 4            **MS. PERRY:**  But he has to be confronted by the prior

 5    inconsistency first.

 6            **MR. DAVIS:**  I will do that, then.  In other words,

 7    tell him --

 8            **THE COURT:**  See what he would -- give him the chance

 9    to recount what he recalls or sort of ask him generally if he

10    recalls testifying to that.

11            **MR. DAVIS:**  I'll do that.  I'll do that.

12            **THE COURT:**  And then if he doesn't remember and he

13    says something different, you can go to the grand jury

14    testimony.

15        (Bench conference concluded.)

16    **BY MR. DAVIS:**

17    **Q.**   Now, Mr. Lashley, during that proceeding, do you remember

18    an occasion being asked if anyone else supplied you with

19    heroin?

20    **A.**   Yes.

21    **Q.**   And do you remember what you said in reference to

22    Mr. Frazier?

23    **A.**   I can't remember everything from back then.

24    **Q.**   Well, let me -- again, directing counsel's attention to

25    Lines 7 through 12 of Page 156.

1       [Reading]:  Now, was there anyone else who supplied you

2  with heroin?

3       [Reading]:  Yes.

4       [Reading]:  Who else?

5       [Reading]:  A few guys.  I would probably buy some from

6  Reese sometimes.

7       And that's your friend Reese; right?

8  **A.**    Right.

9  **Q.**    [Reading]:  I bought some from Syd one time.

10 **A.**    Yeah.  I might was saying as if, like, once before, not

11 maybe, like, just one time, like a one-time purchase.  Like, I

12 might was saying I bought some from Syd one time, like, as if,

13 like, once before, not just one time.

14 **Q.**    Now, you also indicated later on during that same

15 proceeding that you purchased from Syd Frazier a few times; do

16 you recall that?

17 **A.**    Today?

18 **Q.**    No.  Before, back on April 11th of 2019.

19 **A.**    Uh-huh.

20 **Q.**    Do you recall that?

21 **A.**    Yes.

22         **MR. DAVIS:**  And for counsel's reference, that's

23 Page 157, Lines 1 through 2.

24 **BY MR. DAVIS:**

25 **Q.**    [Reading]:  And you said Syd supplied you with heroin.

**JA363**

160

*Malcolm Lashley - Cross*

| | |
|---|---|
| 1 | And your answer:  Yes, a few times. |
| 2 | **A.**   Uh-huh. |
| 3 | **Q.**   And that was your testimony. |
| 4 | And then moving on to Page 158, later on during that same |
| 5 | proceeding, do you recall giving a different answer? |
| 6 | **A.**   Yes. |
| 7 | **Q.**   And what was the different answer you gave? |
| 8 | **A.**   You just said a few times. |
| 9 | **MR. DAVIS:**  And directing counsel's attention to |
| 10 | Page 158, Lines 3 through 8. |
| 11 | **BY MR. DAVIS:** |
| 12 | **Q.**   Question:  Now, you said Syd -- you said Syd sometimes |
| 13 | supplies you with heroin? |
| 14 | Answer:  Yeah, a few times. |
| 15 | Question:  How many times? |
| 16 | [Reading]:  I think I can count on one hand, maybe. |
| 17 | **A.**   Right. |
| 18 | **Q.**   [Reading]:  Like maybe four or five times. |
| 19 | Correct? |
| 20 | **A.**   Right.  It wasn't a lot 'cause I didn't go to him a lot, |
| 21 | but a couple times. |
| 22 | **Q.**   You really didn't know Sydni Frazier that well, did you? |
| 23 | I mean, you weren't close to him.  He wasn't a close friend; |
| 24 | right? |
| 25 | **A.**   I know him for years. |

1  **Q.**   But he wasn't a close friend, was he?

2  **A.**   I wouldn't say close.

3  **Q.**   He was younger than you.

4  **A.**   Right.

5  **Q.**   And during that proceeding back in April of 2019, you gave

6  three different answers.  You gave one answer that you

7  purchased from him once you gave him --

8          **MS. PERRY:**  Objection.

9          **MR. DAVIS:**  -- a second answer --

10          **THE COURT:**  Depends on how you define the difference

11  between "few" and "four to five" and considering it all in

12  context.

13          **MR. DAVIS:**  I'll rephrase the question.

14          **THE COURT:**  Thank you.

15  **BY MR. DAVIS:**

16  **Q.**   Mr. Lashley, back in April of 2019, the first time you

17  were asked how many times you purchased from Mr. Frazier, you

18  said one time.

19      The second time you were asked how many times you

20  purchased from Mr. Frazier, you said a few times.

21      And the third time you were asked you said maybe like four

22  or five times.

23      Which is true?

24  **A.**   I just told you.  When I said "one time," I might was

25  talking about just, like, once before, not exactly just one

1   time.

2   **Q.**   So you're saying they're all true?

3   **A.**   It was -- it was a couple times.

4   **Q.**   So as -- so a couple times you've purchased from him.

5       Which is true?  That's what I'm asking you.  Based on your

6   recollection, two times, a few times, four or five times, or

7   one time?

8   **A.**   A few times.  A couple times.

9   **Q.**   Well, what does "couple" mean to you?

10  **A.**   I mean, I know everybody know "couple" means two.  But

11  what I'm saying, a couple --

12  **Q.**   What does a few mean to you?

13  **A.**   -- a couple of times --

14  **Q.**   What does "a few" mean to you?

15  **A.**   A few times can be two times, too, sir.

16  **Q.**   A few times could be two times, too?

17  **A.**   I said that it can be.

18  **Q.**   Now, how many times did you go down to Bennett Place?

19  **A.**   About three times.

20  **Q.**   And do you recall testifying back in April -- on

21  April 11th of 2019 and being asked a question:  Did you ever

22  see where Syd kept his supply?

23          **MS. PERRY:**  Objection.

24          **THE WITNESS:**  Yes.

25  **BY MR. DAVIS:**

**JA366**

1   **Q.**   And what was your answer back then?

2   **A.**   "Yes."

3   **Q.**   And how many times did you see that back then?  What did

4   you tell us?

5   **A.**   Just a couple of times that I came down there.

6           **MR. DAVIS:**  All right.  And for counsel's reference,

7   it's transcript April 11th, 2019, Page 158, Lines 15

8   through 16.

9   **BY MR. DAVIS:**

10  **Q.**   I'm going to read a question and answer to you,

11  Mr. Lashley, and I'm going to ask you a question.

12          [Reading]:  Did you ever see where Syd kept his supply?

13          Answer:  Yes, once before.

14          Which is accurate, your testimony here today or what you

15  testified to in April of 2019?

16  **A.**   Huh?

17  **Q.**   Which is accurate?  What you told us -- what you testified

18  to under oath back in April of 2019 -- yes, once before -- or

19  what you're telling us here today -- you had been there a few

20  times?

21  **A.**   Both is accurate.

22  **Q.**   So there's no difference between once and a few times to

23  you?

24  **A.**   Yes.

25  **Q.**   Well, which is accurate?

1   **A.**   I don't --

2        **MS. PERRY:**  Objection.

3   **BY MR. DAVIS:**

4   **Q.**   Which is true?

5   **A.**   Both is true.

6   **Q.**   Both is true.

7        Now, you indicated that Mr. Frazier went into this

8   abandoned house.

9        Did you see him go into the house?

10  **A.**   Yes.

11  **Q.**   And how did he enter the house?

12  **A.**   Through the front door.

13  **Q.**   And how did he get in through the front door?

14  **A.**   How did he get in?

15  **Q.**   Yes.  Was it -- how did he get in?

16  **A.**   It was unlocked.  He just walked in.

17  **Q.**   Just walked in, just pushed the door open and went in;

18  right?

19  **A.**   Yes.

20  **Q.**   And, again, it's your testimony that Mr. Frazier takes you

21  to what you've described as the place where he stashes his

22  drugs, an unlocked, abandoned house, and just walks in and gets

23  the drugs for you and comes out and gives them to you and away

24  you go; right?

25  **A.**   Yes.

*Malcolm Lashley - Cross*

1  Q.   I'm going to show you Government's Exhibit No. 8 again,

2  MAP-8.

3       If you'll bear with me one second, Mr. Lashley.

4       Now, Mr. Lashley, you've indicated you guys were right

5  here when Mr. Frazier pulled up on that dirt bike (indicating);

6  correct?

7  A.   Yes.

8  Q.   And what direction was he coming from?

9       And, for the record, I've circled the two buildings

10  directly across the street from the elementary/middle school.

11       What direction was Mr. Frazier coming from when he pulled

12  up on this dirt bike?  Was he coming from the left or was he

13  coming from the right as you look at MAP-8, the circled area

14  which has the two buildings directly across the street from the

15  elementary school?

16  A.   I don't remember exactly where he was coming from.  He

17  just hopped on the curb on the dirt bike.

18  Q.   And you're out there with Creams; right?

19  A.   It was a couple of us out there.

20  Q.   Creams, that's a name you mentioned; right?

21  A.   Yes.

22  Q.   Gang member; correct?

23  A.   Yes.

24  Q.   Your brother; right?

25  A.   Yes.

```
 1   Q.   Older or younger brother?

 2   A.   Older.

 3   Q.   Gang member?

 4   A.   Yes.

 5   Q.   Nickname?

 6   A.   Mal.

 7   Q.   Actually, isn't it Menace?

 8   A.   Well, that's what some people call him.  I don't call him

 9   that.

10   Q.   Well, is that what he was known by, Menace?

11        MS. PERRY:  Objection.

12        THE COURT:  Could I see counsel at the bench,

13   actually, on the schedule.

14      (Bench conference on the record:

15        MR. DAVIS:  I'm going to be a few more minutes.

16        THE COURT:  You're going to be a few more minutes and

17   it's 1 o'clock, so we need to take a break.

18        MR. DAVIS:  Can we advise him not to speak to anyone

19   over the break?  I don't know where he's housed or where

20   he's -- who he's hanging out with, but I would --

21        THE COURT:  He is not to speak to anyone about his

22   testimony.

23        MR. DAVIS:  Including the prosecutors and agents.

24        THE COURT:  Of course.

25        MS. PERRY:  Obviously --
```

1          **MR. DAVIS:**  He may not know it, though.

2          **THE COURT:**  No.  I understand.  I understand.  We'll

3    advise him after we excuse the jury.

4          **MR. DAVIS:**  Certainly.  Thank you.)

5       (Bench conference concluded.)

6          **THE COURT:**  Ladies and gentlemen, I realize it's a

7    little bit after 1 o'clock and some people might be hungry, so

8    we're going to take the lunch recess now.

9          I'll ask counsel and the witness to stick around for a

10   minute.  But we are going to excuse you, ladies and gentlemen,

11   until 2 o'clock, and we will resume at 2 o'clock.

12         Thank you very much.

13      (Jury left the courtroom at 1:04 p.m.)

14         **THE COURT:**  All right.  So we will be resuming at

15   2:00.

16         Mr. Lashley, I'm sure you understand, but I have to

17   ask you not to discuss your testimony with anyone else during

18   the lunch hour.  And please be back here at 2 o'clock.  And I'm

19   sure counsel will take care or someone will be escorting

20   Mr. Lashley.

21         All right.  And we'll be back at 2:00.

22      (Luncheon recess taken.)

23         **THE COURT:**  You can be seated, please.

24         **MR. DAVIS:**  I apologize, Your Honor.  Someone called

25   me at 5 to 2:00, and I didn't look at my watch.

**JA371**

```
 1              THE COURT:  Okay.  Well, we're ready to go now.

 2              MR. DAVIS:  Thank you.

 3              THE COURT:  We can get the jury.

 4          (Jury entered the courtroom at 2:11 p.m.)

 5              THE COURT:  You can be seated.

 6              THE CLERK:  Mr. Lashley, I remind you you're still

 7     under oath.

 8              THE WITNESS:  Yes.

 9              THE COURT:  All right.  If everybody is settled,

10     Mr. Davis.

11              MR. DAVIS:  Thank you, Your Honor.

12     BY MR. DAVIS:

13     Q.   Mr. Lashley, was Uncle Rick a member of a gang?

14     A.   Not that I know of, no.

15     Q.   He had some ongoing issues with some people, didn't he?

16     A.   I guess.

17     Q.   He had a dispute ongoing with a guy by the name of Nick?

18              MS. PERRY:  Objection.

19              THE COURT:  Come up to the bench.

20          (Bench conference on the record:

21              MS. PERRY:  Your Honor, my objection is to the basis

22     of knowledge for this particular witness.  This is the same as

23     Detective Niedermeier.  I don't believe that there's any

24     nonhearsay basis for any of this line of cross.

25              The witness would -- the reports indicate and the
```

```
 1   witness would testify that he heard from someone else that

 2   Uncle Rick had a dispute with someone.

 3           But Mr. Lashley has no personal knowledge of it.  And

 4   so I don't believe it's appropriate.

 5           THE COURT:  Mr. Davis?

 6           MR. DAVIS:  I'm not eliciting it for the truth of the

 7   matter asserted that there was actually an ongoing dispute.

 8   It's just that there were --

 9           THE COURT:  Yes, you are.

10           MR. DAVIS:  No, I'm not.  I mean --

11           THE COURT:  Objection is sustained.)

12       (Bench conference concluded.)

13           THE COURT:  It's sustained.

14   BY MR. DAVIS:

15   Q.   Did you have any problems with Uncle Rick?

16   A.   No.

17   Q.   Do you have personal knowledge that he had been shot

18   before by someone?

19   A.   Um ...

20   Q.   You don't?

21   A.   Yes, I think I recall.

22   Q.   Did Uncle Rick hang out at the BP gas station with all the

23   other fellows?

24   A.   Sometimes.  Not a lot.

25   Q.   Was Uncle Rick a supplier to people at the BP.
```

*Malcolm Lashley - Cross*

```
 1   A.   Not a whole -- not everyone.  Maybe a few.
 2   Q.   Well, what was Uncle Rick's business?  I mean, what did he
 3   supply for people?
 4   A.   Heroin.
 5   Q.   And what quantities did Uncle Rick supply to people?
 6   A.   I guess whatever you wanted.
 7   Q.   Well, I mean, not guessing.  What you know.  I mean, I'm
 8   asking you for your personal knowledge --
 9   A.   Whatever you wanted.
10   Q.   I'm sorry?
11   A.   I said whatever you wanted.
12   Q.   All right.  And that's based on your personal knowledge;
13   correct?
14   A.   Yes.
15   Q.   So you bought whatever you wanted from him on occasion;
16   right?
17   A.   Me?  No.
18   Q.   So how do you know that?
19   A.   (No response.)
20   Q.   How do you know that?  What's your source of knowledge?
21   Just from hearing it from people or what you actually know?
22   A.   It's what I know.
23   Q.   Okay.  How do you know that?
24   A.   'Cause I know guys who bought from him.
25   Q.   And you were there?
```

1   **A.**   Not -- I don't know.  You confusing me, man.

2   **Q.**   It's not a confusing question.

3        Were you there when these guys bought from him?

4   **A.**   No.

5   **Q.**   Let's go back to the dirt bike.

6        Did you see the chase that happened on that day that the

7   police were chasing the dirt bike around?

8   **A.**   No.  I was around there, but --

9   **Q.**   You couldn't see it?

10  **A.**   -- not actual right there when he was gettin' chased.

11  **Q.**   So did you leave and then come back?

12  **A.**   No.  I was out there.

13  **Q.**   And you didn't see a chase?

14  **A.**   It happened on another block.

15  **Q.**   And you're across from the elementary/middle school;

16  right?

17  **A.**   Yeah.

18  **Q.**   Well, let me take you back before the chase.

19       What direction -- I think we talked about this before.

20  And if I'm repeating myself, someone remind me.

21       What direction was the dirt bike coming from when you

22  testified it pulled up and stopped and talked with you and the

23  other people that were out there?

24       **THE COURT:**  You wanted a reminder?

25       **MR. DAVIS:**  Yes.

*Malcolm Lashley - Cross*

```
1          THE COURT:  He said he didn't recall from what
2    direction.
3          MR. DAVIS:  Thank you, Your Honor.
4    BY MR. DAVIS:
5    Q.   So you don't recall what direction.
6         Do you recall what direction the bike left in; in other
7    words, when it leaves the area, do you recall?
8    A.   Yes.
9    Q.   And what direction did it go?  And I'll bring up the
10   map -- I'll bring up MAP-8.
11        I've got my cursor on Dickey Hill right across from the
12   elementary/middle school.
13        Did the dirt bike go right or did it go left?
14   A.   How I'm looking at it, left.
15   Q.   From the way -- so we're looking at it.  It's going left,
16   so it's going over towards -- what's that street over there,
17   North Forest Park Ave?
18   A.   Yeah.
19   Q.   Now, does that street go all the way over there?
20   Dickey Hill Run Road, does it go that far?
21   A.   Yes.
22   Q.   And, again, you're out there with Creams and Menace and
23   Reese; correct?
24   A.   Yes; and a few more people.
25   Q.   Now, when this dirt bike pulls up -- and you've indicated
```

1    it's Mr. Frazier on the dirt bike -- is the individual wearing

2    gloves on his hand?

3    **A.**    I can't remember.

4    **Q.**    When Mr. Frazier pulls up, according to your testimony,

5    what type of clothing is he wearing?

6    **A.**    I don't remember exactly what he had on.

7    **Q.**    Well, let's not go exactly.  Let's just give me an idea, I

8    mean, because this is important.  You're saying you're meeting

9    with this man and you're saying he's showing you a gun.

10         What's he wearing?

11   **A.**    I don't know exactly what he had on that day.

12   **Q.**    And you testified -- a little while ago you testified he

13   put the gun in the book bag.  Do you recall what the color of

14   the book bag was?

15   **A.**    Black.

16   **Q.**    All right.  So he puts the gun in this black book bag.

17        Where does he get the gun from to put it in the black book

18   bag?

19   **A.**    Out his pocket.

20   **Q.**    Out of his pocket.  But you don't remember what he's

21   wearing?

22   **A.**    Exactly.

23   **Q.**    And you don't remember if he had gloves on?

24   **A.**    No.

25   **Q.**    But you do remember he took it out of his pocket; correct?

1   **A.**   Yes.

2   **Q.**   Do you recall being asked that question on April 11th of

3   2019 at another proceeding?

4        [Reading]:  Do you know where he took it out from?

5        Do you recall being asked that?

6   **A.**   Yes.

7   **Q.**   And what was your answer back then?

8   **A.**   Out his pocket.

9        **MR. DAVIS:**  For counsel's benefit, I'm in the

10   transcript of April 11th, 2019, at Page 188, Lines 8

11   through 13.

12   **BY MR. DAVIS:**

13   **Q.**   And if you can bear with me for a second, Mr. Lashley.

14        And I'm beginning at Line 8.

15        [Reading]:  And where -- I'm going to read a question and

16   answer to you, and I'm going to ask you something at the end of

17   this.

18        [Reading]:  And where -- how do you know he had a gun?

19        Answer:  Because I seened it.

20        Question:  What do you mean you seened it?  What happened?

21        Answer:  He had it out.

22        Question:  And do you know where he took it out of?

23        Answer:  A book bag.

24        Now, which is true, Mr. Lashley?  What you've told us here

25   today, that he took it out of a pocket; or that what you told

**Malcolm Lashley - Cross**

1    us -- or what you stated under oath back on April 11th of 2019,

2    that he took the gun out of a book bag?

3    **A.**   No.  I think I said he put it in the book bag.

4    **Q.**   Well, I'll read the question and answer to you one more

5    time.

6         [Reading]:  And where?  How do you know he had a gun?

7         [Reading]:  Because I seened it.

8         Answer: -- or Question:  What do you mean you seened it?

9    What happened?

10        Answer:  He had it out.

11        Question:  And do you know where he took it out of?

12        Answer:  A book bag.

13        That was your answer back then.  You indicated that he

14   took it out of a book bag.  Today you're telling us that he

15   took it out of his pocket.  Which is true?

16             **MS. PERRY:**  Objection.

17             **THE COURT:**  Do you want to come up to the bench?

18             **MS. PERRY:**  Please.

19        (Bench conference on the record:

20             **MS. PERRY:**  Your Honor, Mr. Davis is certainly reading

21   that question and answer colloquy correctly as it was.  So

22   later in that same testimony he did say he saw him take it out

23   of the pocket.  And what he said was --

24             **MR. DAVIS:**  He gives multiple answers again like he

25   did on the other.  And I think this was on direct of the

1    Government.  And I think on cross with me, he says he takes it

2    out of a pocket.  And it was the following few days later.

3              I can tell you where it is.  Would you like to know?

4         **THE COURT:**  Sure.

5         **MR. DAVIS:**  I can tell Your Honor that he did.

6         **MS. PERRY:**  He clarifies.  At this point in the

7    transcript where we're here over (indicating), Mr. Davis asked

8    him.

9         **THE COURT:**  So the testimony at Page 56 --

10        **MR. DAVIS:**  56.

11        **THE COURT:**  -- is consistent with what he said today.

12        **MR. DAVIS:**  Yes.  I mean, that's proper for redirect.

13   But he testified differently under oath.  Actually, he gave two

14   different answers.  I intend to go through both of them with

15   him.

16             But there's nothing improper with impeaching him what

17   he said when the prosecution asked him versus what he said when

18   I cross him.

19             And I guess you can take two out of three and say

20   we'll go with two out of three, but it's fair game to question

21   him about this.  These are important discrepancies.

22        **THE COURT:**  If he doesn't come back to it, you can

23   come back to it.

24        **MS. PERRY:**  I think that the line of questioning about

25   which is accurate, what he said then or today, just shouldn't

 1  go much further than this because it's not the complete

 2  picture.  That's my objection, Your Honor.

 3          **THE COURT:**  I agree.  He said -- he tried to correct

 4  it when he -- just now he said, I think I said that it came

 5  from his pocket.

 6          **MR. DAVIS:**  That's the testimony.

 7          **THE COURT:**  So we'll be moving on.)

 8      (Bench conference concluded.)

 9  **BY MR. DAVIS:**

10  **Q.**  So, Mr. Lashley, that was your answer on April 11th that

11  he took it out of a book bag.

12      On April 15th, do you recall being asked where the gun

13  was?

14  **A.**  Yes.

15  **Q.**  And what was your answer on April 15th?

16  **A.**  I can't remember from then.

17  **Q.**  Well, was your testimony sworn and under oath on

18  April 15th?

19  **A.**  Yes.

20  **Q.**  And is your testimony sworn and under oath here today?

21  **A.**  Yes.

22          **MR. DAVIS:**  And for counsel's reference, it's

23  April 15th, 2019, Page 56, Lines 19 to 23.

24  **BY MR. DAVIS:**

25  **Q.**  Okay.  I'm going to read a couple of questions -- I'm

1    going to read a couple of questions to you, and you can give me

2    your answers.

3         [Reading]:  Okay.  What does he -- he opens up the bag and

4    shows you a gun.

5         Answer:  No.  He put it in the bag.

6         Question:  He put a gun in the bag?

7         Answer:  Yes.

8         [Reading]:  Where did he get the gun from?

9         [Reading]:  He had it on him.

10        [Reading]:  Can you tell us where he got it?

11        [Reading]:  Out of his pocket.

12        Now, that's what you said on April 15th.

13        On April 11th, you were asked [reading]:  Do you know

14   where he took it out of?

15        And your answer was:  A book bag.

16        Which is true, a pocket or a book bag?  You testified two

17   different ways.

18             **THE COURT:**  Just ask him the question.  Let him answer

19   it?

20   **BY MR. DAVIS:**

21   **Q.**   Which is true?

22   **A.**   The first one you said.

23   **Q.**   The first one -- well, which one?  Let's just -- just tell

24   us.  Was it the pocket or the --

25   **A.**   The pocket, the pocket.

1   **Q.**   So that's what he did.  He took it out of his pocket;

2   right?

3   **A.**   Put it in the bag, yes.

4   **Q.**   Took it out of his pocket and put it in the bag.

5        So you just misunderstood before?  Is that what you're

6   telling us?

7   **A.**   Maybe, yes.

8   **Q.**   You didn't lie?

9   **A.**   No.

10  **Q.**   You didn't make it up as you were sitting there?

11  **A.**   No.

12  **Q.**   'Cause that would be untruthful if you did that; correct?

13  **A.**   Right.

14  **Q.**   And your plea agreement is hinged on you being truthful;

15  correct?

16  **A.**   Yeah.

17  **Q.**   Now, who else had guns that day?  The day that you've

18  testified that you were shown a gun by Sydni Frazier, who else

19  had guns?  Did Menace have a gun?

20  **A.**   No, not that I remember.

21  **Q.**   Did Creams have a gun?

22  **A.**   No.

23  **Q.**   Did anyone give the guy on the dirt bike a gun?

24  **A.**   Well, I can't recall.

25  **Q.**   Anybody give him more than one gun?

1   **A.**   (No response.)

2   **Q.**   If you don't know, you can just say you don't know.

3   **A.**   No, I don't know.

4   **Q.**   Now, you pled guilty one year after your arrest,

5   approximately; is that an accurate assessment?

6   **A.**   I think so.

7   **Q.**   I'm going to show you what's been marked Defense Exhibit

8   No. 2.

9        **MR. DAVIS:**  Court's indulgence.

10       (Counsel conferred.)

11       **MS. PERRY:**  Your Honor, may we approach?

12       **THE COURT:**  Yes.

13       (Bench conference on the record:

14       **MR. DAVIS:**  I think they don't want me to show him the

15   plea agreement or move it into evidence.  I removed the factual

16   statement, which is normally what the complaint is, but the

17   actual plea agreement I think is fair game.  This is the

18   agreement he executed.  I intend to ask him about it.

19       **THE COURT:**  Okay.  Well, let me see what the extent of

20   the Government's objection is.

21       **MS. PERRY:**  I don't mind if he shows it to him.  I

22   don't think it should come into evidence, though, Your Honor.

23       **THE COURT:**  You can mark it for identification.

24   Normally, the whole plea agreement doesn't come into evidence,

25   but we can reserve on that question.  For now you can just mark

1    it for identification.

2           You may show it to him and use it if you want to point

3    him to attention of certain things, that's his signature or

4    something like that.

5           **MR. DAVIS:**  Okay.  Can I have the clerk do this so

6    it's just visible to him, or should I come up and stand next to

7    him?

8           **THE COURT:**  Do you have another copy?  I was going to

9    suggest that you give him --

10          **MR. DAVIS:**  I can do that.

11          **THE COURT:**  -- a copy to look at.  And just mark it

12   for identification and just ask him what it is that you want to

13   ask him about it.

14          **MR. DAVIS:**  Okay.)

15      (Bench conference concluded.)

16   **BY MR. DAVIS:**

17   **Q.**   Now, Mr. Lashley, you entered a written plea agreement

18   with the Government; correct?

19   **A.**   Yes.

20   **Q.**   It's a number of pages long; correct?

21   **A.**   Yes.

22   **Q.**   And do you remember the date that you entered this

23   agreement?

24   **A.**   No.

25   **Q.**   I'm going to hand you a copy for identification purposes

1    only at this time.

2            **THE COURT:**  All right.  What number are we up to?

3            **MR. DAVIS:**  Would Your Honor like a copy?

4            **THE COURT:**  Sure.  If you have one.

5            All right.  So that's Defendant's Exhibit 2 for

6    identification.

7            **MR. DAVIS:**  (Handing.)

8            **THE COURT:**  Thank you.

9    **BY MR. DAVIS:**

10   **Q.**   Sir, take a moment to look at that agreement.

11       Does that look familiar to you?

12   **A.**   Yes.

13   **Q.**   And you entered this agreement with the United States on

14   September 28th of 2018; correct?

15   **A.**   Yes.

16   **Q.**   And that's right on the agreement; correct?

17   **A.**   Yes.

18           **THE COURT:**  Well, Mr. Davis, is that significant?  I

19   mean, the date of the letter is September 28th.  It's not the

20   date he signed it.

21           **MR. DAVIS:**  Ah, that's true, Your Honor.  I apologize.

22   **BY MR. DAVIS:**

23   **Q.**   Turn to the last page, Mr. Lashley.

24       Is that your signature that appears on that last page of

25   that plea agreement?

1  **A.**  Yes.

2  **Q.**  And we're on Page 10 of 13; correct?

3  **A.**  Yeah.

4  **Q.**  It's a long agreement; correct?

5  **A.**  Yes.

6  **Q.**  And what date did you sign that plea agreement?

7  **A.**  It says 10/16.

8  **Q.**  Next to your name?

9  **A.**  No.  On top.  I don't know if it's the day or --

10  **Q.**  Oh, is that -- yeah.  Take a look next to your name.  What

11  date did you sign that?

12  **A.**  It's no date next to my name.

13      **THE COURT:**  He may not -- maybe he doesn't have a

14  signed copy.

15      **MR. DAVIS:**  He should.  There are only three copies.

16      **THE COURT:**  This is only a ten-page document, not 13.

17      **MR. DAVIS:**  I might have the wrong one.

18  **BY MR. DAVIS:**

19  **Q.**  Here you are, Mr. Lashley.  (Handing.)

20      Take a look at the last page -- take a look at that last

21  page of that document.

22      What date did you sign that plea agreement?

23  **A.**  On 9th of October.

24  **Q.**  Does that sound about right the time that you pled guilty,

25  give or take?

*Malcolm Lashley - Cross*

1  **A.**   I don't remember.

2  **Q.**   But that's the day you entered the agreement with the

3  United States.  That's the day you decided to resolve the

4  charges that you had with the United States; correct?  That's

5  when you signed off on the agreement?

6  **A.**   Yes.

7  **Q.**   Now, when were you arrested, in June of 2017?

8  **A.**   Yes.

9  **Q.**   So you had over a year before you decided to enter this

10  agreement with the United States; correct?

11  **A.**   Yes.

12  **Q.**   And during that year time period, you had a chance to

13  review all the materials in the case; correct?

14  **A.**   Yes.

15  **Q.**   And you were incarcerated during that time period;

16  correct?

17  **A.**   Yes.

18  **Q.**   And your lawyer would come up and he would go through all

19  the materials with you; right?

20  **A.**   Not everything.  Just what involved me.

21  **Q.**   There were a lot of materials, though; would you agree?

22  **A.**   Huh?

23  **Q.**   There are a lot of materials in the case.

24  **A.**   Yes.

25  **Q.**   'Cause there are a lot of people in the case.  There were

1  about 20 guys in the case, weren't there?

2  **A.**   Yes.

3  **Q.**   And after taking a year going over all the materials, you

4  decided to plead guilty; right?

5  **A.**   Uh-huh.

6  **Q.**   And at the time you entered that plea agreement on

7  October 9th, you had decided to cooperate with the prosecutors

8  in an attempt to reduce your jail time exposure; correct?

9  **A.**   Yes.

10  **Q.**   As a matter of fact, when you signed that plea agreement

11  on October 9th, that was after you had already met with the

12  agents and the prosecutors to talk with them; correct?

13  **A.**   I guess, yes.

14  **Q.**   One of the -- first time you sat down at a table with them

15  was on September 28th --

16  **A.**   Okay.

17  **Q.**   -- 2017.

18      Do you remember that?

19  **A.**   Yes.

20          **THE COURT:**  2017?

21          **MR. DAVIS:**  Oh, 2018.

22  **BY MR. DAVIS:**

23  **Q.**   So it was a few weeks before you actually signed the plea

24  agreement; correct?

25  **A.**   Yes.

1  **Q.**   So when you pled guilty -- and I'm going to direct your

2  attention to Page 2 of the plea agreement.   If you turn to

3  Page 2.

4      In Paragraph 3, it indicates that for the narcotics

5  conspiracy that you pled guilty to -- we're looking at the

6  bottom of the page -- the mandatory minimum term of

7  imprisonment was ten years and the maximum exposure was life.

8  And that's what you agreed to; correct?

9  **A.**   Yes.

10 **Q.**   But you were going to cooperate, so you expected to get

11 much less jail time; correct?

12 **A.**   Yes.

13 **Q.**   And what does "cooperation" mean to you?

14 **A.**   What it says, cooperate.

15 **Q.**   Well, what does it mean, though?   Just in your own words,

16 what does it mean?   What do you have to do to get your jail

17 time down, in your own words?

18 **A.**   Cooperate.

19 **Q.**   Okay.   And tell us what that means to you.

20 **A.**   (No response.)

21 **Q.**   Tell on people; right?

22 **A.**   Yeah.

23 **Q.**   That's what you're doing; right?

24 **A.**   Okay.

25 **Q.**   No.   I'm asking you, that's what you're doing; right?

1   **A.**   Yes.

2   **Q.**   Have you done that in the past before to get out of

3   charges or to reduce your exposure?

4   **A.**   No.

5   **Q.**   Never?

6   **A.**   No.

7   **Q.**   But you did it here; right?

8   **A.**   Yes.

9   **Q.**   And who controls whether you have fulfilled your

10  obligations of the plea agreement?

11  **A.**   The judge.

12  **Q.**   Well, who files the papers with the judge telling the

13  judge that you have complied with the terms of your plea

14  agreement?  It's the prosecutors.

15  **A.**   Okay.

16  **Q.**   Well, I mean, you're very agreeable.  I'm just asking you

17  if -- they're the ones that have to tell the judge that you

18  have fulfilled your obligations; right?  It's right in the

19  plea -- it's right in the sealed supplement that was filed in

20  your case.  It's within their total discretion to inform the

21  Court of the nature and extent of your cooperation; correct?

22  **A.**   Yeah.

23  **Q.**   If they didn't want to do it, you're stuck; right?

24  **A.**   Yes.

25  **Q.**   If they came in and told the judge, Look, Mr. Lashley said

1  he was going to cooperate, but he didn't deliver, you'd be out

2  of luck; right?

3  **A.**   Yes.

4  **Q.**   Pretty much.

5      That didn't happen here, though, did it?

6  **A.**   No.

7  **Q.**   I mean, despite our conversations about guns in pockets or

8  guns in book bags, it didn't happen here.  They told the judge

9  that you cooperated fully; correct?

10 **A.**   I'm guessing.  I don't know what they told the judge, sir.

11 **Q.**   Well, I mean, you know what you got.  What did you get for

12 a sentence?  Did you get ten years mandatory?

13 **A.**   No.

14 **Q.**   What did you get?  Tell us.

15 **A.**   Time served.

16 **Q.**   Time served.

17     So rather than doing ten years in jail, you're out on the

18 streets now; right?

19 **A.**   Yes.

20 **Q.**   So there's a benefit to be derived from your testifying

21 here today; correct?  Aside from being just truthful, you

22 benefit from this; correct?

23 **A.**   Yes.

24 **Q.**   And that's why you pled guilty, because you wanted to

25 avoid jail time; correct?

1    **A.**   Yes.

2    **Q.**   Now, when you got sentenced to time served and -- do you

3    recall when that sentence was?

4    **A.**   No.

5    **Q.**   I'll show you what's been marked as Defendant's Exhibit

6    No. 3 for identification purposes.  (Handing.)

7         I'm going to show you your judgment sheet.  And take a

8    moment to review that and see if that refreshes your

9    recollection when you were sentenced.

10            **THE COURT:**  Is there a date you want him to look at,

11   Mr. Davis?

12            **MR. DAVIS:**  Yeah, I just wanted him to look at the

13   date on the judgment sheet.

14   **BY MR. DAVIS:**

15   **Q.**   Do you see the date on the judgment sheet, Mr. Lashley?

16   **A.**   Yes.

17   **Q.**   And what is the date on that judgment sheet?

18   **A.**   May 28th.

19   **Q.**   May 28th of 2019, and that's when you got time served;

20   right?

21   **A.**   Yes.

22   **Q.**   And when you were in there, your lawyer told the judge

23   that you had complied with the conditions of the agreement you

24   had with the United States; right?

25   **A.**   Yes.

*Malcolm Lashley - Cross*

1   Q.   And you stood up and probably told the judge that you're

2   not going to get in trouble anymore; right?  You're going to

3   abide by the conditions of your supervised release; correct?

4   A.   Yes.

5   Q.   And that's all part of your agreement, isn't it?

6   A.   Yes.

7   Q.   And that was at the end of May.  That was May 28th; right?

8   A.   Yes.

9   Q.   One of the conditions of your terms of supervised release

10  was -- is you report for drug testing; correct?

11  A.   Yes.

12  Q.   Let's see.  We've got May 28th, so we've got June, July,

13  August, September, October, November, December, January.  Got

14  about eight months.

15       During that eight-month period, you failed to report for

16  drug testing on August 8th, 2019; September 7th, 2019;

17  October 19th, 2019; December 17th, 2019; and January 11th of

18  2020.  And your supervising officer reported that to the Court;

19  correct?

20  A.   Yes.

21  Q.   And were you violated for that?

22  A.   No; 'cause I told 'em the days that I missed.

23  Q.   And did the prosecutors ask that you be violated for that?

24  A.   I don't even think they knew, no.

25  Q.   And did anybody -- you don't think they knew?

*Malcolm Lashley - Cross*

1   **A.**   (No response.)

2   **Q.**   Is that your testimony?  You don't think the prosecutors

3   knew that you were in violation --

4   **A.**   I don't think they knew about that until just now.

5   **Q.**   Somebody knew because they reported it to the Court that

6   you failed to appear; correct?

7        **THE COURT:**  Mr. Davis, Mr. Davis, do you want to come

8   up to the bench.

9        (Bench conference on the record:

10       **THE COURT:**  Unless this is an extremely unusual case,

11  prosecutors don't tell me when somebody fails to report for

12  drug testing.  The probation officer tells me, and the

13  Government does not always know.

14       **MR. DAVIS:**  But they know if it's a report sent to the

15  Court because the defense attorney gets notified and the

16  Government does.  They had to -- maybe I should ask:  Since

17  it's exculpatory information, did the Government -- were they

18  aware of the fact that he --

19       **MS. PERRY:**  We gave this to you.

20       **MR. DAVIS:**  So they knew.

21       **MS. PERRY:**  No.  What matters is whether he believes

22  we do.

23       **MR. DAVIS:**  I'm standing back.  I can't get the flu.

24  I just can't, folks.  I'm sorry.

25       **THE COURT:**  No, no.  We understand that.

1          Your last question suggested that the prosecutors

2     would have reported to the Court --

3          **MR. DAVIS:**  Oh, no.  I can frame that out.

4          **THE COURT:**  The prosecutors --

5          **MR. DAVIS:**  He said they didn't know.  I'll straighten

6     that out.

7          **THE COURT:**  He said he didn't know if they knew.

8          **MR. DAVIS:**  Well, I'm going to ask who intervened on

9     his behalf.  Did the Government request that he not be

10    violated?

11         **MS. PERRY:**  They requested that no action be taken.

12         **THE COURT:**  Let me see the Probation Office report.

13    Usually it's up to the probation officer.

14         **MS. PERRY:**  Yes, that was the probation officer's

15    recommendation.

16         **THE COURT:**  Is this the --

17         **MR. DAVIS:**  Well, he wasn't violated.  I'll just move

18    on from there.

19         **THE COURT:**  I'm seeing only the front.  But what this

20    looks like is something that the probation officer gives me and

21    that usually they're not asking for anything to be done.  And

22    it says on the back, "No response required."

23         **MR. DAVIS:**  They didn't seem to violate him.

24         **THE COURT:**  The Probation Office did not seek to

25    violate.

1    **MR. DAVIS:**  And my question to the Government is:  Did

2    they intervene in this --

3    **MS. HOFFMAN:**  No.

4    **MS. PERRY:**  No.

5    **MR. DAVIS:**  -- in any way, manner, or form?

6    I'm just asking, Judge, because --

7    **THE COURT:**  It would be fair game also for me to tell

8    you if I happened to know.  I'm saying I have no recollection.

9    And it would be very unusual for the prosecutors to intervene,

10   so I'm just corroborating what they're telling you.

11   I'm not saying you shouldn't ask the question; but I'm

12   just supporting their answer because that would not normally

13   happen, and I have no recollection of the prosecution being

14   involved in this at all.  I'm not saying they didn't know about

15   it or find it on the docket.  Obviously, they did and they

16   turned it over to you.

17   **MR. DAVIS:**  Well, let me ask a question.  Was he

18   brought in before a Magistrate Judge on this?

19   **MS. PERRY:**  No.

20   **MR. DAVIS:**  So your office took no position on it.

21   You just went with what the Probation Office --

22   **MS. HOFFMAN:**  All we got was the alert, which is all

23   we ever get.

24   **MR. DAVIS:**  Okay.  I'll straighten it out.

25   **THE COURT:**  Okay.)

1          (Bench conference concluded.)

2     **BY MR. DAVIS:**

3     **Q.**   So, Mr. Lashley, you agreed to abide by all conditions of

4     supervised release; right?

5     **A.**   Yes.

6     **Q.**   And one of the conditions of supervised release was, is

7     you report for urinalysis when requested; correct?

8     **A.**   Right; but the ones I missed, I called my officer and told

9     him why I couldn't report that day.

10    **Q.**   And you're talking about August 8th, 2019; September 7th,

11    2019; October 19th, 2019 --

12    **A.**   Maybe was like once a month or -- it wasn't consistent,

13    like.  The reason I couldn't --

14    **Q.**   Well, I'm reading you --

15          **THE COURT:**  Mr. Davis, can you come back up to the

16    bench.

17          (Bench conference on the record:

18          **THE COURT:**  There was no requested violation.  It was

19    a decision made by the Probation Office that this did not

20    warrant a violation.  He's just explained for the second time

21    that he told his officer when he had to miss those dates.  You

22    can't turn this into something that makes it sound like he

23    violated.

24          **MR. DAVIS:**  Your Honor, he didn't show for a number of

25    months.  I'm allowed to inquire into that.

1          **THE COURT:**  You have inquired about it.

2          **MR. DAVIS:**  And now he said he only did it once.

3          **THE COURT:**  No.  You have inquired about it.  We are

4   moving on from this line of cross-examination.  This is not

5   fair.  This is not an accurate reflection of what happened.

6          **MR. DAVIS:**  Well, can I make it an accurate reflection

7   of what happened?

8          **THE COURT:**  You haven't done that so far.

9          **MR. DAVIS:**  Well, I'll do it right now.

10          **THE COURT:**  What are you going to do?

11          **MR. DAVIS:**  I'm going to give him the report.  I'm

12   going to ask him what days --

13          **THE COURT:**  No, you're not going to give him the

14   report.  You have asked twice now.  You have read that into the

15   record twice.  You have made the point --

16          **MR. DAVIS:**  But he's denied it.

17          **THE COURT:**  No, he hasn't denied it.

18          **MR. DAVIS:**  He said once --

19          **THE COURT:**  Mr. Davis, enough.  Move on.

20          **MR. DAVIS:**  Certainly.)

21       (Bench conference concluded.)

22   **BY MR. DAVIS:**

23   **Q.**   Mr. Lashley, when you were sentenced, you agreed that you

24   would abide by all conditions of release; correct?

25   **A.**   Yes.

1  **Q.**  And it's your testimony you did that; correct?

2  **A.**  Yes.

3  **Q.**  But you didn't, did you?

4       **THE COURT:**  Is this -- are we going someplace new,

5  Mr. Davis?

6       **MR. DAVIS:**  No.  I'm leaving now.

7       **THE COURT:**  Then stop.  You can move on to the next

8  question.

9  **BY MR. DAVIS:**

10  **Q.**  Mr. Lashley, are you using drugs today?

11  **A.**  No.

12  **Q.**  Have you used drugs since the day you were sentenced up

13  until now?

14  **A.**  No.  All my urines are clean.

15  **Q.**  On how many occasions have you tested for drugs since you

16  were sentenced back on May 28th of 2019?

17  **A.**  Maybe ten times -- over ten times.  All clean urines.

18  **Q.**  And in reference to the time you were selling out in the

19  5200 block of Windsor Road, you were using heroin at the time?

20  **A.**  No.

21  **Q.**  Were you using cocaine at the time?

22  **A.**  No.

23  **Q.**  What is it that you were using?

24  **A.**  Marijuana.

25  **Q.**  And how often were you smoking weed?

*Malcolm Lashley - Redirect*

```
 1   A.   Every day.

 2   Q.   Does that affect your ability to remember things?

 3   A.   No.

 4           MR. DAVIS:  I have no further questions.

 5           THE COURT:  Thank you.

 6           Any redirect?

 7           MS. PERRY:  Yes, Your Honor.

 8                      REDIRECT EXAMINATION

 9   BY MS. PERRY:

10   Q.   Now, Mr. Lashley, you were asked earlier about being an

11   independent drug dealer; do you remember that?

12   A.   Yes.

13   Q.   And you testified, I believe, that you pled guilty to a

14   drug conspiracy; is that right?

15   A.   Yes.

16   Q.   And when you pled to that drug conspiracy, did you admit

17   that the sale of more than a kilogram of heroin was foreseeable

18   to you?

19   A.   Yes.

20   Q.   And is that because you considered -- while you considered

21   yourself --

22           MR. DAVIS:  Objection; leading.

23           THE COURT:  Sustained.

24   BY MS. PERRY:

25   Q.   Mr. Lashley, were you supplied by other people in the
```

**JA401**

1    neighborhood?

2    **A.**    Yes.

3    **Q.**    And would you discuss your drug dealing with other people

4    in the neighborhood?

5    **A.**    Would I do what?

6    **Q.**    Would you discuss drug dealing with others in the

7    neighborhood?

8    **A.**    I mean, we all just outside doing the same thing.

9    **Q.**    And would you sometimes get supplied by other people in

10   the neighborhood like Syd (indicating)?

11   **A.**    Yes.

12   **Q.**    And was Syd supplied by other people in the neighborhood?

13   **A.**    Yes.

14   **Q.**    And if a customer needed something in the neighborhood and

15   you didn't have it, what might you do?

16   **A.**    If I didn't have anything, I might give it to a homeboy or

17   something.

18   **Q.**    So you might send the sale to someone else in the

19   neighborhood?

20   **A.**    Yes.

21   **Q.**    And would someone -- would people perhaps send those sales

22   to you if they didn't have something and you did?

23   **A.**    Yes.

24   **Q.**    And did you ever see Syd doing that?

25   **A.**    Yes.

1  Q.   And if someone was arrested in the area of Windsor Mill

2  and Forest Park for dealing drugs, would that person call

3  around to other 5200 boys and ask for help with bail?

4       **MR. DAVIS:**  Objection, Your Honor.  This is awfully

5  general.

6       **THE COURT:**  I'm sorry.  The objection is what, that

7  it's awfully general?

8       **MR. DAVIS:**  Speculation.  There's no -- there's no

9  structure or context --

10      **THE COURT:**  Make it specific to Mr. Lashley.

11 **BY MS. PERRY:**

12 Q.   Mr. Lashley, have you ever received a phone call from

13 another 5200 boy or Get Money Boy asking you to help with bail?

14 A.   Yes.

15 Q.   And if you were ever locked up for drugs, would you --

16 have you ever called anyone else from the neighborhood to ask

17 for help?

18 A.   Yes.

19 Q.   And so while you considered yourself an independent drug

20 dealer, were you also working with other people in the

21 neighborhood?

22 A.   What, like working together?

23 Q.   Were you also communicating with them and discussing your

24 drugs with them?

25 A.   Yes.

1  **Q.**   And so you knew, based on your guilty plea and what you

2  knew, that the 5200 boys as a whole --

3       **MR. DAVIS:**  Objection, Your Honor.

4       **THE COURT:**  Sustained.

5  **BY MS. PERRY:**

6  **Q.**   Mr. Lashley, is it your understanding that more or less

7  drugs were being sold in the neighborhood than you yourself

8  were selling?

9  **A.**   More.

10  **Q.**   And when you pled guilty to --

11       **MR. DAVIS:**  Your Honor, I think a question was asked,

12  and Mr. Lashley just --

13       **THE COURT:**  He said "more."

14       **MR. DAVIS:**  "More."  I heard a noise.  I couldn't tell

15  it was said.

16  **BY MS. PERRY:**

17  **Q.**   And, Mr. Lashley, you indicated that you pled guilty to a

18  drug-trafficking conspiracy.  Were there other members of that

19  conspiracy?

20  **A.**   Yes.

21  **Q.**   Mr. Lashley, you were asked a number of questions about

22  your sentencing.

23       Who decided what your sentence would be?

24  **A.**   The judge.

25  **Q.**   And before deciding a sentence, was there information

*Malcolm Lashley - Redirect*

1   presented to the judge?

2   **A.**   Yes.

3   **Q.**   And it was ultimately the judge who sentenced you; is that

4   right?

5   **A.**   Yes.

6   **Q.**   You talked -- we talked -- you were asked a number of

7   questions about your buying drugs from Syd; do you recall those

8   questions?

9   **A.**   Yes.

10  **Q.**   Now, when you answer or when you say "a couple of times"

11  or "a few times," what did you mean?  What do you mean by that?

12  **A.**   More than once.

13  **Q.**   And is "a few" or "a couple" when you use it consistent --

14  let me ask you this:  How many times were you supplied drugs by

15  Syd?

16  **A.**   I would say maybe four times.

17  **Q.**   And when you say "a couple of times" or "a few times," is

18  that consistent with four times?

19  **A.**   Yes.

20  **Q.**   I want to talk about the time that you -- actually, before

21  I go there, I want to talk about those photographs that you saw

22  that you were shown of the neighborhood around the Windsor Mill

23  apartments.

24       Do you recall those photographs?

25  **A.**   Yes.

**JA405**

1  **Q.**   Do you know if there were cameras there in 2016?

2  **A.**   It might have been.  I can't -- I can't remember.

3  **Q.**   And were you often selling drugs in that particular area?

4  **A.**   Yes.

5  **Q.**   And were you selling drugs in that area despite there

6  being cameras?

7  **A.**   Yes.

8         **MR. DAVIS:**  Objection, Your Honor.  He didn't know if

9  they were there.  How could he answer he was selling them there

10  in front of cameras?

11        **THE COURT:**  If there were.  He was selling anyway.

12        **THE WITNESS:**  Right.

13  **BY MS. PERRY:**

14  **Q.**   Did you know whether or not there were cameras there at

15  some point?  I believe you testified that you believe that

16  there were cameras all over the area.

17  **A.**   Yes.

18  **Q.**   Why would you sell there even though there were cameras?

19  **A.**   Huh?

20  **Q.**   Why would you sell there even though there were cameras?

21  **A.**   I don't know.

22  **Q.**   Did you sell there even though there were cameras?

23        **MR. DAVIS:**  Objection.

24        **THE COURT:**  Overruled.

25        **THE WITNESS:**  Yes.

**JA406**

1    **BY MS. PERRY:**

2    **Q.**   Did you see other people selling there?

3    **A.**   Yes.

4    **Q.**   Now, I want to talk about the dirt bike, the day you saw

5    Syd on the dirt bike.

6         Where did you see the gun that you described earlier?

7    **A.**   He pulled it out.  It was in his hand.

8    **Q.**   And when Syd arrived on the dirt bike, where was the gun?

9    **A.**   When he first pulled up?

10   **Q.**   Yes.

11   **A.**   In his pocket.

12   **Q.**   And what did you see him do?

13   **A.**   He pulled it out for whatever reason.

14   **Q.**   Did you ever see it before he pulled it out of his pocket?

15   **A.**   No.

16   **Q.**   Did you see somebody else give it to him?

17   **A.**   No.

18   **Q.**   He had it in his pocket the first time you saw it?

19   **A.**   Yes.

20   **Q.**   And then what did he do with it?

21   **A.**   Before he -- before he rolled off, he put it in the back

22   and rolled off.

23   **Q.**   And is that your memory of what you testified to

24   previously?

25   **A.**   Yes.

```
 1              MS. PERRY:  Court's indulgence.

 2         (Counsel conferred.)

 3              MS. PERRY:  Nothing further, Your Honor.

 4              THE COURT:  All right.  Anything else?

 5              MR. DAVIS:  Nothing.

 6         May we approach for one second, though?

 7              THE COURT:  Of course.

 8         (Bench conference on the record:

 9              MR. DAVIS:  So as not to create more questions, can he

10    go out the front door?  Can we -- how are we going to get him

11    out of here?

12              THE COURT:  Oh.

13              MR. DAVIS:  I just don't want to --

14              THE COURT:  Where would you prefer that he leave from?

15    Do you wish to take him out?

16              MR. DAVIS:  Maybe -- and the agent --

17              MS. PERRY:  There are a number of individuals who

18    entered the courtroom since the lunch break.  I think we would

19    prefer him to be taken out the back way, Your Honor.

20              THE COURT:  I understand what you mean.

21         And we will just take a brief recess.

22              MS. PERRY:  Thank you.

23              MR. DAVIS:  Thank you, Your Honor.

24              THE COURT:  Okay.)

25         (Bench conference concluded.)
                         ********
```

**JA408**